MICHELLE D. ALARIE, ESQ.
Nevada Bar No. 11894
ARMSTRONG TEASDALE LLP
3770 Howard Hughes Parkway, Suite 200
Las Vegas, Nevada 89169
Telephone:  702.678.5070
Facsimile:  702.878.9995
malarie@atllp.com

ROMAINE C. MARSHALL, ESQ. (LR IA 11-2 Admitted)
Utah Bar No. 9654
JOSE ABARCA, ESQ. (LR IA 11-2 Admitted)
Utah Bar No. 12762
EMILY NUVAN, ESQ. (LR IA 11-2 Admitted)
Utah Bar No. 17722
ARMSTRONG TEASDALE LLP
201 South Main Street, Suite 750
Salt Lake City, Utah 84111
Telephone: 801.401.1406
rmarshall@atllp.com
jabarca@atllp.com
enuvan@atllp.com

*Attorneys for Plaintiff Robert Armijo*

## UNITED STATES DISTRICT COURT

## DISTRICT OF NEVADA

| | |
|---|---|
| ROBERT ARMIJO,<br><br>  Plaintiff,<br><br>  vs.<br><br>OZONE NETWORKS, INC. d/b/a OPENSEA, a New York Corporation; YUGA LABS, LLC d/b/a BORED APE YACHT CLUB, a Delaware limited liability company; LOOKSRARE; and DOES 1 to 50,<br><br>  Defendants. | Case No.: 3:22-cv-00112-LRH-CLB<br><br><br>**CERTIFICATE OF SERVICE – COMPLAINT**<br><br>**(LOOKSRARE)** |

1

Certificate of Service of: Jon Wood
Filed on behalf of the Plaintiff
Exhibit marked 'A' attached

### SUMMONS IN A CIVIL ACTION

**UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEVADA**

Civil Action Number: **3:22-cv-00112-LRH-CLB**

**BETWEEN:**

**ROBERT ARMIJO**                                                              **Plaintiff**

**-And-**

**OZONE NETWORKS, INC. d/b/a OPENSEA, a New
York Corporation; YUGA LABS, LLC d/b/a BORED
APE YACHT CLUB, a Delaware limited liability
company; LOOKSRARE; and DOES 1 to 50**                  **Defendant(s)**

Summons in a Civil Action and Complaint

---

## CERTIFICATE OF SERVICE

I, Jon Wood, process server of Tremark Associates Ltd, Joshua Chambers, 332 York Road, Leeds, LS9 9DN, instructed by Armstrong Teasdale, make this Certificate of service and WILL SAY as follows:-

1.  That I did on Thursday 24th March 2022 at 12:00 hours attend at Chase Business Centre, 39-41 Chase Side, London, United Kingdom, N14 5BP this being the registered office of LooksRare Limited.

2.  That I did on Thursday 24th March 2022 at 12:00 hours speak to the female receptionist who would not provide her name although she said the documents are likely belong to CHD Accountants who are no longer based there but collect mail every couple of weeks. Having failed to find any other Director, officer, employee or any other person authorised to accept service of the document on behalf LooksRare Limited, and after checking with Companies House that this remained the registered office, I therefore placed the Summons in a Civil Action and Complaint into a sealed envelope marked clearly for the attention of LooksRare Limited and placed this on the reception desk at Chase Business Centre, 39-41 Chase Side, London, United Kingdom, N14 5BP.

3. It is my belief that as the address remains the company's registered office and the company does not appear to be listed as dormant, that any mail posted address to the company at this address will be either collected by or forwarded to; and come to the attention of the company's directors, or officers of LooksRare Limited.

4. In accordance with the court procedure the deemed date of service is before 16:30 hours on Thursday 24th March 2022.

5. A true copy of the said Summons in a Civil Action and Complaint so served by me is now produced to me and exhibited hereto marked 'A'.

**Statement of truth**

I believe that the facts stated in this statement are true. I understand that proceedings for contempt of court may be brought against anyone who makes, or causes to be made, a false statement in a document verified by a statement of truth without an honest belief in its truth.

Full name ………………………**Jon Wood**…………………………

Signed………………………………………………………………….

Dated…………………29/03/22…………………….

Certificate of Service of: John McNulty
Filed on behalf of the Claimant
Exhibit marked 'A' attached

### SUMMONS IN A CIVIL ACTION

**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF NEVADA**

Civil Action Number: 3:22-cv-00112-LRH-CLB

**BETWEEN:**

**ROBERT ARMIJO**                                                                 **Plaintiff**

**-And-**

**OZONE NETWORKS, INC. d/b/a OPENSEA, a New**
**York Corporation; YUGA LABS, LLC d/b/a BORED**
**APE YACHT CLUB, a Delaware limited liability**
**company; LOOKSRARE; and DOES 1 to 50**                  **Defendant(s)**

Summons in a Civil Action and Complaint


## This is the exhibit 'A' referred to in the Certificate of Service of Jon Wood

AO 440 (Rev. 06/12)  Summons in a Civil Action

# UNITED STATES DISTRICT COURT

for the

District of Nevada

| | |
|---|---|
| ROBERT ARMIJO | ) |
| | ) |
| | ) |
| | ) |
| _Plaintiff(s)_ | ) |
| v. | ) |
| OZONE NETWORKS, INC. d/b/a OPENSEA, a New York Corporation; YUGA LABS, LLC d/b/a BORED APE YACHT CLUB, a Delaware limited liability company; LOOKSRARE; and DOES 1 to 50 | ) |
| | ) |
| | ) |
| | ) |
| _Defendant(s)_ | ) |

Civil Action No.  3:22-cv-00112-LRH-CLB

## SUMMONS IN A CIVIL ACTION

To: _(Defendant's name and address)_  Ozone Networks, Inc. dba OpenSea
228 Park Ave. South, #22014
New York, NY 10003

A lawsuit has been filed against you.

Within 21 days after service of this summons on you (not counting the day you received it) — or 60 days if you are the United States or a United States agency, or an officer or employee of the United States described in Fed. R. Civ. P. 12 (a)(2) or (3) — you must serve on the plaintiff an answer to the attached complaint or a motion under Rule 12 of the Federal Rules of Civil Procedure.  The answer or motion must be served on the plaintiff or plaintiff's attorney, whose name and address are:  Michelle D. Alarie, Esq.
Armstrong Teasdale, LLP
3770 Howard Hughes Pkwy., Ste. 200
Las Vegas, NV 89169

If you fail to respond, judgment by default will be entered against you for the relief demanded in the complaint. You also must file your answer or motion with the court.



CLERK OF COURT

Date:  3/2/2022 _____          _____
_Signature of Clerk or Deputy Clerk_

AO 440 (Rev. 06/12)  Summons in a Civil Action (Page 2)

Civil Action No.   3:22-cv-00112-LRH-CLB

## PROOF OF SERVICE
### *(This section should not be filed with the court unless required by Fed. R. Civ. P. 4 (l))*

This summons for *(name of individual and title, if any)* _____

was received by me on *(date)* _____ .

❏ I personally served the summons on the individual at *(place)* _____

_____ on *(date)* _____ ; or

❏ I left the summons at the individual's residence or usual place of abode with *(name)* _____

_____ , a person of suitable age and discretion who resides there,

on *(date)* _____ , and mailed a copy to the individual's last known address; or

❏ I served the summons on *(name of individual)* _____ , who is

designated by law to accept service of process on behalf of *(name of organization)* _____

_____ on *(date)* _____ ; or

❏ I returned the summons unexecuted because _____ ; or

❏ Other *(specify):*



My fees are $ _____ for travel and $ _____ for services, for a total of $   0.00   .


I declare under penalty of perjury that this information is true.


Date: _____

_____
*Server's signature*

_____
*Printed name and title*

_____
*Server's address*

Additional information regarding attempted service, etc:

AO 440 (Rev. 06/12)  Summons in a Civil Action

# UNITED STATES DISTRICT COURT

for the

District of Nevada

| | |
|---|---|
| ROBERT ARMIJO | ) |
| | ) |
| | ) |
| | ) |
| _____ | ) |
| *Plaintiff(s)* | ) |
| v. | ) Civil Action No. 3:22-cv-00112-LRH-CLB |
| OZONE NETWORKS, INC. d/b/a OPENSEA, a New | ) |
| York Corporation; YUGA LABS, LLC d/b/a BORED | ) |
| APE YACHT CLUB, a Delaware limited liability | ) |
| company; LOOKSRARE; and DOES 1 to 50 | ) |
| _____ | ) |
| *Defendant(s)* | ) |

## SUMMONS IN A CIVIL ACTION

To: *(Defendant's name and address)*    Yuga Labs, LLC dba Bored Ape Yacht Club
c/o Corporation Trust Company
1209 Orange Street
Wilmington, DE 19801

A lawsuit has been filed against you.

Within 21 days after service of this summons on you (not counting the day you received it) — or 60 days if you are the United States or a United States agency, or an officer or employee of the United States described in Fed. R. Civ. P. 12 (a)(2) or (3) — you must serve on the plaintiff an answer to the attached complaint or a motion under Rule 12 of the Federal Rules of Civil Procedure.  The answer or motion must be served on the plaintiff or plaintiff's attorney, whose name and address are:    Michelle D. Alarie, Esq.
Armstrong Teasdale, LLP
3770 Howard Hughes Pkwy., Ste. 200
Las Vegas, NV 89169

If you fail to respond, judgment by default will be entered against you for the relief demanded in the complaint. You also must file your answer or motion with the court.



CLERK OF COURT

Date: _3/2/2022_____    _____
Signature of Clerk or Deputy Clerk

AO 440 (Rev. 06/12)  Summons in a Civil Action (Page 2)

Civil Action No.  3:22-cv-00112-LRH-CLB

## PROOF OF SERVICE
### *(This section should not be filed with the court unless required by Fed. R. Civ. P. 4 (l))*

This summons for *(name of individual and title, if any)* _____

was received by me on *(date)* _____ .

❑ I personally served the summons on the individual at *(place)* _____

_____ on *(date)* _____ ; or

❑ I left the summons at the individual's residence or usual place of abode with *(name)* _____

_____ , a person of suitable age and discretion who resides there,

on *(date)* _____ , and mailed a copy to the individual's last known address; or

❑ I served the summons on *(name of individual)* _____ , who is

designated by law to accept service of process on behalf of *(name of organization)* _____

_____ on *(date)* _____ ; or

❑ I returned the summons unexecuted because _____ ; or

❑ Other *(specify):*

My fees are $ _____ for travel and $ _____ for services, for a total of $ 0.00 .

I declare under penalty of perjury that this information is true.

Date: _____

_____
*Server's signature*

_____
*Printed name and title*

_____
*Server's address*

Additional information regarding attempted service, etc:

AO 440 (Rev. 06/12)  Summons in a Civil Action

# UNITED STATES DISTRICT COURT

for the

District of Nevada

| | |
|---|---|
| ROBERT ARMIJO | ) |
| | ) |
| | ) |
| | ) |
| *Plaintiff(s)* | ) |
| v. | ) |
| OZONE NETWORKS, INC. d/b/a OPENSEA, a New York Corporation; YUGA LABS, LLC d/b/a BORED APE YACHT CLUB, a Delaware limited liability company; LOOKSRARE; and DOES 1 to 50 | ) |
| | ) |
| *Defendant(s)* | ) |

Civil Action No.  3:22-cv-00112-LRH-CLB

## SUMMONS IN A CIVIL ACTION

To: *(Defendant's name and address)*  LooksRare
Address Unknown

A lawsuit has been filed against you.

Within 21 days after service of this summons on you (not counting the day you received it) — or 60 days if you are the United States or a United States agency, or an officer or employee of the United States described in Fed. R. Civ. P. 12 (a)(2) or (3) — you must serve on the plaintiff an answer to the attached complaint or a motion under Rule 12 of the Federal Rules of Civil Procedure.  The answer or motion must be served on the plaintiff or plaintiff's attorney, whose name and address are:    Michelle D. Alarie, Esq.
Armstrong Teasdale, LLP
3770 Howard Hughes Pkwy., Ste. 200
Las Vegas, NV 89169

If you fail to respond, judgment by default will be entered against you for the relief demanded in the complaint. You also must file your answer or motion with the court.



*CLERK OF COURT*

Date:  3/2/2022

_____
*Signature of Clerk or Deputy Clerk*

AO 440 (Rev. 06/12)  Summons in a Civil Action (Page 2)

Civil Action No.  3:22-cv-00112-LRH-CLB

## PROOF OF SERVICE
### *(This section should not be filed with the court unless required by Fed. R. Civ. P. 4 (l))*

This summons for *(name of individual and title, if any)* _____

was received by me on *(date)* _____ .

❑ I personally served the summons on the individual at *(place)* _____
_____ on *(date)* _____ ; or

❑ I left the summons at the individual's residence or usual place of abode with *(name)* _____
_____ , a person of suitable age and discretion who resides there,

on *(date)* _____ , and mailed a copy to the individual's last known address; or

❑ I served the summons on *(name of individual)* _____ , who is

designated by law to accept service of process on behalf of *(name of organization)* _____
_____ on *(date)* _____ ; or

❑ I returned the summons unexecuted because _____ ; or

❑ Other *(specify):*


My fees are $ _____ for travel and $ _____ for services, for a total of $ 0.00 .

I declare under penalty of perjury that this information is true.


