DICKINSON WRIGHT PLLC
JOHN P. DESMOND
Nevada Bar No. 5618
JUSTIN J. BUSTOS
Nevada Bar No. 10320
100 W. Liberty Street, Suite 940
Reno, NV  89501
Tel: 702-550-4400
Fax: 844-670-6009
Email:  jdesmond@dickinsonwright.com
Email:  jbustos@dickinsonwright.com

(Additional counsel listed on signature page)

*Attorneys for Defendant Ozone Networks, Inc.*
*d/b/a OpenSea, a New York Corporation*

**UNITED STATES DISTRICT COURT**
**DISTRICT OF NEVADA**

| | |
|---|---|
| ROBERT ARMIJO,<br><br>Plaintiff,<br><br>vs.<br><br>OZONE NETWORKS, INC. d/b/a OPENSEA, a New York Corporation, YUGA LABS, LLC d/b/a BORED APE YACHT CLUB, a Delaware limited liability company, LOOKSRARE; and DOES 1 to 50,<br><br>Defendants. | CASE NO.  3:22-CV-00112-MMD-CLB<br><br>**DEFENDANT OZONE NETWORKS, INC.'S MOTION TO DISMISS THE AMENDED COMPLAINT** |

Defendant Ozone Networks, Inc. d/b/a OpenSea, by and through its counsel of record, Munger, Tolles & Olson LLP and Dickinson Wright PLLC, hereby submits its Motion to Dismiss the Amended Complaint (the "Motion").  This Motion is made pursuant to Fed. R. Civ. P. 12(b)(6) and is supported by the attached Memorandum of Points and Authorities, the concurrently filed Request for Judicial Notice and Declaration of Ian L. Meader, all papers and pleadings on file herein, and any oral argument this Court chooses to consider.

## <u>TABLE OF CONTENTS</u>

<u>PAGE(S)</u>

MEMORANDUM OF POINTS AND AUTHORITIES ...................................................1

I.    INTRODUCTION .................................................................................................1

II.   FACTUAL AND PROCEDURAL BACKGROUND.........................................3

    A.    The OpenSea Marketplace and the NFT Community...............................3

    B.    Plaintiff Fell Victim To a Third-Party Phishing Attack on a Different Platform..........................................................................................................5

    C.    OpenSea Took Prompt Action, but NFT Theft Is Irreversible ...............5

    D.    Plaintiff's Allegations Against OpenSea ..................................................6

III.  LEGAL STANDARD ...........................................................................................7

IV.   ARGUMENT .........................................................................................................7

    A.    Plaintiff Fails to State a Claim For Negligence .......................................7

        1.    OpenSea Had No Duty To Protect Plaintiff From Third-Party Harm .................................................................................................7

        2.    Even If OpenSea Did Have Such a Duty, Its Actions Did Not Constitute a Breach....................................................................13

        3.    Plaintiff Fails to Plausibly Allege that OpenSea Caused Him the Alleged "Permanent and Irreversible" Harm .................................14

    B.    Plaintiff's Substantively Duplicative Claims for Negligent Hiring and Negligent Training and Supervision Also Fail ........................................16

    C.    OpenSea's Terms of Service Contain a Broad and Enforceable Exculpatory Provision That Bars All of Plaintiff's Claims ...................19

        1.    Plaintiff Agreed to the Terms of Service ....................................19

        2.    The Terms of Service Unambiguously Bar Claims For Harm Caused By Unauthorized Third-Party Activities and for Negligence ...................................................................................20

        3.    The Exculpatory Provision Is Enforceable Against Plaintiff.....22

    D.    The Economic Loss Doctrine Also Bars All of Plaintiff's Claims........23

V.    CONCLUSION....................................................................................................24

## <u>TABLE OF AUTHORITIES</u>

<u>PAGE(S)</u>

**FEDERAL CASES**

*757BD, LLC v. Nat'l Union Fire Ins. Co. of Pittsburgh, PA,*
    804 F. App'x 592 (9th Cir. 2020) ............................................................16

*Acad. of Motion Picture Arts & Scis. v. GoDaddy.com, Inc.,*
    No. CV 10-03738 AB, 2015 WL 5311085 (C.D. Cal. Sept. 10, 2015) ....................14

*Adkins v. Facebook, Inc.,*
    No. C 18-05982 WHA, 2019 WL 3767455 (N.D. Cal. Aug. 9, 2019) ..........................22, 23

*Aegis Ins. Servs., Inc. v. 7 World Trade Co., L.P.,*
    737 F.3d 166 (2d Cir. 2013)........................................................................16

*Altinex Inc. v. Alibaba.com Hong Kong Ltd.,*
    No. SACV 13-01545 JVS, 2016 WL 6822235 (C.D. Cal. Mar. 25, 2016) ...........................14

*Am. Tel. & Tel. Co. v. E. Pay Phones, Inc.,*
    767 F. Supp. 1335 (E.D. Va. 1991) .............................................12

*Ashcroft v. Iqbal,*
    556 U.S. 662 (2009)..................................................................7, 11

*Beckman v. Match.com, LLC,*
    743 F. App'x 142 (9th Cir. 2018) ................................................. passim

*Beckman v. Match.com, LLC,*
    No. 2:13-CV-97 JCM (NJK), 2017 WL 1304288 (D. Nev. Mar. 10, 2017) .................. passim

*Bell Atl. Corp. v. Twombly,*
    550 U.S. 544 (2007)........................................................................7

*Bibicheff v. PayPal, Inc.,*
    844 F. App'x 394 (2d Cir. 2021) .......................................9, 10, 15

*Bladeroom Grp. Ltd. v. Facebook, Inc.,*
    No. 5:15-CV-01370-EJD, 2015 WL 8028294 (N.D. Cal. Dec. 7, 2015) ...............12

*Blanck v. Hager,*
    360 F. Supp. 2d 1137 (D. Nev. 2005)......................................................23

*Bock-Kasminoff v. Walmart, Inc.,*
    No. 2:20-CV-00949-JAD-EJY, 2022 WL 891448 (D. Nev. Mar. 24, 2022) ...................18, 19

**TABLE OF AUTHORITIES**
(CONTINUED)

PAGE

*Brozyna v. Niagara Gorge Jetboating, Ltd.*,
   No. 10-CV-602-JTC, 2011 WL 4553100 (W.D.N.Y. Sept. 29, 2011) ....................................22

*Calove v. Nationstar Mortg., LLC*,
   No. 2:14-CV-01329-JAD-NJK, 2015 WL 4508751 (D. Nev. July 24, 2015) ........................17

*Carroll v. Am. Empire Surplus Lines Ins. Co.*,
   289 F. Supp. 3d 767 (E.D. La. 2017) ......................................................................................9

*Chiles v. Underhill*,
   No. 03:05-CV-00179-LRH-RJJ, 2008 WL 822248 (D. Nev. Mar. 26, 2008) ......................17

*Cincinnati Specialty Underwriters Ins. Co. v. Red Rock Hounds*,
   511 F. Supp. 3d 1105 (D. Nev. 2021) ......................................................................................7

*Closson v. Recontrust Co.*,
   No. 2:11-CV-00146-KJD-RJJ, 2012 WL 893746 (D. Nev. Mar. 15, 2012) .........................24

*Cnty. of Santa Clara v. Astra USA, Inc.*,
   No. C 05-03740 WHA, 2006 WL 1344572 (N.D. Cal. May 17, 2006) .................................12

*Cummings v. Wal-Mart Stores*,
   2:97CV00054, 1998 U.S. Dist. LEXIS 13960 (M.D.N.C. May 15, 1998) ...........................15

*Darnaa, LLC v. Google, Inc.*,
   No. 15-CV-03221-RMW, 2015 WL 7753406 (N.D. Cal. Dec. 2, 2015) ..............................22

*Dyroff v. Ultimate Software Grp., Inc.*,
   934 F.3d 1093 (9th Cir. 2019) .............................................................................9, 10, 11, 13

*Giles v. Gen. Motors Acceptance Corp.*,
   494 F.3d 865 (9th Cir. 2007) ...........................................................................................23, 24

*Ginsberg v. Google Inc.*,
   No. 21-CV-00570-BLF, 2022 WL 504166 (N.D. Cal. Feb. 18, 2022)...................................9

*King v. Facebook, Inc.*,
   No. 21-CV-04573-EMC, 2021 WL 5279823 (N.D. Cal. Nov. 12, 2021) .............................12

*Klayman v. Zuckerberg*,
   753 F.3d 1354 (D.C. Cir. 2014)..............................................................................................9

*Long v. Diamond Dolls of Nev., LLC*,
   No. 3:19-CV-00652-LRH-CLB, 2020 WL 6381673 (D. Nev. Oct. 29, 2020)......................17

<u>**TABLE OF AUTHORITIES**</u>
**(CONTINUED)**

**PAGE**

*My Daily Choice, Inc. v. Butler*,
  No. 2:20-CV-02178-JAD-NJK, 2021 WL 3475547 (D. Nev. Aug. 6, 2021)..........................20

*Nguyen v. Barnes & Noble Inc.*,
  763 F.3d 1171 (9th Cir. 2014) ..................................................................................................20

*Okeke v. Biomat USA, Inc.*,
  927 F. Supp. 2d 1021 (D. Nev. 2013) .......................................................................................17

*Patel v. Citibank Corp.*,
  No. SA CV 19-1539-DOC-KES, 2019 WL 7987113 (C.D. Cal. Sept. 27,
  2019) ..........................................................................................................................................12

*Pelletier v. Rodriguez*,
  No. 3:17-CV-00642-MMD-EJY, 2021 WL 3008594 (D. Nev. July 15, 2021)........................24

