MICHAEL S. DICKE (admitted *pro hac vice*)
mdicke@fenwick.com
JENNIFER C. BRETAN (admitted *pro hac vice*)
jbretan@fenwick.com
KATHERINE A. MARSHALL (admitted *pro hac vice*)
kmarshall@fenwick.com
ALISON C. JORDAN (admitted *pro hac vice*)
ajordan@fenwick.com
SAMUEL SAHAGIAN (admitted *pro hac vice*)
ssahagian@fenwick.com

FENWICK & WEST LLP
555 California Street, 12th Floor
San Francisco, CA 94104
Tel: 415.875.2300

JOHN D. TENNERT III (Nevada Bar No. 11728)
jtennert@fennemorelaw.com
FENNEMORE CRAIG, P.C.
7800 Rancharrah Parkway
Reno, NV 89511
Tel: 775.788.2212

*Attorneys for Defendant Yuga Labs, Inc.*

## UNITED STATES DISTRICT COURT

## DISTRICT OF NEVADA

| | |
|---|---|
| ROBERT ARMIJO, | Case No.: 3:22-cv-00112-MMD-CLB |
| Plaintiff, | **DEFENDANT YUGA LABS' MOTION TO DISMISS PLAINTIFF'S FIRST AMENDED COMPLAINT AND MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT THEREOF** |
| v. | |
| OZONE NETWORKS, INC. d/b/a OPENSEA, a New York Corporation, YUGA LABS LLC d/b/a BORED APE YACHT CLUB, a Delaware limited liability company; LOOKSRARE; and DOES 1 to 50, | **ORAL ARGUMENT REQUESTED** |
| Defendants. | |

FENWICK & WEST LLP

YUGA LABS' MOTION TO DISMISS FAC                    Case No.: 3:22-CV-00112-MMD-CLB

# TABLE OF CONTENTS

**Page**

I.  INTRODUCTION...................................................................................................... 1

II.  STATEMENT OF FACTS ........................................................................................ 3

    A.  Yuga Labs And The Bored Ape Yacht Club.......................................................... 3

    B.  The Alleged Purchase And Theft Of Plaintiff's NFTs........................................... 4

    C.  Plaintiff's Alleged Interactions With Yuga Labs ................................................. 5

III.  ARGUMENT............................................................................................................. 6

    A.  Personal Jurisdiction Over Yuga Labs Is Absent ................................................ 6

        1.  There Is No General Jurisdiction Over Yuga Labs.................................... 6

        2.  Plaintiff Also Cannot Establish Specific Jurisdiction Over Yuga Labs ..... 7

            a.  There Is No Jurisdiction Over Yuga Labs Based On The BAYC............................................................................................ 7

            b.  Purported Sales In Nevada Do Not Establish Jurisdiction............. 8

            c.  There is No Jurisdiction Based On Purported Advertising............ 8

            d.  There Is No Jurisdiction Based on Yuga Labs' Internet Presence.......................................................................................... 9

            e.  The Exercise Of Jurisdiction Is Unreasonable............................ 12

    B.  Plaintiff Still Fails To State A Claim For Negligence Against Yuga Labs.......... 13

        1.  Yuga Labs Owed No Duty Of Care To Plaintiff..................................... 13

            a.  Plaintiff Has No Special Relationship With Yuga Labs.............. 14

            b.  There Is No Other Basis To Impose A Duty On Yuga Labs........ 18

        2.  Plaintiff Cannot Allege That Yuga Labs Caused His Injury................... 19

        3.  The Economic Loss Doctrine Bars Any Claimed Damages.................... 19

    C.  The New Contract Claims Have No Basis In Law or Fact................................. 20

        1.  No Contract Providing For "Rightful" Membership Was Formed ......... 20

        2.  The Actual Bored Ape NFT Terms Preclude Plaintiff's Claim.............. 21

    D.  Plaintiff States No Claim For Breach Of The Implied Covenant....................... 23

IV.  CONCLUSION......................................................................................................... 24

FENWICK & WEST LLP

## TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Alexander v. Circus Circus Enters., Inc.*,
  972 F.2d 261 (9th Cir. 1992) ............................................................................. 9

*AMA Multimedia, LLC v. Wanat*,
  970 F.3d 1201 (9th Cir. 2020) ........................................................................ 8, 9

*Arco Prods. Co. v. May*,
  948 P.2d 263 (Nev. 1997) ............................................................................12, 20

*Asahi Metal Indus. Co. v. Superior Court*,
  480 U.S. 102 (1987) .......................................................................................... 8

*Ashcroft v. Iqbal*,
  556 U.S. 662 (2009) ........................................................................................ 19

*Ballard v. Savage*,
  65 F.3d 1495 (9th Cir. 1995) ........................................................................... 11

*Baton v. Ledger SAS*,
  2021 WL 5226315 (N.D. Cal. Nov. 9, 2021) ...................................................7, 8

*Beckman v. Match.com, LLC*,
  2017 WL 1304288 (D. Nev. Mar. 10, 2017), *aff'd*, 743 F. App'x 142 (9th Cir.
  2018) .............................................................................................. 14, 15, 16, 17

*Bibicheff v. PayPal, Inc.*,
  2020 WL 2113373 (E.D.N.Y. May 4, 2020), *aff'd*, 844 F. App'x 394 (2d Cir.
  2021) ................................................................................................... 16, 18, 19

*Bledsoe v. US Bancorp*,
  2013 WL 12129951 (C.D. Cal. June 12, 2013) ................................................. 18

*Boehm v. Airbus Helicopters Inc.*,
  527 F. Supp. 3d 1112 (D. Ariz. 2020) .............................................................. 11

*Bradshaw v. Blystone Equip. Co. of Nev.*,
  386 P.2d 396 (Nev. 1963) ............................................................................... 13

*Burger King Corp. v. Rudzewicz*,
  471 U.S. 462 (1985) .......................................................................................... 7

*Calloway v. City of Reno*,
  993 P.2d 1259 (Nev. 2000) *overruled on other grounds by Mahon v. Howard
  & Howard Attorneys PLLC*, 499 P.3d 1176 (Nev. 2021) .................................. 20

FENWICK & WEST LLP

ii

*Cybersell, Inc. v. Cybersell, Inc.*,
    130 F.3d 414 (9th Cir. 1997) ......................................................................... 10

*Daimler AG v. Bauman*,
    571 U.S. 117 (2014) ....................................................................................... 6

*Dangelo v. Hartford Cas. Ins. Co.*,
    2012 WL 4482818 (D. Nev. Sept. 27, 2012) .................................................. 24

*Desert Rock Entm't II LLC v. D. Hotel & Suites, Inc.*,
    2016 WL 1732724 (D. Nev. May 2, 2016) ............................................... 10, 11

*Doe v. Nat'l Conference of Bar Examiners*,
    2017 WL 74715 (E.D.N.Y. Jan. 6, 2017) ........................................................ 7

*Doe v. SexSearch.com*,
    551 F.3d 412 (6th Cir. 2008) ................................................................... 16, 17

*Douglas Coder & Linda Coder Family LLLP v. RNO Exhibitions, LLC*,
    2020 WL 5995495 (D. Nev. Oct. 9, 2020) ..................................................... 24

*Foremost Pro Color, Inc. v. Eastman Kodak Co.*,
    703 F.2d 534 (9th Cir. 1983) ......................................................................... 20

*Foster v. Costco Wholesale Corp.*,
    291 P.3d 150 (Nev. 2012) .............................................................................. 13

*Goodrich & Pennington Mortg. Fund, Inc. v. J.R. Woolard, Inc.*,
    101 P.3d 792 (Nev. 2004) .............................................................................. 19

*Goodyear Dunlop Tires Operations, S.A. v. Brown*,
    564 U.S. 915 (2011) ....................................................................................... 6

*Gunter v. United Fed. Credit Union*,
    2016 WL 3457009 (D. Nev. June 22, 2016) ................................................... 22

*Helicopteros Nacionales de Colombia, S.A. v. Hall*,
    466 U.S. 408 (1984) ...................................................................................... 11

*Hilton Hotels Corp. v. Butch Lewis Prods., Inc.*,
    808 P.2d 919 (Nev. 1991) .............................................................................. 23

*Imageline, Inc. v. Hendricks*,
    2009 WL 10286181 (C.D. Cal. Aug. 12, 2009) ............................................... 8

*Insco v. Aetna Health & Life Ins. Co.*,
    673 F. Supp. 2d 1180 (D. Nev. 2009) ............................................................ 13

*Int'l Shoe Co. v. State of Wash.*,
    326 U.S. 310 (1945) ........................................................................................ 6

FENWICK & WEST LLP

*Lee v. GNLV Corp.*,
  22 P.3d 209 (Nev. 2001) ................................................................... 14

*Local Joint Exec. Bd. of Las Vegas, Culinary Workers Union, Local No. 226 v.
  Stern*,
  651 P.2d 637 (Nev. 1982) ............................................................. 19, 20

*Mavrix Photo, Inc. v. Brand Techs., Inc.*,
  647 F.3d 1218 (9th Cir. 2011) ............................................................ 6

*Medinah Mining, Inc., v. Amunategui*,
  237 F. Supp. 2d 1132 (D. Nev. 2002) ................................................ 10

*Midwest Fur Producers Ass'n v. Mutation Mink B. Ass'n*,
  102 F. Supp. 649 (D. Minn. 1951) ...................................................... 7

*Nimbus Data Sys., Inc. v. Modus LLC*,
  2014 WL 7387200 (N.D. Cal. Dec. 29, 2014) .................................... 11

*O'Handley v. Padilla*,
  2022 WL 93625 (N.D. Cal. Jan. 10, 2022) ........................................... 7

*Omeluk v. Langsten Slip & Batbyggeri A/S*,
  52 F.3d 267 (9th Cir.1995) ................................................................. 7

*Paccar Int'l, Inc. v. Commercial Bank of Kuwait, S.A.K.*,
  757 F.2d 1058 (9th Cir. 1985) ........................................................... 12

