MICHELLE D. ALARIE, ESQ.
Nevada Bar No. 11894
ARMSTRONG TEASDALE LLP
One Summerlin
1980 Festival Plaza Drive, Suite 750
Las Vegas, Nevada 89135
Telephone:  702.678.5070
Facsimile:  702.878.9995
malarie@atllp.com

EMILY NUVAN, ESQ. (LR IA 11-2 admitted)
Utah Bar No. 17722
ARMSTRONG TEASDALE LLP
201 South Main Street, Suite 750
Salt Lake City, Utah 84111
Telephone: 801.401.1406
enuvan@atllp.com

ROMAINE C. MARSHALL, ESQ. (LR IA 11-2 admitted)
Utah Bar No. 9654
JOSE ABARCA, ESQ. (LR IA 11-2 admitted)
Utah Bar No. 12762
POLSINELLI
2825 E. Cottonwood Parkway, Ste. 500
Salt Lake City, Utah 84104
rmarshall@polsinelli.com
jabarca@polsinelli.com

*Attorneys for Plaintiff Robert Armijo*

**UNITED STATES DISTRICT COURT**

**DISTRICT OF NEVADA**

| | |
|---|---|
| ROBERT ARMIJO,<br><br>             Plaintiff,<br><br>      vs.<br><br>OZONE NETWORKS, INC. d/b/a OPENSEA, a New York Corporation; YUGA LABS, LLC d/b/a BORED APE YACHT CLUB, a Delaware limited liability company; LOOKSRARE; and DOES 1 to 50,<br><br>             Defendants. | Case No.:  3:22-cv-00112-MMD-CLB<br><br>**RESPONSE IN OPPOSITION TO DEFENDANT OZONE NETWORKS, INC.'S MOTION TO DISMISS THE AMENDED COMPLAINT (ECF NO. 71)** |

Plaintiff Robert Armijo, by and through his counsel, Armstrong Teasdale LLP and Polsinelli LLP, files his Response in Opposition to Defendant Ozone Networks, Inc.'s d/b/a OpenSea ("OpenSea") Motion to Dismiss the Amended Complaint ("MTD") (ECF No. 71).  This Response in

opposition is made and based upon the following Memorandum of Points and Authorities, the papers and pleadings already on file herein, and any argument the Court may allow at the time of the hearing on the Motion.

**MEMORANDUM OF POINTS AND AUTHORITIES**

## I.   INTRODUCTION

Mr. Armijo's claims arise from the new and unregulated world of non-fungible tokens ("NFTs"). NFTs are part of the larger universe of the newest iteration of the internet known as "web3." Web3 is built on decentralized blockchain technology that provides the basis for new technologies like NFTs, cryptocurrencies, decentralized finance, and decentralized autonomous organizations ("DAOs"). The goal of web3 is decentralization—transferring power and authority away from traditional internet-based business organizations and dispersing it to the individual users of web3 and blockchain technologies. Web3 platforms and businesses act as intermediaries between the real world and the decentralized world of digital assets created on blockchains.

In this new world, OpenSea has emerged as an early dominant and influential leader of the web3 space. As the creator of the first and largest NFT marketplace—a virtual exchange that allows digital collectors to buy, sell, and create NFTs—OpenSea has enjoyed astronomical success. In one year alone, OpenSea went from a small operation of seven employees processing roughly $95 million in transactions for the entire year of 2020 to a powerhouse NFT industry with more than ***$3 billion in sales per month*** by the end of 2021. *See* First Amended Complaint ("FAC") ¶¶ 135-140, ECF No. 62. Despite its size, wealth, and clout within the NFT community, OpenSea has at all times prioritized its own growth over the safety and security of its users and the wider NFT community, which has allowed the OpenSea marketplace to be used by thieves as a platform to offload stolen and highly valuable NFTs with impunity.

OpenSea is taking advantage of web3's decentralization but at the same time benefiting from its status as a traditional real-world business. As a centralized business entity, OpenSea has complete control over its platform and the marketplace it created and designed, including the sole discretion to implement measures to deter thefts and keep stolen NFTs out of its marketplace. However, OpenSea's wholehearted "embrace" of the ethos of decentralization allows it to disclaim all obligations to protect

the NFT community and instead OpenSea forces NFT owners to bear the daunting responsibility of providing their own security and shouldering the blame when things foreseeably go wrong. This atmosphere has created a situation where thieves are emboldened to target and attack NFT owners, especially owners of high-value NFTs, without fear of punishment. And rather than try to protect NFT owners from this foreseeable harm, OpenSea has decided to profit from their misfortune, collecting a 2.5% transaction fee on every single sale of NFTs that occurs on its marketplace regardless of whether the sale is legitimate or the result of fraud and theft.

OpenSea's failure to implement even basic security and theft deterrent measures led to the unfortunate and foreseeable events that underlie this case: a thief targeted Mr. Armijo and stole three valuable Bored Ape Yacht Club and Mutant Ape Yacht Club (collectively, "BAYC") NFTs he owned, which were then quickly sold at a price far below their value on OpenSea and another digital NFT marketplace. Following the theft, OpenSea's belated and ineffectual customer service response served to highlight the fact that OpenSea fails to take any proactive steps to deter thieves. This lawsuit seeks to hold OpenSea responsible for its actions (and inactions) that damaged Mr. Armijo.

In its MTD, OpenSea argues that because it was not directly involved with the theft of Mr. Armijo's NFTs, it cannot be held responsible for failing to protect Mr. Armijo from third-party criminal attacks. *See* MTD at 1. OpenSea claims that it did not owe any duties to Mr. Armijo because no special relationship existed between the parties, and even if Mr. Armijo establishes the existence of a duty, OpenSea did not breach any such duties. *See id.* at 1-2. OpenSea's argument falls flat. OpenSea had a duty to protect Mr. Armijo from third-party theft based on the special relationship OpenSea has with Mr. Armijo as an NFT owner. Among other things, this special relationship arises from OpenSea's position as the NFT industry leader with a near-monopoly on all NFT purchases, sales, and resales. OpenSea dominates and exercises control over the entire NFT community, and any individual who engages in buying, selling, or trading NFTs submits themselves to OpenSea's control regardless of whether those transactions occur on OpenSea's platform. *See* FAC ¶¶ 133-46, 193-94. Indeed, in a recent Twitter post, OpenSea itself admitted it has a duty to protect the NFT community by helping to "prevent and disincentivize theft." *See* @opensea, Twitter (Aug. 10, 2022, 4:02 PM), https://twitter.com/opensea/status/1557487545876762625. OpenSea breached its duty by failing to

implement adequate theft deterrents, including user verification and NFT screening procedures.

OpenSea's contention that Mr. Armijo's claims for negligent hiring, supervision, and training fail because Mr. Armijo does not allege that it was OpenSea's employees that caused him harm likewise falls flat. *See* MTD at 2. Mr. Armijo clearly makes that very point when he explained that it was OpenSea and its employees who allowed Mr. Armijo's stolen BAYC NFTs to be illegally sold on OpenSea's platform, stating in paragraph 222 of the FAC, "[T]he illegal trades and sales of NFTs cannot occur without the knowledge, complicity, or negligence by OpenSea . . . employees."