Date: _____                      _____
                                                              *Server's signature*

                                                   _____
                                                              *Printed name and title*

                                                   _____
                                                              *Server's address*

Additional information regarding attempted service, etc:

Print     Save As...     Reset

1  MICHELLE D. ALARIE, ESQ.
   Nevada Bar No. 11894
2  ARMSTRONG TEASDALE LLP
   3770 Howard Hughes Parkway, Suite 200
3  Las Vegas, Nevada 89169
   Telephone:  702.678.5070
4  Facsimile:  702.878.9995
   malarie@atllp.com
5
   ROMAINE C. MARSHALL, ESQ. (will comply with LR IA 11-2 within 14 days)
6  Colorado Bar No. 9654
   JOSE ABARCA, ESQ. (will comply with LR IA 11-2 within 14 days)
7  Colorado Bar No. 12762
   EMILY NUVAN, ESQ. (will comply with LR IA 11-2 within 14 days)
8  Colorado Bar No. 17722
   ARMSTRONG TEASDALE LLP
9  201 South Main Street, Suite 750
   Salt Lake City, Utah 84111
10 Telephone: 801.401.1406
   rmarshall@atllp.com
11 jabarca@atllp.com
   enuvan@atllp.com
12
   *Attorneys for Plaintiff Robert Armijo*
13
14            **UNITED STATES DISTRICT COURT**
15               **DISTRICT OF NEVADA**
16 ROBERT ARMIJO,
                                        Case No.:
17            Plaintiff,
18       vs.
                                        **COMPLAINT**
19 OZONE NETWORKS, INC. d/b/a OPENSEA, a
   New York Corporation; YUGA LABS, LLC d/b/a
20 BORED APE YACHT CLUB, a Delaware limited
   liability company; LOOKSRARE; and DOES 1 to
21 50,
22            Defendants.

23        Plaintiff, Robert Armijo, by and through his counsel, Armstrong Teasdale LLP, hereby makes

24 his Complaint against Defendants Ozone Networks, Inc. d/b/a OpenSea ("OpenSea"), Yuga Labs,

25 LLC d/b/a Bored Ape Yacht Club ("BAYC"), LooksRare, and Does 1-50, and alleges as follows:

26                      **NATURE OF THE ACTION**

27        1.      This action arises out of Defendants OpenSea and LooksRare's failure to implement

28 common sense and reasonable security measures to prevent the foreseeable fraud and sale of stolen

                                        1

non-fungible tokens ("NFTs") on their online NFT marketplaces. It also arises from Defendant Bored Ape Yacht Club's ("BAYC") failure to monitor its proprietary and exclusive ape community by denying entry to individuals whose access is predicated on a stolen BAYC NFT. Defendants have taken advantage of the unregulated digital asset market and have profited enormously from the sale of stolen NFTs, including the NFTs that were stolen from Plaintiff, Robert Armijo.

2.      NFTs are uniquely identifiable digital assets whose authenticity has been certified on a blockchain, the transparent and secure digital ledgers that support the creation of many forms of digital assets, including NFTs and cryptocurrencies. Specifically, NFTs represent and track the ownership of nearly any real or intangible property in digital form, including works of art, images, music files, videos, virtual sports cards, physical objects, memberships, and countless other developing use cases. Unlike regular cryptocurrencies or fiat money, NFTs cannot be mutually exchanged for one another because each NFT has a specific value based on its unique traits and attributes.

3.      NFT marketplaces, such as OpenSea and LooksRare, are virtual exchanges that allow digital collectors, to buy, sell, swap, and create NFTs. Similar to Amazon and eBay, which provide online marketplaces for traditional physical goods, NFT marketplaces provide an online platform for buyers and sellers to meet and exchange digital goods. Due to their unregulated nature, NFT marketplaces do not apply any anti-money laundering or Know Your Customer standards. Individuals or bots (computer programs that are programmed to simulate human activity) can create multiple accounts using fake names and addresses with impunity, allowing criminals to capitalize on the anonymity of the Internet and the failure of NFT marketplaces to verify user information.

4.      Whenever an NFT changes hands, the underlying blockchain technology creates a public record of the transaction on its digital ledger. The record includes the details regarding the specific NFT involved in the transaction and the identities of the digital wallets (the software-based system used to hold the NFTs) utilized to transfer the NFT. The record does not include the names or identities of the owners of the specific NFTs or digital wallets involved. Because blockchain technology is decentralized and spread across thousands of computer nodes at various locations,

individual NFT marketplaces do not have the ability to undo a transaction once it has been completed on the blockchain—it becomes permanent and irreversible.

5.      Beginning in February 2021, NFTs exploded in popularity with NFT marketplaces conducting a minimum of $44.2 billion worth of transactions in NFT sales in 2021, up from just $106 million in 2020.[1] This incredible growth—combined with extremely valuable individual NFTs, weak security infrastructure, a largely unregulated market, and no recourse for victims to retrieve their stolen property—has made NFT creators and owners natural targets for thieves. Even the savviest NFT owners can lose millions of dollars in a matter of seconds if they fall victim to a scam or a hack. NFT marketplaces, which provide the platforms for secondary sales of stolen NFTs, and content creators like BAYC, who control the entry requirements to their content communities, have done little to deter fraudulent activity on their platforms; rather, they have created a system where thieves can act without fear of retribution or consequences. Indeed, crypto crime, of which stolen NFT transactions are included, accounted for a record-setting $14 billion worth of blockchain transactions in 2021.[2]

6.      Certain NFT projects have become so popular that their value has increased exponentially, and market watchers have labeled several of these projects as blue-chip investments, including the Bored Ape Yacht Club.[3] Bored Ape NFTs are an exclusive collection of 10,000 original digital art images of apathetic-looking apes, each with their own unique characteristics and properties—varying fur types, clothing, accessories, facial expressions, and more. Bored Ape NFTs are currently the most popular and one of the most expensive NFT collections in the world; the floor

---

[1] *See* Chainalysis Team, *Crime and NFTs: Chainalysis Detects Significant Wash Trading and Some Money Laundering in This Emerging Asset Class*, CHAINANLYSIS (Feb. 2, 2022), hiips://blog.chainalysis.com/reports/2022-crypto-crime-report-preview-nft-wash-trading-money-laundering/.

[2] *See* Cheyenne Ligon, *Crypto Crime Hit All-Time High of $14B in 2021 As Prices Climbed: Chainalysis*, COINDESK (Jan. 6, 2022), hiips://www.coindesk.com/tech/2022/01/06/crypto-crime-hit-an-all-time-high-of-14b-in-2021-as-prices-climbed-chainalysis/.

[3] *See* Yashu Gola, *Bored Ape Yacht Club Is a Huge Mainstream Hit, but Is Wall Street Ready for NFTs?*, COINTELEGRAPH (Jan. 8, 2022), hiips://cointelegraph.com/news/bored-ape-yacht-club-is-a-huge-mainstream-hit-but-is-wall-street-ready-for-nfts.

3

price to buy the cheapest Bored Ape NFT is now more than $280,000, and the collection has a market capitalization of $2.8 billion.[4] The success of BAYC's business model is predicated on maintaining a level of strict exclusivity by restricting community membership and all the benefits associated with membership to only those individuals who own a Bored Ape NFT. Due to their valuableness, Bored Ape NFTs have become a frequent target of hackers, scammers, and thieves.

7.      OpenSea, recently valued at $13.3 billion,[5] is the largest NFT marketplace in the world and commands more than 97% of the emerging NFT market.[6] OpenSea recognizes its duty as an NFT community leader to create standards for the industry that keep consumers safe, as evidenced by several recent blog posts focusing on safety and security on OpenSea's website.[7] However, the safety programs currently (and belatedly) being put in place on the OpenSea platform involve high-level technological measures that focus on stopping complicated computer hacking and malicious software attacks. The safety programs do not include any mechanisms that protect consumers from less sophisticated scamming and phishing schemes that rob owners of their NFTs and allow the thieves to use OpenSea as an immediate marketplace to offload the stolen goods. Rather, OpenSea puts all the onus on consumers, focusing on community education to teach users about the benefits and "unique pitfalls" that come with buying and selling NFTs.[8] In one memorable recommendation, OpenSea encourages consumers to use an "air-gapped" computer when viewing their digital wallets

---

[4] Katie Notopoulos, *We Found the Real Names of Bored Ape Yacht Club's Pseudonymous Founders*, BUZZFEED NEWS (Feb. 4, 2022), hiips://www.buzzfeednews.com/article/katienotopoulos/bored-ape-nft-founder-identity.

[5] *See* Eliza Haverstock, *The First NFT Billionaires: OpenSea Founders Each Worth Billions After New Fundraising*, FORBES (Jan. 5, 2022), hiips://www.forbes.com/sites/elizahaverstock/2022/01/05/nft-billionaires-opensea-founders-each-worth-billions-following-latest-funding-round/?sh=44acd584f9be.

[6] Tim Fries, *How OpenSea Captured 97% of the NFT Market*, THE TOKENIST (Nov. 11, 2021), hiips://tokenist.com/how-opensea-captured-97-of-the-nft-market/.

[7] *See, e.g.,* Alex Atallah, *Important Updates for Listing and Delisting Your NFTs*, OPENSEA BLOG (Jan. 26, 2022), hiips://opensea.io/blog/safety-security/important-updates-for-listing-and-delisting-your-nfts/; Alex Atallah, *Introducing the NFT Security Group*, OPENSEA BLOG (Jan. 17, 2022), hiips://opensea.io/blog/safety-security/introducing-the-nft-security-group/.

[8] *Id.*

to achieve the highest level of security.[9] An air-gapped computer is one that has never been connected to the internet, and the use of such computers is a security technique utilized by, for example, government officials dealing with sensitive national security information at the Department of Defense.[10]

8.      LooksRare, in contrast to OpenSea, disclaims all responsibility for consumer safety. In response to users who attempt to alert LooksRare to potential scams through its customer service channel, LooksRare states that as a "decentralized protocol" it will not freeze or remove assets, collections, or user accounts from its exchange. Instead, consumers are told "to always ensure you are buying what you intended to." LooksRare, which has only been in operation for a month and has already generated more than $9.5 billion in trading volume in its first three weeks, explains that it is "looking to set the new industry standard for NFT marketplaces."[11] That standard does not include any consumer protections or monitoring of the LooksRare marketplace for stolen NFTs.

9.      All three defendants employ a simple method for earning profits from the sale of NFTs:

- OpenSea receives a 2.5% cut of each transaction that occurs on its platform;[12]

- LooksRare receives a 2% cut of each transaction on its platform;[13] and

- BAYC receives a 2.5% royalty fee for each secondary sale of its Bored Ape and Mutant Ape NFT creations.[14]

---

[9] *See* Hamish Barnes, *10 Tips for Avoiding Scams and Staying Safe on the Decentralized Web*, OPENSEA BLOG (Oct. 4, 2021), hiips://opensea.io/blog/guides/10-tips-for-avoiding-scams-and-staying-safe-on-the-decentralized-web/.

[10] *See, e.g.*, Claudio Buttice, *What Does Air Gap Mean?*, TECHOPEDIA (last updated June 10, 2021), hiips://www.techopedia.com/definition/17037/air-gap (citing typical examples of air gapped computers and systems, including "life-critical power plant controls, military and aviation computers, government networks, financial computer systems or computerized medical equipment").

[11] LooksRare, *The NFT Marketplace You've Been Waiting For*, LOOKSRARE BLOG (Jan. 1, 2022), hiips://docs.looksrare.org/blog/the-nft-marketplace.

[12] *See* Haverstock, *supra* note 5.

[13] *See* Elaine Hu, *Clever NFT Traders Exploit Crypto's Unregulated Landscape by Wash Trading on LooksRare*, COINTELEGRAPH (Jan. 30, 2022), hiips://cointelegraph.com/news/clever-nft-traders-exploit-crypto-s-unregulated-landscape-by-wash-trading-on-looksrare.

OpenSea and LooksRare, therefore, have an incentive to allow NFTs to be bought and sold as many times as possible because they profit from every transaction that occurs in their marketplaces, and BAYC is incentivized to allow as many sales of its NFT creations as possible because it profits from every sale no matter where it occurs. Considering that valuable NFTs can be worth hundreds of thousands or even millions of dollars, the percentage fees received by Defendants from sales is extremely lucrative. It does not matter whether the sale is legitimate or criminal, the computer code underlying all NFTs automatically ensures that Defendants are able to continue to collect their fees.

10.     Unlike NFT theft cases where hackers employ complicated, high-level techniques to find and exploit weaknesses in a platform's computer code, thieves in cases like Mr. Armijo's simply take advantage of Defendants' complete disregard for NFT consumers. In exchange for explosive growth and enormous profits, Defendants have refused to implement even basic safety measures that would discourage NFT theft. And while enticing new and inexperienced consumers into the world of cryptocurrencies and NFTs, Defendants have failed to provide even a semblance of effective customer service to make consumers whole again when things foreseeably go wrong. Defendants' wholehearted embrace of the ethos of decentralization, which forces consumers to bear the daunting responsibility of providing their own security, has created a situation where thieves are emboldened to strike without fear of punishment. Rather than try to protect NFT consumers, Defendants have decided to profit from their misfortune.

11.     Defendants OpenSea and LooksRare disregarded the safety of all consumers who participate in the NFT market by:

    a.     negligently failing to employ reasonable security measures to ensure their NFT marketplaces are free from stolen NFTs,

    b.     failing to provide adequate and reasonable customer service to aid victims of NFT theft,

    c.     failing to monitor their platforms to timely detect instances of theft,

---

14 *See* Notopoulos, *supra* note 4.

d.      failing to provide adequate remedies to later, unsuspecting purchasers of stolen NFTs, and

e.      failing to adequately assist law enforcement officials in attempts to retrieve stolen NFTs.