*Redman v. John D. Brush & Co.*,
  111 F.3d 1174 (4th Cir. 1997) ..................................................................................................24

*Ripple Labs Inc. v. YouTube LLC*,
  No. 20-CV-02747-LB, 2020 WL 6822891 (N.D. Cal. Nov. 20, 2020)....................................14

*Spacil v. Home Away, Inc.*,
  No. 2:19-CV-00983-GMN-EJY, 2020 WL 184985 (D. Nev. Jan. 13, 2020)..........................20

*Spancake v. Aggressor Fleet Ltd.*,
  No. 91 CIV. 5628 (DLC), 1995 WL 322148 (S.D.N.Y. May 26, 1995)..................................20

*Tiffany (NJ) Inc. v. eBay Inc.*,
  600 F.3d 93 (2d Cir. 2010).......................................................................................................14

*Tokio Marine v. Macready*,
  803 F. Supp. 2d 193 (E.D.N.Y. 2011) ......................................................................................22

**STATE CASES**

*Agric. Aviation Eng'g Co. v. Bd. of Clark Cnty. Comm'rs*,
  794 P.2d 710 (Nev. 1990)........................................................................................................22

*Calloway v. City of Reno*,
  993 P.2d 1259 (Nev. 2000).........................................................................................3, 23, 24

*Cardiello v. Venus Grp., Inc.*,
  129 Nev. 1102 (2013) (unpublished disposition) ...................................................................15

**TABLE OF AUTHORITIES**
(CONTINUED)

PAGE

*Clark Cnty. Sch. Dist. v. Richardson Constr., Inc.*,
  168 P.3d 87 (Nev. 2007) ............................................................................14

*Cruz v. Sun Buggy Fun Rentals, Inc.*,
  No. 11A652884, 2012 WL 7831781 (Nev. Dist. Ct. Nov. 19, 2012)...........3, 22, 23

*Ison v. Brown Bros. Cadillac Chevrolet*,
  No. 2009-CA-002345-MR, 2011 WL 112997 (Ky. Ct. App. Jan. 14, 2011) ..........14

*Kaufman v. Sweat It Out, Inc.*,
  No. A-18-778889-C, 2020 WL 4251083 (Nev. Dist. Ct. June 17, 2020)................3, 20, 22

*Laudisio v. Amoco Oil Co.*,
  108 Misc. 2d 245 (N.Y. Sup. Ct. 1981) ...............................................20

*Local Joint Exec. Bd. Of Las Vegas Culinary Workers Union, Local No .226 v.
  Stern*,
  651 P2.d 637 (Nev. 1982) ...........................................................23

*McLaren v. Hb Klub, LLC*,
  No. 07 CVC 1767, 2009 WL 8581696 (Ohio Com. Pl. Oct. 26, 2009)..............18, 19

*Miller v. A & R Joint Venture*,
  636 P.2d 277 (Nev. 1981) ...........................................................20

*Rockwell v. Sun Harbor Budget Suites*,
  925 P.2d 1175 (Nev. 1996) ......................................................2, 17, 18

*Scialabba v. Brandise Constr. Co.*,
  921 P.2d 928 (Nev. 1996) ...........................................................8

*Sparks v. Alpha Tau Omega Fraternity, Inc.*,
  255 P.3d 238 (Nev. 2011) ......................................................7, 8, 10

*Waldschmidt v. Edge Fitness, LLC*,
  417 P.3d 1120 (Nev. 2018) (unpublished disposition) ..........................20

**FEDERAL RULES**

Rule 12(b)(6).........................................................................7

## MEMORANDUM OF POINTS AND AUTHORITIES

## I.   INTRODUCTION

Ozone Networks, Inc. d/b/a OpenSea ("OpenSea") operates a platform dedicated to non-fungible tokens ("NFTs"), which are uniquely identifiable items on blockchains (i.e., distributed or decentralized digital ledgers).  Users can visit OpenSea to explore NFTs and connect directly with other users to buy or sell NFTs in peer-to-peer transactions.  These purchases and sales occur on public blockchains, not OpenSea, and NFTs are stored by users in their personal digital "wallets," not by OpenSea.  OpenSea does not take custody of its users' NFTs.

Although NFTs are relatively novel, the legal issues presented in this case are not—and Plaintiff Robert Armijo's Amended Complaint does not resolve the fatal flaws of his first complaint.  Armijo alleges that although he used the OpenSea platform to *purchase* three NFTs from other users, those NFTs were subsequently stolen by a third-party scammer using a completely different online platform—Discord—that is not affiliated with OpenSea in any way.  (First Am. Compl. ("FAC") ¶¶ 80-81, ECF No. 62; *id.* ¶ 86 ("[T]he theft did not occur on OpenSea's platform.").)  Plaintiff nevertheless asserts that OpenSea is liable for theft enabled by his use of the unaffiliated Discord platform because OpenSea purportedly breached a duty to prevent the third-party scammer from relisting the already-stolen NFTs for sale using OpenSea.

That is not the law.  First, OpenSea had no such duty to prevent this third-party harm to Plaintiff because it was not in a "special relationship" with him, which Plaintiff's Amended Complaint concedes must exist here.  "Nevada courts have never recognized a special relationship akin to that" required for a duty to protect or warn between a website and its users. *Beckman v. Match.com, LLC*, 743 F. App'x 142, 142 (9th Cir. 2018) (Mem. Disp.) (subscription dating website has no duty to protect subscribers from harm caused by third parties) (*Beckman II*).  Plaintiff's conclusory new allegation that OpenSea somehow controls each and every NFT transaction through its "dominance of the NFT community and the industry standards it chooses to implement" (FAC ¶ 193) is legally insufficient to establish the existence of a special relationship.  Among other flaws, this claim is *squarely contradicted* by Plaintiff's other

DEFENDANT OPENSEA'S MOTION TO DISMISS AMENDED COMPLAINT

1    allegations.  (*See* FAC ¶¶ 9, 96.)  Because OpenSea owed no duty to Plaintiff, his claim for

2    negligence fails as a matter of law.  *Beckman II*, 743 F. App'x at 143 (affirming dismissal where

3    plaintiff "failed to allege facts sufficient to show" a "special relationship").

4           Nor does Plaintiff plausibly allege that OpenSea breached any purported duties to him or

5    that OpenSea's actions were the proximate cause of his alleged harm.  First, Plaintiff

6    acknowledges that because OpenSea acted within a matter of hours to disable the ability to buy,

7    sell, or transfer the NFTs using OpenSea's services, two of the three NFTs stolen via a third

8    party on the Discord platform were never resold using OpenSea.  The third NFT was resold just

9    two hours after the theft via the Discord platform.  (FAC ¶¶ 94-96, ECF No. 62.)  Second,

10   Plaintiff did not suffer harm proximately *caused by OpenSea* from this resale because, as the

11   Amended Complaint alleges, the theft of Plaintiff's NFTs became "permanent and irreversible"

12   the instant the phishing scam Plaintiff fell prey to on the Discord platform was complete.  (*See*

13   *id.* ¶ 4.)  Plaintiff's own allegations explain that OpenSea is powerless to "undo a transaction

14   once it has been completed on the blockchain" or "prevent the stolen NFTs from being

15   purchased or traded on any other NFT marketplaces" other than OpenSea—which is exactly

16   what happened with two of the stolen NFTs.  (*Id.* ¶¶ 4, 95.)

17          Plaintiff's claims for negligent hiring, training, and supervision are substantively

18   duplicative of his negligence claim, and are similarly flawed.  As with his negligence claim,

19   Plaintiff does not allege that *OpenSea's employees* caused him harm—only that their steps to

20   remediate harm caused by an unaffiliated third-party scam on another platform were inadequate.

21   "It is a basic tenet that for an employer to be liable for negligent hiring, training, or supervision

22   of an employee, the person [causing the harm] must actually be an employee," not a third party.

23   *Rockwell v. Sun Harbor Budget Suites*, 925 P.2d 1175, 1181 (Nev. 1996).

24          Finally, all of Plaintiff's claims are separately barred both by contract and by the

25   economic loss doctrine.  First, Plaintiff agreed to OpenSea's Terms of Service, which clearly and

26   unambiguously disclaim liability for negligence claims focused on harms caused by third parties,

27   including injuries related to "phishing."  *See Kaufman v. Sweat It Out, Inc.*, No. A-18-778889-C,

28

2020 WL 4251083, at *3 (Nev. Dist. Ct. June 17, 2020) ("The exculpatory clause unambiguously identifies the parties' intent; and therefore, the Court has no authority to alter the terms of the Agreement."); *Cruz v. Sun Buggy Fun Rentals, Inc.*, No. 11A652884, 2012 WL 7831781, ¶¶ 6, 9 (Nev. Dist. Ct. Nov. 19, 2012) (exculpatory provision enforceable when customers "simply can walk away").  Second, all of Plaintiff's claims are barred by Nevada's economic loss doctrine because they seek damages that are solely monetary in nature.  "Under the economic loss doctrine . . . economic losses are not recoverable in negligence absent personal injury or damage to property other than the defective entity itself," neither of which Plaintiff alleges here.  *Calloway v. City of Reno*, 993 P.2d 1259, 1267 (Nev. 2000), *overruled on other grounds by Olson v. Richard*, 89 P.3d 31, 33 (Nev. 2004).

For each of these reasons, Plaintiff's Amended Complaint against OpenSea should be dismissed, and because these issues cannot be addressed by amendment—a conclusion reinforced by Plaintiff's unsuccessful first amendment—the dismissal should be without leave to amend.