*Patel v. Am. Nat'l Prop. & Cas. Co.*,
  367 F. Supp. 3d 1186 (D. Nev. 2019) ................................................ 23

*Pebble Beach Co. v. Caddy*,
  453 F.3d 1151 (9th Cir. 2006) ...................................................... 6, 10

*Phoneternet, LLC v. LexisNexis Risk Solutions, Inc.*,
  2019 WL 4748271 (N.D. Tex. Sept. 30, 2019), *aff'd*, 816 F. App'x 909 (5th
  Cir. 2020) ...................................................................................... 18

*Reynolds v. Binance Holdings Ltd.*,
  481 F. Supp. 3d 997 (N.D. Cal. 2020) ................................................. 6

*Sanchez v. Wal-Mart Stores, Inc.*,
  221 P.3d 1276 (Nev. 2009) ........................................................... 13, 17

*Sateriale v. R.J. Reynolds Tobacco Co.*,
  697 F.3d 777 (9th Cir. 2012) ......................................................... 20, 21

*Schwarzenegger v. Fred Martin Motor Co.*,
  374 F.3d 797 (9th Cir. 2004) ....................................................... *passim*

FENWICK & WEST LLP

*Scialabba v. Brandise Constr. Co.*,
  921 P.2d 928 (Nev. 1996) ...................................................................................... 14, 17

*Silver State Broad., LLC v. Crown Castle MU, LLC*,
  2018 WL 6606064 (D. Nev. Dec. 17, 2018) .............................................................. 23

*Sinatra v. Nat'l Enquirer, Inc.*,
  854 F.2d 1191 (9th Cir. 1988) ...................................................................................... 9

*Software Dev. & Inv. of Nevada v. Wall*,
  2006 WL 8442597 (D. Nev. Feb. 13, 2006) ............................................................... 10

*Spacey v. Burgar*,
  207 F. Supp. 2d 1037 (C.D. Cal. 2001) ....................................................................... 8

*Sparks v. Alpha Tau Omega Fraternity, Inc.*,
  255 P.3d 238 (Nev. 2011) ..................................................................................... 15, 16

*Spartalian v. Citibank, N.A.*,
  2013 WL 593350 (D. Nev. Feb. 13, 2013) ................................................................. 13

*Starr v. Baca*,
  652 F.3d 1202 (9th Cir. 2011) .................................................................................... 13

*Steckman v. Hart Brewing, Inc.*,
  143 F.3d 1293 (9th Cir. 1998) .................................................................................... 24

*Tapia v. Cal-W. Reconveyance Corp.*,
  2012 WL 3231018 (D. Nev. Aug. 6, 2012) ................................................................ 18

*ThermoLife Int'l, LLC v. NetNutri.com LLC*,
  813 F. App'x 316 (9th Cir. 2020) ................................................................................. 8

*TransparentBusiness, Inc. v. Infobae*,
  2021 WL 2670704 (D. Nev. June 29, 2021) .............................................................. 11

*Treasury Mgmt. Servs., Inc. v. Wall St. Sys. Del. Inc.*,
  2016 WL 6916236 (S.D. Tex. Mar. 16, 2016) ........................................................... 11

*Tulip Trading Ltd. v. Bitcoin Ass'n for BSV & Others*
  [2022] EWHC 667 (Ch) BL-2021-000313 .............................................................. 14, 18

*Walden v. Fiore*,
  571 U.S. 277 (2014) .................................................................................................... 11

*Wiley v. Redd*,
  885 P.2d 592 (Nev. 1994) ........................................................................................... 17

*Yanase v. Auto. Club of S. Cal.*,
  212 Cal. App. 3d 468 (1989) ....................................................................................... 18

FENWICK & WEST LLP

*Zippo Mfg. Co. v. Zippo Dot Com, Inc.*,
    952 F. Supp. 1119 (W.D. Pa. 1997) .................................................................................. 10

**Statutes**

Nev. Rev. Stat. § 14.065(1) .................................................................................................. 6

**Rules**

Federal Rules of Civil Procedure

    12(b)(2) ....................................................................................................................... 1
    12(b)(6) ....................................................................................................................... 1

**Other Authorities**

Phoenix Angell, "*Not All NFTs That Are Reported Stolen Are Actually Stolen*,"
    SCREENRANT (July 16, 2022), https://screenrant.com/nfts-theft-reported-
    stolen-opensea-abuse/ .............................................................................................. 22

FENWICK & WEST LLP

FENWICK & WEST LLP

**NOTICE OF MOTION AND MOTION TO DISMISS**

Defendant Yuga Labs, Inc. ("Yuga Labs" or the "Company"), by and through its undersigned counsel, and pursuant to Federal Rules of Civil Procedure 12(b)(2) and 12(b)(6), hereby moves to dismiss the claims asserted against it by plaintiff Robert Armijo ("plaintiff") in his First Amended Complaint ("FAC") (ECF No. 62). This motion is supported by the following Memorandum of Points and Authorities, the Declaration of Nicole Muniz, the Request for Judicial Notice, the Declaration of Jennifer Bretan and Exhibits A-E thereto, the pleadings and papers on file, any argument of counsel, and such other matters as are properly before the Court.

**MEMORANDUM OF POINTS AND AUTHORITIES**

**I.     INTRODUCTION**

Plaintiff claims to be a victim of theft. As alleged, a bad actor tricked him into providing access to his collection of "non-fungible tokens" or "NFTs" and quickly drained plaintiff's digital wallet of its prized collectibles. Among them, a Bored Ape NFT and two Mutant Ape NFTs that plaintiff had purchased in the secondary market. The bad actor offloaded the stolen NFTs and disappeared. The theft of valued NFTs was unfortunate, but plaintiff has only himself to blame. It was plaintiff – no one else – who opened the door, unlocked the safe, and let the thief right in.

Rather than direct his ire at those who actually wronged him, and acknowledge his own missteps, however, plaintiff seeks to lay the blame for these events everywhere else. Thus, he takes aim, not just at the providers of secondary markets where the thief went on to sell the stolen NFTs, but at the original developer of the Bored Ape NFTs and Mutant Ape NFTs – Yuga Labs. Even though *he did not buy his NFTs from Yuga Labs*, and even though *Yuga Labs had nothing whatsoever to do with the theft*, plaintiff nonetheless claims that it is somehow negligent for not preventing the criminal attack and for not voluntarily coming to his aid in the aftermath. Just like Tiffany & Co. is not a downstream insurer of stolen diamond rings, and Topps does not guarantee against the theft of a collector's baseball cards, the law in this case is clear. Absent a special relationship among the parties – and none exists here – there is no duty for a private entity like Yuga Labs to protect against third-party criminal attacks, much less to provide aid or monitor for potentially stolen NFTs and prevent their use thereafter. As a legal matter, Yuga Labs is just not

liable for losses resulting from such an attack.

This defect alone is fatal to the negligence claim.  But, even if plaintiff could drum up some sort of special relationship, none of the other essential elements – breach, causation, and damages – are present, so the negligence claim fails, regardless. Yuga Labs cannot be said to breach duties that do not exist as a matter of law.  And, as for causation, plaintiff's theory, that Yuga Labs *caused* plaintiff's injuries by creating a series of NFTs that became so popular (and valuable) that bad guys now try to steal them, is not only nonsensical, it is plainly belied by *specific* allegations demonstrating that the theft was the *direct* product of third-party criminal activity and would not have occurred *but for* plaintiff's own negligence.  Likewise, any claimed damages are barred by the economic loss doctrine.  Nor does plaintiff's newly-conjured-up theory in the FAC – that Yuga Labs somehow breached a "contract" providing for perpetual membership in the Bored Ape Yacht Club, irrespective of holding an NFT, survive scrutiny.  Generic Tweets by Yuga Labs created no contract, much less one with the obligations plaintiff attempts to assert here.

But the Court does not even need to reach those issues to dismiss the action as to Yuga Labs.  That is because plaintiff has not – and cannot – meet his burden to establish that this Court has personal jurisdiction over Yuga Labs.  The threadbare and factually inaccurate jurisdictional recitals offered fail as a matter of law, and the deficiencies cannot be cured.  Yuga Labs is a Delaware entity.  It has no offices in Nevada, and no employees or contractors reside there.  Yuga Labs has never purchased or used any advertising space in Nevada and has never held a sales or marketing event – or any event of any kind – in Nevada.  Even if Yuga Labs ever sold anything to Nevada residents, such sales would have *no connection whatsoever to plaintiff's claim*, so are not a basis for jurisdiction.  Nor is jurisdiction shown merely because a publicly available Discord discussion channel hosted by Yuga Labs was accessible to plaintiff in Nevada.  Such sites and interactions are not the sort of commercial activity that allow for the exercise of jurisdiction.

Faced with Yuga Labs' motion to dismiss his original complaint (and its single negligence claim against Yuga Labs), plaintiff did not try to oppose, and instead filed the FAC.  Replete with false and irrelevant allegations relating to a different entity (the ApeCoin DAO), attempting to assert a "special relationship" with no basis in law, relying on purported activities of third parties

FENWICK & WEST LLP

1  in Nevada to suggest activity by (and thus jurisdiction over) Yuga Labs despite **knowing** that

2  claim is baseless, and tacking on new "contract" claims – the FAC is just an exercise in delaying

3  the inevitable.  Plaintiff had no factual or legal basis for naming Yuga Labs in the first place and

4  nothing the FAC offers changes that fact.  If anything, it just compounds the harm to Yuga Labs in

5  having to defend against additional, equally baseless claims.  Personal jurisdiction is still absent.

6  No cognizable legal duty is alleged, much less breach, causation, or damages, and the FAC's new

7  claims for breach of contract and the implied covenant are as strained as they are groundless.