Finally, OpenSea's argument that OpenSea's Terms of Service and the economic loss doctrine bar Mr. Armijo's claims are incorrect. *See* MTD at 2-3. Mr. Armijo's claims do not rely upon OpenSea's Terms of Service because Mr. Armijo was not subject to them when the theft of his BAYC NFTs and his attempts to recover them occurred. Similarly, the economic loss doctrine does not apply to Mr. Armijo's claims because the losses Mr. Armijo suffered are not solely monetary in nature.

OpenSea is actively engaged in establishing NFTs as mainstream consumer goods and attracting millions of new mainstream customers, like Mr. Armijo, into the NFT market. *See* FAC ¶ 25. At the same time, OpenSea is loath to abandon the decentralized principles that orthodox web3 enthusiasts demand. Fearing that it will be seen as "too centralized," OpenSea refuses to implement strong procedures that would effectively deter thieves.[1] In short, OpenSea is attempting to have a foot in both worlds—embracing centralization when it is good for its business model and championing decentralization when it is not. Nowhere is this problematic stance more visible than OpenSea's failure to implement adequate security, which leaves its users and the wider NFT-owning community vulnerable to being targeted by bad actors and victimized by scams. As the largest and most powerful NFT marketplace, OpenSea is in the best position to implement standards and security procedures that will disincentive NFT theft and protect the NFT community. OpenSea's failure to do so was the cause

---

[1] *See, e.g.*, Gian M. Volpicelli, *Why OpenSea's NFT Marketplace Can't Win*, WIRED (Feb. 10, 2022, 7:00 AM), https://www.wired.com/story/opensea-nfts-twitter/ (explaining that OpenSea's security is "years behind what needs to be done" and citing pushback from decentralization advocates as one of the factors for this); Will Gottsegen, *OpenSea's Week From Hell*, CoinDesk (Jan. 28, 2022, 6:16 PM MST), https://www.coindesk.com/layer2/2022/01/28/openseas-week-from-hell/ (explaining that OpenSea's response to security problems on its platform is to fall back on "overarching libertarian security philosophy" and put the blame on users for failing to understand the technology).

of the foreseeable harm that Mr. Armijo endured and the damages he has suffered when his NFT was illegally sold on OpenSea's platform shortly after its theft.

For these reasons, OpenSea's Motion to Dismiss the Amended Complaint must be denied.

## II.    FACTUAL BACKGROUND

Mr. Armijo is an NFT enthusiast who became involved with the NFT community in November 2021. Following his purchase of BAYC NFT #4329 and MAYC NFTs #1819 and #7713, Mr. Armijo became a member of the exclusive and highly sought after Bored Ape Yacht Club. Due to the popularity and extensive membership benefits that BAYC club members enjoy both socially and financially, BAYC NFTs are one of the most popular NFT collections ever created. Unfortunately, this popularity, combined with OpenSea's failure to implement basic security safeguards and provide adequate and reasonable customer service and theft deterrents, has made BAYC NFT owners the victims of sophisticated and targeted attacks designed to steal their BAYC NFTs and has also made OpenSea the marketplace of choice for thieves to quickly offload stolen goods.

On February 1, 2022, Mr. Armijo fell prey to a phishing scam and all three of his BAYC NFTs were stolen in an instant. *See* FAC ¶¶ 80-85. Mr. Armijo unwittingly interacted with a thief through the online communication platform known as "Discord." *Id.* Discord is a different and separate entity that is unaffiliated with OpenSea. However, knowing that the thief would take advantage of OpenSea's lack of security and screening processes for stolen NFTs, Mr. Armijo immediately and desperately contacted OpenSea's customer service department to report the theft and to stop any future sale of his BAYC NFTs on OpenSea's platform. *Id.* ¶ 87. Mr. Armijo received no response from OpenSea. *Id.* ¶ 94. Instead, Mr. Armijo watched helplessly as his BAYC NFT #4329 was sold on the OpenSea platform just hours after the theft and at a price far below its actual value. *Id.* It was not until several hours after the theft occurred—and, upon information and belief, only after customer service employees for Yuga Labs, Inc. (the creators of the BAYC NFT collection and codefendants in this action) reached out to OpenSea through an unofficial communication channel—that OpenSea took the belated step of freezing Mr. Armijo's stolen BAYC NFTs, disallowing them from being bought or sold on OpenSea's marketplace. *Id.* ¶ 95.

OpenSea's negligence knowingly put a target on Mr. Armijo's back. Among other things,

OpenSea owed Mr. Armijo as an NFT owner a duty to implement adequate security processes to deter NFT thefts and monitor its marketplace for stolen NFTs. OpenSea further owed Mr. Armijo a duty to provide adequate customer service for victims of NFT theft. These duties arose from the special relationship OpenSea has with Mr. Armijo.

### A.  How NFT Marketplaces Work

NFT marketplaces are more complicated than their traditional online marketplace counterparts due to the complexity of the underlying blockchain technology. To understand how an NFT marketplace works, it is necessary to begin with an explanation of the NFTs themselves. NFTs are digital goods that are created with the use of smart contracts. A smart contract is a self-executing contract where the terms of the agreement are written directly into computer code and stored on a blockchain.[2] When a person creates an NFT, they are executing computer code that will assign ownership and govern the transferability of the NFT *on the specific blockchain* where the NFT was created.[3] In other words, all transactions regarding a specific NFT must occur on the blockchain where the NFT was created and permanently resides.

The Ethereum blockchain was launched in 2015 specifically for the purpose of creating smart contracts and quickly became the blockchain of choice for creating NFTs.[4] Ethereum continues to be the dominant leader of the NFT industry, hosting tens-of-thousands of NFT collections, including the most popular and successful projects such as the Bored Ape Yacht Club and Crypto Punks.[5] Ethereum-based NFTs can only be bought and sold in an NFT marketplace that supports the Ethereum blockchain.

Many NFT marketplaces serve niche markets for high-end digital art, sports, gaming, or music. These marketplaces are often built using a platform's proprietary blockchain—for example, the Binance NFT platform is built upon the Binance Smart Chain—or utilize a blockchain other than Ethereum—for example, the popular NBA Top Shot marketplace uses the Flow blockchain to create

---

[2] *See* Jake Frankenfield, *What Are Smart Contracts on the Blockchain and How They Work*, INVESTOPEDIA (Mar. 24, 2022), https://www.investopedia.com/terms/s/smart-contracts.asp.

[3] *See* Onkar Singh, *Why is Ethereum Used for NFTs?*, COINTELEGRAPH (May 21, 2022), https://cointelegraph.com/explained/why-is-ethereum-used-for-nfts.

[4] *See Top NFT Blockchains to Buy and Sell (2022)*, NANSEN (Aug. 11, 2022), https://www.nansen.ai/guides/top-nft-blockchains-to-buy-and-sell.

[5] *See id.*

NFTs of great moments in NBA history.[6] These smaller scale marketplaces serve targeted audiences, generally supporting only one blockchain and utilizing only one type of digital wallet and cryptocurrency for processing payments. Because numerous NFT marketplaces functioning today are not built to support Ethereum, BAYC NFTs (which are Ethereum based) cannot be bought and sold on those platforms. NFT marketplaces that support Ethereum (and attempt to mimic OpenSea's broad model) are dwarfed in comparison to the transaction numbers and sales volume OpenSea regularly achieves.[7]

### B. OpenSea's Business Model

OpenSea was founded in 2017, making it the first NFT marketplace in the world. *See* FAC ¶ 134. OpenSea's founders built a platform where any kind or category of Ethereum NFT can be bought and sold. OpenSea's ease-of-use, free NFT minting tool, and built-in secondary sales market lured hundreds of thousands of "ordinary folks" into the world of web3, crypto, and NFTs.[8] In March of 2021, the popularity of NFTs exploded and OpenSea became an overnight sensation, attracting multiple rounds of venture capital funding worth hundreds of millions of dollars. *See* FAC ¶¶ 135-141. By January 2022, OpenSea was valued at $13.3 billion and commanded more that 97% of the NFT market. FAC ¶ 8.