12.      Defendant BAYC disregarded its duty to monitor its community of legitimate owners of BAYC NFTs by failing to restrict the access of NFTs that are known to be stolen, failing to provide adequate and reasonable customer service to aid victims whose BAYC NFTs were stolen, and failing to adequately assist law enforcement officials in attempts to retrieve stolen NFTs.

13.      Defendants' conduct gives rise to claims for negligence, negligent hiring, and negligent training and supervision. Mr. Armijo seeks to recover his stolen property and also to recover damages, punitive damages, equitable relief, restitution, disgorgement, reasonable costs and attorneys' fees, and all other remedies this Court deems proper.

### **PARTIES**

14.      Plaintiff Robert Armijo is a resident of Incline Village, Nevada. Mr. Armijo was the owner of three BAYC NFTs. On February 1, 2021, the BAYC NFTs were stolen from Mr. Armijo's online digital wallet and subsequently sold without his permission on Defendant OpenSea's and Defendant LooksRare's online marketplaces.

15.      Defendant OpenSea is incorporated in New York with its principal place of business in New York City, New York. At all times relevant to this lawsuit, OpenSea transacted business in Nevada.

16.      Defendant BAYC is a Delaware limited liability company with its principal place of business in Alexandria, Virginia. At all times relevant to this lawsuit, BAYC transacted business in Nevada.

17.      At the time of filing, it is unknown what type of business entity Defendant LooksRare is or where it is registered, incorporated, or headquartered. At all times relevant to this lawsuit, LooksRare transacted business in Nevada.

**JURISDICTION AND VENUE**

18.     Upon information and belief, this Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. § 1332(a) based on diversity of citizenship and the amount in controversy exceeds $75,000 based on the current estimated value of the NFTs at issue in this action as described more fully below.

19.     This Court has personal jurisdiction over Defendants because OpenSea, BAYC, and LooksRare purposefully direct their conduct at Nevada, transact substantial business in Nevada, have substantial aggregate contacts with Nevada, have engaged and are engaging in conduct that has and had a direct, substantial, reasonably foreseeable and intended effect of causing injury to persons in Nevada, and purposefully avail themselves of the laws of Nevada.

20.     Venue is proper in the United States District Court for the District of Nevada pursuant to 28 U.S.C. § 1391(b)(1) because all three Defendants do substantial business in Nevada and with Nevada residents, like Mr. Armijo, through their online platforms. This is also the District in which a substantial part of the events or omissions giving rise to the claims occurred. Mr. Armijo was at his home in Nevada when his BAYC NFTs were stolen. Mr. Armijo was also in Nevada when he fruitlessly attempted to contact and get help from Defendants to recover his stolen property. Mr. Armijo was harmed in this jurisdiction, where he resides, by Defendants' acts and omissions, as detailed in this Complaint.

**FACTUAL ALLEGATIONS**

*Relevant Background*

21.     The NFT community is made up of a wide array of collectors, artists, creators, speculators, technology fans, and others who have led the boom in NFT popularity over the past year. Early enthusiasts have been drawn to cryptocurrencies and NFTs precisely because they enjoy the free-for-all atmosphere of NFT marketplaces, which offer a deregulated atmosphere that allows users to buy and sell NFTs free from banks, regulated stock markets, and the scrutiny of government agencies.[15] On the heels of surging popularity, NFTs have become mainstream goods,[16] and NFT

---

[15] *See* Justin Scheck, *OpenSea's NFT Free-for-All*, WALL ST. J. (Feb. 12, 2022, 12:00 AM EST), hiips://www.wsj.com/articles/openseas-nft-free-for-all-

marketplaces are increasingly seeking to attract mainstream customers.[17] These everyday consumers are accustomed to interacting with businesses that offer strong fraud safeguards and theft protections but do not understand that NFT marketplaces are unable or unwilling to help when things go wrong.[18]

22. The NFT community primarily communicates through two platforms: Twitter and Discord.

23. Twitter, an online news and social networking site, is home to the top NFT influencers who use the space to "educate, motivate, and elevate" the NFT community.[19]  Defendants are active on Twitter, using the platform to communicate with NFT consumers and members of their communities.

24. Discord is an online communications app that serves as a semipublic, forum-style community platform. Groups of people with common interests can create or join Discord "servers" that allow group members to meet and chat *via* text, video, or voice. Each Discord community is called a server, and each server usually has multiple channels within it that are dedicated to different issues. For example, OpenSea has its own Discord server, and within the OpenSea server, there is an OpenSea customer service channel. To access Discord, a person must have an account with the Discord platform.

---

11644642042?st=a3lsbnrbatw6ruf&reflink=desktopwebshare_permalink.

[16] *See* Annabelle Williams, *From Paris Hilton to Christie's Auction House: How NFTs Went Mainstream*, Business Insider (Mar. 14, 2021, 6:22 AM), hiips://www.businessinsider.com/how-nfts-went-mainstream-cryptocurrency-blockchain-2021-3.

[17] *$2B+ NFT Summer & What's Next with OpenSea CEO Devin Finzer*, at 29:52-30:31, NFT NOW PODCAST (Aug. 18, 2021), hiips://nftnow.com/podcasts/opensea-devin-finzer-interview/.

[18] *See* Tomio Geron & Benjamin Pimentel, *OpenSea Puts Web3's Decentralized Nature to the Test*, PROTOCOL (Jan 7. 2022), hiips://www.protocol.com/newsletters/protocol-fintech/opensea-nft-frozen?rebelltitem=1#rebelltitem1; *see also* Atallah, *Introducing the NFT Security Group*, *supra* note 7 ("Today, consumers are expected to have significant knowledge and blockchain background in order to onboard and participate safely." Yet, "most people do not understand that companies like OpenSea cannot move their items for them, or that another company can interact with their listings and items just like OpenSea can.").

[19] *See The 15 Biggest NFT Influencers on Twitter and YouTube*, COFFEE BROS. BLOG (Feb. 6, 2022), hiips://coffeebros.com/blog/the-15-biggest-nft-influencers-on-twitter-and-youtube/.

25.     Defendants host their own Discord servers to communicate with users. Upon information and belief, none of the Defendants have dedicated customer service centers that are reachable through a phone number, live chat feature, or email address listed on their websites. Rather, Defendants use customer service channels on their Discord servers that customers may use to try and get in touch with Defendants' representatives.

26.     Many NFT projects use Discord to discuss their work, organize content, and allow community members to meet. Because OpenSea and LooksRare only allow customers to buy or sell NFTs, consumers often use Discord's NFT servers to find other individuals who are holding NFTs in which they are interested, and the parties then set up NFT trades through third-party NFT trading websites.

27.     Because Discord hosts many NFT servers in an open, community-based format, the platform is easily accessible to bad actors and is rife with phishing scams and malicious hacking.[20] One common scam is for hackers to pose as OpenSea customer service agents on OpenSea's official Discord server to lure unsuspecting users onto another Discord server that is made to look like a customer support channel for OpenSea.[21] Once victims arrive on the fake channel, hackers gain access to the victims' digital wallets and immediately steal all of the NFTs and other digital assets contained therein.[22]

28.     In November 2021, due to the growing popularity of NFTs, Mr. Armijo decided to become involved in the NFT community. He signed up for a Twitter account and began following NFT influencers, and he became active on several Discord servers associated with various NFT projects. Mr. Armijo also set up a digital wallet with MetaMask, an online service that houses

---

[20] *See* Tomio Geron, *Bored Ape Yacht Club NFT Theft Shows the Ease of Hacking Crypto*, Protocol (Jan. 7, 2022), hiips://www.protocol.com/fintech/bored-ape-hack-nft.

[21] *See* Andrew Wang, *The NFT Scammers Are Here*, THE VERGE (Sept. 21, 2021, 10:00 AM EDT), hiips://www.theverge.com/22683766/nft-scams-theft-social-engineering-opensea-community-recovery.

[22] *Id.*

software-based digital wallets that allow users to store their digital assets, and he began purchasing NFTs.

29.     Mr. Armijo specifically wanted to buy blue-chip NFTs, meaning digital assets that are considered safe, long-term assets that will retain a high value into the future. He was particularly interested in the Bored Ape Yacht Club, not just because he loved the BAYC NFT artwork, but also due to the utility of the NFTs, including BAYC's promise of community and the multitude of benefits that come with community membership.

30.     On November 14, 2021, Mr. Armijo used some of his Ethereum cryptocurrency to purchase BAYC #4329 on the OpenSea marketplace for 50 Ether[23] or around $221,337 at the time of the sale.[24] Mr. Armijo's ownership of the Bored Ape NFT was recorded on the Ethereum blockchain.



BAYC #4329

31.     On November 15, 2021, Mr. Armijo purchased MAYC #1819 on the OpenSea marketplace for 10 Ether or $27,452.10 at the time of the sale.[25] His ownership of the Mutant Ape NFT was recorded on the Ethereum blockchain.

---

23 *See* OpenSea, List of Activity for the Account of bo66ydigital (last visited Feb. 19, 2022), hiips://opensea.io/bo66ydigital?tab=activity.

24 *See Ethereum (ETH) Price Per Day from August 2015 to February 17, 2022 (in U.S. Dollars)*, STATISTA (last visited Feb. 19, 2022), hiips://www.statista.com/statistics/806453/price-of-ethereum/.



MAYC #1819

32.    On January 2, 2022, Mr. Armijo purchased MAYC #7713 on the OpenSea marketplace for 20 Ether or $54,904.20 at the time of the sale.[26] His ownership of the Mutant Ape NFT was recorded on the Ethereum blockchain.



MAYC #7713

---

25 *See* OpenSea, List of Activity for the Account of bo66ydigital (last visited Feb. 19, 2022), hiips://opensea.io/bo66ydigital?tab=activity.

26 *See id.*

33.    The value of each of the Bored Ape and Mutant Ape NFTs has continued to rise since the date of their purchase by Mr. Armijo.

*The BAYC Community*

34.    BAYC was launched by startup company Yuga Labs, LLC in the Spring of 2021. As previously explained, BAYC consists of an original set of 10,000 Bored Ape NFTs, which depict artistic images of disinterested-looking apes customized with unique facial expressions, outfits, and accessories. Following the success of the original Bored Ape NFTs, BAYC released a second set of 10,000 images depicting Mutant Apes, which are grotesquely altered versions of the original ape designs.

35.    BAYC NFTs are not simply valuable as a piece of digital art. They also serve as a type of digital identity and community ID card, allowing owners of the BAYC NFTs to receive special rights and privileges based on confirming proof of ownership through the blockchain ledger.

36.    BAYC NFT owners use their Bored Ape and Mutant Ape images as profile pictures for their multiple social media accounts. The valuable images are a status symbol among the NFT community, similar to the way chief executives wear Rolex watches to project status and wealth.[27] Community members describe BAYC NFTs as the Lamborghinis of the digital world.[28]

37.    Dozens of celebrities, including Gwyneth Paltrow, Snoop Dogg, Steph Curry, Justin Bieber, and Eminem own BAYC NFTs.[29]

38.    BAYC NFT owners are granted access to exclusive community events, including admittance to Ape Fest—an annual in-person event featuring an actual yacht party and concert with

---

[27] *See* Daniel Van Boom, *Bored Ape Yacht Club NFTs: Everything You Need to Know*, CNET (Feb. 8, 2022, 7:50 PM PST), hiips://www.cnet.com/how-to/bored-ape-yacht-club-nfts-everything-you-need-to-know/.

[28] *See* Sophie Haigney, *What Makes Bored Ape NFTs So Desirable?*, WALL ST. J. MAGAZINE (Feb. 24, 2022, 8:34 AM ET), hiips://www.wsj.com/articles/bored-ape-nfts-so-expensive-11645709606?st=70azl4boqlzm25n&reflink=desktopwebshare_permalink.

[29] *See* Shanti Escalante-De Mattei, *Bored Apes Founders in Talks with Andreesen Horowitz for Funding*, ARTNEWS (Feb. 4, 2022, 12:08 PM), hiips://www.artnews.com/art-news/news/bored-apes-andreessen-horowitz-investment-1234618014/.

13

appearances from famous comedians and music bands.[30] Other organized BAYC meetups have occurred in New York, California, Hong Kong, and the United Kingdom.[31] BAYC NFT owners are also allowed entry to a private Discord server and gain privileged access to other NFTs.[32]

39. BAYC NFT owners possess full commercial rights to their digital images and the underlying ape characters.[33] Owners can, for example, sell merchandise depicting their ape. One BAYC NFT owner setup a Twitter account and developed a backstory for his ape, calling the character Jenkins.[34] In September 2021, Jenkins was signed to a real-world talent agency and will have a biography written in part by a best-selling novelist.[35] Another group of BAYC NFT owners created a band consisting of three Bored Apes and one Mutant Ape, which was subsequently contracted under the Universal Music Group.[36] Still other BAYC NFT owners have capitalized by licensing their ape characters for comic books, film and tv projects, and cannabis branding.[37]

40. Defendant BAYC earns profits from its NFT ape collections in multiple ways.

41. BAYC initially profits from the primary sales of its NFT collections. On April 29, 2021, BAYC launched the original 10,000 Bored Ape NFTs. The entire collection sold within a few days, netting the BAYC founders a $2 million dollar profit.[38]

42. On August 29, 2021, BAYC launched a public sale of its 10,000 Mutant Ape NFTs. The Mutant Apes sold within an hour and raised $96 million in profit for the BAYC founders.[39] The

---

30 *See* Van Boom, *supra* note 27.