## II.   FACTUAL AND PROCEDURAL BACKGROUND

### A.   The OpenSea Marketplace and the NFT Community

OpenSea operates a "web3" platform dedicated to NFTs, where users can find NFTs that interest them and connect with each other to purchase and sell NFTs in direct peer-to-peer transactions.  Notably, however, OpenSea does not take custody of its users' NFTs and NFT transactions do not take place on OpenSea.  (*See* FAC ¶ 4, ECF No. 62 ("Whenever an NFT changes hands, the blockchain technology underlying the NFT creates a public record of the transaction on its digital ledger," including "the identities of the digital wallets" used by NFT owners to store the assets).)

Although Plaintiff alleges that OpenSea possesses "dominance of the NFT community and the industry standards it chooses to implement," (*id.* ¶¶ 193-194), the complaint contains numerous examples showing how diverse and segmented the NFT community actually is.  (*id.* ¶¶ 3, 25-28).  Plaintiff, for example, acknowledges that there are other web3 marketplaces that allow users to list NFTs for sale—notably including another named defendant, LooksRare, in

1   this case (*id.* ¶¶ 3, 25).  The complaint acknowledges that members of the "NFT community

2   primarily communicate[] through two platforms: Twitter and Discord."  (*Id.* ¶¶ 26, 28

3   (describing Discord).)  And the Amended Complaint acknowledges that because OpenSea and

4   LooksRare facilitate cryptocurrency transactions but do not facilitate trades or exchanges of one

5   NFT for another, "consumers often use Discord's NFT servers to . . . set up NFT trades through

6   third-party NFT trading websites."  (*Id.* ¶ 30.)

7            The Amended Complaint alleges that it is well-known in the NFT community that

8   platforms like Discord are "easily accessible to bad actors and [are] rife with phishing scams and

9   malicious hacking."  (*See id.* ¶¶ 31, 128.)  OpenSea routinely warns users about the significant

10  security risks involved in holding and trading NFTs and provides recommendations for how to

11  address such risks—including offering what Plaintiff characterizes as a "memorable

12  recommendation" that consumers "use an 'air-gapped' computer when viewing their digital

13  wallets to achieve the highest level of security.  An air-gapped computer is one that has never

14  been connected to the internet," let alone used to access the Discord platform.  (*See id.* ¶ 8.)

15           OpenSea also warns its users about the risks associated with NFTs in its Terms of

16  Service, which all users must accept to use the platform.  (*See* Declaration of Ian L. Meader

17  ("Meader Decl.") Ex. A at 12 (disclosing "the risk that third parties may obtain unauthorized

18  access to information stored within your wallet").)[1]  The Terms of Service also contain express

19  limitations of liability, providing that OpenSea "WILL NOT BE RESPONSIBLE OR LIABLE

20  TO YOU FOR . . . ANY LOSSES, DAMAGES OR CLAIMS ARISING FROM . . . ANY

21  UNAUTHORIZED THIRD PARTY ACTIVITIES, INCLUDING WITHOUT LIMITATION

22  . . . PHISHING," and further providing that the user agrees that "IN NO EVENT WILL

23  OPENSEA BE LIABLE TO YOU OR ANY THIRD PARTY FOR ANY . . . DAMAGES . . .

24  WHETHER CAUSED BY," *inter alia*, "TORT (INCLUDING NEGLIGENCE)."  (*Id.* at 11-12.)

25           Plaintiff agreed to OpenSea's Terms of Service on multiple occasions, including when he

26

27  [1] As set forth in its Request for Judicial Notice, OpenSea requests that the Court take judicial
    notice of the Terms of Service, which are incorporated by reference into the Amended Complaint.

28

purchased NFTs using OpenSea and used the mobile app for the first time.  (Meader Decl. ¶¶ 5-8; *see* FAC ¶¶ 32, 36, ECF No. 62.)  In doing so, Plaintiff was at least twice required to check a box next to the statement that, "By checking this box, I agree to OpenSea's Terms of Service," which contained a hyperlink to the Terms of Service.  (Meader Decl. ¶¶ 6-8.)

**B.     Plaintiff Fell Victim To a Third-Party Phishing Attack on a Different Platform**

This is not a case "where hackers employ[ed] complicated high-level techniques to find and exploit weaknesses in [OpenSea's] computer code."  (FAC ¶ 11, ECF No. 62.)  In fact, the phishing attack to which Plaintiff fell prey did not occur on the OpenSea platform at all.  As Plaintiff acknowledges, it happened on Discord, a third-party platform.  (*See id.* ¶¶ 80-86.)

Between November 2021 and January 2022, Plaintiff purchased a "Bored Ape" NFT and two "Mutant Ape" NFTs.  (*Id.* ¶¶ 34-37.)  In February 2022, he accessed a Discord server associated with a collection of NFTs called "Cool Cats" with the goal of trading one of his NFTs for a "Cool Cats" NFT.  (*Id.* ¶ 80.)  Plaintiff reached an agreement on terms for such a trade with another user on Discord and—because NFTs cannot be traded using the OpenSea platform—proposed to execute the trade on a third-party website called "NFT Trader."  (*Id.* ¶ 81.)

The other user agreed, and sent Plaintiff a link to what appeared to be the "NFT Trader" website—despite having claimed just "a few minutes" earlier that he "had never heard of or used NFT Trader before."  (*Id.* ¶¶ 81-82.)  Unfortunately, when Plaintiff followed the link and then clicked another link to approve the trade, he fell victim to a "phishing" attack.  (*Id.* ¶¶ 83-85 ("The link [the attacker] had sent was actually connected to a fake website made to look like the real NFT Trader site.").)  When Plaintiff clicked the links, the other Discord user (the attacker) gained access to Plaintiff's NFTs and transferred them to his own wallet.  (*Id.*)  As Plaintiff alleges, the NFTs were irretrievably stolen at that point.  (*See id.* ¶ 4 (NFT transactions "become[] permanent and irreversible" after they have "been completed on the blockchain").)

**C.     OpenSea Took Prompt Action, but NFT Theft Is Irreversible**

"Although the theft did not occur on OpenSea's platform, [Plaintiff] suspected that the

1   thief would list the stolen NFTs on OpenSea to try and sell them as quickly as possible." (*Id.*

2   ¶ 86.)  Plaintiff sent messages to OpenSea customer service, and its representatives acted

3   promptly (within four hours) to prohibit further purchase or sale of the NFTs using OpenSea.

4   (*Id.* ¶ 95.)  OpenSea's prompt action thwarted the attacker from ever reselling two of the three

5   stolen NFTs using the OpenSea platform; the third NFT was resold using OpenSea

6   approximately two hours after the theft occurred via Discord.  (*Id.* ¶¶ 94-96.)

7           Due to the decentralized nature of blockchain technology, disabling the ability to

8   purchase or sell the NFTs using OpenSea does "not prevent the stolen NFTs from being

9   purchased or traded on any other NFT marketplaces." (*Id.* ¶ 95.)  That is exactly what

10  happened—"[f]ollowing the freeze of the NFTs on OpenSea's marketplace," *i.e.*, following

11  OpenSea's prompt action, the other two "NFTs were later listed and resold on LooksRare," a

12  different NFT marketplace.  (*Id.* ¶ 96 (noting that one of the three NFTs has resold more than

13  once on LooksRare).)

14          **D.      Plaintiff's Allegations Against OpenSea**

15          Plaintiff filed this action on February 28, 2022, against OpenSea, LooksRare (which

16  never disabled listings of Plaintiff's NFTs), and the makers of the "Bored Ape" and "Mutant

17  Ape" NFT collections, Yuga Labs, LLC (d/b/a the Bored Ape Yacht Club ("BAYC")).  (*See id.*

18  ¶¶ 6-9.)  Following the filing of OpenSea's and BAYC's motions to dismiss the original

19  complaint, Plaintiff filed the Amended Complaint.  In brief, Plaintiff alleges that OpenSea failed

20  to "monitor[] [its] NFT marketplace[] for stolen NFTs" and "utilize[] an approval process to

21  screen NFTs prior to listing them on the OpenSea marketplace" to prevent stolen NFTs at issue

22  from being listed on OpenSea.  (*Id.* ¶¶ 190, 142-143.)  Plaintiff brings claims against OpenSea

23  for (1) negligence; (2) negligent supervision and training; and (3) negligent hiring.  (*Id.* ¶¶ 1, 14,

24  189-205, 216-235.)  Plaintiff alleges that he was harmed by the loss of the "significant monetary

25  value" of the NFTs, the "commercialization rights he possessed" in the NFT images, his "ability

26  to earn future profits from his BAYC NFTs," and other "benefits, opportunities, and exclusive

27

28

offers," including "free giveaways" of NFTs, cryptocurrency, and event tickets.  (*Id.* ¶¶ 39-42, 47, 52, 63, 65, 159-160, 180, 203, 224.)

## III.   LEGAL STANDARD

"To survive a motion to dismiss" pursuant to Rule 12(b)(6), "a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)).  "[L]egal conclusions are not entitled to the assumption of truth," and "[m]ere recitals of the elements of a cause of action, supported only by conclusory statements, do not suffice."  *Cincinnati Specialty Underwriters Ins. Co. v. Red Rock Hounds*, 511 F. Supp. 3d 1105, 1113 (D. Nev. 2021) (citing *Iqbal*, 556 U.S. at 678).

## IV.   ARGUMENT

Plaintiff fails to state a claim as to any of his three substantively identical causes of action for negligence.  Each of these claims is also barred by contract—the liability limitations in the OpenSea Terms of Service, to which Plaintiff agreed—and by the economic loss doctrine.