8  Because none of these defects can be cured, Yuga Labs should be dismissed with prejudice.

9  **II.    STATEMENT OF FACTS**

10  **A.    Yuga Labs And The Bored Ape Yacht Club**

11      Yuga Labs is the developer of smart contracts (programmed lines of code) that, when

12  executed on the Ethereum blockchain, allow individuals a license to mint pieces of digital art

13  ("non-fungible tokens" or "NFTs").  *See* Declaration of Nicole Muniz ("Muniz Decl.") ¶ 4.  At the

14  time of the events at issue, Yuga Labs was a Delaware limited liability company with its principal

15  place of business in Virginia.  FAC ¶ 17.  It later converted to a Delaware corporation.  *Id.*  Yuga

16  Labs has no offices in Nevada.  Muniz Decl. ¶ 3.  No Yuga Labs employees or contractors reside

17  in Nevada.  *Id.*  The Company has never purchased or used physical advertising space in Nevada,

18  and it has never held a sales or marketing event – or an event of any kind – in Nevada.  *Id.*

19      In early 2021, as part of a large-scale, community-driven art project, Yuga Labs created a

20  series of NFTs called "Bored Apes."  *Id.* ¶ 5; FAC ¶ 38.  After the project launched in April 2021,

21  collectors minted Bored Ape NFTs (from a collection 10,000 available) by paying 0.08 ETH (a

22  cryptocurrency) to Yuga Labs as the developer.  Muniz Decl. ¶ 5.  The complete series sold out by

23  May 1, 2021.  *Id.*  Based on the price of ETH at the time, each Bored Ape cost in the range of $169

24  to $236.  *Id.*  Later in 2021, Yuga Labs created another smart contract (a "serum") allowing

25  individual Bored Ape holders to receive a "mutant" version of their Bored Ape NFT, resulting in a

26  series of "Mutant Ape" NFTs.  *Id.* ¶ 6.  Another 10,000 Mutant Ape NFTs were made available to

27  mint, whether or not an individual already held a Bored Ape NFT.  *Id.*; *see also* FAC ¶ 39.[1]

28  _____
[1] Bored Ape and Mutant Ape NFTs are collectively referred to herein as "Bored Ape NFTs."

FENWICK & WEST LLP

Once minted, a Bored Ape NFT confers on its holder certain commercial rights to content featured on the NFT, which rights are tied to and transfer with the NFT.  Muniz Decl. ¶ 7.  Yuga Labs does not control secondary purchases, sales, transfers, or trades of Bored Ape NFTs.  *Id*. While in possession of a Bored Ape NFT, holders may also be eligible for certain benefits and opportunities, the vast majority of which are offered by third parties unaffiliated with Yuga Labs. *Id*. ¶ 8.  Indeed, as the Bored Ape project took hold in the collective imagination, it spawned countless third-party websites, businesses and commercial opportunities, online and offline events, and other community-driven initiatives that Yuga Labs does not control.  *Id*. ¶ 9; *see also* FAC ¶ 46.  Yuga Labs does host the "Bored Ape Yacht Club" or "BAYC" ([boredapeyachtclub.com](boredapeyachtclub.com)) website, which is the virtual "home" of Bored Apes.  Muniz Decl. ¶ 8.  But, other than a token-gated feature allowing NFT holders to contribute to a communal artwork, the site is largely passive and informational and does not provide specific benefits to Bored Ape NFT holders.  *Id*. Yuga Labs also has a BAYC Discord channel.  Muniz Decl. ¶ 10.  The BAYC Discord is a social and informational space, where enthusiasts can read announcements, review FAQs, discuss Yuga Labs' and their own projects, or link to Yuga Labs' verified official channels on the web.  Muniz Decl. ¶ 10.  Yuga Labs does not sell anything on the BAYC Discord.  *Id*.  It is available worldwide, with both public facing and token-gated sub-channels.  *Id*. ¶ 11.  No BAYC Discord support employees are in Nevada.  *Id*.

**B.     The Alleged Purchase And Theft Of Plaintiff's NFTs**

At the heart of this suit are three NFTs plaintiff bought from sellers (***not*** Yuga Labs) on the OpenSea marketplace.  FAC ¶¶ 34, 36-37.  Specifically, plaintiff purchased BAYC #4329 (a Bored Ape NFT) on November 14, 2021 and MAYC #1819 and MAYC #7713 (two Mutant Ape NFTs) on November 15, 2021 and January 2, 2022, respectively.  *Id*.  As plaintiff recounts it, on February 1, 2022, he decided to trade away one of his Mutant Ape NFTs.  *Id*. ¶ 80.  Without any involvement by Yuga Labs, plaintiff visited a Discord server for Cool Cats (another NFT project entirely unaffiliated with and not controlled by Yuga Labs) and, using a chat feature, found a user (@Nodelee) who was interested in exchanging Cool Cats NFTs for one of plaintiff's Mutant Apes. *Id*. ¶¶ 80-81.  After rejecting as "unfamiliar" several trading sites proposed by @Nodelee, plaintiff

FENWICK & WEST LLP

suggested he and @Nodelee use the "NFT Trader" website because he heard "from several reliable NFT community members" (*not* Yuga Labs) that it was a "legitimate and trustworthy trading platform." *Id.* ¶ 81.  But rather than navigating to the NFT Trader website to set up the trade himself, plaintiff instead *chose* to use a link provided by @Nodelee. *Id.* ¶¶ 82-83.  Plaintiff claims the link opened what appeared to be the NFT Trader website. *Id.* ¶ 83.  Once there, he verified that the information for the planned trade was correct and, without confirming the website was legitimate, clicked a button to approve the exchange. *Id.* ¶ 84.  Nothing happened. *Id.*  So, plaintiff clicked the button to approve the trade "a few more times." *Id.*  Only then did plaintiff see that the amount of ETH in his digital wallet had dropped. *Id.*  Checking his wallet, he also discovered that his Bored Ape NFT and Mutant Ape NFTs were gone. *Id.*  Plaintiff realized his mistake: the link sent by @Nodelee was to a fake website instead of the real NFT Trader website. *Id.* ¶ 85.  With each click of the button, plaintiff provided @Nodelee access to (and the opportunity to steal from) his digital wallet. *Id.*

### C.   Plaintiff's Alleged Interactions With Yuga Labs

Plaintiff does not allege that he purchased the Bored Ape NFTs at issue from Yuga Labs. *See* FAC ¶¶ 34, 36-37.  Nor does he allege Yuga Labs was connected *in any way* to @Nodelee (or whoever stole his NFTs), or to the series of events enabling that theft, or to any of the software or mechanisms used to steal his NFTs. *Id.* ¶¶ 80-85.  Yuga Labs also had nothing to do with the resale of plaintiff's NFTs, nor could it. *Id.* ¶¶ 94, 96.  As plaintiff notes, the blockchain is decentralized, and transactions are "permanent and irreversible." *Id.* ¶ 4; *see also* Muniz Decl. ¶ 8.

Plaintiff's sole purported interaction with Yuga Labs in connection with the theft was an *after-the-fact* exchange based on a BAYC Discord help ticket he submitted.  FAC ¶ 89.  Plaintiff asked Yuga Labs to post about his NFTs on social media and to "blacklist" (deny) any holder of the stolen NFTs access to the BAYC website, supposedly to "disincentivize the theft" (although the theft had *already* occurred). *Id.* ¶ 91.  According to plaintiff, the Yuga Labs representative explained that it was an "issue between him and OpenSea" and, while sorry to hear about what happened, there was nothing Yuga Labs could do to help him. *Id.* ¶ 90.  Plaintiff claims no other interaction with Yuga Labs, its employees, or any of its services or products.

III.   ARGUMENT

A.   Personal Jurisdiction Over Yuga Labs Is Absent

Plaintiff bears the burden of establishing personal jurisdiction.  *See Schwarzenegger v. Fred Martin Motor Co.*, 374 F.3d 797, 802 (9th Cir. 2004).  In the Ninth Circuit, "personal jurisdiction over a defendant is proper if it is permitted by a long-arm statute and if the exercise of that jurisdiction does not violate federal due process." *Pebble Beach Co. v. Caddy*, 453 F.3d 1151, 1154-55 (9th Cir. 2006).  Nevada's long-arm statute provides for jurisdiction so long as it comports with the state and federal Constitution.  Nev. Rev. Stat. § 14.065(1).  To satisfy federal due process, a defendant must have "minimum contacts" with the forum such that the assertion of jurisdiction "does not offend 'traditional notions of fair play and substantial justice.'" *Int'l Shoe Co. v. State of Wash.*, 326 U.S. 310, 316 (1945).  The burden has not been met here.

1.   There Is No General Jurisdiction Over Yuga Labs

General jurisdiction over a foreign corporation is appropriate only when its "affiliations with the State are so 'continuous and systematic' as to render [it] essentially at home in the forum State." *Goodyear Dunlop Tires Operations, S.A. v. Brown*, 564 U.S. 915, 919 (2011); *see also Daimler AG v. Bauman*, 571 U.S. 117, 127 (2014).  After *Daimler*, a corporation is generally "at home" only where it is incorporated or has its principal place of business.  *See Daimler*, 571 U.S. at 127.  There is no general jurisdiction here.  Yuga Labs is a Delaware corporation (FAC ¶ 17) with no offices, employees, or contractors in Nevada.  Muniz Decl. ¶ 2-3.  It has not purchased or used advertising space or held an event of any kind in Nevada (*id*. ¶ 3); and nothing in the unsupported claim that the "BAYC transacted business in Nevada," or allegation that Bored Ape NFT holders may live there and can access its publicly available website and Discord channel from there, changes the result.  *See Mavrix Photo, Inc. v. Brand Techs., Inc.*, 647 F.3d 1218, 1226 (9th Cir. 2011) ("an interactive website—even a 'highly interactive' website—does not confer general jurisdiction.").  Far from the kind of "continuous and systematic" contacts with Nevada that would make jurisdiction over Yuga Labs appropriate, the FAC's jurisdictional allegations reflect nothing of the kind.  *See Reynolds v. Binance Holdings Ltd.*, 481 F. Supp. 3d 997, 1003-04 (N.D. Cal. 2020) (no general jurisdiction where facts did not place entity "at home" in the state).