OpenSea has continued to focus on growth and attracting even more users. OpenSea now supports five distinct blockchains, including Solana, the second most popular blockchain for NFTs,[9] allows the use of more than a dozen digital crypto wallets, and accepts more than 150 different cryptocurrencies as methods of payment.[10] OpenSea hosts more than 80 million NFTs on its

---

[6] *See, e.g.*, David Rodeck, *Top NFT Marketplaces of 2022*, FORBES (Sept. 1, 2022, 9:42 AM), https://www.forbes.com/advisor/investing/cryptocurrency/best-nft-marketplaces/; Zoltan Vardai, *What is OpenSea and Why Is Everyone Talking About It?*, FORKAST (Jan. 28, 2022, 6:16 AM HKT), https://forkast.news/what-is-opensea-nft-marketplace/.

[7] *See, e.g.*, Connor Brooke, *Best NFT Marketplace—Where to Buy NFTs*, BUSINESS2COMMUNITY (last updated Sept. 30, 2022), https://www.business2community.com/nft/best-marketplaces.

[8] *See* Jeff Kauflin, *What Every Crypto Buyer Should Know About OpenSea, the King of the Crypto Market*, FORBES (Nov. 23, 2021, 6:30 AM EST), https://www.forbes.com/sites/jeffkauflin/2021/11/23/what-every-crypto-buyer-should-know-about-opensea-the-king-of-the-nft-market/?sh=1bdc4c562f89.

[9] *See Which Blockchains are Compatible with OpenSea?*, OPENSEA HELP CENTER, https://support.opensea.io/hc/en-us/articles/4404027708051-Which-blockchains-are-compatible-with-OpenSea- (last visited Sept. 30, 2022).

[10] *See* Vardai, *supra* note 6.

marketplace and has more than 1.26 million users.[11]

Regarding security, OpenSea made three key decisions that are crucial to understanding what led scammers to begin targeting NFT owners like Mr. Armijo and stealing their valuable NFTs. First, OpenSea *does not* employ any Know Your Customer or anti-money laundering standards. *See* FAC ¶ 3. Users need only connect their digital wallets to the platform to begin buying and selling NFTs. While the blockchain makes a record of the details of each transaction, including the specific NFT and the identity of the digital wallet involved, such record does not include the name or other identifying information of the owner of the digital wallet. *Id.* ¶ 4. This allows thieves to unload stolen NFTs anonymously on OpenSea, knowing that it will be nearly impossible for anyone, including law enforcement officials, to discover their true identity.

Second, OpenSea does not take custody of any user's digital assets at any time.[12] OpenSea merely provides the platform infrastructure for users to make peer-to-peer trades directly from one digital wallet to another. Without custodial abilities, OpenSea has no way of pausing a transaction to stop a fraudulent or illegal sale if it has been notified of a theft.

Third, when OpenSea first began operating, it employed an approval process to screen NFTs for possible theft or copyright violations prior to listing them on its marketplace. *See* FAC ¶ 142. OpenSea canceled the process in March 2021 just as the NFT market gained steam and OpenSea sales volume exploded, stating that the decision "was made to better reflect OpenSea's commitment to enabling decentralized economies." *Id.* In other words, OpenSea removed the one barrier it had for detecting stolen goods, thus allowing thieves to use OpenSea's marketplace as a fence for stolen NFTs. OpenSea does nothing to proactively deter theft or protect its users from being targeted by bad actors. Instead, OpenSea chooses to rely on anemic after-the-fact customer service measures that do nothing to solve the problem of stolen NFTs being sold on its marketplace.

Because OpenSea was an established, user-friendly platform capable of hosting the most popular Ethereum-based NFT collections, at the time the NFT craze took off in the spring of 2021, OpenSea was perfectly poised to become the biggest and most successful NFT marketplace, and it has

---

[11] *See* Eduard Banulescu, *OpenSea Review: Everything You Need to Know*, BEINCRYPTO (Feb. 25, 2022, 11:13 GMT), https://beincrypto.com/learn/opensea-review/.

[12] *See id.*

continued to maintain its dominance today. The decisions OpenSea made when designing and implementing its marketplace shaped the NFT industry and continue to affect the behavior of all NFT market participants. As the creator of the largest and most influential NFT marketplace, OpenSea is in the best position to implement standards and security procedures that will disincentive NFT theft and protect Mr. Armijo and others like him who own valuable NFTs from being targeted and attacked by thieves. OpenSea's failure to do so was the cause of the foreseeable harm that Mr. Armijo endured and the damages he has suffered.

### C. Industry Standards Can Include Preventive Measures for Fraud and Theft

There is nothing to prevent OpenSea from implementing theft deterrent measures; however, OpenSea chooses to operate its marketplace without safeguards despite having the resources to put them in place. Several other NFT marketplaces employ security solutions that significantly reduce the likelihood that stolen NFTs will be sold on their platforms. For example, Nifty Gateway, which focuses on selling high-end art NFTs, does not allow individuals to sell NFTs on its marketplace unless they are registered as "Authorized Sellers," which includes providing personal and bank account information to the platform's financial services team for verification.[13] Nifty Gateway instituted the policy to reduce instances of fraud and malicious activity on its platform and further described the decision by stating, "While we embrace the open spirit of the blockchain ecosystem, we still have a responsibility to follow the rules and regulations of the legacy financial system and to remain a trusted and compliant platform."[14]

Magic Eden, another NFT marketplace that supports the Solana blockchain, has a policy of keeping its users' NFTs in an escrow wallet to ensure their security and keep them safe from the types of hacks that have plagued OpenSea in the past and resulted in millions of dollars' worth of stolen NFTs.[15] Magic Eden also requires stringent Know Your Customer requirements for creators who drop

---

[13] *See* Miguel Angel Romero Jr., *Introducing 'Authorized Sellers' on Nifty Gateway*, MEDIUM (Jun. 3, 2021), https://medium.com/nifty-gateway/introducing-authorized-sellers-on-nifty-gateway-e58dc76a8a61#:~:text=In%20order%20to%20sell%20Nifties,Seller%20Settings%20on%20Nifty%20Gateway
[14] *Id.*
[15] *See* Andrew Hayward, *Magic Eden Rivals Say NFTs on Solana's Biggest Marketplace Are at Risk*, DECRYPT (Aug. 1, 2022), https://decrypt.co/106273/magic-eden-nfts-solana-biggest-marketplace-risk.

their NFT projects on the Magic Eden marketplace.[16]

Traditional online marketplaces like Amazon, eBay, and Facebook are also being pressured to do more to keep stolen goods out of their marketplaces. Several states passed legislation requiring verification of sellers who deal in online goods, and the U.S. House recently passed a bill known as the INFORM Consumers Act that would require sellers on online marketplaces to provide verifiable personal and financial information.[17] Like OpenSea, these online retailers claimed they cannot be held responsible for protecting victims from third-party theft because they simply provide a marketplace and are not directly involved in the illegal activity themselves.[18] But following a significant increase in large-scale robberies that use online retailers to unload the stolen goods, greater attention and scrutiny has been turned to these online marketplaces themselves, and demand has risen for them to stop allowing anonymous sellers on their sites and perform better monitoring and policing of their platforms.