31 *Id.*

32 *See* Viktor, *The Bored Ape Yacht Club Business Model—How Does Bored Ape Yacht Club Make Money?*, PRODUCTMINT (Feb. 8, 2022), hiips://productmint.com/bored-ape-yacht-club-business-model-how-does-bored-ape-yacht-club-make-money/.

33 *See* Van Boom, *supra* note 27.

34 *Id.*

35 *Id.*

36 *Id.*

37 *See* Haigney, *supra* note 28.

38 *See* Viktor, *supra* note 32.

39 *See* Ekin Genc, *Bored Ape Yacht Club Sells $96 Million of Mutant Ape NFTs in One Hour*,

Mutant Ape launch also provided existing Bored Ape NFT owners with 10,000 free vials of "mutant serum," allowing the existing owners to create additional mutant versions of their original apes that they could then sell or commercialize as the owners preferred.[40]

43.     As explained above, BAYC receives a 2.5% royalty fee for every secondary sale of BAYC NFTs. In early September 2021, a collection of 101 BAYC NFTs sold for $24.4 million at a Sotheby's auction, followed by another Sotheby's auction in October 2021, in which a single Bored Ape NFT sold for $3.4 million.[41] As of January 2022, BAYC had a sales turnover of over $1 billion,[42] with the founders of BAYC collecting more than $60 million in secondary sales income.[43] BAYC also receives a portion of the revenue generated through other secondary transactions, including royalty sales from commercialized content associated with the apes.[44]

44.     While BAYC NFT owners receive commercialization rights for their individual ape images, BAYC retains the rights to the collective BAYC name, logo, and ape community.[45] BAYC is expanding into an "offchain" brand, meaning it exists outside of the blockchain. BAYC has a partnership with Adidas, has launched a BAYC mobile video game, and a Bored Ape image was recently featured on the cover of Rolling Stone Magazine.[46] A managing director for a venture capitalist fund that invests in crypto assets characterized BAYC as "the next Disney."[47] BAYC

---

DECRYPT (Aug. 29, 2021), hiips://decrypt.co/79718/bored-ape-yacht-club-sells-96-million-of-nfts-in-hour-for-mutant-apes-launch.

[40] *Id.*

[41] *See* Viktor, *supra* note 32.

[42] *See* Gola, *supra* note 3.

[43] *See* Viktor, *supra* note 32.

[44] *Id.*

[45] *See* Andrew Hayward, *Arizona Iced Tea's Bored Ape NFT Brand Use Was 'Inappropriate,' Creators Warn*, DECRYPT (Aug. 23, 2021), hiips://decrypt.co/79231/arizona-iced-tea-bored-ape-nft-brand-use-inappropriate.

[46] *See* Van Boom, *supra* note 27.

[47] *See* Haigney, *supra* note 28.

founders have plans to expand BAYC into "a Web3 lifestyle company."[48] Web3 is an idea for a new iteration of the internet based on blockchain technology, which incorporates decentralized and crypto-based economies.

45.     BAYC is currently in negotiation discussions with venture capital firm Andreesen Horowitz, preparing to sell a multimillion-dollar stake in the company, which would reportedly value BAYC somewhere between $4 billion and $5 billion.[49]

*The Theft of Mr. Armijo's NFTs*

46.     On February 1, 2022, Mr. Armijo wanted to trade one of his Mutant Ape NFTs for two or three NFTs of another popular NFT collection known as Cool Cats. Mr. Armijo went to the Cool Cats Discord server around 10:00 a.m. (PT) and began negotiating with several members through the chat feature.

47.     Eventually, Mr. Armijo received an offer he liked from a user known as @Nodelee. @Nodelee offered three Cool Cat NFTs for one of Mr. Armijo's Mutant Ape NFTs. Because they were planning an NFT trade rather than a sale, they had to use a third-party NFT trading website to facilitate the transaction. @Nodelee suggested several trading sites, but Mr. Armijo refused because he was unfamiliar with them. Rather, Mr. Armijo proposed using a site called NFT Trader (nfttrader.io). Mr. Armijo was familiar with the NFT Trader site because he had heard from several reliable NFT community members on Twitter and Discord that NFT Trader was a legitimate and trustworthy trading platform. @Nodelee claimed that he had never heard of or used NFT Trader before but agreed to use the site to complete the transaction.

48.     After a few minutes, @Nodelee posted in the Discord chat that he had uploaded the three Cool Cat NFTs he was planning to trade onto the NFT Trader website, and the only thing left was for Mr. Armijo to upload his Mutant Ape NFT to the site and approve the transaction. @Nodelee sent Mr. Armijo a link to the NFT Trader website with the transaction details.

---

[48] Samantha Hissong, *How Four NFT Novices Created a Billion-Dollar Ecosystem of Cartoon Apes*, Rolling Stone (Nov. 1, 2021), hiips://www.rollingstone.com/culture/culture-news/bayc-bored-ape-yacht-club-nft-interview-1250461/.

[49] *See* Escalante-De Mattei, *supra* note 29.

49.     When Mr. Armijo clicked on the link, it took him to what appeared to be the NFT Trader website. When completing a transaction on NFT Trader, there are two boxes, one for each participant, which list the identifying information of the NFTs that are to be traded. This allows participants to verify that the information is correct before approving the transaction.

50.     Mr. Armijo verified that the one Mutant Ape NFT he intended to trade was listed in his dialogue box and that the three Cool Cat NFTs that @Nodelee had offered were listed in @Nodelee's dialogue box. When Mr. Armijo clicked the button to approve the trade, however, nothing happened. He tried to approve the trade a few more times, but it still would not go through. At that moment, Mr. Armijo noticed that the amount of Ether cryptocurrency he held in his digital wallet had declined. He then checked his digital wallet to determine the problem and discovered that his Bored Ape NFT and two Mutant Ape NFTs had vanished.

51.     Mr. Armijo then realized he was the victim of a phishing attack. The link @Nodelee had sent was actually connected to a fake website made to look like the real NFT Trader site. Every time Mr. Armijo clicked the link to approve what he thought was a legitimate trade, he was actually unwittingly allowing @Nodelee access to his digital wallet, which allowed @Nodelee to steal his NFTs.

52.     Mr. Armijo was devastated by the loss of his NFTs, and he immediately tried to contact anyone who could help him recover them. Although the theft did not occur on OpenSea's platform, Mr. Armijo suspected that the thief would list the stolen NFTs on OpenSea to try and sell them as quickly as possible.

53.     Mr. Armijo tried to find a phone number to contact OpenSea customer service, but no such number exists. The only option available on OpenSea's website is to fill out a form to set up a "help ticket" to report fraudulent activity. Mr. Armijo created multiple help tickets, desperately pleading with OpenSea to not allow any sales of his stolen NFTs. He did not receive any responses to his requests.

54.     Mr. Armijo next went to OpenSea's Discord server. He posted several messages on the customer service channel begging for help in locating his stolen NFTs. Although Mr. Armijo did not receive an immediate response from anyone at OpenSea on the channel, he did find messages

from other users stating that they had filed help tickets with OpenSea customer service days or even weeks prior and still had not received a response from OpenSea.

55. In desperation, Mr. Armijo next turned to BAYC for help. He went to the BAYC Discord server and created a help ticket on BAYC's customer service channel. After a few minutes, Mr. Armijo received a message from one of BAYC's "Community and Social Managers." Mr. Armijo pleaded with the BAYC employee to help him by sending out a tweet from the BAYC Twitter account alerting the community about the stolen BAYC NFTs and asking people not to buy them and/or return them to Mr. Armijo.

56. The BAYC employee responded, explaining that the only thing BAYC could do was reach out to OpenSea to try and expedite Mr. Armijo's help tickets. Although BAYC was "sorry to hear" about what happened, the employee told Mr. Armijo that it was an issue between him and OpenSea and there was nothing further BAYC could do to help him.

57. Mr. Armijo pressed the employee again to help him as a BAYC community member. He also asked if BAYC could blacklist the stolen BAYC NFTs to deny them access to the community in an attempt to disincentivize the theft. The employee retorted that BAYC could not do anything further to help because "there are too many issues like this happening." The employee further informed Mr. Armijo that BAYC can only try to "educate people how to be safe through security."

58. Mr. Armijo also tried to reach out to LooksRare to ask for help, but the only method of contacting LooksRare is through their Discord server, which already contained a post stating that Discord refuses to freeze or remove any listed NFTs from their marketplace regardless of whether they have been stolen.

59. While Mr. Armijo waited for a response from OpenSea, he reported the theft to the cybercrimes unit of the FBI. The FBI has agreed to handle Mr. Armijo's case and try to find the original thief, but it is unclear whether the FBI can recover the stolen BAYC NFTs or stop their subsequent resells.

60. While Mr. Armijo was frantically trying to find anyone who could help him, he watched helplessly as his Bored Ape NFT #4319 was listed for sale on OpenSea for 120 Ether—a

price well below its value at the time—and was then purchased by a new user around 2:00 p.m. (PT), approximately two hours after the theft occurred.

61.     About four hours after the sale of Mr. Armijo's Bored Ape NFT, an OpenSea customer service representative finally contacted Mr. Armijo through email, explaining that OpenSea would freeze the three BAYC NFTs that had been stolen from Mr. Armijo, which would not allow them to be bought or sold on OpenSea's marketplace. However, this would not prevent the stolen NFTs from being purchased or traded on any other NFT marketplaces. In response to Mr. Armijo's questioning, the OpenSea representative wrote in another email that they did not know of any agencies who could assist Mr. Armijo in recovering his stolen property.

62.     Due to the transparent nature of blockchain technology, Mr. Armijo has been able to find and track all three of his stolen BAYC NFTs. Following the freeze of the NFTs on OpenSea's marketplace, Mr. Armijo's two Mutant Ape NFTs were later listed and sold on LooksRare. Mutant Ape #1819 was sold on February 4, 2022. Mutant Ape #7713 was initially sold on February 14, 2022 and then again on February 16, 2022.

63.     OpenSea has refused to contact the new owners of Mr. Armijo's NFTs to try and broker a return of the stolen property. Mr. Armijo has personally been able to contact one of the new owners, but they are unwilling to return the BAYC NFT without being compensated for the amount they paid for the stolen item.

*The Harm Suffered by Mr. Armijo Was Foreseeable*

64.     Mr. Armijo's ordeal is not a unique experience for owners of valuable NFTs, especially those who own BAYC NFTs. As BAYC's own employee acknowledged to Mr. Armijo, "there are too many issues like this happening." Defendants are aware of the heightened risk for NFT consumers but have utterly failed to protect consumers or do anything to disincentivize or stop the thefts.

65.     Sometime in August 2021, an NFT enthusiast named Jeff Nicholas was seeking customer service help on OpenSea's Discord server.[50] Nicholas fell victim to scammers who

---

[50] *See* Wang, *supra* note 21.

impersonated OpenSea employees and then led him to a fake OpenSea customer service channel. The thieves were able to gain access to Nicholas's digital wallet and drain it of all the NFTs he had stored there, including multiple Bored Ape NFTs. The damage totaled roughly $480,000.[51]

66.    The thieves who attacked Nicholas used pseudonyms and anonymous digital wallets, and they unloaded the stolen goods by immediately listing and selling them on OpenSea. By the time OpenSea finally responded to Nicholas's pleas for help and froze the stolen NFTs, they had already been sold to individuals who had no idea they were purchasing stolen property.[52] The thieves eluded identification and punishment while Nicholas and the innocent subsequent purchasers were left without recourse from OpenSea.

67.    In November 2021, another NFT collector named Calvin Becerra was attacked by scammers who stole his three Bored Ape NFTs, which were purportedly worth more than one million dollars.[53] The thieves posed as NFT buyers on a Discord channel and pretended to help Becerra fix a problem with his digital wallet, but instead stole his entire NFT collection.[54]

68.    Although OpenSea eventually froze the stolen Bored Ape NFTs on its platform, it did not do so until Becerra posted news of the theft on Twitter, begging the NFT community not to purchase the stolen NFTs and to return them to their rightful owner. The posts went viral, and Becerra credited his complaints with convincing OpenSea to finally freeze the stolen goods.[55]

69.    In December 2021, Todd Kramer had eight Bored Ape NFTs and seven Mutant Ape NFTs stolen when a phishing scam gained access to his digital wallet after Kramer clicked on a

---

51 *Id.*

52 *Id.*

53 *See* Will Gottsegen, *Ape Theft is an Expensive Way to Learn About Crypto's Security Philosophy*, COINDESK (Jan. 3, 2022, 2:14 PM MST), hiips://www.coindesk.com/layer2/2022/01/03/ape-theft-is-an-expensive-way-to-learn-about-cryptos-security-philosophy/; *see also* Lorenzo Franceschi-Bicchierai, *Man Upset That Hackers Stole His Bored Ape NFTs*, VICE (Nov. 3, 2021, 7:00 AM), hiips://www.vice.com/en/article/qjb4nq/investor-says-bored-ape-nfts-were-stolen-by-hackers.