### A.   Plaintiff Fails to State a Claim For Negligence

Plaintiff's allegations against OpenSea fail to establish three of the four elements of negligence.  "A plaintiff alleging negligence must demonstrate '(1) the existence of a duty of care, (2) breach of that duty, (3) legal causation, and (4) damages.'"  *Sparks v. Alpha Tau Omega Fraternity, Inc.*, 255 P.3d 238, 244 (Nev. 2011).  Plaintiff fails to allege the existence of a duty, any breach of that duty, or legal causation.

#### 1.   OpenSea Had No Duty To Protect Plaintiff From Third-Party Harm

Plaintiff contends that OpenSea violated a duty to monitor its platform and react more quickly to aid users in preventing the listing of NFTs stolen by third parties.  No such duty exists.

##### (a)   No "Special Relationship" Exists Between Plaintiff and OpenSea

"Under Nevada law, no duty is owed to control the dangerous conduct of another or to warn others of the dangerous conduct, except where a special relationship exists and the harm is created by foreseeable conduct."  *Beckman v. Match.com, LLC*, No. 2:13-CV-97 JCM (NJK),

2017 WL 1304288, at *3 (D. Nev. Mar. 10, 2017) (*Beckman I*), *aff'd in relevant part*, 743 F. App'x 142 (9th Cir. 2018) (Mem. Disp.).  Plaintiff does not dispute that the theft of his NFTs was, as stated in *Beckman I*, the fault "of another," alleging that "the theft did not occur on OpenSea's platform" and was executed by a third party with no relation to OpenSea.  (FAC ¶¶ 80-81, 86, ECF No. 62.)  Plaintiff also concedes in his Amended Complaint that a special relationship is a prerequisite to establishing a duty in this case.  (*See id.* ¶¶ 193-194.)  Plaintiff nonetheless fails to allege *specific facts* to support his claim that such a relationship existed.  *See Beckman I*, 2013 WL 2355512, at * 9 ("[T]he court finds that plaintiff's factual allegations do not support her claim that a special relationship existed between herself and Match.com.").

"[T]he pivotal factor in the determination of liability arising from" a special relationship is "the element of control" over the harmed party where the harm occurred.  *Scialabba v. Brandise Constr. Co.*, 921 P.2d 928, 930 (Nev. 1996) (existence of duty "turns on whether [the defendant] exercised control over the premises").  When one party has control over another, that party may have a duty to protect the controlled party when "the ability of [the plaintiff] to provide for his own protection has been limited in some way by his submission to the control of the other."  *Sparks*, 255 P.3d at 244-45 (quoting *Scialabba*, 921 P.2d at 930).  Conversely, when the plaintiff's ability to protect themselves has not been limited to submission to such control, there is no special relationship.  *Compare Sparks*, 255 P.3d at 245 (fraternity had no duty to protect from third-party harm outside controlled area), *with Scialabba*, 921 P.2d at 931 (contractor "responsible for locking the doors" owed duty to protect against third-party harm).

Courts consistently hold as a matter of law that websites and other online platforms do not have a "special relationship" with their users—particularly when, as here, the harm alleged (the theft of the NFTs) did not even take place on the platform.  In a case analogous to this one, the Ninth Circuit upheld dismissal under Nevada law of a plaintiff's claim against the subscription dating website Match.com for negligence based on allegations that she was "viciously attacked" by a third party with whom she was matched by the website—noting that "Nevada courts have never recognized a special relationship akin to that between" Match.com

and its users.  *Beckman II*, 743 F. App'x at 142; *Beckman I*, 2017 WL 1304288, at *3

("Beckman's ability to protect herself was not limited in any way by her submission to the

control of another.").  As the Ninth Circuit held in a subsequent case, finding that a social-media

website did not have a duty to protect user against a third party who sold illegal drugs using the

platform, "[n]o website could function if a duty of care was created when a website facilitates

communication, in a content-neutral fashion, of its users' content. . . . We decline to create such

a relationship." *Dyroff v. Ultimate Software Grp., Inc.,* 934 F.3d 1093, 1100-01 (9th Cir. 2019).

      Likewise, in a case similar to this one involving fraud perpetrated by a third party, the

Second Circuit cited *Beckman II* to support its conclusion that the online payment processing site

PayPal was not in a special relationship with its users and thus did not owe a user a duty to

monitor accounts created by a third party with unauthorized access to the user's information—

even though the harm at issue there *did* take place using the platform.  *Bibicheff v. PayPal, Inc.*,

844 F. App'x 394, 397 (2d Cir. 2021) (summary order) (noting that the plaintiff's "injury was a

result of [a third party's] access to [her] personal and business information, including credit card

information–access used by the [third party] to defraud [the plaintiff], but for which PayPal is not

alleged to have been responsible").  Other courts across the country have held similarly.  *See,

e.g.*, *Klayman v. Zuckerberg*, 753 F.3d 1354, 1359-60 (D.C. Cir. 2014) (no special relationship

between Facebook and its users); *Ginsberg v. Google Inc.*, __ F. Supp. 3d __, No. 21-CV-00570-

BLF, 2022 WL 504166, at *8 (N.D. Cal. Feb. 18, 2022) (Google's guidelines for app developers

do not give rise to duty to protect users from hate speech); *Carroll v. Am. Empire Surplus Lines

Ins. Co.*, 289 F. Supp. 3d 767, 774 (E.D. La. 2017) ("Airbnb did not owe Plaintiffs a duty" to

protect from injuries on hosts' properties).

      The same result is compelled here.  Plaintiff's proposal that the Court find a "duty" for

OpenSea to protect Plaintiff from third-party harm by monitoring its own platform for listings of

stolen NFTs and removing such listings (*see* FAC ¶ 190, ECF No. 62) is indistinguishable from

the duties proposed and consistently rejected, again and again, in this line of case law.  *E.g.*,

*Beckman II*, 743 F. App'x at 142 (no duty to warn users that another user might be dangerous);

1   *Bibicheff*, 844 F. App'x at 397 (no duty to monitor and investigate fake accounts used to commit

2   fraud); *Dyroff*, 934 F.3d at 1101 (no duty to warn users about another user's criminal activity).

3   Plaintiff's specific allegations of fact establish that his ability to protect himself "was not limited

4   in any way by [his] submission to" OpenSea's control—control which Plaintiff's own allegations

5   demonstrate is nonexistent. *Beckman I*, 2017 WL 1304288, at *3.

6           Indeed, the alleged facts here starkly demonstrate the *absence* of any conceivable duty by

7   OpenSea to protect Plaintiff from third-party harm on another platform.  Plaintiff does not and

8   cannot allege that OpenSea had custody or control over his NFTs because—like all OpenSea

9   users—Plaintiff held his NFTs on the blockchain using his own personal digital wallet, the NFTs

10  were not in the custody of OpenSea.  (FAC ¶ 4, ECF No. 62 ("digital wallets" are "the software-

11  based system used to hold the NFTs"), *id.* ¶ 32 ("Mr. Armijo also set up a digital wallet with

12  MetaMask, an online service that houses software-based digital wallets").)

13          Plaintiff's claim to such a duty is therefore even weaker than the basis for the duties

14  proposed in many of the cases cited above, such as *Beckman* and *Dyroff*, where the wrongdoer

15  connected with the injured plaintiff using the defendant's platform.  Here, the wrongdoer and

16  Plaintiff connected and the attack occurred on a Discord server hosted by third parties over

17  which OpenSea indisputably had no control.  (*Compare* FAC ¶¶ 193-194, ECF No. 62 (alleging

18  OpenSea's control of activity "on its platform") *with id.* ¶¶ 80-81, 193-194 (Plaintiff sought to

19  negotiate trade using the third-party "Cool Cats Discord server," then sought to consummate a

20  trade on "a third-party NFT trading website"); *cf. id.* ¶¶ 30-31("[C]onsumers often use Discord's

21  NFT servers" to arrange trades because OpenSea "only allow[s] customers to buy or sell NFTs,"

22  not to trade them).)  OpenSea owes no duty to protect against harm from third parties incurred

23  entirely outside its control.  *Beckman I*, 2017 WL 1304288, at *3 (holding that even if plaintiff

24  could show that Match.com paired her with the third party, "the claim would still fail because the

25  brutal attack occurred offline several months" later); *Sparks*, 255 P.3d at 245 (no duty to protect

26  from third-party harm outside area of control).  This alone warrants dismissal.

27          The fact that resale of two of the three stolen NFTs occurred using the alternative

28

DEFENDANT OPENSEA'S MOTION TO DISMISS AMENDED COMPLAINT

1   LooksRare platform demonstrates the sharply circumscribed limits of OpenSea's purported

2   "control" over anything—OpenSea cannot limit transactions on other platforms because it does

3   not have any control over those platforms or the decentralized blockchain technology underlying

4   NFTs generally.  (FAC ¶¶ 95-96. ECF No. 62.)  And although (like any website) OpenSea can

5   monitor or prohibit listings on its own platform, those actions could not have prevented the resale

6   of Plaintiff's NFTs elsewhere (in other words, resale using LooksRare or another platform could

7   still go forward)—and even more importantly, the law is well-settled that such routine website

8   monitoring operations are insufficient as a matter of law to establish the existence of a special

9   relationship.  *E.g., Beckman II*, 743 F. App'x at 142 (no special relationship where website

10  allegedly had unique access to user data and used data to create "matches" between users);

11  *Dyroff*, 934 F.3d at 1101 (no special relationship where website's algorithm generated

12  "recommendations and notifications" to users).