FENWICK & WEST LLP

FENWICK & WEST LLP

2.     **Plaintiff Also Cannot Establish Specific Jurisdiction Over Yuga Labs**

Specific jurisdiction is also lacking.  To invoke specific jurisdiction, plaintiff must show that: (1) Yuga Labs directed its activities at Nevada ("purposefully availed itself" of the privilege of conducting activities in the state) so as to "invoke[e] the benefits and protections of its laws;" (2) the claim "arises out of or relates to the defendant's forum-related activities;" and (3) jurisdiction must "comport with fair play and substantial justice, i.e. it must be reasonable." *Schwarzenegger*, 374 F.3d at 802.  This test "ensures that a defendant will not be haled into a jurisdiction solely as a result of 'random,' 'fortuitous,' or 'attenuated contacts.'" *Burger King Corp. v. Rudzewicz*, 471 U.S. 462, 475 (1985).  "If any of the three requirements is not satisfied, jurisdiction in the forum would deprive the defendant of due process of law." *Omeluk v. Langsten Slip & Batbyggeri A/S*, 52 F.3d 267, 270 (9th Cir.1995).  It is plaintiff's burden to satisfy "the first two prongs of the test." *Schwarzenegger*, 374 F.3d at 802.  He does not come close.

a.     **There Is No Jurisdiction Over Yuga Labs Based On The BAYC**

Plaintiff's boilerplate claim that Yuga Labs directs its conduct at Nevada and its residents by maintaining a "club that includes members in Nevada" and in providing websites accessible by them (FAC ¶ 21), is not sufficient to establish specific personal jurisdiction here.  Even if plaintiff were considered a member of the virtual Bored Ape Yacht Club (and, as discussed herein, unless he holds a Bored Ape NFT *at the time in question*, he is not), jurisdiction over a nationwide entity is not established simply because it has members in a given state, and this is true even if the organization interacts with or benefits those members.  *See, e.g, O'Handley v. Padilla*, 2022 WL 93625, at *25 (N.D. Cal. Jan. 10, 2022) ("[n]ational organizations are not subject to jurisdiction in every state where their members live"); *Baton v. Ledger SAS*, 2021 WL 5226315, at *6 (N.D. Cal. Nov. 9, 2021) ("[A] finding [of] purposeful direction cannot 'be based on the mere fact that [an entity] provides services to customers nationwide, including but not limited to [the forum state].'"); *see also Doe v. Nat'l Conference of Bar Examiners*, 2017 WL 74715, at *5-6, 9 (E.D.N.Y. Jan. 6, 2017) (no jurisdiction over national organization where it had no physical presence in forum state, its sales into the forum state were minimal, and its contacts with the forum state were merely "episodic and responsive"); *Midwest Fur Producers Ass'n v. Mutation*

*Mink B. Ass'n*, 102 F. Supp. 649, 651-52 (D. Minn. 1951) (no jurisdiction over foreign trade association, even though members lived in forum and benefited from the association's activities).

### b. Purported Sales In Nevada Do Not Establish Jurisdiction

It is well-established that "[t]he placement of a product into the stream of commerce, without more, is not an act of the defendant purposefully directed toward the forum State." *Asahi Metal Indus. Co. v. Superior Court*, 480 U.S. 102, 112 (1987).  Thus, it follows, the mere fact that Bored Ape NFTs ultimately ended up in the hands of a Nevada resident does not support personal jurisdiction over Yuga Labs in Nevada.  Even if plaintiff had shown that *Yuga Labs* sold Bored Ape NFTs to Nevada residents (he does not), that would not suffice to establish jurisdiction here. Plaintiff admits he bought his Bored Ape NFTs from third party sellers, not Yuga Labs, and those sales have no connection to his claims, which arise from *theft* of his NFTs, not his purchase of them.  *See ThermoLife Int'l, LLC v. NetNutri.com LLC*, 813 F. App'x 316, 318 (9th Cir. 2020) (rejecting jurisdiction based on "nonspecific, nationwide sales" where contact with forum was "random, fortuitous, or attenuated" and claims did not relate to forum state contacts); *see also Baton*, 2021 WL 5226315, at *8-11 (no jurisdiction based on sales of cryptocurrency wallets to forum state residents who sued defendant in tort based on data breach by third parties); *Imageline, Inc. v. Hendricks*, 2009 WL 10286181, at *4 (C.D. Cal. Aug. 12, 2009) (no personal jurisdiction based on sales to California residents where "sales . . . were not specifically directed contacts, but instead occurred only because the purchasers . . . happened to reside in California").

### c. There is No Jurisdiction Based On Purported Advertising

Alleged efforts *by third parties* to engage Nevada residents via "advertisements, airdrops, and exclusive commercial opportunities" (FAC ¶¶ 22, 69-74) do not suggest that *Yuga Labs* directed any activities at Nevada.  *See, e.g.*, *AMA Multimedia, LLC v. Wanat*, 970 F.3d 1201, 1211-12 (9th Cir. 2020) (affirming dismissal for lack of personal jurisdiction where third parties could use defendant's website to direct ads at forum state residents, but defendant "d[id] not personally control the advertisements"); *Spacey v. Burgar*, 207 F. Supp. 2d 1037, 1044-45 (C.D. Cal. 2001) (no personal jurisdiction based on third parties' advertisements on defendants' websites "[a]bsent any reliable evidence that Defendants were involved in the solicitation and

FENWICK & WEST LLP

negotiation of advertisement placements" and finding "conclusory statements on the matter are insufficient" to meet plaintiffs' burden).

Here, plaintiff points to Nevada billboards and bus stop ads featuring pictures of Bored Apes to assert jurisdiction.  FAC ¶¶ 22, 70.  While the FAC feigns ignorance about Yuga Labs' relationship to the ads in question (*see* FAC ¶ 70 – claiming "[i]t is unclear what role BAYC itself played in the advertising campaign" and speculating it is "[m]ore likely" that BAYC "implicitly allowed" the campaign to be conducted), there is no need for guesswork.  In a May 2, 2022 letter, ***plaintiff and his counsel were specifically told*** that Yuga Labs "did not post the billboards and bus stop advertisements" that are now being used to allege jurisdiction in the FAC.  *See* Bretan Decl., ¶ 7.  Yuga Labs' CEO also provided a declaration (in support of the prior motion to dismiss, and again here), attesting that "Yuga Labs has never purchased or used any physical advertising space in the state of Nevada and has never held a sales or marketing event – or an event of any kind – within the state of Nevada."  ECF No. 53 at ¶ 3; Muniz Decl. ¶ 3.  Far from having support for the "advertising" based contentions in the FAC, plaintiff knows those claims are baseless.  *See Alexander v. Circus Circus Enters., Inc.*, 972 F.2d 261, 262 (9th Cir. 1992) ("[A court] may not assume the truth of allegations in a pleading which are contradicted by affidavit.").

As the Ninth Circuit explained in *Wanat*, third party ads targeting residents of a particular forum do not constitute express aiming by a defendant because that would "impermissibly allow[] a plaintiff's contacts with the . . . forum to drive the jurisdictional analysis."  970 F.3d at 1211 (quoting *Walden v. Fiore*, 571 U.S. 277, 289 (2014)).  More significant still, even if Yuga Labs ***itself*** advertised to Nevada residents in Nevada (and it has not), there is still no jurisdiction because plaintiff's claims do not arise ***out of*** those advertisements.  *See Schwarzenegger*, 374 F.3d at 802 (no personal jurisdiction unless claim "arises out of or relates to the defendant's forum-related activities"); *cf. Sinatra v. Nat'l Enquirer, Inc.*, 854 F.2d 1191, 1195-98 (9th Cir. 1988) (finding purposeful availment where claim itself was based on content of the ads at issue).

### d.     There Is No Jurisdiction Based On Yuga Labs' Internet Presence

Nor is it sufficient for plaintiff to point to the BAYC website or social media channels. Whether the operation of a website constitutes "express aiming" sufficient to confer personal

FENWICK & WEST LLP

jurisdiction "is directly proportionate to the nature and quality of commercial activity that an entity conducts" through the website. *Zippo Mfg. Co. v. Zippo Dot Com, Inc.*, 952 F. Supp. 1119, 1124 (W.D. Pa. 1997); *see Cybersell, Inc. v. Cybersell, Inc.*, 130 F.3d 414, 419 (9th Cir. 1997) (adopting Zippo sliding scale test). There can be no personal jurisdiction based on a "passive [w]eb site that does little more than make information available to those who are interested in it." *Zippo*, 952 F. Supp. at 1124; *see also Pebble Beach*, 453 F.3d at 1159 (website advertising B&B accommodations, including lodging rates, menu, and wine list, was passive and thus insufficient to confer personal jurisdiction). Even where a website allows users to share information, personal jurisdiction only exists if the exchange is "commercial" in nature. *Zippo*, 952 F. Supp. at 1124.

A website that "simply post[s] information . . . which is accessible to users in foreign jurisdictions" is passive and not enough. *Id.*; *see also Software Dev. & Inv. of Nevada v. Wall*, 2006 WL 8442597, at *2 (D. Nev. Feb. 13, 2006) (no specific personal jurisdiction based on "passive websites provide information and advertising"). "There has to be something more . . . to indicate that the defendant purposefully (albeit electronically) directed his activity in a substantial way to the forum state." *Desert Rock Entm't II LLC v. D. Hotel & Suites, Inc.*, 2016 WL 1732724, at *3 (D. Nev. May 2, 2016) (internal quotations omitted).

*Software Development* is instructive. There, the court held that defendant's maintenance of "a 'blog' where he and third parties [could] post comments and remarks[,] which constitute[d] the majority of the site's format," was not sufficiently commercial to confer personal jurisdiction, even though defendant also allegedly sold a book through the site. *Software Dev.*, 2006 WL 8442597, at *3. The court rejected jurisdiction "based on the mere possibility that Defendant will sell books to Nevada residents," finding "minimal purchases" by forum residents on the website "insufficient." *Id.* Although the blog was "interactive in the sense that it allow[ed] individuals to read and post comments on a forum," it did "not rise to the level of interactivity to tip the 'sliding scale' in favor of personal jurisdiction." *Id.*; *see also Medinah Mining, Inc.*, *v. Amunategui*, 237 F. Supp. 2d 1132, 1135 (D. Nev. 2002) (website allowing public to view and post information on companies was passive and thus insufficient to confer personal jurisdiction).