Although OpenSea's marketplace deals in the buying and selling of digital goods, it is no different from traditional online marketplaces. OpenSea's duties to protect Mr. Armijo as an NFT owner include monitoring its NFT marketplace for stolen NFTs, implementing adequate screening and verification processes for the NFTs on its platform, and providing adequate customer service for victims of theft that occur on its platform. *See* FAC ¶¶ 190-191.

## III. LEGAL ARGUMENT

### A. Mr. Armijo Has Stated a Claim for Negligence Against OpenSea

To prevail on a traditional negligence theory, Nevada law requires a plaintiff to demonstrate "(1) the existence of a duty of care, (2) breach of that duty, (3) legal causation, and (4) damages." *Sanchez v. Wal-Mart Stores*, 221 P.3d 1276, 1280 (Nev. 2009). Because negligence is generally a question of fact for the jury to resolve, dismissal is only appropriate if a plaintiff cannot recover as a matter of law. *See Foster v. Costco Wholesale Corp.*, 291 P.3d 150, 154 (Nev. 2012). Here, Mr. Armijo

---

[16] *See Magic Eden Has Safety Procedures in Place to Prevent Future Scams*, CRYPTURED (Feb. 24, 2022), https://www.cryptured.com/magic-eden-has-safety-procedures-in-place-to-prevent-future-scams/.

[17] *See* Katie Schoolov, *Stolen Goods Sold on Amazon, eBay and Facebook Are Causing Havoc for Major Retailers*, CNBC (Jun. 17, 2022), https://www.cnbc.com/2022/06/17/the-fight-against-stolen-products-on-amazon-and-facebook-marketplace.html.

[18] *Id.*

has adequately pled all four negligence elements, and OpenSea has failed to show that Mr. Armijo's "prima facie case is clearly lacking as a matter of law." *Scialabba v. Brandise Const. Co., Inc.*, 921 P.2d 928 (Nev. 1996).

### 1. OpenSea Owed Mr. Armijo a Duty of Care Based on the Special Relationship That Existed Between the Parties

Whether OpenSea owed Mr. Armijo a duty of care is a question of law. *Scialabba*, 921 P.2d at 968. "As a general rule, a private person does not have a duty to protect another from a criminal attack by a third person." *Id.* However, there is an exception to this rule when a "special relationship" exists between the parties—meaning, when "the ability of one of the parties to provide for his own protection has been limited in some way by his submission to the control of the other, a duty should be imposed upon the one possessing control (*and thus the power to act*) to take reasonable precautions to protect the other one from assaults by third parties which, at least, could reasonably have been anticipated. *Id.* at 969 (citation omitted) (emphasis added). When analyzing the independent facts of each case to determine whether a special relationship exists, courts consider two key factors: control and foreseeability.

Here, the question is whether OpenSea, as a dominant NFT marketplace allowing the reselling of NFTs on its platform, exercises control over an NFT owner and marketplace participant, like Mr. Armijo, sufficient to establish a special relationship. Not only does OpenSea exercise control over Mr. Armijo as a participant in its marketplace, but the parties have a direct and prior relationship with each other: Mr. Armijo purchased the BAYC NFTs in question from the OpenSea marketplace on three separate occasions, and he has been an active user of the OpenSea marketplace to buy and sell NFTs both before and after the theft in this case occurred. *See* FAC ¶¶ 34-37; *see also Flaherty v. Wells Fargo Bank Nat'l Ass'n*, No. 3-22-cv-00025-MMD-CLB, 2022 WL 3648033, at *3 (D. Nev. Aug. 24, 2022) (finding no special relationship where the plaintiff was an anonymous member of the public previously unknown to the defendant).

Mr. Armijo also submitted himself to OpenSea's control (1) by agreeing to abide by OpenSea's Terms of Service *when using its platform* to buy or sell NFTs, and (2) by contacting OpenSea's customer service following the theft of his BAYC NFTs. *See* MTD at 19, FAC ¶ 194. First, as

articulated in the Terms of Service, users are prohibited from violating any law or third party right, using the OpenSea Service "in any manner that could interfere with, disrupt, negatively affect or inhibit other users from fully enjoying the Service," or using the OpenSea Service "for any illegal or unauthorized purpose." *See* Declaration of Ian L. Meader Ex. A at 5-6, ECF No. 72. Mr. Armijo agreed to abide by these terms, and in doing so, he relied on OpenSea to enforce the terms as promised for all users, including prohibiting other users from illegally selling stolen NFTs on OpenSea's marketplace. Second, Mr. Armijo submitted himself to the control of OpenSea's customer service employees by relying on them to address the theft promptly and effectively by prohibiting Mr. Armijo's NFTs from being resold on OpenSea's platform and aiding Mr. Armijo to identify the thief and recover the stolen NFTs. *See* FAC ¶ 194.

Additionally, OpenSea exercises control over Mr. Armijo more broadly as an NFT owner due to the tremendous influence OpenSea maintains over the NFT industry as a whole. *See* FAC 193. As explained above, OpenSea is the leading NFT marketplace, particularly for the most popular NFT projects, including BAYC NFTs. The early decisions OpenSea made regarding how NFTs are bought and sold on its platform influence the way third parties interact with NFT owners wherever they are located. Specifically, OpenSea's complete lack of security procedures signals to thieves that they can attack NFT owners, steal their NFTs, and utilize OpenSea's marketplace to quickly unload stolen goods to an enormous pool of buyers with no consequences for their illegal acts. OpenSea recognizes the "huge responsibility" it has to create industry standards for NFT marketplaces, but rather than building "the world's most trusted and inclusive marketplace," OpenSea has created the NFT world's largest unregulated pawn shop. *See id.* ¶ 133. In doing so, it has put all NFT owners under the control of its nonexistent safety standards and at risk of being victimized by thieves.

Because OpenSea has complete control over its NFT marketplace, it maintains the exclusive ability to implement any security measures it chooses. *See Scialabba*, 921 P.2d at 931 (explaining that whether defendant owes plaintiff a duty of care "turns on whether [defendant] exercised control of the premises"). If it wanted to, OpenSea could reinstate the screening process it previously used to detect stolen NFTs or implement any number of proactive security procedures to deter theft. This exclusive *power to act*, as contemplated by the *Scialabba* court, demonstrates the control OpenSea has to

disincentivize theft and protect NFT owners from becoming the targets of third parties' criminal actions. Indeed, OpenSea's ability to exercise this control is "real and not fictional and, if exercised, would meaningfully reduce the risk of the harm that actually occurred" to Mr. Armijo. *Sparks v. Alpha Tau Omega Fraternity, Inc.*, 255 P.3d 238, 245 (Nev. 2011). Because OpenSea refuses to employ any type of theft deterrent measures, Mr. Armijo and other NFT owners are limited in their ability to protect themselves from becoming the target of thieves.