54 Franceschi-Bicchierai, *supra* note 53.

55 *Id.*

malicious link. The fifteen BAYC NFTs had a combined value of $2.2 million.[56] Kramer frantically posted a series of tweets on his Twitter account, pleading for help from OpenSea and the NFT community to retrieve his stolen property. It was not until five hours later that OpenSea froze the stolen BAYC NFTs after many of them had already been sold to new owners.[57]

70.     In January 2022, a Twitter user who goes by the name larrylawliet was tricked by scammers into approving access to his digital wallet. The thieves stole one Bored Ape NFT and five Mutant Ape NFTs and then immediately sold the entire group on OpenSea for just under $700,000.[58] Larrylawliet claims the BAYC NFTs' true value was $2.7 million, but the thieves undersold the NFTs because they needed to immediately offload the stolen goods before they were frozen by OpenSea.[59] Currently, the stolen NFTs are listed as frozen on OpenSea's marketplace, but the thieves have eluded identification and punishment.

71.     Upon information and belief, the preceding examples are only a small sampling of the number of BAYC NFT thefts that have occurred since BAYC launched in April 2021.

72.     At a minimum, Defendants knew as early as August 2021 that BAYC NFT owners were being targeted and attacked by NFT scammers and thieves. Yet, they failed to implement any proactive measures to deter such attacks and protect the community members and NFT consumers who used their platforms.

73.     In light of the long list of similar events, the harm suffered by Mr. Armijo was foreseeable, and Defendants' negligent inaction incentivized thieves to continue to prey on vulnerable NFT consumers.

---

56 *See* Brian Newar, *OpenSea Freezes $2.2M of Stolen Bored Apes*, COINTELEGRAPH (Dec. 31, 2021), hiips://cointelegraph.com/news/opensea-freezes-2-2m-of-stolen-bored-apes.

57 *See* Shanti Escalante-De Mattei, *Thieves Steal Gallery Owner's Multimillion-Dollar NFT Collection: 'All My Apes Gone,'* ARTNEWS (Jan. 4, 2022, 5:23 PM), hiips://www.artnews.com/art-news/news/todd-kramer-nft-theft-1234614874/.

58 *See* Lorenzo Franceschi-Bicchierai, *NFT Collector 'ILovePonzi' Loses Valuable Ape NFTs to Hackers, Is Upset*, VICE (Feb. 1, 2022, 5:10 PM), hiips://www.vice.com/amp/en/article/5dg5xq/nft-collector-iloveponzi-loses-valuable-ape-nfts-to-hackers-is-upset.

59 *Id.*

*Lack of Government Regulations*

74.     The U.S. government does not currently regulate NFTs specifically. The government's lack of regulation is likely to change, however, at both the federal and state levels. This is due to NFTs' meteoric rise in popularity, as well as the potential harms associated with digital transfers.

75.     While there are currently limited regulations for cryptocurrencies, NFTs often fall outside the umbrella of U.S. regulations because the government and its agencies have primarily had difficulty categorizing NFTs. However, both legislators and regulators are currently seeking ways to place guardrails around digital assets, including NFT transactions.

76.     NFTs are comparably functional when juxtaposed with digital currencies. NFTs have several forms of utility, serving to provide both identification and status in a digital context and also intellectual property rights. While both NFTs and cryptocurrencies such as Bitcoin are digital stores of value, NFTs are comparably complex as they perform more like functional digital art than a means of transferring value from one party to the next.[60]

77.     Government officials are actively speaking out on impending NFT regulations. Recently, government officials in the SEC noted that they believe some NFTs could currently be considered securities.[61] Under the *Howey Test*, a security is defined as an investment in a "common enterprise" with the expectation that the efforts of others will increase the value of the investment.[62]

78.     Some NFTs are fractionalized and sold in slices, comparable to a stock.[63] Some developers and creators, including BAYC, retain ownership over a certain number of their NFTs.[64] A maintained interest by owners in such an enterprise calls for regulations to protect consumers.

---

[60] *See* Patrick Ryan, *NFT Regulation is on the Horizon*, THE DALES REPORT (Dec. 28, 2021), hiips://thedalesreport.com/crypto-nfts/nft-regulation-is-on-the-horizon/.

[61] *See* Sophie Kiderlin, *The SEC's 'Crypto Mom' Hester Peirce Says Selling Fractionalized NFTs Could Be Illegal*, BUSINESS INSIDER (Mar. 26, 2021, 7:52 AM EST), hiips://markets.businessinsider.com/currencies/news/sec-crypto-mom-hester-peirce-selling-nft-fragments-illegal-2021-3-1030250153.

[62] *SEC v. W.J. Howey Co.*, 328 U.S. 293, 301 (1946).

[63] *See* Will Gottsegen, *Some NFTs Are Probably Illegal. Does the SEC Care?*, COINDESK (Oct. 20, 2021, 12:57 PM PST), *https*://www.coindesk.com/policy/2021/10/20/some-nfts-are-probably-illegal-does-the-sec-care/.

79.     Additionally, the Federal Trade Commission has noted its power under 15 U.S.C. § 45 to utilize laws governing unfair or deceptive acts or practices (UDAP) against misinformation flowing through the NFT advertising, sales, and reselling process.[65]

80.     Because digital assets are inherently cross-border by nature, the selling and trading of NFTs raises complex issues of applicable law and regulation.[66] In the European Union, Luxembourg recently grouped NFTs into three specific categories: collective investment instruments, electronic money, and financial instruments, each of which has its own qualities and regulations.[67]

81.     The existing EU and UK anti-money laundering rules applicable to certain art market participants could apply as well when parties are involved in the sale of NFTs for an amount of €10,000 or more.[68] Such parties would be required to implement a risk-based "anti-money laundering program"; conduct initial and ongoing client due diligence, which includes identifying and verifying clients' identity; document such diligence and maintain records; monitor for politically exposed persons (PEPs) and adverse media; monitor transactions for suspicious activity; and submit suspicious activity reports.[69]

---

[64] *See* Rahul Nambiampurath, *Bored Ape Yacht Club Explained: What is BAYC?*, BE[IN]CRYPTO (Sept. 20, 2021, 14:12 GMT), hiips://beincrypto.com/learn/bored-ape-yacht-club-bayc/ ("The twist is that after they enter the secondary market, the BAYC collection will have a 2.5% royalty fee attached to each sale.").

[65] *See* Chugani, Bank, & Levine, *The Notorious NFT: Consumer Protection Issues Raised by Non-Fungible Tokens (NFTs)*, REED SMITH LLP (Apr. 15, 2021), hiips://uk.practicallaw.thomsonreuters.com/w-0304989?originationContext=knowHow&transitionType=KnowHowItem&contextData=(sc.DocLink)&firstPage=true.

[66] *See* Werner Vermaak, *MiCA: A Guide to the EU's Proposed Markets in Crypto-Assets Regulation,* SYGNA (last visited Feb. 28, 2022), hiips://www.sygna.io/blog/what-is-mica-markets-in-crypto-assets-eu-regulation-guide/.

[67] Directive (EU) 2018/843 of the European Parliament and of the Council of 30 May 2018 on the prevention of the use of the financial system for the purposes of money laundering or terrorist financing (AMLD5), Article 1(1)(c)(i).

[68] *Id.*

[69] *Id.*

82.     Government regulation is necessary because of the gravely serious risk factors associated with NFTs regarding money laundering, tax evasion, and terrorist financing. Such fears were confirmed on February 4, 2022, when the U.S. Department of the Treasury issued a report warning that high-value NFTs present a significant risk of being used for money laundering.[70] Specifically, entities—such as the defendants in this case—that have large sales turnover and regularly transact in high-value art in the regular course of business present a higher risk for being used by criminals involved in money laundering activities.[71] To address the risks, the Treasury recommended consideration of several options, including: encouraging the creation of private-sector information sharing programs to promote transparency among art market participants; using FinCEN recordkeeping authorities to support information collection and greater due diligence; and obligating certain art-market participants to create and maintain anti-money laundering and know-your-customer requirements.[72]

83.     U.S. Congressional committees and government agencies have deliberated over the last three years to grasp what digital assets truly mean for the global and domestic economy.[73] Most recently, Congress appeared determined to even classify crypto miners as "brokers," thus requiring them to adhere to the same reporting standards as banks or brokerages.[74]

84.     Such regulation is necessary and appropriately involves parties who are involved in the marketing and sales of NFTs, as NFTs have become a booming target for scams and theft.

---

[70] *See* Nikhilesh De, *US Treasury Department Warns of NFT Risk in Art-Related Money Laundering*, COINDESK (Feb. 4, 2022, 12:29 PM MST), hiips://www.coindesk.com/policy/2022/02/04/us-treasury-department-warns-of-nft-risk-in-art-related-money-laundering/.

[71] Press Release, U.S. Dept. of the Treasury, Treasury Releases Study on Illicit Finance in the High-Value Art Market (Feb. 4, 2022), hiips://home.treasury.gov/news/press-releases/jy0588.

[72] *Id.*

[73] *See* Adrian Krion, *NFT Regulation Looms Large, So Let's Start with the Proper Framework*, NASDAQ (Nov. 9, 2021 9:58 AM EST), hiips://www.nasdaq.com/articles/nft-regulation-looms-large-so-lets-start-with-the-proper-framework.

[74] *Id.*

85.    With no government regulations currently in place, highly susceptible and unsophisticated investors are at risk with little to no recourse against bad actors and those who facilitate the illegal sales of stolen digital assets.

86.    Defendants, who have a direct financial interest in the facilitation of NFT sales, have a duty to ensure that NFT consumers are provided with safeguards and recourse from harm. That duty is heightened when there are no government regulations in place that could provide a background set of rules that would mitigate the risk of harm NFT consumers face.

*Defendants' Inadequate Security Practices Failed to Protect NFT Consumers*

87.    Blockchains and the technology associated with them may be decentralized in theory, but not in practice. Defendants are centralized entities in that they do not share governance with their communities or the wider NFT consumer base. Defendants designed their platforms, chose the security measures they deemed necessary, and determined the level of customer service they wanted to offer. Any decisions regarding how to conduct Defendants' business operations continue to be made at a centralized level. As such, Defendants are centralized entities that act as intermediaries between the real world and the decentralized world of digital assets created on blockchains.

88.    Implementing basic fraud and theft protections, verifying user identities, maintaining adequate records, addressing customer concerns, and providing recourse if things go wrong are easiest to execute in a centralized environment. Given that the NFT economy is based on immediate and irreversible blockchain ledger entries, centralized intermediaries owe NFT consumers a duty to monitor their platforms to prohibit the sale of stolen goods and implement robust security measures to protect vulnerable consumers.

*OpenSea's Inadequate Security Practices*

89.    Prior to the theft of Mr. Armijo's BAYC NFTs, OpenSea cofounder, Alex Atallah, acknowledged the "huge responsibility" OpenSea has to create standards for the new NFT community.[75] Particularly, Atallah explained that OpenSea is "on a mission to build the world's most

---

[75] *See* Atallah, *Important Updates for Listing and Delisting Your NFTs*, *supra* note 7.

trusted and inclusive NFT marketplace."[76] Although OpenSea is aware of its duty to protect consumers and provide a platform that is free from fraud and theft, it has failed to live up to its own standards.

90.    OpenSea was founded in 2017 with an initial funding round of $2 million from Founders Fund and other industry-leading crypto firms.[77]

91.    From the time OpenSea officially launched in February 2018 until the NFT market began to grow in February 2021, OpenSea maintained a small team of employees that handled a small volume of yearly transactions. At 2020 year's end, OpenSea employed seven people and processed only $94.8 million in NFT sales volume for the entire year.[78]

92.    In March 2021, following the rise of popularity in NFTs, OpenSea announced a $23 million-dollar institutional funding round led by venture capital firm Andreesen Horowitz, which would be used to grow the platform and hire engineers and other technical staff.[79]

93.    In July 2021, OpenSea processed $350 million in NFT sales.[80] The company was valued at $1.5 billion and received $100 million in a Series B funding round again led by Andreesen Horowitz.[81] OpenSea planned to use the funds to hire engineering talent, expand internationally to new markets, and make more ways for users to easily access, buy, and sell NFTs.[82] There were no plans to invest in security or theft deterrents.

---

[76] *See* Alex Atallah, *OpenSea's Bug Bounty Program*, OPENSEA BLOG (Jan. 12, 2022), hiips://opensea.io/blog/safety-security/openseas-bug-bounty-program/.

[77] *See* Dean Takahashi, *OpenSea Raises $100M at $1.5B Valuation for NFT Marketplace*, VentureBeat (July 20, 2021, 3:00 AM), hiips://venturebeat.com/2021/07/20/opensea-raises-100m-at-1-5b-valuation-for-nft-marketplace/.

[78] *See* Tim Fries, *How OpenSea Captured 97% of the NFT Market*, THE TOKENIST (Nov. 11, 2021), hiips://tokenist.com/how-opensea-captured-97-of-the-nft-market/.

[79] *See* Takahashi, *supra* note 77.

[80] *See* Jeff Kauflin, *What Every Crypto Buyer Should Know About OpenSea, the King of the NFT Market*, FORBES (Nov. 23, 2021 6:30 AM EST), hiips://www.forbes.com/sites/jeffkauflin/2021/11/23/what-every-crypto-buyer-should-know-about-opensea-the-king-of-the-nft-market/?sh=7d2364e82f89.

[81] *See* Haverstock, *supra* note 5.

[82] *See* Takahashi, *supra* note 77.