13              (b)    *Plaintiff's Newly-Added Market "Dominance" Allegations Do Not
                        Support the Existence of a Duty*

15              Recognizing that OpenSea had *zero* control over his NFTs, Plaintiff in his Amended

16  Complaint concocts a new theory to support a special relationship by vaguely alleging that

17  "[a]ny individual who wishes to buy, sell, or trade NFTs submits themselves to OpenSea's

18  control, whether or not the transactions actually occur on OpenSea's website due to OpenSea's

19  dominance of the NFT community and the industry standards it chooses to implement."  (FAC

20  ¶ 193, ECF No. 62.)  Plaintiff fails to support this naked legal conclusion with any specific

21  allegations of fact.  *Iqbal*, 556 U.S. at 681 ("bare assertions" and "bald allegations" not entitled

22  to presumption of truth).  Indeed, his other allegations regarding LooksRare—another NFT

23  marketplace where two of the three stolen NFTs at issue were sold—wholly refute it.  (*E.g.,* FAC

24  ¶ 96, ECF No. 62 (alleging resales using LooksRare).)  Plaintiff also alleges that, like OpenSea,

25  LooksRare is "looking to set the new industry standard for NFT marketplaces."  (*Id.* ¶ 9.)  These

26  allegations demonstrate the implausibility of Plaintiff's new market "dominance" theory.  *E.g.*,

27  *Beckman I*, 2017 WL 1304288, at *3 ("Even if Beckman had adequately asserted a special

28

DEFENDANT OPENSEA'S MOTION TO DISMISS AMENDED COMPLAINT

1    relationship, the factual allegations set forth in the amended complaint are insufficient to

2    maintain that relationship under Nevada law.")  Nor could Plaintiff plausibly allege such a duty

3    as to OpenSea, which does not have custody or control over users' NFTs or the blockchains on

4    which transactions occur.

5          At any rate, courts have specifically rejected the argument that a party's purported market

6    power itself establishes the existence of a special relationship and imposes a duty.  *E.g., Am. Tel.*

7    *& Tel. Co. v. E. Pay Phones, Inc.*, 767 F. Supp. 1335, 1340 (E.D. Va. 1991), *opinion vacated on*

8    *non-substantive grounds*, 789 F. Supp. 725 (E.D. Va. 1992) (rejecting argument that "AT&T's

9    position as a monopolist" or parties' "dependence upon" AT&T "imposes a duty" or creates a

10   "special relationship"); *Cnty. of Santa Clara v. Astra USA, Inc.*, No. C 05-03740 WHA, 2006

11   WL 1344572, at *10 (N.D. Cal. May 17, 2006), *aff'd, Astra USA, Inc. v. Santa Clara Cnty., Cal.*,

12   563 U.S. 110 (2011) ("Even if there were disparities in market power between plaintiff and drug

13   manufacturers, that would not be uncommon or sufficient to create the kind of special

14   relationship that warrants extension of tort remedies").[2]  Thus, even if the Court were to credit

15   Plaintiff's conclusory and contradictory allegations on this front, they do not establish the

16   existence of a "special relationship" imposing a duty.

17         Lastly, the policy consequences of creating a new duty for online platforms like OpenSea

18   to protect their users from harm by third parties would be severe.  The full scope of the duties

19   Plaintiff alleges is breathtaking: he would require OpenSea not only to eliminate all listings for

20   any NFT that any user reported stolen within seconds and without investigation, but even to be

21   deputized by law enforcement to help retrieve such NFTs.  (*See, e.g.*, FAC. ¶ 12, ECF No. 62

22   (alleging duties to "monitor their platforms to timely detect instances of theft," provide "remedies

23

24   [2] And indeed, courts have repeatedly held that there is no special relationship between much
     larger and more dominant market players and their users.  *See e.g.*, *Patel v. Citibank Corp.*, No.
25   SA CV 19-1539-DOC-KES, 2019 WL 7987113, at *6 (C.D. Cal. Sept. 27, 2019) ("there is also
     no special relationship between Apple/Google and Plaintiffs"); *King v. Facebook, Inc.*, No. 21-
26   CV-04573-EMC, 2021 WL 5279823, at *6 (N.D. Cal. Nov. 12, 2021) (plaintiff pointed to no
     duty of Facebook "by virtue of a special relationship"); *Bladeroom Grp. Ltd. v. Facebook, Inc.*,
27   No. 5:15-CV-01370-EJD, 2015 WL 8028294, at *6 (N.D. Cal. Dec. 7, 2015) (same).

28

to provide adequate remedies to later, unsuspecting purchasers of stolen NFTs," and "assist law enforcement officials in attempts to retrieve stolen NFTs").)  As the Ninth Circuit observed, creating such expansive, unbounded duties could effectively prohibit online platforms from functioning.  *Dyroff*, 934 F.3d at 1101 ("No website could function if a duty of care was created when a website facilitates communication, in a content-neutral fashion, of its users' content.").

### 2. Even If OpenSea Did Have Such a Duty, Its Actions Did Not Constitute a Breach

Plaintiff contends that OpenSea had a duty to "exercise reasonable care in providing adequate customer service for victims of theft or other illegal activities that occurred *on [its] platform[]*" and in "monitoring [its] NFT marketplace[] for stolen NFTs."  (FAC ¶¶ 190-191, ECF No. 62.)  As explained above, OpenSea owed no such duty—but even if it did, its actions did not constitute a breach.

*First*, Plaintiff readily admits that "the theft did not occur on OpenSea's platform" and does not allege that OpenSea is responsible in any way for the phishing attack that enabled the theft of his NFTs; indeed, Plaintiff alleges that OpenSea warned users of such risks.  (*Id.* ¶ 86; *see id.* ¶ 8 (OpenSea routinely warns users about the risks of third-party attacks and has taken "high-level technological measures" to stop "complicated computer hacking and malicious software attacks"); *id.* ¶ 11 (contrasting this case with "NFT theft cases where hackers employ complicated, high-level techniques to find and exploit weaknesses in a platform's computer code").)  As set forth above, it is indisputable that the theft itself took place entirely on platforms outside of OpenSea's control—the unaffiliated Discord platform and the (fake) third-party "NFT Trader" website—and OpenSea had nothing to do with the theft itself.

*Second*, Plaintiff also admits that OpenSea acted within hours to disable the listings on OpenSea, and that two of the three stolen NFTs have never been resold using OpenSea.  (*Id.* ¶ 96.)  Thus, even if Plaintiff could plead a special relationship with OpenSea sufficient to give rise to a duty to control listings of stolen NFTs, he himself alleges that OpenSea indisputably acted consistent with that purported duty with respect to two of the three NFTs at issue.

Third and finally, with respect to the one NFT that was resold a single time using OpenSea within *just two hours* of Plaintiff falling victim to the phishing attack on the Discord platform and the (fake) third-party "NFT Trader" website, and before OpenSea could take action, Plaintiff does not and cannot plausibly allege a breach of his proposed duty.  (*Id.* ¶¶ 94-95 (OpenSea disabled the ability to buy, sell, or transfer of the NFTs using OpenSea within four hours).)  OpenSea's expeditious action does not constitute a breach of the (nonexistent) duty Plaintiff alleges.  *See, e.g.*, *Ripple Labs Inc. v. YouTube LLC*, No. 20-CV-02747-LB, 2020 WL 6822891, at *4 (N.D. Cal. Nov. 20, 2020) (holding that YouTube is not liable for trademark infringement when it took down videos that mark holder alleged were infringing within "a week, several weeks, around two months"); *Acad. of Motion Picture Arts & Scis. v. GoDaddy.com, Inc.*, No. CV 10-03738 AB (CWx), 2015 WL 5311085, at *10, *35 (C.D. Cal. Sept. 10, 2015) (GoDaddy "quickly responded" and acted "promptly . . . upon receipt of any complaint," *i.e.*, "[o]n average . . . within 2.75 days").[3]

### 3.   Plaintiff Fails to Plausibly Allege that OpenSea Caused Him the Alleged "Permanent and Irreversible" Harm

Plaintiff's conclusory allegation that OpenSea's alleged inaction is the "direct and proximate cause" of the theft of his NFTs and their subsequent sale (FAC ¶ 203, ECF No. 62) also falls far short of the well-established standard for pleading proximate cause and, in fact, is contradicted by Plaintiff's own factual allegations.

"In tort actions," allegations "that a party other than the defendant caused the plaintiffs damages . . . negate an essential element of the plaintiff's claim—proximate cause." *Clark Cnty. Sch. Dist. v. Richardson Constr., Inc.*, 168 P.3d 87, 96 (Nev. 2007).  Courts routinely decide

---

[3] *See also, e.g., Altinex Inc. v. Alibaba.com Hong Kong Ltd.*, No. SACV 13-01545 JVS (RNBx), 2016 WL 6822235, at *12 (C.D. Cal. Mar. 25, 2016) (Alibaba acted "expeditiously" when listing was removed in same month as report); *Tiffany (NJ) Inc. v. eBay Inc.*, 600 F.3d 93, 99, 106 (2d Cir. 2010) (eBay terminated listings "promptly," *i.e.*, "within twenty-four hours of receiving" notice); *Ison v. Brown Bros. Cadillac Chevrolet*, No. 2009-CA-002345-MR, 2011 WL 112997, at *3 (Ky. Ct. App. Jan. 14, 2011) ("Even if we could find a duty here, the undisputed security measures on the premises" of auto dealership "would make untenable the finding of a breach that could be cognizable as the legal and proximate cause of" injuries caused by third-party car thief).