If the *Software Development* and *Medinah* sites were not sufficiently commercial so as to

confer personal jurisdiction, then the same is true of the BAYC Twitter and Discord, which are, as plaintiff admits, the primary information and communication platforms adopted by the NFT projects and the community of enthusiasts. FAC ¶¶ 26-28, 30. Visitors go to the sites learn about announcements, read FAQs, discuss Yuga Labs' (or their own) projects and interests with other NFT enthusiasts, or to visit Yuga Labs' official channels through verified links. *See also* Muniz Decl. ¶ 10. If anything, the BAYC Twitter and Discord are even less interactive than the blog in *Software Development* because nothing is sold through the sites. *Id.* While the sites may be open to Nevada residents, they do not target them. Muniz Decl. ¶ 12; *see TransparentBusiness, Inc. v. Infobae*, 2021 WL 2670704, at \*3-4 (D. Nev. June 29, 2021). In short, they offer ***nothing*** "more" to establish specific personal jurisdiction over Yuga Labs. *Desert Rock*, 2016 WL 1732724, at \*4.

Plaintiff's limited interaction with a BAYC Discord representative does not alter the equation. This is because "the relationship must arise out of contacts that the 'defendant *[it]self*' creates with the forum State," and the defendant's contacts must be "with the forum State itself, not . . . with persons who reside there." *Walden*, 571 U.S. at 284-85; *see also Helicopteros Nacionales de Colombia, S.A. v. Hall*, 466 U.S. 408, 417 (1984) (the relevant inquiry is "whether a defendant has sufficient contacts with a forum State to justify an assertion of jurisdiction," not plaintiff's unilateral activity). Yuga Labs did not initiate the interaction with plaintiff here. *See* FAC ¶ 89. Even if it had, that is just remote contact with a person residing in the forum, not contact ***with the forum itself***. *See Walden*, 571 U.S. at 285. ("[T]he plaintiff cannot be the only link between the defendant and the forum . . . [and] . . . it is the defendant's conduct that must form the necessary connection . . . ."). Indeed, courts routinely find that customer support services are not commercial activity sufficient to establish personal jurisdiction over a defendant. *See, e.g.*, *Boehm v. Airbus Helicopters Inc.*, 527 F. Supp. 3d 1112, 1119-20 (D. Ariz. 2020); *Nimbus Data Sys., Inc. v. Modus LLC*, 2014 WL 7387200, at \*5 (N.D. Cal. Dec. 29, 2014); *Treasury Mgmt. Servs., Inc. v. Wall St. Sys. Del. Inc.*, 2016 WL 6916236, at \*7 (S.D. Tex. Mar. 16, 2016).

The claims themselves must also "arise[] out of or relate[] to the defendant's forum-related activities." *See Schwarzenegger*, 374 F.3d at 802. Stated differently, the forum-directed activity must be a "but for" cause of plaintiff's harm. *Ballard v. Savage*, 65 F.3d 1495, 1500 (9th Cir.

FENWICK & WEST LLP

1995).  Nothing in Yuga Labs' website, or on Twitter or Discord, was a "but for" cause of the alleged harms here.  Plaintiff did not buy his Bored Ape NFTs from Yuga Labs.  *See* FAC ¶¶ 34-37.  Yuga Labs did not cause him to contact @Nodelee on another project's Discord to trade his Bored Ape NFTs.  *See id*. ¶¶ 80-81.  And Yuga Labs did not deploy a phishing scam to steal them.  *Id*. ¶¶ 82-85.  The attenuated claim that "BAYC has conducted transactions with Nevada residents through each of" its websites (FAC ¶ 79) is accordingly of no consequence.  Even if social media and websites hosted by Yuga Labs could be deemed forum-directed activities (they are not), plaintiff's claims (based on events that had ***already transpired***) do not arise out of or relate to any of them.  In such circumstances, personal jurisdiction is not established.  *See Schwarzenegger*, 374 F.3d at 802.

### e.   The Exercise Of Jurisdiction Is Unreasonable.

In the absence of ***any*** activity by Yuga Labs in or directed at Nevada, much less activity even arguably tied to plaintiff's claimed harm, the exercise of jurisdiction here is not reasonable.  *Paccar Int'l, Inc. v. Commercial Bank of Kuwait, S.A.K.*, 757 F.2d 1058, 1065-66 (9th Cir. 1985).  In assessing the issue, the Ninth Circuit evaluates many factors, including:  (1) the extent of the purposeful interjection into the forum state, (2) the burden on defendant of defending in the forum, (3) the extent of conflict with the sovereignty of defendant's state, (4) the forum state's interest in adjudicating the dispute, (5) the most efficient judicial resolution of the controversy, (6) the importance of the forum to plaintiff's interest in convenient and effective relief, and (7) the existence of an alternative forum.  *See id*.  Here, these factors overwhelmingly reflect that jurisdiction over Yuga Labs in Nevada is not reasonable.  Yuga Labs directed no actions at the state.  It is a Delaware entity, has no employees in Nevada, and any evidence relating to it would be outside the state.  Muniz Decl. ¶¶ 2-3.  Because relief in a forum of general jurisdiction is available, and as there is no special state interest to speak of, burdening Yuga Labs with litigation in Nevada simply because plaintiff ***may*** be here is both unwarranted and unreasonable.[2]

---

[2] Records reflect that plaintiff sold his Incline Village residence prior to filing the FAC and so may not, in fact, still live in Nevada.  *See* Bretan Decl. ¶¶ 3-4, Exs. B, C.  Plaintiff's counsel did not respond to an inquiry on this point.  *Id*.

FENWICK & WEST LLP

**B.    Plaintiff Still Fails To State A Claim For Negligence Against Yuga Labs**

Even if plaintiff had met his jurisdictional burden, the negligence claim fails as a matter of law.  FAC ¶¶ 206-15; *see Starr v. Baca*, 652 F.3d 1202, 1216 (9th Cir. 2011) (plaintiff must offer facts to "plausibly suggest an entitlement to relief, such that it is not unfair to require the opposing party to be subjected to the expense of discovery and continued litigation").  In Nevada, to plead negligence, plaintiff must allege "(1) the defendant owed the plaintiff a duty of care, (2) the defendant breached that duty, (3) the breach was the legal cause of the plaintiff's injuries, and (4) the plaintiff suffered damages." *Foster v. Costco Wholesale Corp.*, 291 P.3d 150, 153 (Nev. 2012) (quotation omitted); *accord Sanchez v. Wal-Mart Stores, Inc.*, 221 P.3d 1276 (Nev. 2009).  The FAC fails as to all four elements.

**1.    Yuga Labs Owed No Duty Of Care To Plaintiff**

Plaintiff does not and cannot plausibly allege Yuga Labs owed him "an existing duty of care."  This defect is fatal. *Insco v. Aetna Health & Life Ins. Co.*, 673 F. Supp. 2d 1180, 1191 (D. Nev. 2009) (absent an "existing duty of care" there is no prima facie claim for negligence); *see also Spartalian v. Citibank, N.A.*, 2013 WL 593350, at *6 (D. Nev. Feb. 13, 2013) (dismissing negligence claim where Nevada law did not recognize plaintiff's alleged duty).  Under Nevada law, "liability based on negligence does not exist in the absence of a breach of duty." *Bradshaw v. Blystone Equip. Co. of Nev.*, 386 P.2d 396, 397 (Nev. 1963); *see also Sanchez*, 221 P.3d at 1280-81.  Whether a duty of care exists is a question of law for the Court. *Id*. at 1280.

The purported "duties" plaintiff manufactures here ***do not exist as a matter of law***, and the claim against Yuga Labs must be dismissed.  Without any support, plaintiff avers that Yuga Labs had a "duty to monitor and maintain" the BAYC community to "ensur[e] that the BAYC NFTs used to access private benefits on the BAYC platform were not the product of theft or fraud and being improperly used to gain access," to respond and act quickly when stolen Bored Ape NFTs were detected or reported by users, and to alert and cooperate with law enforcement to retrieve stolen Bored Ape NFTs.  FAC ¶¶ 13, 207.  Plaintiff also invents a purported duty "to provide adequate customer service and reporting measures" so that illegal activity regarding Bored Ape NFTs can be reported to "competent customer service agents." *See id*. ¶¶ 13, 208.

FENWICK & WEST LLP

Setting aside the baseless suggestion that Yuga Labs would not assist law enforcement, Yuga Labs has found no case in the Ninth Circuit, or elsewhere, recognizing anything close to these purported "duties,"[3] much less basing a finding of negligence on breach of them.[4]  On the contrary, in the only case involving digital assets and similar factual circumstances, a court in the United Kingdom recently held that the defendant developers of a digital currency *had no duty* to protect against theft of users' digital assets by third parties or to allow their users the means to recover stolen digital assets.  *See Tulip Trading Ltd. v. Bitcoin Ass'n for BSV & Others* [2022] EWHC 667 (Ch) BL-2021-000313; Bretan Decl., Ex. A ("*Tulip Trading*").  *Tulip Trading* is directly on point and is consistent with Nevada law holding that a private entity has no duty to protect another from the criminal activity of a third party unless a special relationship exists.  *See Scialabba v. Brandise Constr. Co.*, 921 P.2d 928, 930 (Nev. 1996).  Absent such a relationship, and with no showing that Yuga Labs voluntarily assumed any such duties otherwise, plaintiff's negligence claim must be dismissed.