Turning to the issue of foreseeability, the FAC lists numerous examples of BAYC NFT owners being targeted and attacked by scammers and thieves. *See* FAC ¶¶ 106-117. These thefts are often highly publicized and involve similar sophisticated tactics as those used to target Mr. Armijo. One common detail runs through the victims' stories: after their BAYC NFTs are stolen, the NFTs are immediately listed on OpenSea and quickly resold at discount prices. *See id.* OpenSea even has firsthand experience with these targeted attacks as its own marketplace and official Discord server have been hacked on several occasions and used to steal valuable NFTs. *See* FAC ¶¶ 98-105. Upon information and belief, OpenSea has been aware as early as August 2021 that BAYC NFT owners were being preyed upon by third party thieves, and yet it did nothing to disincentivize the thefts.

Not only does Mr. Armijo allege that OpenSea had a duty to protect him from third-party criminal attacks based on the special relationship between them, OpenSea itself acknowledges that this duty exists. *See* FAC ¶¶ 133, 139, 145, 192. As recently as August 10, 2022, OpenSea reaffirmed and defined the duties it owes to the NFT community and individuals like Mr. Armijo. In a Twitter thread posted on the official OpenSea Twitter account, OpenSea clarified its "stolen items policy," and stated the following: "2/ Our policy is designed to keep our community safe . . ."; "4/ So why do we have this policy? It is against US law to knowingly allow the sale and transfer of stolen items. We do not want to incentivize theft by allowing our platform to be used to help sell stolen items."; "9/ In the long term, our key focus areas continue to be on finding solutions that tackle this problem at the root. Efforts are already underway to automate threat and theft detection . . ."; "10/ Beyond that, we are collaborating closely with ecosystem partners to help prevent and disincentivize theft . . ."; "12/ We care DEEPLY about enabling users to operate safely on our platform. Allowing the sale of stolen items and operating with stolen goods is no sign of a healthy ecosystem . . ."; "13/ Doing better begins w/ sharing &

listening   more   .   .   .   ." *See* @opensea, Twitter (Aug. 10, 2022, 4:02 PM), https://twitter.com/opensea/status/1557487545876762625.

OpenSea further acknowledges that it has a duty to help victims after a theft has occurred, including downstream purchasers who unwittingly buy an NFT that they later learn is stolen. In messages to affected users, OpenSea explains that if a purchaser's NFT is later disabled due to a report of theft, OpenSea will refund the 2.5% fee it received from the transaction so long as the stolen item is confirmed by a police report. *See, e.g.*, @franklinisbored, Twitter (Sept. 27, 2022, 8:41 AM), https://twitter.com/franklinisbored/status/1574771200349405184. This information clearly contradicts OpenSea's stated position that it "owes no duty to protect against harm from third parties incurred entirely outside its control." MTD at 10.

OpenSea's reliance on *Beckman v. Match.com, LLC* is misplaced as it is not analogous to the facts presented here. No. 2:13-CV-97 JCM (NJK), 2017 WL 1304288 (D. Nev. Mar. 10, 2017), *aff'd*, 743 F. App'x 142 (9th Cir. 2018). In *Beckman*, the plaintiff was attacked by a man she met while using a dating website. After plaintiff ended the relationship, the man sent plaintiff many harassing and threatening text messages. *Four months later*, the man viciously attacked plaintiff. *Id.* at *1. The plaintiff sued Match, the owner of the dating site, claiming that it was negligent for failing to warn her that use of the site, and the man who attacked her, were dangerous. *Id.* at *2. Although plaintiff claimed a special relationship existed between Match and herself, the court found that plaintiff's amended complaint utterly failed to "plead facts giving rise to the plausibility of such a special relationship" and merely contained an insufficient recitation of the elements of the claim." *Id.* at *3. The court further explained that even if the plaintiff had adequately asserted her claim, no special relationship existed because plaintiff made no allegations that Match played any role in connecting plaintiff and the man together, and by the time the offline attack occurred months later, "Match was so far removed from any relationship" between the parties "that no special relationship between [them] existed." *Id.* at *3-4.

Unlike the plaintiff in *Beckman*, Mr. Armijo has pled multiple facts showing that a special relationship exists between himself and OpenSea. *See, e.g.*, FAC ¶¶ 193-94, 197-99. And far from being "removed from any relationship" with Mr. Armijo, it was OpenSea's own actions that created

14

the dangerous situation Mr. Armijo found himself in and the harm that occurred. Because OpenSea refused to implement any theft deterrent measures, malicious third-party actors were incentivized to target and attack Mr. Armijo as an owner of valuable NFTs. The thieves then listed the stolen NFTs on OpenSea's marketplace moments after the thefts, and sold the most valuable BAYC NFT in less than two hours for less than market value. In other words, OpenSea played a leading role in the events that occurred, justifying the existence of a special relationship in this case.

Likewise, the courts' findings in *Dyroff v. Ultimate Software Grp., Inc.*, 934 F.3d 1093 (9th Cir. 2019) and *Bibicheff v. PayPal, Inc.*, 844 F. App'x 394, (2d Cir. 2021) are inapplicable. In *Dyroff*, the court found a duty of care did not exist between owners of a website and the plaintiff because the website's features "amounted to content-neutral functions that did not create a risk of harm." 934 F.3d at 1100. As the court explained, "[n]o website could function if a duty of care was created when a website facilitates communication, in a content-neutral fashion, of its users' content." *Id.* at 1101. OpenSea does much more than facilitate "communication" between users. OpenSea facilitates sales, and in Mr. Armijo's case, the sale of stolen goods. This is neither content neutral nor unlikely to create a risk of harm to Mr. Armijo.

In *Bibicheff*, the plaintiff's office manager gained access to plaintiff's personal and business information and used it to defraud plaintiff by opening twelve fake PayPal accounts in plaintiff's name. *See* 844 F. App'x at 395. Although the plaintiff alleged that PayPal failed to monitor and investigate the fake accounts, the court found that plaintiff failed to set forth any "factual allegations to suggest that PayPal would have detected this fraud, even assuming diligent monitoring of the transactions on its platform." *Id.* at 397. Unlike that plaintiff, Mr. Armijo has made multiple factual allegations that not only was OpenSea aware of the thefts of valuable NFTs and its role in facilitating the sales of the stolen NFTs on its marketplace, but that OpenSea's failure to diligently monitor the transactions on its platform was one of the driving forces behind the thefts.

Additionally, OpenSea misleadingly claims that "courts have specifically rejected the argument that a party's purported market power itself establishes the existence of a special relationship and imposes a duty." *See* MTD at 12. The five cases OpenSea cites to support this claim offer no such support. *See id.* & n.2. In *Am. Tel. & Tel. Co. v. E. Pay Phones, Inc.*, the plaintiff explicitly admitted

15

that no special relationship existed between the parties; therefore, the court did not engage in a special relationship analysis. 767 F. Supp. 1335, 1340 (E.D. Va. 1991). Similarly, in the remaining four cases, the plaintiffs *did not even allege* a special relationship under tort law that would require the defendants to protect them from the criminal actions of third parties. OpenSea has simply gathered cases where plaintiffs have accused large corporations of negligence and created a judicial doctrine out of whole cloth. But more importantly, OpenSea misstates Mr. Armijo's argument. As previously explained, it is not OpenSea's market power itself that establishes a special relationship in this case; rather, it is OpenSea's domination of the NFT industry that establishes the necessary control over Mr. Armijo as an NFT owner that must be proven for a special relationship to exist.