94.     In August 2021, the NFT craze reached a fever pitch, leading to a monthly transaction volume on OpenSea of $3.4 billion, which produced an $85 million commission windfall for the company.[83] OpenSea's monthly expenses at the time were likely around $5 million.[84] At the time, OpenSea had a team of 37 employees and were desperately searching for new staff to deal with the onslaught of new customers.[85]

95.     On August 18, 2021, OpenSea co-founder, Devin Finzer, participated in a podcast interview with NFT Now. During the interview, Finzer acknowledged that the astronomical growth took everyone by surprise and that the OpenSea team was "now in catch-up mode of company building."[86] Finzer went on to explain that "fraud is becoming a really big thing," and the company must focus on "improving trust" and "investing in those simple things" that can help improve the user experience.[87] However, when asked about OpenSea's goals for the near future, Finzer stated that general growth was the company's focus, including developing better search functions, easier fiat on-ramping, better notification systems, and better multichain support.[88] Finzer did not mention any plans to improve security or consumer protections.

96.     In December 2021, OpenSea processed more than $3.3 billion in sales, generating around $82.5 million in revenue.[89] The company also announced that it had raised $300 million in a Series C funding round led by venture capital firms Paradigm and Coatue.[90] OpenSea stated that it

---

[83] *See* Kauflin, *supra* note 80.

[84] *Id.*

[85] *See* Tim Fries, *With a Team of 37, OpenSea Exceeded $3 Billion in August's Trading Volume*, THE TOKENIST (Aug. 30, 2021), hiips://tokenist.com/with-team-of-37-opensea-exceeded-3-billion-august-monthly-trading-volume/.

[86] *See* NFT NOW PODCAST, *supra* note 17 at 24:16.

[87] *Id.* at 24:40.

[88] *Id.* at 30:07.

[89] *See* Haverstock, *supra* note 5.

[90] *Id.*

planned to use the funds for product development, hiring, and to significantly improve customer support and customer safety.[91]

97.     The number of OpenSea's employees increased from 37 in July 2021 to around 70 by the end of 2021.[92]

98.     Despite OpenSea's meteoric growth over the past year, OpenSea has prioritized growth over consumer safety and the security of consumer's digital assets. For example, in OpenSea's early days, the company utilized an approval process to screen NFTs prior to listing them on the OpenSea marketplace. The process was intended to combat abuse by screening NFTs for possible theft or copyright violations.[93] But OpenSea canceled the review process in March 2021, following the initial surge in NFT sales. An OpenSea spokesperson stated that the decision to roll back the screening process "was made to better reflect OpenSea's commitment to enabling decentralized economies."[94]

99.     Without a careful screening process in place (like the one it previously used), OpenSea has no way to determine whether the NFTs uploaded to its platform have been stolen. OpenSea does nothing to proactively stop illegal sales before they occur. This is especially problematic because once sales are recorded on the blockchain, OpenSea claims that it cannot do anything to help consumers because blockchain transactions are irreversible. OpenSea has sacrificed consumer safety and the security of consumer's digital assets for convenience.

100.     OpenSea's limited customer service options are ineffectual at best. When OpenSea does take action on behalf of consumers, its responses are slow and uneven.[95] As previously stated, OpenSea does not have a dedicated customer service phone number or instant chat feature on its

---

91 *See* Zack Seward, *NFT Marketplace OpenSea Valued at $13.3B in $300M Funding Round*, COINDESK (Jan. 4, 2022, 6:52 PM MST), hiips://www.coindesk.com/business/2022/01/05/nft-marketplace-opensea-valued-at-133b-in-300m-funding-round-report/.

92 *See* Haverstock, *supra* note 5.

93 *See* Scheck, *supra* note 15.

94 *Id.*

95 *Id.*

website, and "help tickets" sent by victims of theft are ignored for days or weeks at a time. After filing a help ticket, most aggrieved consumers receive a message from OpenSea stating that "due to our support ticket volume, our responses can take up to a week."[96] This response is completely unhelpful to a person who has just had millions of dollars' worth of their property stolen, and they are trying desperately to stop the thieves from immediately selling it off at bargain prices before OpenSea eventually freezes the stolen assets.

101.    OpenSea is aware and has acknowledged that its customer service responses are inadequate. In a blog post on October 4, 2021, OpenSea recommended that users protect themselves from scammers by only receiving help from official OpenSea customer support.[97] However, the post also stated that "customer support is never as fast as we want it to be (we're working on it)." Individuals only have two choices: wait for official OpenSea support that could take more than a week or expose themselves to potential scammers if they seek help elsewhere.

102.    OpenSea frequently refers to itself as the "eBay" or "Amazon of cryptogoods." However, unlike eBay or Amazon, Opensea has failed to adequately scale its customer support services or create a dedicated fraud department. For example, Amazon has more than 10,000 employees dedicated solely to fighting fraud on its platform. OpenSea currently has only 70 employees in total, none identified as being solely for fighting fraud.

103.    OpenSea's failure to implement proactive theft detection methods, along with its failure to provide adequate customer service, has created a situation that incentivizes thieves to target and attack individuals who own valuable NFTs. As the leading NFT marketplace with hundreds of millions of dollars at its disposal, OpenSea has a duty to provide basic consumer protections for the NFT community.

/ / /

/ / /

---

[96] *Id.*

[97] *See* Barnes, *supra* note 9.

*LooksRare's Inadequate Security Practices*

104.    LooksRare launched its NFT marketplace on January 10, 2022, billing itself as the "the community-first NFT marketplace with rewards for trading."[98] However, in the six weeks LooksRare has been in operation, it has done several things to cause concern among the NFT community.

a.    The LooksRare founders are identified only by their pseudonyms, "Zodd" and "Guts."[99] There is also no address, phone number, or company information of any kind listed on LooksRare's website or its Discord server.

b.    In a blog post on January 1, 2022, the LooksRare team stated that it was launching its NFT marketplace as soon as possible, which meant that "some stuff might not be working totally smoothly right off the bat."[100]

c.    At the time of its debut, LooksRare launched unaudited and without a public GitHub repo.[101] GitHub is an online platform used by computer programmers to share computer code among collaborators. Because LooksRare does not allow the public to view the code its platform uses, many NFT consumers see this as a red flag.

105.    Following LooksRare's launch, the platform immediately attracted attention for its enormous daily sales volumes that more than doubled OpenSea's numbers on only the second day of LooksRare's operability.[102] Within three weeks, LooksRare generated at least $10.8 billion in trading volume.[103] However, LooksRare averaged less than 3,500 sales per day, compared with OpenSea's

---

98  *See* Elizabeth Howcroft, *Unreal Demand? Irregular Sales Worth Billions Fire Up Wile NFT Market*, Reuters (Feb. 7, 2022, 3:55 PM MST), hiips://www.reuters.com/technology/unreal-demand-irregular-sales-worth-billions-fire-up-wild-nft-market-2022-02-07/.

99  *Id.*

100  *The NFT Marketplace You've Been Waiting For*, LOOKSRARE BLOG (Jan. 1, 2022), hiips://docs.looksrare.org/blog/the-nft-marketplace.

101  *See* Ryan Sean Adams, *Looks Rare, The Community-Owned Competitor to OpenSea is Here. Is it Legit?*, BANKLESS (Jan. 15, 2022), hiips://newsletter.banklesshq.com/p/looks-rare?utm_source=url.

102  *See* Hu, *supra* note 13.

103  *See* Howcroft, *supra* note 98.

57,000-90,000 transactions per day.[104] Technology researchers characterize the high-value transactions occurring on LooksRare as "wash trades."[105] Wash trades occur when an individual buys and sells an asset multiple times while acting as both the buyer and the seller simultaneously. Wash trading gives a false impression of demand for an asset and has been banned from traditional markets in the U.S. since 1936.[106]

106.    In its report highlighting the risks of money laundering associated with high-value NFT trading, the Treasury Department explicitly addressed wash trading, stating, "NFTs can be used to conduct self-laundering, where criminals may purchase an NFT with illicit funds and proceed to transact with themselves to create records of sales on the blockchain … The NFT could then be sold to an unwitting individual who would compensate the criminal with clean funds not tied to a prior crime."[107]

107.    As previously explained, LooksRare refuses to freeze or remove any NFTs listed on its marketplace regardless of whether the NFT has been stolen.

108.    LooksRare's website encourages users to "scope out the market" for high-value NFTs on its platform, including Bored Ape and Mutant Ape NFTs.[108]

109.    LooksRare's failure to implement any type of consumer protections puts the entire NFT community at significant risk for attacks from thieves and scammers. LooksRare's negligent and reckless actions have created a situation that incentivizes thieves to target and attack individuals who own valuable NFTs and also encourages money laundering.

110.    LooksRare's refusal to provide any identifying information regarding its co-founders, management team, business registration, physical address, telephone number, or email address further harms the NFT community because NFT consumers are denied the ability to find and hold

---

[104] *Id.*

[105] *Id.*

[106] *See* Hu, *supra* note 13.

[107] *See* De, *supra* note 70.

[108] *See LooksRare NFT Marketplace & Token Launch – Now Live!*, LOOKSRARE BLOG (Jan. 10, 2022), hiips://docs.looksrare.org/blog/launch-post.

LooksRare accountable when illegal activities occur on its platform. LooksRare's anonymity encourages a culture of lawlessness and criminality—teams of developers are allowed to create blatantly harmful platforms without responsibility for the harm they cause to NFT consumers and the NFT community at large.

*BAYC's Inadequate Security Practices*

111.    Each individual Bored Ape and Mutant Ape NFT includes a number designating the NFT's official place in the two groups of 10,000 BAYC NFTs. Community members cannot access the special perks of ownership without first verifying that they own and possess a numbered BAYC NFT. The verification process is done through technological review of the blockchain ledger, which clearly tracks the history of each BAYC NFT.

112.    Upon being alerted that a specific BAYC NFT was reported to law enforcement as stolen, BAYC could block the specific NFT in question from accessing the BAYC community or exercising any commercial rights associated with the underlying image, thereby stripping the BAYC NFT of its utility.

113.    BAYC's failure to implement a policy to discourage the use of stolen NFTs to access the BAYC community puts owners of BAYC NFTs at significant risk for targeted attacks from scammers and thieves. As the leading NFT community with hundreds of millions of dollars at its disposal, BAYC has a duty to provide basic consumer protections for the BAYC community.

*Mr. Armijo Suffered Substantial Damages*

114.    The theft of Mr. Armijo's BAYC NFTs deprived Mr. Armijo not only of the significant monetary value of the NFTs he owned, but also stripped him of his membership in the BAYC community and the commercialization rights he possessed in his underlying Bored Ape and Mutant Ape images. Mr. Armijo also lost the ability to earn future profits from his BAYC NFTs.

115.    The theft of Mr. Armijo's BAYC NFTs was the direct and proximate result of Defendants' failure to provide consumer protections and deter criminal activity in the NFT community.

116.    Defendants had the resources necessary to deter or remedy the theft but neglected to implement security measures and invest in adequate customer service support.

117.   Had Defendants remedied the deficiencies in their security processes and customer support services, they would have disincentivized the targeting of BAYC NFT owners and could have helped deter the attack on Mr. Armijo or adequately remedied the effects of such an attack.

*Defendants' Actions Harmed the NFT Community and all NFT Consumers*

118.   Defendants' failure to implement adequate security measures and to deter the sale of stolen NFTs was detrimental to the NFT community and all NFT consumers.

119.   Without robust theft protections, all NFT consumers who own valuable NFTs are targets for fraud and theft, and the NFT market is a haven for anonymous criminals.

120.   Mainstream consumers are wary of participating in the NFT market without the basic safety and fraud protections consumers are accustomed to in comparable online marketplaces.

121.   Nothing prevented Defendants from implementing security measures, including user verification and NFT screening procedures. Defendants chose to operate their platforms without such safeguards despite having the resources to put them in place.

122.   Defendants' actions have directly fostered the free-for-all atmosphere prevalent in the NFT community that allows thieves to target NFT consumers with impunity. NFT consumers will continue to be at risk until Defendants implement adequate security measures.

## CLAIMS FOR RELIEF

### FIRST CLAIM FOR RELIEF
#### NEGLIGENCE
(by OpenSea and LooksRare)

123.   Plaintiff realleges and incorporates the foregoing paragraphs, as if set forth herein.

124.   OpenSea and LooksRare owed a duty to Mr. Armijo as an NFT consumer to exercise reasonable care in monitoring their NFT marketplaces for stolen NFTs. This duty included, among other things, designing, maintaining, and implementing adequate screening and verification processes for any and all NFTs on their platforms to ensure that the NFTs uploaded to their marketplaces were not the product of theft, fraud, or other illegal activities. OpenSea and LooksRare's duty to monitor their platforms further included a duty to respond and act quickly when stolen NFTs were detected or reported by users and to alert law enforcement officials of thefts that occurred on their platforms and cooperate with law enforcement officials to retrieve stolen NFTs.

125.     OpenSea and LooksRare additionally owed a duty to Mr. Armijo as an NFT consumer to exercise reasonable care in providing adequate customer service for victims of theft or other illegal activities that occurred on their platforms. This duty included, among other things, designing, maintaining, and implementing effective and immediate reporting procedures to provide NFT consumers with the ability to quickly report thefts and other illegal activity directly to competent customer service agents employed by OpenSea and LooksRare. The duty to provide adequate customer service further included a duty to provide timely, effective, and equal recourse to all NFT consumers, including Mr. Armijo, who are victims of theft or other illegal activities on OpenSea and LooksRare's platforms.

126.     In a February 9, 2022 interview with an NFT influencer on Twitter Spaces, OpenSea co-founder, Alex Atallah, acknowledged these duties by stating that OpenSea has "an obligation" to "immediately protect users" and notify other platforms when a security issue is flagged.[109] That obligation was not met here.