1    issues of proximate cause on the pleadings, particularly where the plaintiff alleges to have been

2    harmed by the actions of a third party.  *See, e.g.*, *Cardiello v. Venus Grp., Inc.*, 129 Nev. 1102

3    (2013) (unpublished disposition) (upholding dismissal when plaintiff alleged "that the auto

4    accident that resulted in her injuries was caused by the negligence of the two drivers that rear

5    ended her vehicle," not her employer's failure to carry workers' compensation insurance);

6    *Bibicheff*, 844 F. App'x at 397 (upholding dismissal without leave to amend when alleged injury

7    was result of third party's access to and unauthorized use of plaintiff's financial information, "for

8    which PayPal is not alleged to have been responsible"); *cf. Cummings v. Wal-Mart Stores*,

9    2:97CV00054, 1998 U.S. Dist. LEXIS 13960, at *11 (M.D.N.C. May 15, 1998) (dismissing

10    claim for "failure to respond properly" to incident causing personal injury where there was "no

11    evidence that defendant's [response] contributed to or worsened plaintiffs' injuries in any way").

12      On Plaintiff's own allegations, OpenSea could not conceivably have prevented the harm

13    Plaintiff alleges—loss of the "significant monetary value" of the NFTs.  (FAC ¶ 159, ECF No.

14    62.)  Plaintiff does not allege any harm other than the damages flowing directly from the theft

15    itself, and such harm became "permanent and irreversible" the second the attacker transferred

16    Plaintiff's NFTs into the attacker's own wallet.  As Plaintiff explains, "individual NFT

17    marketplaces do not have the ability to undo a transaction once it has been completed on the

18    blockchain"—it becomes "permanent and irreversible" because "blockchain technology is

19    decentralized and spread across thousands of computer nodes at various locations."[4]  (*Id.* ¶ 4.)

20      Because, as Plaintiff alleges, it is technically impossible to unwind the transfer of an

21    NFT, Plaintiff was irreparably harmed the moment a third-party attacker took control of his

22

23

---

24 [4] Plaintiff also alleges that the technical limitations on intervention—including intervention by
law enforcement—are considered to be a "feature," rather than a "bug," of decentralized

25 technology, and acknowledges it is at best "unclear" whether *even the FBI* could recover a stolen
NFT.  (*Id.* ¶ 25 ("Early enthusiasts have been drawn to cryptocurrencies and NFTs precisely

26 because they enjoy the free-for-all atmosphere of NFT marketplaces, which offer a deregulated
atmosphere that allows users to buy and sell NFTs free from banks, regulated stock markets, and

27 the scrutiny of government agencies."); *id.* ¶ 93 ("[I]t is unclear whether the FBI can recover the
stolen BAYC NFTs or stop their subsequent resells.").)

28

1   NFTs—which was immediately after Plaintiff clicked on the attacker's link to a fake "NFT

2   Trader" website and the button to "approve the trade," and before he contacted OpenSea

3   customer service.  (*See id.* ¶ 84.)  Indeed, as Plaintiff acknowledges as to the two NFTs for which

4   OpenSea disabled the listings, those NFTs were subsequently sold by the third-party attacker on

5   another platform.  (*Id.* ¶ 96 ("Following the freeze of the NFTs on OpenSea's marketplace," two

6   "NFTs were later listed and resold on LooksRare.").)  Because Plaintiff's "irreparable" loss had

7   already occurred by the time the stolen NFTs were relisted on OpenSea, OpenSea cannot be

8   deemed the proximate cause of his alleged injuries.  *757BD, LLC v. Nat'l Union Fire Ins. Co. of*

9   *Pittsburgh, PA*, 804 F. App'x 592, 594 n.3 (9th Cir. 2020) ("It is axiomatic that X cannot be a

10  proximate cause of Y if Y has already occurred before X."); *Aegis Ins. Servs., Inc. v. 7 World*

11  *Trade Co., L.P.*, 737 F.3d 166, 179 (2d Cir. 2013) ("A defendant's conduct is not a cause-in-fact

12  of an injury or loss if the injury or loss would have occurred regardless of the conduct.").[5]

13          OpenSea indisputably did not directly or proximately cause a third party operating on the

14  unaffiliated third-party Discord server and (fake) "NFT Trader" website to steal Plaintiff's NFTs,

15  and all of his alleged harms flow directly from that theft.  OpenSea's actions subsequent to the

16  "permanent and irreversible" harm caused by the theft could not possibly have reversed—let

17  alone retroactively caused—such harm.

18          **B.     Plaintiff's Substantively Duplicative Claims for Negligent Hiring and
                    Negligent Training and Supervision Also Fail**

19
20          Plaintiff's claims for negligent training and supervision (third cause of action) and

21  negligent hiring (fourth cause of action) effectively re-plead his (deficient) claim for simple

22  negligence.  As noted above, OpenSea does not owe any duty to protect Plaintiff from harm

23  caused by a third party, *see supra* section IV.A.1, and OpenSea was not the cause of Plaintiff's

24
_____

25  [5] For the same reason, even if Plaintiff were further harmed by the subsequent resale of his
    NFTs—which he does not allege—OpenSea cannot be the proximate cause of such harm
26  because two of the three NFTs were never resold using OpenSea and the third could have been
    resold using LooksRare even if OpenSea had disabled the ability to buy or sell it before it was
27  resold using OpenSea.

28

harm, *see supra* section IV.A.3.  These duplicative claims should therefore also be dismissed.

Further, these claims are both facially inapposite because Plaintiff does not claim that OpenSea's employees directly caused his harm—only that their steps to remediate harm caused by a third party were inadequate.  "To succeed on a claim for negligent hiring, training, supervision, and/or retention under Nevada law, a plaintiff must establish that: (1) defendant owed a duty of care to the plaintiff; (2) defendant breached that duty by hiring, retaining, training, and/or supervising an employee even though defendant knew or should have known *of the employee's dangerous propensities*; (3) the breach *caused the plaintiff's injuries*; and (4) damages."  *Long v. Diamond Dolls of Nev., LLC*, No. 3:19-CV-00652-LRH-CLB, 2020 WL 6381673, at *6-7 (D. Nev. Oct. 29, 2020) (emphases added) ("A breach occurs when an employer hires an employee even though the employer knew or should have known of that employee's dangerous propensities.") (internal citation omitted).

"It is a basic tenet that for an employer to be liable for negligent hiring, training, or supervision of an employee, the person [causing the harm] must actually be an employee." *Rockwell*, 925 P.2d at 1181 n.5 ("When the cause of action is for negligent supervision . . . it does not matter if *the employee's actions* occurred within or without his scope of employment.") (emphasis added).  Further, "there must be evidence that the employer's negligence caused the alleged injury." *Chiles v. Underhill*, No. 03:05-CV-00179-LRH-RJJ, 2008 WL 822248, at *11 (D. Nev. Mar. 26, 2008) (even if employee had failed a psychological exam, there is no evidence that such failure was "in any way related" to the harm alleged); *see also Okeke v. Biomat USA, Inc.*, 927 F. Supp. 2d 1021, 1028 (D. Nev. 2013) (same); *Calove v. Nationstar Mortg.*, LLC, No. 2:14-CV-01329-JAD-NJK, 2015 WL 4508751, at *3 (D. Nev. July 24, 2015) (dismissing on pleadings claim for negligent hiring/supervision when plaintiff failed to name employees or allege facts showing it was plausible defendant failed to conduct reasonable background checks).

Allegations that a defendant's employees *failed to protect* a plaintiff from harm caused *by a third party* do not state a claim for negligent hiring, training, or supervision.  In one recent case, the District of Nevada cited *Rockwell* in dismissing a claim for negligent hiring, training,

1   and supervision against Walmart because there was no evidence that the plaintiff's injury (from

2   slipping on liquid on the floor) was caused by Walmart's employees.  *Bock-Kasminoff v.*

3   *Walmart, Inc.*, No. 2:20-CV-00949-JAD-EJY, 2022 WL 891448, at *3 (D. Nev. Mar. 24, 2022)

4   ("Without evidence that Walmart was responsible for the liquid on the floor, [Plaintiff] can't"

5   show that her "injury was caused by an employee who was negligently hired, trained, or

6   supervised.").  Courts have also specifically dismissed negligent hiring, training, and supervision

7   claims that are premised on criminal attacks caused by third parties, as is the case here.  *McLaren*

8   *v. Hb Klub, LLC*, No. 07 CVC 1767, 2009 WL 8581696 (Ohio Com. Pl. Oct. 26, 2009) ("There

9   is no evidence that an *employee's* act or omission proximately caused McLaren's injuries and

10   that defendants' negligence in hiring and retaining their employees proximately caused the

11   injuries. Instead, McLaren's injuries were caused by a third-party criminal attack off of the

12   premises," which plaintiff alleged defendant's employees had failed to stop).

13         Plaintiff does not and cannot allege that *OpenSea's employees* stole his NFTs or in any

14   way caused the third-party phishing attack that resulted in his injury.  With respect to the

15   negligent hiring claim, Plaintiff simply alleges that OpenSea and its employees "fail[ed] to hire

16   sufficient numbers of competent security and customer service employees who would safeguard

17   and protect any and all NFTs" listed for sale "on their platforms" and that its employees "failed

18   to monitor and verify the NFTs [listed for sale] on OpenSea's platform."  (FAC ¶¶ 230-232, ECF

19   No. 62.)  With respect to the negligent supervision and training claim, Plaintiff similarly alleges

20   that OpenSea breached an alleged duty "by not requiring employees to adhere to adequate and

21   basic monitoring, verification, security, reporting, and response measures," that illegal sales of

22   NFTs "cannot occur without knowledge, complicity, or negligence by OpenSea and LooksRare

23   employees," and that OpenSea employees "failed to adequately verify, monitor, and respond to

24   reports of improper and illegal sales."  (*Id.* ¶¶ 222-223.)  But OpenSea's employees had nothing

25   to do with the alleged theft or the resulting "permanent and irreversible" harm—and acted

26   promptly to disable listings of the NFTs when they were alerted about the alleged theft.