### a.    Plaintiff Has No Special Relationship With Yuga Labs

As noted, there is no duty to control the dangerous conduct of another under Nevada law (such as protecting against a third-party attack) absent a special relationship among the parties. *See Scialabba*, 921 P.2d at 930; *see also Beckman v. Match.com, LLC*, 2017 WL 1304288, at \*3-4 (D. Nev. Mar. 10, 2017), *aff'd*, 743 F. App'x 142 (9th Cir. 2018).  Plaintiff (now) contends that his putative membership in the BAYC created a special relationship (*see* FAC ¶ 209), but that claim has no basis in law (or fact).  Nevada courts recognize special relationships in limited contexts, and club membership is *not* among them.  *See Lee v. GNLV Corp.*, 22 P.3d 209, 212 (Nev. 2001) (collecting cases recognizing a special relationship between innkeeper-guest, teacher-student, employer-employee, and restaurant-patron); *see also Scialabba*, 921 P.2d at 930 (collecting cases recognizing special relationship between landowner-invitee, businessman-patron, school district-

---

[3] In effect, plaintiff offers a circular theory of negligence:  manufacturing "duties" based on what Yuga Labs allegedly failed to do.  If that were enough, negligence could be made out every time.  If anything, the very opposite is true.  Because the claimed duties here *do not exist as a matter of law*, Yuga Labs cannot be shown to have breached them.

[4] In fact, Yuga Labs' terms and conditions, which apply to holders of Bored Ape NFTs, expressly disclaim responsibility for the safety and management of the NFTs, for holders' digital wallets, and for transactions involving digital collectibles.  *See* Muniz Decl. ¶ 8; Bretan Decl., Exs. D, E.

FENWICK & WEST LLP

1   pupil, hospital-patient, and carrier-passenger).

2   More fundamentally, a special relationship requires that the "ability of one of the parties to

3   provide for his own protection has been *limited in some way by his submission to the control of*

4   *the other*." *Sparks v. Alpha Tau Omega Fraternity, Inc.*, 255 P.3d 238, 244-45 (Nev. 2011)

5   (emphasis added).  Control is a "crucial factor," it "must be real and not fictional and, if exercised,

6   would meaningfully reduce the risk of the harm that actually occurred." *Id.*  Absent such control,

7   "there is no special relationship." *Id.*  The conclusory assertion that purchasers of Bored Ape

8   NFTs somehow "submit[] themselves to BAYC's control" (FAC ¶ 209) does not suffice.  Far from

9   it.  Every single *fact* alleged by plaintiff demonstrates that Yuga Labs had *no control* over

10   plaintiff, his NFTs, his decision to engage with @Nodelee, and ultimately, his resulting loss.

11   At the outset, plaintiff never plausibly alleges what membership in the BAYC entails,

12   much less that Yuga Labs had the obligation (or ability) to protect him from losing his Bored Ape

13   NFTs as the result of any such "membership."[5]  Plaintiff's claimed "submission" to Yuga Labs'

14   control is also anathema to the defining feature of web3 (in which plaintiff is a willing participant),

15   namely, that control vests solely in the holder of a digital asset according to the blockchain.  But

16   even if one were to ignore those glaring issues, plaintiff will never be able to demonstrate that

17   *Yuga Labs somehow limited his ability* to: (1) avoid the decision to sell or trade his NFTs; (2)

18   avoid interacting with a purported purchaser with whom he was not familiar on a website with

19   which Yuga Labs has no relationship and over which it exercises no control; (3) avoid using basic

20   security tools and measures; (4) avoid using a trading site with which he was unfamiliar and which

21   he had not verified; (5) avoid conducting a trade or sale through a link provided by an anonymous

22   individual he did not know; (6) avoid clicking on a phishing link (and doing so multiple times);

23   and (7) avoid voluntarily providing access to his wallet and Bored Ape NFTs to a thief.  Of course,

24   there was no such limitation, and so the FAC contains no such allegations. *See Beckman*, 2017

25   WL 1304288, at *3-4 (no negligence claim where plaintiff was not under defendant's control).

26   What the FAC much more readily demonstrates is that Yuga Labs played *no role at all* in

27

28   ───────────────
   [5] Indeed, plaintiff *admits* Yuga Labs *does not* control secondary trading of Bored Ape NFTs and
   has *no ability* to undo "permanent and irreversible" transactions on the blockchain.  FAC ¶ 4.

FENWICK & WEST LLP

FENWICK & WEST LLP

1   plaintiff's predicament.  Plaintiff  purchased his Bored Ape NFTs from a secondary seller, not

2   Yuga Labs.  FAC ¶¶ 34, 36-37.  He admits that *he alone* decided to engage with an unknown

3   individual, on a Discord server for Cool Cats (an NFT collection and Discord server unaffiliated

4   with Yuga Labs), voluntarily opened a fake link, and chose to press a button providing access to

5   his self-custodied digital wallet to a thief.  *See* FAC ¶¶ 80-85.  Far from being able to limit

6   plaintiff's ability to protect himself, Yuga Labs had nothing whatsoever to do with plaintiff's

7   exercise of free will and this series of events.  And nothing even hints at a special relationship.

8       *Beckman* makes the point well.  In that case, plaintiff was assaulted by a man she met on

9   Match.com's dating service.  2017 WL 1304288, at *1.  Plaintiff sued Match for negligence, but

10  the Court dismissed the complaint, noting "Match was so far removed from any relationship

11  between [plaintiff and her attacker] at the time of the attack that no special relationship between

12  Match and [plaintiff] existed." *Id*. at *4.  The Ninth Circuit affirmed, holding "Nevada courts

13  have never recognized a special relationship akin to that between [plaintiff and defendant]," and

14  plaintiff failed to allege a special relationship where her ability to protect herself was in no way

15  limited by any "submission to the control of the other." *Beckman*, 743 F. App'x at 142-43; *see*

16  *also Bibicheff v. PayPal, Inc.*, 2020 WL 2113373, at *4-5 (E.D.N.Y. May 4, 2020), *aff'd*, 844 F.

17  App'x 394 (2d Cir. 2021).

18      As the FAC also makes clear, only plaintiff had the ability to protect himself from such

19  scams, not Yuga Labs.  When setting up the trade that ultimately led to the theft, plaintiff admits

20  that he refused to transact using trading sites with which he was "unfamiliar" and specifically

21  proposed NFT Trader because he heard (*not from Yuga Labs*) that it was "legitimate and

22  trustworthy."  FAC ¶ 81.  According to plaintiff, "[m]any illegal thefts and transfers of BAYC

23  NFTs have been highly publicized across the internet and garnered national media attention." *Id*.

24  ¶ 210.  Not only was plaintiff aware of the risk of online theft of his NFTs, he had the ability to

25  protect himself.  In no way was his ability to do so limited by submission to the control of another,

26  and certainly not on account of claimed "membership" in the BAYC. *Sparks*, 255 P.3d at 245.[6]

---

[6] There is also no duty to warn or protect plaintiff where the danger was "open and obvious."
*Doe v. SexSearch.com*, 551 F.3d 412, 420 (6th Cir. 2008) ("Where only one conclusion can be
drawn from the established facts, the issue of whether a risk was open and obvious may be

Laid bare, plaintiff's central grievance is that, because Yuga Labs created a series of NFTs that are now considered "blue-chip" (*i.e.*, highly coveted digital art collectibles), and because holders of Bored Ape NFTs may get certain benefits and opportunities, Yuga Labs somehow has a duty to protect him (and all others in the community) from third-party theft, resale, and use. *See, e.g.*, FAC ¶ 213 ("But for BAYC's breach of its duty of reasonable care owed to Mr. Armijo as a BAYC club member, Mr. Armijo's BAYC NFTs would not have been a target for thieves because their utility would have been significantly diminished. It was BAYC's breach of its duties that caused Mr. Armijo to lose access and benefits provided by BAYC to its BAYC NFT owners."). But nothing in those claims suggests a special relationship with Yuga Labs or its control over plaintiff. *See Scialabba*, 921 P.2d at 930; *see also Wiley v. Redd*, 885 P.2d 592, 595-96 (Nev. 1994) (no special relationship between alarm company and police department that the company alerted); *Sanchez*, 221 P.3d at 1280-81 (no special relationship between pharmacy and third parties harmed by pharmacy's patients).[7] Just because the Bored Ape project was met with great success, and the NFTs became valuable, does not mean that *Yuga Labs* now has a special duty to provide protection to the BAYC community, as plaintiff suggests. FAC ¶ 156.

The consequences of accepting plaintiff's theory is not trivial. It would introduce endless liability for creators of goods that might, one day, be the target of theft. The absurdity of that proposition is self-evident. Imagine a Ferrari owner suing the manufacturer, or car club, because months (or years) after she purchased it on the secondary market, she left the garage door open, with the keys in the ignition, and her car was stolen. The practical impact and cost of imposing a duty on creators or clubs to protect all downstream purchasers or members from harm (or to deter attacks) is also contrary to public policy, and weighs against imposition of a new legal duty where none exists. *See Wiley*, 885 P.2d at 596 ("[W]e perceive no sound basis for extending the reach of

---

decided by the court as a matter of law."). Here, plaintiff **admits** that the risk of attacks by NFT scammers and thieves online was no secret. *Id.* ("Internet users' anonymity and potential for false personal representations are well known.").

[7] Absent a special relationship, whether or not Yuga Labs was aware that owners of its NFTs may be targets of scammers and thieves (FAC ¶ 116) is also irrelevant. *Beckman*, 2017 WL 1304288, at *4 ("Only after a special relationship is established does the defendant have a duty to warn foreseeable victims of foreseeable harms."); *Sanchez*, 221 P.3d at 1280-81 (no duty to aid others unless **both** a special relationship exists **and** the harm from defendant's conduct is foreseeable).

FENWICK & WEST LLP

duty to include [defendant] under the circumstances of this case.").[8]  Creators of coveted NFTS,

like Yuga Labs' Bored Ape NFTs, simply cannot insure against every unrelated, downstream loss.

That is particularly true here, where Yuga Labs had nothing whatsoever to do with the

circumstances leading to the theft of plaintiff's NFTs.