Finally, holding NFT marketplaces like OpenSea to a duty of care to protect their users from the criminal actions of third parties is not unjustly severe nor against public policy. *See Flaherty*, 2022 WL 3648033 at *4. OpenSea argues that Mr. Armijo's demands are unreasonable, in that it "would require OpenSea not only to eliminate all listings for any NFT that any user reported stolen within seconds and without investigation, but even to be deputized by law enforcement to help retrieve such NFTs." MTD at 12. OpenSea's argument is pure hyperbole.  But also, perplexing considering that OpenSea has already acknowledged these duties exist and has implemented some of the very procedures it claims are not possible.

In a February 9, 2022 interview on "Twitter Spaces," OpenSea co-founder, Alex Atallah, stated that OpenSea has "an obligation" to "*immediately* protect users" and notify other platforms when a security issue is flagged. *See* FAC ¶ 192. And as mentioned previously, OpenSea currently employs a policy of freezing NFTs for seven days upon a report of theft. If OpenSea does not receive a valid police report within those seven days, it will reenable buying and selling of the reported item. *See* @opensea, Twitter (Aug. 10, 2022), https://twitter.com/opensea/status/1557487555330723840. And far from needing to deputize OpenSea and its employees, it would go a long way toward helping law enforcement recover stolen NFTs and holding thieves accountable if OpenSea were to require identity verification of the sellers on its platform rather than allowing anonymous transactions.

Imposing such duties on OpenSea would not "create a zone of risk that would be impossible to define" and would not expose OpenSea to "limitless and unpredictable liability." *Flaherty*, 2022 WL

3648033 at *4 (citation omitted). Rather, the boundaries are quite clear: OpenSea need only look to itself and its own actions to protect Mr. Armijo and others like him from third-party theft. Namely, OpenSea must implement effective theft deterrent measures, including adequate screening processes for the NFTs listed on its marketplace, verification of user identities, and provide adequate customer service for victims of theft.

### 2. OpenSea Breached its Duty of Care and Was the Cause of Mr. Armijo's Injuries

Nevada courts are reluctant to preemptively decide questions of negligence because issues of "foreseeability, duty, proximate cause and reasonableness usually are questions of fact for the jury." *Lee v. GNLV Corp.*, 22 P.3d 209, 212 (Nev. 2001). Indeed, "[b]reach of duty and causation are classically issues of fact." *Klasch v. Walgreen Co.*, 264 P.3d 1155, 1161 (Nev. 2011).

Regarding breach, because a special relationship exists between OpenSea and Mr. Armijo, OpenSea had a legal duty to protect Mr. Armijo from the foreseeable criminal attacks of third parties and come to his aid when Mr. Armijo was robbed of his BAYC NFTs. *See GNLV* 22 P.3d at 212. "[R]easonable care under the circumstances" (*id.*) would include implementing adequate security measures to deter theft, monitoring the OpenSea marketplace and prohibiting the listing of stolen NFTs, responding quickly to reports of theft, and providing adequate customer service. *See* FAC ¶¶ 190-94. OpenSea breached its duties by failing to implement *any* proactive theft deterrent measures that would protect Mr. Armijo and other NFT owners from becoming the target of malicious third-party actors, and by failing to provide adequate and timely customer service. *See id.* ¶ 200-01. Given the threat NFT owners face, OpenSea's conduct is the exact opposite of reasonable.

It does not matter that the theft occurred outside of OpenSea's marketplace. *See* MTD at 13. OpenSea's actions caused Mr. Armijo to be a target for thieves no matter where he was because once the theft happened, OpenSea provided the thieves with the marketplace they needed to offload the stolen NFTs.  And that is exactly what occurred in this case:  Mr. Armijo's stolen BAYC NFT was listed and sold on OpenSea's marketplace shortly after the theft. Additionally, OpenSea's hours-long response was neither expeditious nor effective in the context of the facts of this case. *See* MTD at 13-14. OpenSea knows that sales of high-value NFTs occur almost instantaneously on OpenSea's marketplace. As such, requiring victims of theft to wait hours, days, or even weeks before receiving a

response to their pleas for help is not reasonable. *See* FAC ¶¶ 88, 144-45, 219, 223. Such long wait times also violate OpenSea's own acknowledged duty: OpenSea has "an obligation" to "*immediately* protect users" and notify other platforms when a security issue is flagged. *See* FAC ¶ 192.

Turning to causation, "it must appear that the injury was the natural and probable consequence of the negligence or wrongful act, and that it ought to have been foreseen in the light of the attending circumstances." *Yamaha Motor Co., U.S.A. v. Arnoult*, 955 P.2d 661, 664 (Nev. 1998). As explained above and within the FAC, it was OpenSea's negligent actions, which included failing to implement adequate theft deterrent measures, that caused Mr. Armijo to suffer the injury of being targeted and attacked by thieves seeking to steal his valuable NFTs. *See, e.g.*, FAC ¶ 203. Such an injury was foreseeable given OpenSea's knowledge of the many similar attacks that had occurred within the NFT community and within its own platform.

OpenSea's reliance on *Clark County School District v. Richardson Construction, Inc.* is puzzling. *See* MTD at 14-15. In *Clark*, the court stated that when considering tort actions, "allegations that a party other than the defendant caused the plaintiffs (*sic*) *damages* . . . such allegations negate an essential element of the plaintiff's claim—proximate cause." *Clark*, 168 P.3d 87, 96 (Nev. 2007). Mr. Armijo has never made any such allegation. Indeed, the FAC clearly states that "OpenSea's . . . negligence was a direct and proximate cause of Mr. Armijo's resulting *damages*[.]" FAC ¶ 203.

OpenSea also mischaracterizes Mr. Armijo's argument claiming that Mr. Armijo "does not allege any harm other than the damages flowing directly from the theft itself[.]" MTD at 15. Mr. Armijo has repeatedly explained that the harm he suffered—and which was caused by OpenSea's negligent actions—was being targeted and attacked by thieves due to his ownership of high-value NFTs. *See, e.g.*, FAC ¶¶ 5, 116, 146, 163, 165, 168, 193.

For these reasons, the issues of breach and causation are inappropriate for decision here and should be decided by a jury.

**B. Mr. Armijo Has Sufficiently Pled Claims for Negligent Hiring and Negligent Supervision and Training.**

Under Nevada law, a claim for negligent hiring, training, supervision, and/or retention must establish that: "(1) defendant owed a duty of care to the plaintiff; (2) defendant breached that duty by

18

hiring, retaining, training, and/or supervising an employee even though defendant knew or should have known of the employee's dangerous propensities; (3) the breach caused the plaintiff's injuries; and (4) damages." *Long v. Diamond Dolls of Nevada, LLC*, No. 3:19-CV-00652-LRH-CLB, 2020 WL 6381673, at *6 (D. Nev. Oct. 29, 2020).