127.     LooksRare has consistently stated its opposition to monitoring its platform and providing security measures to deter or prohibit the sale of illegal NFTs in its marketplace. LooksRare has further refused to provide any customer service or reporting mechanisms for victims of theft or other illegal activities. LooksRare zealously maintains the anonymity of its cofounders and management team, thus insulating Looksrare from accountability when its platform is used to conduct illegal activity. These actions demonstrate LooksRare's premeditated intention to evade responsibility and a dismissive approach to their duties and obligations. LooksRare has a financial interest in facilitating the sale of NFTs on its platform, and therefore owed a duty to Mr. Armijo as an NFT consumer to monitor its platform for stolen or otherwise illegal NFTs and to provide adequate customer service and timely recourse to victims of illegal activity. That duty was not met here.

128.     OpenSea and LooksRare knew of the prevalence of NFT theft prior to the February 1, 2022, theft and subsequent sales of Mr. Armijo's BAYC NFTs.

---

[109] Interview by Ohh Shiny with Alex Atallah, Co-Founder, OpenSea, on the OhhShiny Show Twitter Space (Feb. 9, 2022).

129.     As an NFT consumer, Mr. Armijo was the foreseeable and probable victim of any inadequate monitoring, screening, security, and reporting procedures. OpenSea and LooksRare knew of the significant and inherent risks in owning valuable NFTs and the likelihood that NFT consumers would be preyed upon by hackers, scammers, and thieves.

130.     OpenSea and LooksRare's own conduct created a foreseeable risk of harm to Mr. Armijo as an NFT consumer. OpenSea and LooksRare took advantage of the lack of government regulations and the philosophy of decentralization to refuse to implement any consumer safety standards or theft deterrents. OpenSea and LooksRare's actions have contributed to the free-for-all, lawless nature of the NFT market, thus placing all NFT consumers, including Mr. Armijo, at significant and foreseeable risk for being victimized by hackers, scammers, and thieves.

131.     OpenSea and LooksRare breached their duties to Mr. Armijo as an NFT consumer to exercise reasonable care in monitoring their NFT marketplaces for stolen NFTs by, among other things: (a) failing to design, implement, and maintain adequate screening and verification processes for any and all NFTs on their platforms; (b) failing to collect adequate identification information for users of their platforms; (c) failing to respond immediately to reports of theft or other illegal activity on their platforms; (d) failing to contact law enforcement about reported illegal activity or otherwise cooperate with law enforcement to recover stolen NFTs.

132.     OpenSea and LooksRare breached their duties to Mr. Armijo as an NFT consumer to exercise reasonable care in providing adequate customer service for victims of theft or other illegal activities that occurred on their platforms by, among other things: (a) failing to provide dedicated, immediate, and easily accessible customer service; (b) failing to design, implement, and maintain safe, effective, and immediate reporting procedures on their platforms to allow NFT consumers the ability to report thefts and other illegal activity; (c) failing to provide timely, effective, and equal recourse to all NFT consumers, including prohibiting the sale of stolen NFTs on their platforms, participating in NFT recovery efforts, and providing incentives for later holders of stolen NFTs to return them to their rightful owners.

133.     As set out above, NFTs may be illegally and impermissibly sold, but those transactions cannot occur absent negligent acts by OpenSea, LooksRare, and/or their employees.

134.     But for OpenSea and LooksRare's breach of their duties of reasonable care owed to Mr. Armijo as an NFT consumer, Mr. Armijo's NFTs would not have been impermissibly sold and transferred on February 1, 2022. It was OpenSea and LookRare's breach of their duties—as they lacked adequate verification and security parameters and allowed their platforms to be used as marketplaces for illegally stolen NFTs—that caused Mr. Armijo to suffer significant harm. OpenSea's negligence was a direct and proximate cause of Mr. Armijo's resulting damages, including but not limited to, the theft and subsequent sale of Mr. Armijo's BAYC NFTs worth at least $1 million, the loss of Mr. Armijo's membership in the BAYC community and the privileges associated with it, and the loss of Mr. Armijo's commercialization rights to the ape characters underlying his BAYC NFTS and their future earning potential worth, at a minimum, $5 million.

135.     Based on OpenSea and LookRare's actions and inactions as described herein, OpenSea is guilty of oppression or malice, express or implied, and Mr. Armijo is entitled to an award of punitive damages.  In particular, OpenSea and LooksRare's negligent and reckless conduct was intentionally undertaken with knowledge of the probable harmful consequences and with a willful and deliberate failure to avoid the foreseeable consequences facing Mr. Armijo as an NFT consumer as described herein.  OpenSea and LooksRare acted with the intent to harm Mr. Armijo, or with a conscious disregard for Mr. Armijo's rights and property as an NFT consumer, thereby subjecting Mr. Armijo to cruel and unjust hardship as described herein.

136.     As a result of OpenSea and LooksRare's actions as described herein, it has been necessary for Mr. Armijo to retain the service of counsel to represent him in the above-entitled matter, and he is therefore entitled to reasonable attorney's fees and costs incurred herein.

## SECOND CLAIM FOR RELIEF
### NEGLIGENCE
(by BAYC)

137.     Plaintiff realleges and incorporates the foregoing paragraphs, as if set forth herein.

138.     BAYC owed a duty to Mr. Armijo as a member of the BAYC community to exercise reasonable care in monitoring and verifying the BAYC NFTs used to access its proprietary and exclusive BAYC community. This duty included ensuring the BAYC NFTs used to access private benefits on the BAYC platform were not the product of theft or fraud and being improperly used to

gain access. BAYC's duty to monitor its community further included a duty to respond and act quickly when stolen BAYC NFTs were detected or reported by users, and to alert law enforcement officials of reported thefts of BAYC NFTS and cooperate with law enforcement officials to retrieve the stolen BAYC NFTs.

139.   BAYC further owed a duty to Mr. Armijo as a member of the BAYC community to provide adequate customer service and reporting measures that would allow victims to quickly and safely report thefts or other illegal activity regarding BAYC NFTs to competent customer service agents employed by BAYC.

140.   BAYC knew of the prevalence of fraudulent transfers and thefts of its BAYC NFTs. Many illegal thefts and transfers of BAYC NFTs have been highly publicized across the internet and garnered national media attention. BAYC has a financial interest in facilitating the trade of BAYC NFTs, as it profits off each sale of its BAYC NFTs. Therefore, BAYC owed a duty to Mr. Armijo as a BAYC community member to allow proper reporting and security measures in order to deter the targeting of BAYC NFT owners and community members by hackers, scammers, and thieves. That duty was not met.

141.   BAYC breached its duties to Mr. Armijo as a BAYC community member by, among other things: (a) failing to design, implement, and maintain adequate security and verification measures to prohibit access of BAYC NFTs to the BAYC community that were the product of theft or other illegal activities; (b) failing to provide dedicated, immediate, and easily accessible customer service; (c) failing to design, implement, and maintain safe, effective, and immediate reporting procedures to allow BAYC NFT consumers the ability to report thefts and other illegal activity; (d) failing to provide timely, effective, and equal recourse to all NFT consumers, including prohibiting the use of stolen BAYC NFTs on their platforms, participating in BAYC NFT recovery efforts, and providing incentives for later holders of stolen BAYC NFTs to return them to their rightful owners

142.   As set out above, BAYC NFTs may be illegally stolen and improperly sold or traded, but accessing and using the benefits provided by BAYC on its platform cannot occur absent negligent acts by BAYC and/or its employees.

143. But for BAYC's breach of its duty of reasonable care owed to Mr. Armijo as a BAYC community member, Mr. Armijo's BAYC NFTs would not have been a target for thieves because their utility would have been significantly diminished. It was BAYC's breach of its duties that caused Mr. Armijo to lose access and benefits provided by BAYC to its BAYC NFT owners. BAYC's negligence was a direct and proximate cause of Mr. Armijo's resulting damages, including but not limited to, the theft and subsequent sale of Mr. Armijo's BAYC NFTs worth at least $1 million, the loss of Mr. Armijo's membership in the BAYC community and the privileges associated with it, and the loss of Mr. Armijo's commercialization rights to the ape characters underlying his BAYC NFTs and their future earning potential worth, at a minimum, $5 million.

144. Based on BAYC's actions and inactions as described herein, BAYC is guilty of oppression or malice, express or implied, and Mr. Armijo is entitled to an award of punitive damages. In particular, BAYC's negligent and reckless conduct was intentionally undertaken with knowledge of the probable harmful consequences and with a willful and deliberate failure to avoid the foreseeable consequences facing Mr. Armijo as a BAYC community member as described herein. BAYC acted with the intent to harm Mr. Armijo, or with a conscious disregard for Mr. Armijo's rights and property as a BAYC community member, thereby subjecting Mr. Armijo to cruel and unjust hardship as described herein.

145. As a result of BAYC's actions as described herein, it has been necessary for Mr. Armijo to retain the service of counsel to represent him in the above-entitled matter, and he is therefore entitled to reasonable attorney's fees and costs incurred herein.

### THIRD CLAIM FOR RELIEF
### NEGLIGENT SUPERVISION AND TRAINING
(by OpenSea and LooksRare)

146. Plaintiff realleges and incorporates the foregoing paragraphs, as if set forth herein.

147. OpenSea and LooksRare owed a duty to Mr. Armijo as an NFT consumer to exercise reasonable care in supervising and training their employees to timely respond and react to reports from NFT consumers. OpenSea and LooksRare owed a duty to Mr. Armijo as an NFT consumer to safeguard and protect any and all NFTs upon reports of theft and to prohibit said NFTs from being improperly used, sold, or transferred to unauthorized parties on their platforms. This duty included

OpenSea and LooksRare's training, instructing, and supervising its employees to adhere to basic monitoring, security, reporting, and response obligations as is common practice in the industry of online marketplaces.

148.    OpenSea and LooksRare were aware of the ability of their employees to freeze certain NFTs, as well as the ability to arbitrarily flag specific tickets submitted by users in order to move them up in the queue, thus allowing them to receive a quicker response. OpenSea and LooksRare's knowledge is apparent from their company statements regarding security and reporting as set forth above.

149.    OpenSea and its employees currently utilize a customer service policy of allowing more than a week to respond to help tickets. OpenSea is aware that such a time frame is insufficient and meaningless to NFT consumers who have filed reports, including Mr. Armijo.

150.     LooksRare and its employees have disclaimed all customer service and refuses to freeze problematic NFTs on its platform. LooksRare is aware that this decision does nothing to curb the incentive for hackers, scammers, and thieves to target NFT consumers who own valuable NFTs.

151.    OpenSea and LooksRare knew that fraudulent and stolen NFTs were being sold regularly on their platforms. OpenSea and LooksRare also knew that these types of digital assets were attractive to foreseeable bad actors and that "fire sales" are typically conducted on their platforms almost immediately following the NFT's theft.

152.    OpenSea and LooksRare breached their duty to supervise and train their employees to safeguard and protect any and all NFTs on their platforms by not requiring employees to adhere to adequate and basic monitoring, verification, security, reporting, and response measures. As set forth above, the illegal trades and sales of NFTs cannot occur without knowledge, complicity, or negligence by OpenSea and LooksRare employees.

153.    OpenSea and LooksRare knew the supervision, training, and monitoring of their employees was inadequate because sales nearly identical to those successfully executed involving Mr. Armijo's NFTs occurred on multiple prior occasions. OpenSea and LooksRare employees failed to adequately verify, monitor, and respond to reports of improper and illegal sales. Multiple other

NFT consumers have stated they filed help tickets with OpenSea and have not heard back as of three weeks of their initial reporting. Such non-response on behalf of OpenSea is negligent.

154.    But for OpenSea and LooksRare's wrongful and negligent breach of its duties to supervise, train, and monitor their employees, Mr. Armijo's BAYC NFTs would not have been subsequently sold to unauthorized individuals on their platforms. OpenSea and LooksRare's negligence in supervising, training, and monitoring their employees was a direct and proximate cause of Mr. Armijo's resulting damages, including but not limited to, the theft and subsequent sale of Mr. Armijo's BAYC NFTs worth at least $1 million, the loss of Mr. Armijo's membership in the BAYC community and the privileges associated with it, and the loss of Mr. Armijo's commercialization rights to the ape characters underlying his BAYC NFTS and their future earning potential worth, at a minimum, $5 million.

155.    Based on Open Sea and LooksRare's actions and inactions as described herein, Open Sea and LooksRare are guilty of oppression or malice, express or implied, and Mr. Armijo is entitled to an award of punitive damages.  In particular, Open Sea and LooksRare's negligent and reckless conduct was intentionally undertaken with knowledge of the probable harmful consequences and with a willful and deliberate failure to avoid the foreseeable consequences facing Mr. Armijo as an NFT consumer as described herein.  Open Sea and LooksRare acted with the intent to harm Mr. Armijo, or with a conscious disregard for Mr. Armijo's rights and property as an NFT consumer, thereby subjecting Mr. Armijo to cruel and unjust hardship as described herein.

156.    As a result of Open Sea and LooksRare's actions as described herein, it has been necessary for Mr. Armijo to retain the service of counsel to represent him in the above-entitled matter, and he is therefore entitled to reasonable attorney's fees and costs incurred herein.

### FOURTH CLAIM FOR RELIEF
**NEGLIGENT HIRING**
(by OpenSea and LooksRare)

157.    Plaintiff realleges and incorporates the foregoing paragraphs, as if set forth herein.

158.    OpenSea and LooksRare owed a duty to Mr. Armijo as an NFT consumer to hire a sufficient number of competent, honest, and ethical employees to respond to reports and to safeguard and protect any and all NFTs on their platforms. OpenSea and LooksRare also owed a duty to Mr.