27         These allegations simply restate Plaintiff's negligence claim, and as shown by *Rockwell*,

28

1    *Bock-Kasminoff*, and *McLaren*, allegations that OpenSea's employees failed to thwart harm

2    caused by third parties are insufficient to state a claim for negligent hiring, training, or

3    supervision.  OpenSea has a duty to protect the public from harm caused *by its employees*—but

4    *not* from harm caused by a third party.  Plaintiff's claims for negligent hiring and for negligent

5    training and retention should therefore be dismissed.

6    **C.    OpenSea's Terms of Service Contain a Broad and Enforceable Exculpatory**

7    **Provision That Bars All of Plaintiff's Claims**

8         Each of Plaintiff's claims also fails for a more fundamental reason:  Plaintiff voluntarily

9    accepted OpenSea's Terms of Service in the course of accessing his account and engaging in

10   transactions, and his claims fall within the scope of the unambiguous exculpatory provision

11   contained in the Terms of Service.  This provision should be enforced to bar his claims.

12              **1.    Plaintiff Agreed to the Terms of Service**

13        OpenSea publishes Terms of Service on its website.  (Meader Decl. ¶ 3.)  OpenSea

14   periodically updates the Terms of Service, most recently on June 1, 2021 (the "June Terms"),

15   and again on December 31, 2021 (the "December Terms").  (*Id.*)  Both the June Terms and the

16   December Terms state: "if you do not agree to these Terms, you may not access or use the

17   Service."  (*See id.*; *id.* Ex. A at 2.)

18        Plaintiff expressly agreed to the OpenSea Terms on multiple occasions, including when

19   he purchased NFTs using OpenSea and when he used the mobile app for the first time.  (Meader

20   Decl. ¶¶ 6, 8; *see* FAC ¶¶ 32-37, ECF No. 62.)  Specifically, before purchasing NFTs for the first

21   time using OpenSea with a particular wallet, Plaintiff would have been required to check a box

22   next to the statement that, "By checking this box, I agree to OpenSea's Terms of Service," which

23   would have contained a hyperlink to OpenSea's Terms of Service.  (Meader Decl. ¶ 5.)  Plaintiff

24   did this at least twice when the June Terms were in effect.  (*Id.* ¶ 6.)  Likewise, when Plaintiff

25   used the OpenSea mobile app with a particular wallet for the first time, he would have been

26   required to click a button underneath the statement: "By continuing, you agree to OpenSea's

27   Privacy Policy and Terms of Service," which would have contained a link to the Terms.  (*Id.*

28

¶ 7.)  Plaintiff also did this at least twice when the June Terms were in effect.  (*Id.* ¶ 8.)

"Courts throughout [the Ninth Circuit] have consistently enforced agreements presented to users as clear, hyperlinked terms located near a required 'I agree' button, despite the agreement being imposed unilaterally on the user and the user not actually reading the terms." *My Daily Choice, Inc. v. Butler*, No. 2:20-CV-02178-JAD-NJK, 2021 WL 3475547, at *6 (D. Nev. Aug. 6, 2021) (enforcing terms "presented as a clear hyperlink near an 'I understand and agree to these policies and procedures' button"); *Spacil v. Home Away, Inc.*, No. 2:19-CV-00983-GMN-EJY, 2020 WL 184985, at *4 (D. Nev. Jan. 13, 2020) ("clickwrap agreements, which require the user to consent to terms and conditions by clicking a box on their computer screen before proceeding, are commonly upheld by the federal courts"); *Nguyen v. Barnes & Noble Inc.*, 763 F.3d 1171, 1176–77 (9th Cir. 2014) (courts have found "requisite notice for constructive assent . . . where the user is required to affirmatively acknowledge the agreement before proceeding with use of the website").  Plaintiff likewise agreed to OpenSea's Terms here.

### 2. The Terms of Service Unambiguously Bar Claims For Harm Caused By Unauthorized Third-Party Activities and for Negligence

Exculpatory provisions are "generally regarded as a valid exercise of the freedom of contract" and may be upheld to waive liability for alleged negligence when, as here, the exculpatory provision is unambiguous about whether it applies to claims for negligence.  *Miller v. A & R Joint Venture*, 636 P.2d 277, 278 (Nev. 1981); *Waldschmidt v. Edge Fitness, LLC*, 417 P.3d 1120, 1120 (Nev. 2018) (unpublished disposition) (holding that "unambiguous exculpatory clause explicitly relieved respondent of liability" for negligence); *Kaufman*, 2020 WL 4251083, at *3 ("The exculpatory clause contained within the Agreement is clear and unambiguous and disclaims liability. . . .  The exculpatory clause unambiguously identifies the parties' intent; and therefore, the Court has no authority to alter the terms of the Agreement."); *Laudisio v. Amoco Oil Co.*, 108 Misc. 2d 245, 247 (N.Y. Sup. Ct. 1981) (upholding provision that "clearly purports to absolve [defendant] from responsibility for 'its negligent acts or omissions'"); *Spancake v. Aggressor Fleet Ltd.*, No. 91 CIV. 5628 (DLC), 1995 WL 322148, at *3 (S.D.N.Y. May 26,

1995) (upholding provision "*even if such claims arise out of the sole negligence*" of defendant).

The OpenSea Terms of Service are clear and unambiguous.  They identify the various risks associated with use of OpenSea and with the purchase, possession, and sale of NFTs more generally, and plainly state that by using OpenSea's services, the user agrees to assume all such risk.  Specifically, the June Terms of Service include a disclaimer section stating that:

> **WE WILL NOT BE RESPONSIBLE OR LIABLE TO YOU FOR** ANY LOSS AND TAKE NO RESPONSIBILITY FOR, AND WILL NOT BE LIABLE TO YOU FOR, ANY USE OF CRYPTO ASSETS, INCLUDING BUT NOT LIMITED TO **ANY LOSSES, DAMAGES, OR CLAIMS ARISING FROM:** . . . (D) UNAUTHORIZED ACCESS . . . **(E) ANY UNAUTHORIZED THIRD PARTY ACTIVITIES, INCLUDING WITHOUT LIMITATION THE USE OF VIRUSES, PHISHING,** BRUTEFORCING OR OTHER MEANS OF ATTACK AGAINST THE SERVICE OR CRYPTO ASSETS.

(Meader Decl. Ex. A at 11 (emphasis added); Meader Decl. ¶ 3 (Dec. Terms substantially similar).)

The June Terms also include an express limitation of liability section:

> TO THE FULLEST EXTENT PERMITTED BY LAW, **IN NO EVENT WILL OPENSEA BE LIABLE TO YOU OR ANY THIRD PARTY FOR ANY** LOST PROFIT OR ANY INDIRECT, CONSEQUENTIAL, EXEMPLARY, INCIDENTAL, SPECIAL OR PUNITIVE **DAMAGES** ARISING FROM THESE TERMS, THE SERVICE, PRODUCTS OR THIRD-PARTY SITES AND PRODUCTS, OR FOR ANY DAMAGES RELATED TO LOSS OF REVENUE, LOSS OF PROFITS, LOSS OF BUSINESS OR ANTICIPATED SAVINGS, LOSS OF USE, LOSS OF GOODWILL, OR LOSS OF DATA, AND **WHETHER CAUSED BY TORT (INCLUDING NEGLIGENCE), BREACH OF CONTRACT, OR OTHERWISE,** EVEN IF FORESEEABLE AND EVEN IF OPENSEA  HAS BEEN ADVISED OF THE POSSIBILITY OF SUCH DAMAGES. ACCESS TO, AND USE OF, THE SERVICE, PRODUCTS OR THIRD-PARTY SITES AND PRODUCTS ARE AT YOUR OWN DISCRETION AND RISK, AND YOU WILL BE SOLELY RESPONSIBLE FOR ANY DAMAGE TO YOUR COMPUTER SYSTEM OR MOBILE DEVICE OR LOSS OF DATA RESULTING THEREFROM.

(Meader Decl. Ex. A at 12 (emphasis added); Meader Decl. ¶ 3 (Dec. Terms substantially similar).)

Because the exculpatory provision "unambiguously identifies the parties' intent" to

1    exculpate OpenSea for liability for harm caused by third-party conduct, including "phishing,"

2    and for any liability allegedly caused by negligence, "the Court has no authority to alter the

3    terms of the Agreement." *Kaufman*, 2020 WL 4251083, at \*3; *Agric. Aviation Eng'g Co. v. Bd.*

4    *of Clark Cnty. Comm'rs*, 794 P.2d 710, 713 (Nev. 1990) (same).  As all of the claims in this

5    action arise from harm caused by "third party activities" including "phishing," and sound in

6    negligence, the claims are barred by this provision.

### 3.    The Exculpatory Provision Is Enforceable Against Plaintiff

8    The Terms of Service are enforceable because they do not contravene public policy and

9    are not unconscionable as they "do[] not relate to essential services.  [They] merely govern[] a

10   voluntary [] activity.  The signers are free agents who simply can walk away without signing the

11   release and participating in the activity." *Cruz*, 2012 WL 7831781, ¶¶ 6, 9.