**b.    There Is No Other Basis To Impose A Duty On Yuga Labs**

Plaintiff's inability to plead a special relationship is fatal to his negligence claim against

Yuga Labs.  Suggesting that it had a "duty to monitor" or "to provide adequate customer service"

does not salvage the claim.  FAC ¶¶ 207-08.  There is no general duty to monitor the provision of

its services to prevent theft.  *See Bledsoe v. US Bancorp*, 2013 WL 12129951, at *5 (C.D. Cal.

June 12, 2013) (dismissing negligence claim and rejecting theory that bank had a duty to prevent

fraudulent activity or to maintain adequate safeguards); *see also Tapia v. Cal-W. Reconveyance

Corp.*, 2012 WL 3231018, at *5 (D. Nev. Aug. 6, 2012) (dismissing negligence claim where

"[d]efendants had no extra-contractual duty to exercise reasonable care to protect borrowers or to

advance their interests"); *Bibicheff*, 844 F. App'x at 395-96 (summary order) (website has no duty

to monitor for and investigate third party accounts used to commit fraud).[9]  Nor does plaintiff

plausibly allege that Yuga Labs or its employees somehow voluntarily assumed a duty of care in

connection with the theft of his NFTs.  That argument is foreclosed by plaintiff's ***admission*** that,

when he contacted Yuga Labs' support, "the employee told Mr. Armijo that … there was nothing

further BAYC could do to help him." FAC ¶¶ 89-91.  No other interaction with Yuga Labs or its

employees is alleged.

---

[8] Finding a duty here also suggests an open-ended duty to investigate, which courts disfavor. *See Yanase v. Auto. Club of S. Cal.*, 212 Cal. App. 3d 468, 475-76 (1989) (no special relationship between plaintiff injured at motel and maker of lodging guide, because court "would be imposing not just a duty to warn but a duty to investigate, monitor and evaluate reports of off-premises dangers"); *see also Tulip Trading*, Ex. A at p. 25, ¶ 105 (rejecting duty where defendants "would be obliged to investigate and address any claim that a person had lost their private keys or had them stolen.  How they would go about that in practice . . . is wholly unclear.").

[9] Yuga Labs has identified no case where a court imposed a duty to provide adequate customer service or reporting measures.  If anything, the cases suggest otherwise. *See, e.g., Phoneternet, LLC v. LexisNexis Risk Solutions, Inc.*, 2019 WL 4748271, at *11 (N.D. Tex. Sept. 30, 2019) (rejecting negligence claim where "no legal authority [] support[s] [plaintiff's] contention that [defendant] owed it or breached a duty arising from a special relationship based on [calls to defendant's] customer service department and representations made during those calls."), *aff'd*, 816 F. App'x 909 (5th Cir. 2020).

FENWICK & WEST LLP

FENWICK & WEST LLP

### 2.    Plaintiff Cannot Allege That Yuga Labs Caused His Injury

Plaintiff's negligence claim also fails because the FAC does not allege that Yuga Labs caused his injury.  The conclusory assertion that "[Yuga Labs'] negligence was a direct and proximate cause of Mr. Armijo's resulting damages" from the theft of his NFTs is not enough.  FAC ¶ 213; *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (court need not accept as true mere "labels and conclusions" or a "formulaic recitation of the elements.").  More fundamentally, no injury flowed from any claimed breach by Yuga Labs.  *Goodrich & Pennington Mortg. Fund, Inc. v. J.R. Woolard, Inc.*, 101 P.3d 792, 797 (Nev. 2004) (to demonstrate actual cause, plaintiff must allege that "but for" defendant's actions, plaintiff would not have suffered the injury).  The problem plaintiff faces is that, even if Yuga Labs fulfilled each of the supposed "duties" (FAC ¶ 211), ***he still would have suffered the alleged injury***.  The injury here resulted from (1) an alleged criminal act; and (2) plaintiff's own missteps.  *Id.* ¶¶ 80-85.  But for ***those*** acts, plaintiff's NFTs would not have been stolen, and he would not have lost the associated rights in them.  Plaintiff alone decided to trade his NFTs with an anonymous third party (*id.* ¶¶ 81-82) and, as a result, fell prey to a phishing scam (*id.* ¶ 84).  Yuga Labs is noticeably absent in that chain of events and thus cannot be the actual or legal cause of his injury.  *See PayPal*, 844 F. App'x at 395 (causation lacking where alleged injury was the result of third party's misuse of plaintiff's financial data).

### 3.    The Economic Loss Doctrine Bars Any Claimed Damages

Even if plaintiff could establish that Yuga Labs owed him a duty, breached that duty, and somehow caused him harm, the negligence claim still fails where only economic harm is alleged.  The economic loss doctrine bars recovery for economic losses absent personal injury or damage to other property.  *Local Joint Exec. Bd. of Las Vegas, Culinary Workers Union, Local No. 226 v. Stern*, 651 P.2d 637, 638 (Nev. 1982).  The purpose of the rule "is to shield a defendant from unlimited liability for all of the economic consequences of a negligent act . . . and thus to keep the risk of liability reasonably calculable." *Id.* at 638. [10]  In an overt effort to avoid this bar, the FAC removes all references to plaintiff's monetary losses and now attempts to recast that economic

---

[10] The late addition of contract claims, seeking recovery for the same harms (FAC ¶ 180), is just further evidence that the FAC is an attempted end-run of the economic loss doctrine.

injury as "loss of his property," "loss of his legal interest in membership in the BAYC club," and "loss of his commercialization rights to the ape characters underlying his BAYC NFTs." *See* FAC ¶ 213.[11]  Post hoc wordsmithing aside, these "benefit of the bargain" losses (all of which are clearly economic in nature – including BAYC membership – which is no different than loss of the Bored Ape NFT itself) are *precisely* what the economic loss doctrine prohibits. *Calloway v. City of Reno*, 993 P.2d 1259, 1263 (Nev. 2000) *overruled on other grounds by Mahon v. Howard & Howard Attorneys PLLC*, 499 P.3d 1176 (Nev. 2021) ("[T]here can be no recovery in tort for purely economic losses" which are defined as "the loss of the benefit of the user's bargain"). Because no personal injury or property *damage* is alleged, the doctrine bars such a claim. *See Stern*, 651 P.2d 637; *ARCO Prods. Co. v. May*, 948 P.2d 263, 266 (Nev. 1997).

### C.   The New Contract Claims Have No Basis In Law Or Fact

#### 1.   No Contract Providing For "Rightful" Membership Was Formed

Plaintiff's contract claims suffer from numerous facial deficiencies.  As an initial matter, the parties did not form a contract entitling plaintiff to perpetual membership rights, as he alleges, simply because the BAYC Twitter account accurately states that one must "buy a Bored Ape or Mutant Ape on OpenSea" to become "a member."  That is a statement of fact, not an "invitation" to lifetime membership as plaintiff would have the Court believe.  *See* FAC ¶ 172.  Even if the statement could be viewed as generally promoting membership in the community of Bored Ape NFT holders, it does not act as a contractual "offer" to join the BAYC, because advertisements are "uniformly regarded as mere preliminary invitations which create no power of acceptance in the recipient." *Foremost Pro Color, Inc. v. Eastman Kodak Co.*, 703 F.2d 534, 539 (9th Cir. 1983).  Advertisements count as offers only where they "invite the performance of a specific act without further communication and *leave nothing for negotiation*." *Sateriale v. R.J. Reynolds Tobacco Co.*, 697 F.3d 777, 788 (9th Cir. 2012) (emphasis added).  Here, Yuga Labs' purported "offer" said nothing at all about what membership entails.[12]  Nor does it even hint at the term

---

[11] Plaintiff fails to ground his damages claims in reality (FAC ¶ 213) and never reconciles them with the fact that the theft occurred while attempting to *trade away* one of his NFTs.  *Id.* ¶ 80.
[12] Although plaintiff claims the parties "intended to contract with each other, and promises were exchanged" (FAC ¶ 175), no terms are identified, much less what promises plaintiff made or exchanged.  Such conclusory allegations are insufficient to establish contract formation.

FENWICK & WEST LLP

FENWICK & WEST LLP

1  plaintiff contends Yuga Labs allegedly breached:  that Yuga Labs would continue to provide

2  membership benefits to "rightful" owners of a Bored Ape or Mutant Ape NFT irrespective of

3  whether they hold an NFT according to the blockchain.  *See,* e.g., FAC ¶¶ 158, 178-179.

4  <b>2.</b>  <b>The Actual Bored Ape NFT Terms Preclude Plaintiff's Claim</b>

5  To the extent that the NFTs themselves carry with them, from holder to holder, certain

6  rights which may have accrued to plaintiff when he purchased his Bored Ape NFTs, plaintiff does

7  not point to any language – anywhere – stating that membership benefits survive where an

8  individual no longer holds a Bored Ape NFT according to the blockchain.  If anything, the

9  opposite is true.  As plaintiff readily (and repeatedly) admits, **holding** a Bored Ape NFT is "the

10  key to membership into the exclusive BAYC Club."  *See,* e.g., FAC ¶ 7 (admitting "the token

11  itself doubles as your membership"); *id*. at ¶ 40 ("[m]embership is predicated on ownership of a

12  BAYC NFT (or affiliated NFT)." )  He also admits that membership is tied to the NFT itself, not

13  claimed "rightful" ownership.  *See id*. at ¶ 41 ("[BAYC NFTs] also serve as a type of digital

14  identity and club ID card, allowing owners of the BAYC NFTs to receive special rights and

15  privileges based on confirming proof of ownership through the blockchain ledger."); *id*. at ¶ 154

16  (membership is based on "first verifying that they own and possess a numbered BAYC NFT (or

17  affiliate NFT), [and such] . . . verification process is done through technological review of the

18  blockchain ledger, which clearly tracks the history of each BAYC NFT").  Simple logic and

19  technological reality dictate that, if the NFT serves as the digital identity or "membership" key,

20  only one person can hold that unique identifier at a time – that is, the current holder according to

21  the blockchain.  Thus, the **only** "members" of the BAYC at any given point are those who hold

22  Bored Ape NFTs on the blockchain, not former holders (like plaintiff) or anyone else.

23  As the Terms & Conditions applicable to holders of Bored Ape NFTs further provide:

24  "[o]wnership of the NFT is mediated entirely by the Smart Contract and the
   Ethereum Network:  at no point may we seize, freeze, or otherwise modify the

25  ownership of any Mutant Ape."