"It is a basic tenet that for an employer to be liable for negligent hiring, training, or supervision of an employee, the person involved must actually be an employee." *Rockwell v. Sun Harbor Budget Suites*, 925 P.2d 1175, 1181 (Nev. 1996). OpenSea argues that Mr. Armijo "cannot allege that *OpenSea's employees* stole his NFTs or in any way caused the third-party phishing attack that resulted in his injury." MTD at 18. Again, OpenSea mischaracterizes the claims at issue. Mr. Armijo's allegation is that it was the actions and inactions of both OpenSea and its employees that caused the harm he suffered: being targeted and attacked by thieves due to his ownership of high-value NFTs. *See, e.g.*, FAC ¶ 222 ("[T]he illegal trades and sales of NFTs cannot occur without the knowledge, complicity, or negligence by OpenSea . . . employees.") By failing to implement or use any proactive theft deterrent measures, monitor the OpenSea marketplace for stolen NFTs, or provide adequate customer service, OpenSea employees have incentivized NFT theft and put Mr. Armijo and others like him at risk of being targeted by malicious third-party actors.

**1.  Mr. Armijo's Negligent Hiring Claim Has Been Adequately Pled.**

"The tort of negligent hiring imposes a general duty on the employer to conduct a reasonable background check on a potential employee to ensure that the employee is fit for the position. An employer breaches this duty when it hires an employee even though the employer knew, or should have known, of that employee's dangerous propensities." *Chiles v. Underhill*, No. 3:05-CV-00179-LRH-RJJ, 2008 WL 822248, at *11 (D. Nev. Mar. 26, 2008) (citations and quotation marks omitted).

Because the web3 industry is in its infancy, it is difficult to determine what constitutes a "reasonable background check" for employees of an NFT marketplace. However, despite a lack of guidance, there is evidence to suggest that OpenSea has not conducted reasonable background checks of its employees and has hired employees that it knew, or should have known, were dangerous.

For example, in September 2021, OpenSea's former product manager, Nathaniel Chastain, was fired when it was discovered that he was using his position to profit from inside information. Chastain

was subsequently indicted on charges of wire fraud and money laundering and became the first person ever to be charged in a digital asset insider trading scheme.[19] Although Chastain's crime is not involved with the specific allegations in this case, the way his criminal actions were discovered is relevant to this cause of action. Chastain's actions were exposed by NFT traders on Twitter who noticed that Chastain used multiple digital wallets to buy and sell the NFTs he was illegally profiting from.[20] Because blockchain transactions are public, it is telling that OpenSea had no knowledge of Chastain's multiple wallets and nefarious transaction history and did not take action until the illegal acts were reported by the NFT community.[21] This is especially problematic in an industry where insider and wash trading are a known concern,[22] and it suggests that OpenSea is not conducting reasonable background checks of its employees' web3 history to determine whether they engage in questionable or illegal NFT transactions that could harm others, like the very kinds at issue here.

Because OpenSea owed Mr. Armijo a duty to conduct reasonable background checks of its employees, OpenSea has breached that duty by failing to conduct such background checks. Hiring potentially dangerous employees who failed to perform their duties (as described above) that would have protected Mr. Armijo from the criminal acts of third-party thieves was the cause of Mr. Armijo's harm and resulted in the damages he suffered.

**2. Mr. Armijo's Negligent Supervision and Training Claim Has Been Adequately Pled.**

"Employers also have a duty to use reasonable care in training, supervision, and retention of his or her employees to make sure that employees are fit for their positions." *Chiles*, 2008 WL 822248, at *11. "Claims for negligent training and supervision are based upon the premise that an employer should be liable when it places an employee, who it knows or should have known behaves wrongfully, in a position in which the employee can harm someone else." *Okeke v. Biomat USA, Inc.*, 927 F. Supp. 2d 1021, 1028 (D. Nev. Feb. 25, 2013).

---

[19] *See* Alex Castro, *Disgraced OpenSea Manager Arrested for Insider Trading*, THE VERGE (June 1, 2022, 1:30 PM MDT), https://www.theverge.com/2022/6/1/23150429/opensea-insider-trading-nathaniel-chastain-arrested-homepage-nfts.

[20] *See* Sam Reynolds, *OpenSea's Nate Chastain Calls It Quits After Insider Trading Allegations*, BLOCKWORKS (Sept. 17, 2021, 7:03 AM EDT), https://blockworks.co/openseas-nate-chastain-calls-it-quits-after-insider-trading-allegations/.

[21] *Id.*

[22] *Id.*

As with the negligent hiring claim, there is evidence to suggest that OpenSea has breached its duty to reasonably supervise and train its employees to protect NFT owners from third-party thefts. Because OpenSea employees slowly and inconsistently apply OpenSea's policy of flagging/freezing stolen NFTs (*see* FAC ¶ 144), many downstream users purchase NFTs on OpenSea only to find out days later that the NFT they bought has been reported stolen and has now been frozen by OpenSea. This has been the source of many customer complaints.[23]

For example, in response to one user who unwittingly purchased a stolen NFT on OpenSea's marketplace, OpenSea employees offered the following suggestion:[24]



OpenSea's users are directly communicating with OpenSea employees via OpenSea's official Discord and Twitter accounts and are, upon information and belief, receiving similar responses from OpenSea employees. Given the public nature of these communications, OpenSea knows, or should know, that its employees are behaving wrongfully when they tell users to sell stolen NFTs on another marketplace to get around OpenSea's own stolen items policy. Because OpenSea employees do not do anything to prevent NFT theft and refuse to provide help after a theft, they are directly contributing to the harm Mr. Armijo and others like him suffer when they are targeted by third-party thieves. As their employer, OpenSea is liable for failing to supervise its employees and correct their wrongful behavior with proper training.

---

[23] *See, e.g.*, @boredspaceape, Twitter (Aug. 12, 2022, 7:37 AM), https://twitter.com/boredspaceape/status/1558085202315984896.
[24] @MarleyThunder, Twitter (Aug. 10, 2022, 7:57 PM), https://twitter.com/MarleyThunder/status/1557546606056046592.

**C. Mr. Armijo's Claims Are Not Barred by OpenSea's Terms of Service.**

OpenSea's Terms of Service ("Terms") do not apply here because Mr. Armijo was not subject to the Terms when the theft of his BAYC NFTs and his attempts to recover them occurred. As OpenSea clearly states in its MTD, Mr. Armijo's BAYC NFTs were stolen "by a third-party scammer using a completely different online platform—Discord—that is not affiliated with OpenSea in any way." MTD at 1. Mr. Armijo does not dispute that he agreed to OpenSea's Terms and is governed by them when *actually using* OpenSea's platform; however, Mr. Armijo is not bound by OpenSea's Terms wherever he goes. As OpenSea itself makes clear, individuals can only be subject to OpenSea's Terms when they are actively using and engaging with OpenSea's platform in the manner for which it is intended— buying, selling, listing, or minting NFTs. *See* MTD at 4 (OpenSea users must accept the Terms "*to use the platform*"); at 19 (if an OpenSea user does not agree to the Terms, they "may not *access or use the service*"); at 21 (the Terms "plainly state that *by using OpenSea's services*" the user agrees to assume the risk "associated *with using OpenSea*"). Additionally, attempting to contact OpenSea's customer service department to report a theft from a third-party website does not subject an individual to OpenSea's Terms.

In this scenario, the only person who actually used OpenSea's platform was the thief who stole Mr. Armijo's BAYC NFTs and listed them for sale on OpenSea, which was a clear violation of OpenSea's Terms. As articulated in the Terms, users are prohibited from violating any law or third party right, using the OpenSea Service "in any manner that could interfere with, disrupt, negatively affect or inhibit other users from fully enjoying the Service," or using the OpenSea Service "for any illegal or unauthorized purpose." *See* Decl. of Ian L. Meader, Ex. A at ¶¶ 5-6, ECF No. 72.