Armijo as an NFT consumer to exercise reasonable care in creating dedicated security and customer service departments and hiring sufficient numbers of competent employees that would allow them to effectively perform their duties.

159.    OpenSea and LooksRare knew that the NFTs being sold or traded on their platforms, including Mr. Armijo's, were valuable and required time sensitive responses. OpenSea and LooksRare also knew that this type of information was attractive to foreseeable bad actors who subsequently sell stolen NFTs on OpenSea and LooksRare's marketplaces. OpenSea and LooksRare further knew that their failure to hire a sufficient number of security and customer service employees was inadequate because of the numerous previous attacks involving similar facts to those set forth above.

160.    OpenSea and LooksRare breached their duties by, among other things, failing to hire sufficient numbers of competent security and customer service employees who would safeguard and protect any and all NFTs on their platforms.

161.    The subsequent sale of Mr. Armijo's NFTs could not have occurred without the negligence of OpenSea and LooksRare employees.

162.    The employee(s) who failed to monitor and verify the NFTs on OpenSea's platform did not live up to OpenSea's purported security standards. Additionally, the LooksRare employee(s) who failed to monitor and verify the NFTs on the LooksRare platform were negligent as LooksRare fails to claim any responsibility for illegal sales taking place on its platform.

163.    But for OpenSea and LooksRare's wrongful and negligent breach of their duties to hire sufficient numbers of competent and ethical security and customer service employees, Mr. Armijo's NFTs would have been timely frozen, and they would not have been sold on those either OpenSea or LooksRare's platforms. OpenSea and LooksRare's negligence was a direct and proximate cause of Mr. Armijo's resulting damages, including but not limited to, the theft and subsequent sale of Mr. Armijo's BAYC NFTs worth at least $1 million, the loss of Mr. Armijo's membership in the BAYC community and the privileges associated with it, and the loss of Mr. Armijo's commercialization rights to the ape characters underlying his BAYC NFTS and their future earning potential worth, at a minimum, $5 million.

164. Based on Open Sea and LooksRare's actions and inactions as described herein, Open Sea and LooksRare are guilty of oppression or malice, express or implied, and Mr. Armijo is entitled to an award of punitive damages. In particular, Open Sea and LooksRare's negligent and reckless conduct was intentionally undertaken with knowledge of the probable harmful consequences and with a willful and deliberate failure to avoid the foreseeable consequences facing Mr. Armijo as an NFT consumer as described herein. Open Sea and LooksRare acted with the intent to harm Mr. Armijo, or with a conscious disregard for Mr. Armijo's rights and property as an NFT consumer, thereby subjecting Mr. Armijo to cruel and unjust hardship as described herein.

165. As a result of Open Sea and LooksRare's actions as described herein, it has been necessary for Mr. Armijo to retain the service of counsel to represent him in the above-entitled matter, and he is therefore entitled to reasonable attorney's fees and costs incurred herein.

## JURY TRIAL DEMAND

166. Mr. Armijo hereby demands a trial by jury on all claims so triable.

## REQUEST FOR RELIEF

Plaintiff Robert Armijo demands judgment against Defendants as follows:

1. For general and compensatory damages against all Defendants, and each of them, jointly and severally, in an amount to be determined at trial in, but in no event less than $6 million;

2. For exemplary and punitive damages against all Defendants, and each of them, jointly and severally, in an amount to be determined at trial;

3. For reasonably attorney's fees and costs of suit in this action;

/ / /

/ / /

/ / /

/ / /

42

4. For pre- and post-judgment interest as allowed by law; and

5. Any and all other and further relief this Court deems just and proper.

DATED this 28th day of February, 2022.  ARMSTRONG TEASDALE LLP

By: ___/s/ Michelle D. Alarie_____
   MICHELLE D. ALARIE, ESQ.
   Nevada Bar No. 11894
   3770 Howard Hughes Parkway, Suite 200
   Las Vegas, Nevada 89169

   ROMAINE C. MARSHALL, ESQ.
   (LR IA 11-2 petition forthcoming)
   Colorado Bar No. 9654
   JOSE ABARCA, ESQ.
   (LR IA 11-2 petition forthcoming)
   Colorado Bar No. 12762
   EMILY NUVAN, ESQ.
   (LR IA 11-2 petition forthcoming)
   Colorado Bar No. 17722
   201 South Main Street, Suite 750
   Salt Lake City, Utah 84111

   *Attorneys for Plaintiff Robert Armijo*

# CIVIL COVER SHEET

The JS 44 civil cover sheet and the information contained herein neither replace nor supplement the filing and service of pleadings or other papers as required by law, except as provided by local rules of court. This form, approved by the Judicial Conference of the United States in September 1974, is required for the use of the Clerk of Court for the purpose of initiating the civil docket sheet. *(SEE INSTRUCTIONS ON NEXT PAGE OF THIS FORM.)*

## I. (a) PLAINTIFFS

Robert Armijo

**(b)** County of Residence of First Listed Plaintiff    Washoe County, NV
*(EXCEPT IN U.S. PLAINTIFF CASES)*

**(c)** Attorneys *(Firm Name, Address, and Telephone Number)*
Michelle D. Alaire, Esq.; Armstrong Teasdale, LLP
3770 Howard Hughes Pkwy., Ste. 200
Las Vegas, NV 89168; (702) 678-5070

## DEFENDANTS

Ozone Networks, Inc. D/B/A Opensea, A New York Corporation; et al.

County of Residence of First Listed Defendant    New York County, NY
*(IN U.S. PLAINTIFF CASES ONLY)*

NOTE:    IN LAND CONDEMNATION CASES, USE THE LOCATION OF THE TRACT OF LAND INVOLVED.

Attorneys *(If Known)*

## II. BASIS OF JURISDICTION *(Place an "X" in One Box Only)*

| | |
|---|---|
| ☐ 1 U.S. Government Plaintiff | ☐ 3 Federal Question *(U.S. Government Not a Party)* |
| ☐ 2 U.S. Government Defendant | ☒ 4 Diversity *(Indicate Citizenship of Parties in Item III)* |

## III. CITIZENSHIP OF PRINCIPAL PARTIES *(Place an "X" in One Box for Plaintiff*
*(For Diversity Cases Only)* *and One Box for Defendant)*

| | PTF | DEF | | PTF | DEF |
|---|---|---|---|---|---|
| Citizen of This State | ☒ 1 | ☐ 1 | Incorporated *or* Principal Place of Business In This State | ☐ 4 | ☐ 4 |
| Citizen of Another State | ☐ 2 | ☐ 2 | Incorporated *and* Principal Place of Business In Another State | ☐ 5 | ☒ 5 |
| Citizen or Subject of a Foreign Country | ☐ 3 | ☐ 3 | Foreign Nation | ☐ 6 | ☐ 6 |

## IV. NATURE OF SUIT *(Place an "X" in One Box Only)*

Click here for: Nature of Suit Code Descriptions.

| CONTRACT | TORTS | FORFEITURE/PENALTY | BANKRUPTCY | OTHER STATUTES |
|---|---|---|---|---|
| ☐ 110 Insurance | **PERSONAL INJURY** / **PERSONAL INJURY** | ☐ 625 Drug Related Seizure of Property 21 USC 881 | ☐ 422 Appeal 28 USC 158 | ☐ 375 False Claims Act |
| ☐ 120 Marine | ☐ 310 Airplane / ☐ 365 Personal Injury - | ☐ 690 Other | ☐ 423 Withdrawal | ☐ 376 Qui Tam (31 USC |
| ☐ 130 Miller Act | ☐ 315 Airplane Product     Product Liability | | 28 USC 157 | 3729(a)) |
| ☐ 140 Negotiable Instrument | Liability / ☐ 367 Health Care/ | | | ☐ 400 State Reapportionment |
| ☐ 150 Recovery of Overpayment | ☐ 320 Assault, Libel &     Pharmaceutical | | **PROPERTY RIGHTS** | ☐ 410 Antitrust |
| & Enforcement of Judgment | Slander     Personal Injury | | ☐ 820 Copyrights | ☐ 430 Banks and Banking |
| ☐ 151 Medicare Act | ☐ 330 Federal Employers'     Product Liability | | ☐ 830 Patent | ☐ 450 Commerce |
| ☐ 152 Recovery of Defaulted | Liability / ☐ 368 Asbestos Personal | | ☐ 835 Patent - Abbreviated | ☐ 460 Deportation |
| Student Loans | ☐ 340 Marine     Injury Product | | New Drug Application | ☐ 470 Racketeer Influenced and |
| (Excludes Veterans) | ☐ 345 Marine Product     Liability | | ☐ 840 Trademark | Corrupt Organizations |
| ☐ 153 Recovery of Overpayment | Liability | **PERSONAL PROPERTY** | ☐ 880 Defend Trade Secrets | ☐ 480 Consumer Credit |
| of Veteran's Benefits | ☐ 350 Motor Vehicle / ☐ 370 Other Fraud | | Act of 2016 | (15 USC 1681 or 1692) |
| ☐ 160 Stockholders' Suits | ☐ 355 Motor Vehicle / ☐ 371 Truth in Lending | **LABOR** | | ☐ 485 Telephone Consumer |
| ☐ 190 Other Contract | Product Liability / ☐ 380 Other Personal | ☐ 710 Fair Labor Standards | **SOCIAL SECURITY** | Protection Act |
| ☐ 195 Contract Product Liability | ☐ 360 Other Personal     Property Damage | Act | ☐ 861 HIA (1395ff) | ☐ 490 Cable/Sat TV |
| ☐ 196 Franchise | Injury / ☐ 385 Property Damage | ☐ 720 Labor/Management | ☐ 862 Black Lung (923) | ☐ 850 Securities/Commodities/ |
| | ☐ 362 Personal Injury -     Product Liability | Relations | ☐ 863 DIWC/DIWW (405(g)) | Exchange |
| | Medical Malpractice | ☐ 740 Railway Labor Act | ☐ 864 SSID Title XVI | ☐ 890 Other Statutory Actions |
| **REAL PROPERTY** | **CIVIL RIGHTS** | **PRISONER PETITIONS** | ☐ 751 Family and Medical | ☐ 865 RSI (405(g)) | ☐ 891 Agricultural Acts |
| ☐ 210 Land Condemnation | ☐ 440 Other Civil Rights | **Habeas Corpus:** | Leave Act | | ☐ 893 Environmental Matters |
| ☐ 220 Foreclosure | ☐ 441 Voting | ☐ 463 Alien Detainee | ☐ 790 Other Labor Litigation | | ☐ 895 Freedom of Information |
| ☐ 230 Rent Lease & Ejectment | ☐ 442 Employment | ☐ 510 Motions to Vacate | ☐ 791 Employee Retirement | **FEDERAL TAX SUITS** | Act |
| ☐ 240 Torts to Land | ☐ 443 Housing/ | Sentence | Income Security Act | ☐ 870 Taxes (U.S. Plaintiff | ☐ 896 Arbitration |
| ☐ 245 Tort Product Liability | Accommodations | ☐ 530 General | | or Defendant) | ☐ 899 Administrative Procedure |
| ☐ 290 All Other Real Property | ☐ 445 Amer. w/Disabilities - | ☐ 535 Death Penalty | **IMMIGRATION** | ☐ 871 IRS—Third Party | Act/Review or Appeal of |
| | Employment | **Other:** | ☐ 462 Naturalization Application | 26 USC 7609 | Agency Decision |
| | ☐ 446 Amer. w/Disabilities - | ☐ 540 Mandamus & Other | ☐ 465 Other Immigration | | ☐ 950 Constitutionality of |
| | Other | ☐ 550 Civil Rights | Actions | | State Statutes |
| | ☐ 448 Education | ☐ 555 Prison Condition | | | |
| | | ☐ 560 Civil Detainee - | | | |
| | | Conditions of | | | |
| | | Confinement | | | |

## V. ORIGIN *(Place an "X" in One Box Only)*

| | | | | | | |
|---|---|---|---|---|---|---|
| ☒ 1 Original Proceeding | ☐ 2 Removed from State Court | ☐ 3 Remanded from Appellate Court | ☐ 4 Reinstated or Reopened | ☐ 5 Transferred from Another District *(specify)* | ☐ 6 Multidistrict Litigation - Transfer | ☐ 8 Multidistrict Litigation - Direct File |

## VI. CAUSE OF ACTION

Cite the U.S. Civil Statute under which you are filing *(Do not cite jurisdictional statutes unless diversity)*:
28 U.S.C. 1332(a)

Brief description of cause:
Negligence claims arising from online platforms' failure to implement adequate security measures to protect NFT owner.

## VII. REQUESTED IN COMPLAINT:

☐ CHECK IF THIS IS A **CLASS ACTION** UNDER RULE 23, F.R.Cv.P.

**DEMAND $**
$6,000,000

CHECK YES only if demanded in complaint:

**JURY DEMAND:**    ☒ Yes    ☐ No

## VIII. RELATED CASE(S) IF ANY

*(See instructions):*

JUDGE _____    DOCKET NUMBER _____

| DATE | SIGNATURE OF ATTORNEY OF RECORD |
|---|---|
| 2/28/2022 | /s/ Michelle D. Alarie |

**FOR OFFICE USE ONLY**

| RECEIPT # | AMOUNT | APPLYING IFP | JUDGE | MAG. JUDGE |
|---|---|---|---|---|