12   Courts in the Ninth Circuit have also consistently enforced limitation of liability clauses

13   against users of websites for the same reason that the Nevada District Court enforced such a

14   provision in *Cruz*—because the users are not required to use the service at issue.  *See, e.g.,*

15   *Adkins v. Facebook, Inc.*, No. C 18-05982 WHA, 2019 WL 3767455, at \*2 (N.D. Cal. Aug. 9,

16   2019) (holding that Facebook limitation of liability clause is not procedurally unfair even though

17   it is a contract of adhesion and enforcing clause because "plaintiff could have simply not

18   enrolled in Facebook's social media service.  Facebook is not a necessity of life and anyone who

19   does not like the terms of service can go elsewhere"); *Darnaa, LLC v. Google, Inc.*, No. 15-CV-

20   03221-RMW, 2015 WL 7753406, at \*5 (N.D. Cal. Dec. 2, 2015) (noting that limitation of

21   liability clauses "have long been recognized [as] valid in California" and enforcing such clause

22   to bar claim for negligence notwithstanding argument that it is contrary to public policy, and

23   even though there was "no dispute" that terms of service containing the clause were "a contract

24   of adhesion"); *cf. Brozyna v. Niagara Gorge Jetboating, Ltd.*, No. 10-CV-602-JTC, 2011 WL

25   4553100, at \*6 (W.D.N.Y. Sept. 29, 2011) (provision enforceable when "[t]he excursion 'is a

26   strictly voluntary recreational pursuit, and does not constitute the rendition of essential

27   services'"); *Tokio Marine v. Macready*, 803 F. Supp. 2d 193, 201 n.6 (E.D.N.Y. 2011) (provision

28

1   enforceable when "[n]othing in the record suggests that the college-educated Macreadys were

2   prevented from reading the Lease Agreement . . . or from simply walking away").

3          Just as in *Cruz*, and just like users of Facebook and Google, Plaintiff was a "free agent[]

4   who simply [could] walk away without" agreeing to the Terms of Service or using OpenSea.

5   OpenSea is "not a necessity of life and anyone who does not like the terms of service can go

6   elsewhere," including other NFT marketplaces like LooksRare. *See Adkins*, 2019 WL 3767455,

7   at *2.  The exculpatory provision is thus enforceable and applies to bar all of Plaintiff's claims.

8          **D.     The Economic Loss Doctrine Also Bars All of Plaintiff's Claims**

9          All of Plaintiff's claims are also separately barred by the economic loss doctrine because

10  they seek damages that are solely monetary in nature.

11         "Under the economic loss doctrine . . . economic losses are not recoverable in negligence

12  absent personal injury or damage to property other than the defective entity itself." *Calloway*,

13  993 P.2d at 1267; *see also Giles v. Gen. Motors Acceptance Corp.*, 494 F.3d 865, 879 (9th Cir.

14  2007) ("Broadly speaking, Nevada applies the economic loss doctrine to bar recovery in tort for

15  purely monetary harm in product liability and in negligence cases unrelated to product liability.")

16  "The primary purpose of the rule is to shield a defendant from unlimited liability for all of the

17  economic consequences of a negligent act, particularly in a commercial or professional setting,

18  and thus to keep the risk of liability reasonably calculable." *Local Joint Exec. Bd. Of Las Vegas*

19  *Culinary Workers Union, Local No .226 v. Stern*, 651 P2.d 637, 638 (Nev. 1982).  Courts have

20  applied the economic loss doctrine to bar negligent hiring, training, and supervision claims as

21  well. *See Blanck v. Hager*, 360 F. Supp. 2d 1137, 1157-59 (D. Nev. 2005) (dismissing negligent

22  hiring, training, and supervision claim under Nevada law where plaintiff "has not alleged

23  personal injury, property damage, or intentional tortious behavior").

24         "The term 'economic loss' refers to damages that are solely monetary, as opposed to

25  damages involving physical harm to person or property." *Giles*, 494 F.3d at 873 (analyzing

26  Nevada's economic-loss rule).  Here, Plaintiff's negligence claims fall squarely within the

27  economic loss rule; his claimed damages are purely economic and do not involve any physical

28

harm to person or property.  Plaintiff claims that the theft of the BAYC NFTs "deprived [him] of the NFTs he owned and their significant monetary values," the "commercialization rights he possessed" in the NFT images and his "ability to earn future profits from his BAYC NFTs," and "benefits, opportunities, and exclusive offers" resulting from membership in BYAC, including the (compensable) loss of access to free cryptocurrency, NFTs, and event promotions.  (*See, e.g.*, FAC ¶¶ 39-42, 47, 52, 63, 65, 159-160, 180, 203, 224, ECF No. 62.) [6]  These are all plainly economic losses.  *See Giles*, 494 F.3d at 873 ("The term 'economic loss' refers to damages that are solely monetary, as opposed to damages involving *physical harm* to person or property." (emphasis added); *Calloway*, 993 P.2d at 1263 ("purely economic losses" include "consequent loss of profits, without any claim of personal injury or damage to other property"; damage to various parts of "integrated structures" still constitutes economic loss); *Pelletier v. Rodriguez*, No. 3:17-CV-00642-MMD-EJY, 2021 WL 3008594, at *9 (D. Nev. July 15, 2021) ("Plaintiff does allege harm to his property, but the harm alleged is purely economic: 'damages to crop, loss of cattle business opportunities, loss of profits from sale of Alfalfa/Orchard grass, and delays of closing.'"); *Redman v. John D. Brush & Co.,* 111 F.3d 1174, 1183 (4th Cir. 1997) (economic loss rule barred claims against safe manufacturer where coin collection of the plaintiff was stolen during a burglary from safe; "[t]he essence of [his] claim is that he suffered a loss because the safe did not function at the level he expected").

Accordingly, Plaintiff's claims should be dismissed as barred by the economic loss rule.

## V.   CONCLUSION

Plaintiff's claims against OpenSea should be dismissed without leave to amend.

---

[6] Plaintiff also vaguely and speculatively suggests that he has lost "membership in the BAYC club and the privileges associated with it."  (*E.g.*, FAC ¶ 180, ECF No. 62.)  Plaintiff, however, nowhere defines what those privileges are and whether or why they might be non-economic in nature, and the Amended Complaint's allegations make clear that Plaintiff is focused on the alleged monetary loss from the stolen NFTs.  At any rate, such conclusory and vague allegations are insufficient to overcome the economic loss rule.  *See, e.g., Closson v. Recontrust Co.*, No. 2:11-CV-00146-KJD-RJJ, 2012 WL 893746, at *2 (D. Nev. Mar. 15, 2012) (holding that "statement of damages is too speculative and tangential" to "state a claim").

1  DATED this 29th day of July, 2022.

2                                          DICKINSON WRIGHT PLLC

3                                          */s/ Justin J. Bustos*
                                           JOHN P. DESMOND
4                                          Nevada Bar No. 5618
                                           JUSTIN J. BUSTOS
5                                          Nevada Bar No. 10320
                                           100 W. Liberty Street, Suite 940
6                                          Reno, NV 89501
                                           Tel: (775) 343-7500
7                                          Fax: 844-670-6009
8                                          Email: jdesmond@dickinsonwright.com
                                           Email: jbustos@dickinsonwright.com
9

10                                         MUNGER, TOLLES & OLSON, LLP
                                           JONATHAN H. BLAVIN (Pro Hac Vice)
11                                         560 Mission Street, 27th Floor
                                           San Francisco, CA  94105
12                                         Tel: (415) 512-4011
                                           Email:  Jonathan.Blavin@mto.com
13

14                                         ERIN J. COX (Pro Hac Vice)
                                           BRANDON R. TEACHOUT (Pro Hac Vice)
15                                         APRIL D. YOUPEE-ROLL (Pro Hac Vice)
                                           350 South Grand Avenue, Suite 5000
16                                         Los Angeles, CA  90071
                                           Tel:  (213) 683-9100
17                                         Email: Brandon.Teachout@mto.com
18                                         Email: Erin.Cox@mto.com
                                           Email: April.youpee-roll@mto.com
19

20                                         *Attorneys for Defendant Ozone Networks, Inc. d/b/a*
                                           *OpenSea, a New York Corporation*
21

22

23

24

25

26

27

28

DEFENDANT OPENSEA'S MOTION TO DISMISS AMENDED COMPLAINT

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

## CERTIFICATE OF SERVICE

The undersigned, an employee of Dickinson Wright PLLC, hereby certifies that on the 29th day of July 2022, caused a copy of the foregoing **DEFENDANT OZONE NETWORKS, INC.'S MOTION TO DISMISS THE AMENDED COMPLAINT** to be transmitted by electronic service in accordance the Court's CM/ECF e-filing system, addressed to:

Emily Brinn Nuvan (Pro Hac Vice)
Jose A. Abarca (Pro Hac Vice)
Romaine C. Marshall (Pro Hac Vice)
Armstrong Teasdale LLP
201 South Main Street, Suite 750
Salt Lake City, UT  84111
enuvan@atllp.com
jabarca@atllp.com
rmarshall@atllp.com

*Attorneys for Plaintiff Robert Armijo*

John D. Tennert
Fennemore Craig, P.C.
7800 Rancharrah Parkway
Reno, NV  89511
jtennert@fclaw.com

*Attorneys for Defendant Yuga Labs, LLC*

Alison Clare Jordan
Fenwick & West LLP
801 California Street
Mountain View, CA  89041
Ajordan@fenwick.com

*Attorneys for Defendant Yuga Labs, LLC*

Michelle D. Alarie
Armstrong Teasdale LLP
3770 Howard Hughes Parkway, Suite 200
Las Vegas, NV  89169
malarie@atllp.com

*Attorneys for Plaintiff Robert Armijo*

Samuel Sahagian (Pro Hac Vice)
Jennifer C. Bretan (Pro Hac Vice)
Katherine A. Marshall (Pro Hac Vice)
Michael S. Dicke (Pro Hac Vice)
Fenwick & West LLP
555 California Street, 12th Floor
San Francisco, CA  94104
ssahagian@fenwick.com
jbretan@fenwick.com
kmarshall@fenwick.com
mdicke@fenwick.com

*Attorneys for Defendant Yuga Labs, LLC*

*/s/ Laura P. Browning*
An Employee of Dickinson Wright PLLC