26  Bretan Decl., Exs. C, D (BAYC and MAYC Terms & Conditions). [13]  Thus, even if one becomes

27  ―――――――――――――――――――――――――
[13] Plaintiff specifically alleges that BAYC's official website, boredapeyachtclub.com, contains
   terms applicable to the NFTs and their holders.  *See* FAC ¶ 173 ("The offer is explained in further

28  detail on BAYC's official website ….").  Bretan Decl. ¶¶ 5-6, Exs. D, E.

a member of the BAYC by acquiring a Bored Ape NFT, the terms that plaintiff admits govern *expressly disclaim* the very obligation that he claims Yuga Labs breached.  There is no ambiguity here.  These allegations, all of which are "reallege[d] and incorporate[d]" into plaintiff's claim for breach of contract, bar any such claim.  *Gunter v. United Fed. Credit Union*, 2016 WL 3457009, at *2 (D. Nev. June 22, 2016) ("In the absence of ambiguity, contract interpretation is an issue of law for the court, and may be decided on a motion to dismiss.").

By contrast, if BAYC membership were predicated on plaintiff's amorphous claims of "rightful" ownership – as opposed to being a holder of the NFT according to the blockchain – it would force Yuga Labs to adjudicate disputes between multiple parties all claiming rights to an NFT.  But Yuga Labs has zero control over or ability to assess "rightful" ownership of the NFT – which is a legal determination, and which is often far from clear.[14]  *See* Muniz Decl. ¶ 7.  This puts Yuga Labs right in the middle of a dispute between two (or potentially *more*) third parties and is a no-win situation.  Effectively, as plaintiff would have it, Yuga Labs should deny bona fide Bored Ape NFT holders the ability to participate, while providing token-gated access and participation to non-NFT holders (an impossibility), just based on a claimant's "rightful" say so. *See* FAC ¶¶ 1, 91.  That is an unworkable position and is why, as clearly set forth in the Terms & Conditions applicable to NFT holders, the rights inherent in holding Bored Ape NFTs are based entirely on the blockchain.  It is also why, as the BAYC terms unequivocally state, NFT holders (not Yuga Labs) are:  "entirely responsible for the safety and management of their own private Ethereum wallets and validating all transactions and contracts . . . [and] as the [Bored Ape/Mutant Ape] Yacht Club smart contract runs on the Ethereum network, there is no ability to undo, reverse, or restore any transactions."  *See* Muniz Decl. ¶ 8, Bretan Decl., Exs. D, E.

Dispatching the FAC's newly-minted contract claim is straightforward.  Plaintiff does not hold any Bored Ape NFT according to the blockchain.  Absent holding a Bored Ape NFT, there is no "membership right" in the BAYC, regardless of the circumstances.  Nor is there any other

---

[14] *See* Phoenix Angell, "*Not All NFTs That Are Reported Stolen Are Actually Stolen*," SCREENRANT (July 16, 2022), https://screenrant.com/nfts-theft-reported-stolen-opensea-abuse/ (noting hundreds of "big-name NFTs that had been stolen" and asserting "many of [these NFTs] aren't actually stolen, but were still reported as stolen by malicious users").

FENWICK & WEST LLP

1   agreement providing the rights plaintiff seeks.  Because plaintiff does not and cannot allege

2   mutual assent to a contract providing continuing membership rights in the BAYC to those who do

3   not hold a Bored Ape NFT according to the blockchain, his purported breach of contract claim

4   must be rejected.  *See Patel v. Am. Nat'l Prop. & Cas. Co.*, 367 F. Supp. 3d 1186, 1192 (D. Nev.

5   2019) (granting motion to dismiss where complaint did not allege "what terms of the contract

6   were allegedly breached and the manner in which Defendant allegedly breached them").

7        **D.**     **Plaintiff States No Claim For Breach Of The Implied Covenant**

8        As noted, no agreement to provide for continuing membership in the BAYC, irrespective

9   of holding a Bored Ape or Mutant Ape NFT, was ever formed (much less one based on a general

10   statement of fact on Twitter).  But even if such a contract had been formed, the claim for breach

11   of the implied covenant of good faith and fair dealing cannot be reconciled with that claim *as*

12   *alleged*.  Such a claim is available only where it is alleged that "the terms of a contract [were]

13   literally complied with but one party to the contract deliberately [contravened] the intention and

14   spirit of the contract."  *Hilton Hotels Corp. v. Butch Lewis Prods., Inc.*, 808 P.2d 919, 922-23

15   (Nev. 1991).  ***Plaintiff cannot have it both ways***.  Either Yuga Labs "literally complied" with the

16   contract, and thus there is no breach of contract stated, or it did not, and there is no claim for

17   breach of the implied covenant stated.

18        But even if that irreconcilable conflict could be overcome, Yuga Labs cannot be said to

19   have violated the "intention and spirit" of any agreement by doing ***precisely*** what the terms,

20   which plaintiff admits apply to holders of Bored Ape NFTs (*see* FAC ¶ 173),[15] said it would do:

21   rely on the blockchain to determine ownership and rely on NFT holders to safeguard themselves.

22   *See* Bretan Decl., Exs. D, E (noting "[o]wnership of the NFT is mediated entirely by the Smart

23   Contract and the Ethereum Network" and that "[u]sers are entirely responsible for the safety and

24   management of their own private Ethereum wallets"); *Silver State Broad., LLC v. Crown Castle*

25   *MU, LLC*, 2018 WL 6606064, at *5 (D. Nev. Dec. 17, 2018) (granting motion to dismiss claim

---

26   [15] *See also* FAC ¶ 41 (recognizing that "rights and privileges [are] based on confirming proof of
27   ownership through the blockchain ledger"); ¶ 154 (noting membership relies on "possess[ion] [of]
     a numbered BAYC NFT" and "verification . . . through . . . the blockchain ledger").  Stated in
     more functional terms, the smart contracts underlying the NFTs are programmed lines of code that
28   work precisely as designed – cryptographically identifying current holders of Bored Ape NFTs.

FENWICK & WEST LLP

FENWICK & WEST LLP

1  for breach of the implied contract of good faith and fair dealing where "[p]laintiff [did] not allege

2  anything about the 'intention and spirit' of the Licensing Agreement that would justify Plaintiff's

3  expectation" that defendant would take certain actions).  Where, as here, the implied covenant

4  claim is really no different than the breach of contract claim, dismissal is appropriate.  *Douglas*

5  *Coder & Linda Coder Family LLLP v. RNO Exhibitions, LLC*, 2020 WL 5995495, at *4 (D. Nev.

6  Oct. 9, 2020) (dismissing breach of the implied covenant claim where plaintiff alleged breach of

7  the contract, which is "incongruent" with an implied covenant that requires literal compliance and

8  a conflict with the spirit of the contract); *see also Dangelo v. Hartford Cas. Ins. Co.*, 2012 WL

9  4482818, at *2 (D. Nev. Sept. 27, 2012) (dismissing claim where plaintiff's allegations "may

10  support a claim for breach of contract, but are legally insufficient to establish how [defendant]

11  interfered with the intent of the contract").

12  **IV.   CONCLUSION**

13  Plaintiff allegedly put himself in a position to have his NFTs stolen and that is unfortunate.

14  But it does not provide him license to pursue baseless claims against others.  Here, where plaintiff

15  cannot demonstrate that personal jurisdiction over Yuga Labs is proper, and cannot otherwise

16  overcome the many, fundamental legal and factual deficiencies dooming his purported negligence,

17  breach of contract, and breach of the implied covenant claims, Yuga Labs respectfully requests

18  that its motion to dismiss be granted.  Having chosen to amend while Yuga Labs' prior motion to

19  dismiss was pending, the FAC is now plaintiff's second opportunity to try to state a claim.  This

20  has required Yuga Labs to move to dismiss *twice over* when it should never have been named in

21  this case in the first place, given that jurisdiction is lacking and the many legal and factual defects

22  which cannot be overcome.  Dismissal is thus appropriate with prejudice and without leave to

23  amend.  *See Steckman v. Hart Brewing, Inc.*, 143 F.3d 1293, 1298 (9th Cir. 1998) (leave to amend

24  "does not extend to cases in which any amendment would be an exercise in futility.").

25  Dated:   July 29, 2022                      FENWICK & WEST LLP

26                                                        By:   */s/ Jennifer C. Bretan*
                                                                   Jennifer C. Bretan
27

28                                                        Michael S. Dicke (admitted *pro hac vice*)
                                                            Katherine A. Marshall (admitted *pro hac vice*)

Alison C. Jordan (admitted *pro hac vice*)
Samuel Sahagian (admitted *pro hac vice*)
FENWICK & WEST LLP
555 California Street, 12th Floor
San Francisco, CA 94104
Telephone: 415.875.2300
Facsimile:  415.281.1350
Email: mdicke@fenwick.com
Email: jbretan@fenwick.com
Email: kmarshall@fenwick.com
Email: ajordan@fenwick.com
Email: ssahagian@fenwick.com

John D. Tennert III (Nevada Bar No. 11728)
FENNEMORE CRAIG, P.C.
7800 Rancharrah Parkway
Reno, NV 89511
Telephone: 775.788.2200
Facsimile: 775.786.1177
Email: jtennert@fclaw.com

*Attorneys for Defendant Yuga Labs, Inc.*

**CERTIFICATE OF SERVICE**

Pursuant to F.R.C.P. 5(b) and Electronic Filing Procedure IV(B), I certify that on July 29, 2022, a true and correct copy of **YUGA LABS' MOTION TO DISMISS PLAINTIFF'S FIRST AMENDED COMPLAINT AND MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT THEREOF** was transmitted electronically through the Court's CM/ECF e-filing electronic notice system to all attorneys associated with the above-captioned case.

*/s/ Jennifer C. Bretan*
Jennifer C. Bretan
Fenwick & West LLP