For these same reasons, Mr. Armijo objects to OpenSea's Request for Judicial Notice of the Terms (ECF No. 73). *See* Opposition to OpenSea's Request for Judicial Notice filed concurrent herewith. The Terms do not form the basis of Mr. Armijo's claims, nor does Mr. Armijo rely upon or reference the Terms at any point in his FAC.

But, even if this Court were to find that the Terms apply here, which they do not, OpenSea's overly broad exculpatory provision is invalid as it contravenes public policy and unconscionably seeks to waive liability for OpenSea's grossly negligent and reckless conduct. *See Royal Ins. Co. of Am. v.*

*Sw. Marine*, 194 F.3d 1009, 1016 (9th Cir. 1999) (parties cannot shield themselves contractually from liability for gross negligence; "A term exempting a party from tort liability for harm caused intentionally or recklessly is unenforceable on grounds of public policy.") (citation omitted); *Waldschmidt v. Edge Fitness, LLC*, 417 P.3d 1120, 1120 (Nev. 2018) (unpublished) (exculpatory clause relieved liability because the claims were confined to "ordinary negligence"); *Bernstein v. GTE Directories Corp.*, 631 F. Supp. 1551, 1552 (D. Nev. Apr. 16, 1983) (company may contract to limit its liability "so long as it does not seek immunity from gross negligence or willful misconduct").

In Nevada, gross negligence is defined as a "very great negligence, or the absence of slight diligence, or the want of even scant care that amounts to indifference to present legal duty, and to utter forgetfulness of legal obligations so far as other persons may be affected[.]" *Porchia v. City of Las Vegas*, 504 P.3d 515, 521 (Nev. 2022). And a person acts with reckless disregard when they disregard "a substantial risk that a wrongful act may occur" of which they are aware and their "disregard of that risk is a gross deviation from conduct that a reasonable person would exercise in the same situation." *Paiva v. City of Reno*, 939 F. Supp. 1474, 1493 n.27 (D. Nev. Aug. 30, 1996).

Here, OpenSea's complete indifference to its duty to protect Mr. Armijo from the harm its own actions caused rises to the level of gross negligence. OpenSea also recklessly disregarded the known and substantial risk Mr. Armijo faced from third party thieves and failed to do *anything* to stop it. Thus, to allow OpenSea to waive liability for harm caused by third-party conduct (which its own actions induced) that does not even occur on its own platform would be against public policy.

### D.  Mr. Armijo's Claims for Damages Are Not Barred by the Economic Loss Doctrine.

Mr. Armijo's claims are not barred by Nevada's economic loss doctrine because the losses he suffered are not solely monetary in nature.  Not only did Mr. Armijo lose his BAYC NFTs, but also, his membership in the BAYC club. FAC ¶¶ 159-161. As the FAC illustrates, membership in the BAYC club provided (and continues to provide) a multitude of social and experiential benefits that are not tethered to any economic benefit. *See, e.g.*, FAC ¶¶ 42-52, 64, 68. The BAYC club is a cultural phenomenon, and BAYC club members are granted a multitude of privileges, including admittance to exclusive parties, access to limited-time only merchandise, and building BAYC's newest venture, the Otherside Metaverse. *Id.*

Likewise, Mr. Armijo has a significant property interest in the commercialization rights of his stolen BAYC NFTs, which was damaged when Mr. Armijo was targeted and attacked by thieves. *Calloway v. City of Reno*, 993 P.2d 1259, 1267 (Nev. 2000), *overruled on other grounds by Olson v. Richard*, 89 P.3d 31, 33 (Nev. 2004) (holding that the economic loss doctrine does not bar recovery where there is "personal injury or damage to property"). In *Sadler v. PacifiCare of Nevada*, the Nevada Supreme Court clarified that the definition of injury is not limited only to a physical injury. *See* 130 Nev. 990, 999-1000, 340 P.3d 1264, 1270 (Nev. 2014). Rather, the definition of injury includes "the invasion of *any legally protected interest* of another." *Id.* (citation omitted) (emphasis in original). Therefore, a physical injury is not a required "prerequisite to a tort claim generally." *Id.* at 1268 (explaining that certain torts, such as negligent infliction of emotional distress, do require a showing of a physical injury due to the elements of the claim). Here, Mr. Armijo had a legally protected interest in his NFTs, his BAYC club membership, and the commercialization rights to his BAYC NFTs. As such, Mr. Armijo suffered a noneconomic injury when his BAYC NFTs were stolen, and these interests were invaded due to OpenSea's negligent actions.

The economic loss doctrine does not apply here, and therefore, OpenSea's request to dismiss must be denied.

## VI.    CONCLUSION

For each of the foregoing reasons, this Court must deny OpenSea's Motion to Dismiss the Amended Complaint in its entirety.

DATED this 3rd day of October 2022.

**ARMSTRONG TEASDALE LLP**

By:    */s/ Michelle D. Alarie*
MICHELLE D. ALARIE, ESQ.
Nevada Bar No. 11894
One Summerlin
1980 Festival Plaza Drive, Suite 750
Las Vegas, Nevada 89135

EMILY NUVAN, ESQ.
(LR IA 11-2 admitted)
Utah Bar No. 17722
ARMSTRONG TEASDALE LLP
201 South Main Street, Suite 750
Salt Lake City, Utah 84111

ROMAINE C. MARSHALL, ESQ.
(LR IA 11-2 admitted)

Utah Bar No. 9654
JOSE ABARCA, ESQ.
(LR IA 11-2 admitted)
Utah Bar No. 12762
POLSINELLI
2825 E Cottonwood Parkway, Suite 500
Salt Lake City, UT 84104

*Attorneys for Plaintiff Robert Armijo*

## CERTIFICATE OF SERVICE

Pursuant to Fed.R.Civ.P.5(b) and Section IV of District of Nevada Electronic Filing Procedures, I certify that I am an employee of ARMSTRONG TEASDALE LLP, and that the foregoing document:

☒ was served via electronic service to the address(es) shown below:

John Patrick Desmond   jdesmond@dickinsonwright.com,
Justin James Bustos   jbustos@dickinsonwright.com
John D. Tennert   jtennert@fclaw.com,
Erin Joan Cox   erin.cox@mto.com
Alison Clare Jordan   ajordan@fenwick.com,
Michael S. Dicke   mdicke@fenwick.com
Jennifer C. Bretan   jbretan@fenwick.com
Katherine A. Marshall   kmarshall@fenwick.com
Samuel Sahagian   ssahagian@fenwick.com
April D. Youpee-Roll   april.youpee-roll@mto.com
Jonathan H. Blavin   jonathan.blavin@mto.com
Brandon R. Teachout   brandon.teachout@mto.com


☐ was served via the U.S. Postal Service at Las Vegas, Nevada, in a sealed envelope, with first-class postage prepaid and to the address(es) shown below:


LooksRare, Ltd.
Chase Business Center
39-41 Chase Side
London, United Kingdom, N14 5BP


Date: October 3, 2022                   /s/ Christie Rehfeld
                                        An employee of Armstrong Teasdale LLP