MICHELLE D. ALARIE, ESQ.
Nevada Bar No. 11894
ARMSTRONG TEASDALE LLP
One Summerlin
1980 Festival Plaza Drive, Suite 750
Las Vegas, Nevada 89135
Telephone:  702.678.5070
Facsimile:  702.878.9995
malarie@atllp.com

EMILY NUVAN, ESQ. (LR IA 11-2 admitted)
Utah Bar No. 17722
ARMSTRONG TEASDALE LLP
201 South Main Street, Suite 750
Salt Lake City, Utah 84111
Telephone: 801.401.1406
enuvan@atllp.com

ROMAINE C. MARSHALL, ESQ. (LR IA 11-2 admitted)
Utah Bar No. 9654
JOSE ABARCA, ESQ. (LR IA 11-2 admitted)
Utah Bar No. 12762
POLSINELLI
2825 E. Cottonwood Parkway, Ste. 500
Salt Lake City, Utah 84104
rmarshall@polsinelli.com
jabarca@polsinelli.com

*Attorneys for Plaintiff Robert Armijo*

# UNITED STATES DISTRICT COURT

# DISTRICT OF NEVADA

| | |
|---|---|
| ROBERT ARMIJO,<br><br>        Plaintiff,<br><br>    vs.<br><br>OZONE NETWORKS, INC. d/b/a OPENSEA, a New York Corporation; YUGA LABS, LLC d/b/a BORED APE YACHT CLUB, a Delaware limited liability company; LOOKSRARE; and DOES 1 to 50,<br><br>        Defendants. | Case No.:  3:22-cv-00112-MMD-CLB<br><br>**PLAINTIFF'S RESPONSE IN OPPOSITION TO DEFENDANT YUGA LABS, INC.S MOTION TO DISMISS PLAINTIFF'S FIRST AMENDED COMPLAINT AND MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT THEREOF (ECF NO. 74)** |

Plaintiff Robert Armijo, by and through his counsel, Armstrong Teasdale LLP and Polsinelli LLP, files his Opposition to Defendant Yuga Labs, Inc.'s f/k/a Yuga Labs, LLC d/b/a Bored Ape Yacht Club ("Yuga Labs") Motion to Dismiss Plaintiff's First Amended Complaint and Memorandum of

1

Points and Authorities in Support Thereof ("MTD") (ECF No. 74).  This Response in opposition is made and based upon the following Memorandum of Points and Authorities, the papers and pleadings already on file herein, and any argument the Court may allow at the time of the hearing on the Motion.

## MEMORANDUM OF POINTS AND AUTHORITIES

## I.   INTRODUCTION

Mr. Armijo's claims arise from the new and unregulated world of non-fungible tokens ("NFTs"). NFTs are part of the larger universe of the newest iteration of the internet known as "web3." Web3 is built on decentralized blockchain technology that provides the basis for new technologies like NFTs, cryptocurrencies, decentralized finance, and decentralized autonomous organizations ("DAOs"). The goal of web3 is decentralization—transferring power and authority away from traditional internet-based business organizations and dispersing it to the individual users of web3 and blockchain technologies. Web3 platforms and businesses act as intermediaries between the real world and the decentralized world of digital assets created on blockchains.

In this new world, Yuga Labs has emerged as an early leader of the web3 space. As the creator of the enormously popular Bored Ape Yacht Club ("BAYC"), its corresponding Bored Ape and Mutant Ape NFT collections (collectively, "BAYC NFTs"), and subsequent expansion into other real world and digital spaces, Yuga Labs has enjoyed astronomical success. Indeed, Yuga Labs' BAYC NFTs are one of the most popular NFT collections ever created.

Yuga Labs takes advantage of web3's decentralization but at the same time benefits from its status as a traditional real-world business. As a centralized business entity, Yuga Labs has complete control over its platform and the BAYC club that it created and designed. Yuga Labs is the sole gatekeeper of the BAYC club.  Yuga Labs chooses who will be permitted into the BAYC club and how and to whom the club's many membership benefits will be distributed. Yet at the same time, Yuga Labs' wholehearted "embrace" of the ethos of decentralization allows it to disclaim all obligations to protect the BAYC community and instead forces BAYC club members to bear the daunting responsibility of providing their own security and shoulder the blame for when things foreseeably go wrong. This atmosphere has created a situation where thieves are emboldened to target and attack BAYC NFT owners without fear of punishment. Rather than try to protect BAYC club members from

this foreseeable harm, Yuga Labs has decided to profit from its members' misfortune because it continues to collect 2.5% royalty fee on secondary sales of BAYC NFTs regardless of whether the sale is legitimate or the result of fraud and theft.

Yuga Labs' failure to implement even basic security measures to discourage BAYC NFT theft led to the unfortunate and foreseeable events that underlie this case: a thief targeted Mr. Armijo, stealing three valuable BAYC NFTs he owned that were then quickly sold at a price far below their value on NFT marketplaces. Rather than help Mr. Armijo, Yuga Labs denied responsibility and stripped Mr. Armijo, a rightful BAYC club member, of his membership in the BAYC club and thereby depriving him of the multitude of benefits he is entitled to as a BAYC club member. This lawsuit seeks to hold Yuga Labs responsible for its actions (and inactions) that damaged Mr. Armijo.

Yuga Labs' MTD first seeks dismissal of Mr. Armijo's First Amended Complaint ("FAC") on the grounds that this Court lacks personal jurisdiction over Yuga Labs pursuant to Fed. R. Civ. P. 12(b)(2). *See* ECF No. 74. Yuga Labs also seeks dismissal arguing that the FAC fails to state a claim pursuant to Fed. R. Civ. P. 12(b)(6). *Id.*

Regarding jurisdiction, Yuga Labs argues that because it is a Delaware entity with no offices or employees in Nevada this Court cannot have personal jurisdiction over it. *See id.* at 2. This argument falls flat. Among other things, the FAC sets forth a multitude of facts demonstrating Yuga Labs' extensive use of interactive websites to conduct commercial transactions with and to otherwise interact and reach out to BAYC club members like Mr. Armijo and those that reside in Nevada. *See* FAC ¶ 78. Moreover, Yuga Labs touts itself as part of the decentralized web3 space and its commercial business relies on these new technology concepts. Yuga Labs appreciates the benefits of decentralization in its commercial transactions. As such, Yuga Labs should be prohibited from relying on traditional boundary notions when its own business model seeks to eliminate and benefit from those very same boundaries.

Yuga Labs argument that Mr. Armijo has failed to state a claim also falls flat. Yuga Labs has a duty to protect Mr. Armijo from third-party theft based on the special relationship between Yuga Labs and Mr. Armijo as well as all BAYC club members. This special relationship arises from Yuga Labs' complete control of all aspects of the BAYC club, including the distribution of all benefits and

opportunities that BAYC club members enjoy. Moreover, this special relationship establishes that Yuga Labs owes a duty of care to its BAYC club members, which includes the duty to monitor the BAYC club—a duty that Yuga Labs breached by failing to verify that the BAYC NFTs used to access its exclusive club were not the product of theft or fraud.

Beyond Yuga Labs' negligent actions, Yuga Labs also breached the contractual obligations it owed to Mr. Armijo as a rightful BAYC club member. Yuga Labs promises that upon purchasing a BAYC NFT, as Mr. Armijo did, "[y]ou are gaining membership access to a club whose benefits and offerings will increase over time." *See* FAC ¶ 22. Yuga Labs did not keep that promise when it wrongfully stripped Mr. Armijo of his BAYC club membership and deprived him of the multitude of benefits he is entitled to as a rightful BAYC club member.

Yuga Labs promotes the BAYC club as an exclusive community where individual members are valued and rewarded for their engagement. Indeed, the BAYC community is the key component to the success of Yuga Labs' business model. As the creator and gatekeeper of the BAYC club and its ever-expanding BAYC ecosystem, Yuga Labs is in the best position to implement standards and safety and security procedures that will disincentive BAYC NFT theft and protect the members of the BAYC club. Yuga Labs failure to do so was the cause of the foreseeable harm that Mr. Armijo endured and the damages he has suffered.

For these reasons, Yuga Labs' Motion to Dismiss the First Amended Complaint must be denied.

## II. FACTUAL BACKGROUND

Yuga Labs is the original creator and developer of the BAYC NFTs, which consist of 10,000 original Bored Ape NFTs and up to 20,000 Mutant Ape NFTs. *See* FAC at ¶¶ 38-39. Far more than a "community-driven art project," *see* MTD at 3, BAYC NFTs are the key to membership in the exclusive BAYC club, which allows BAYC NFT owners to receive all the special rights and privileges that Yuga Labs releases (and releases in conjunction with its partners and affiliates) to the members of the BAYC club. The membership benefits include substantial perks, such as access to exclusive community events, airdrops of valuable BAYC NFTs and affiliated NFTs, access to limited-time-only BAYC merchandise, preferential status in Yuga Labs' new virtual metaverse known as "The Otherside," and airdrops of Yuga Labs' defacto cryptocurrency known as ApeCoin, which is used to

buy and sell goods throughout the BAYC ecosystem. *See* FAC ¶¶ 61-68. But most importantly, Yuga Labs grants BAYC NFT owners the full commercial rights to their digital images and the underlying ape characters. *Id.* ¶ 52. BAYC NFT owners have capitalized on this unique situation by, among other things, creating music bands with their apes at the helm, opening Bored Ape restaurants, and licensing their ape characters for comic book, film, and tv projects. *Id.* To say the least, membership in the BAYC club has substantial social and financial reward.

Membership in the BAYC club is not predicated on purchasing a BAYC NFT directly from Yuga Labs. Following Yuga Labs' initial direct sale of the original 10,000 Bored Ape NFTs in April 2021, and the subsequent direct sale of the 10,000 Mutant Ape NFTs in August 2021, the only way to become a member of the BAYC club is to buy a BAYC NFT on the secondary market. *See* FAC ¶¶ 38-40. Yuga Labs actively solicits new members through its official website (boredapeyachtclub.com) and its official BAYC Twitter account, encouraging the public to join the BAYC club by buying a BAYC NFT on OpenSea, a digital NFT marketplace. *See id.* ¶ 40. Once a person accepts the offer and becomes part of the BAYC club, Yuga Labs promises a host of benefits and offerings that "will increase over time." *Id.* ¶ 22.

Mr. Armijo is an NFT enthusiast who became involved with the NFT community in November 2021. Through his purchase of Bored Ape NFT #4329 and Mutant Ape NFTs #1819 and #7713, Mr. Armijo became a member of the exclusive BAYC club. On February 1, 2022, all three of Mr. Armijo's BAYC NFTs were stolen in an instant. *Id.* ¶¶ 80-85. The theft occurred when Mr. Armijo unwittingly interacted with a thief through the online communication platform known as "Discord." *Id.* Discord is a different and separate entity unaffiliated with Yuga Labs, but is highly active within the web3 space. Until recently, Discord appeared to be one of Yuga Lab's preferred online communication platforms.[1]

Following the theft, Mr. Armijo immediately and desperately contacted OpenSea, the industry leading NFT marketplace, to have OpenSea block any sales of Mr. Armijo's stolen BAYC NFTs. *Id.* at ¶¶ 86-87. OpenSea did not respond. Mr. Armijo next turned to Yuga Labs for help. He went to the

---

[1] In a recent Tweet, one of Yuga Labs' founding members, Wylie Aronow—who goes by the pseudonym Gordon Goner—stated, "Discord isn't working for web3 communities. We need a better platform that puts security first." @GordonGoner, Twitter (Jun. 4, 2022, 2:42 PM), https://twitter.com/gordongoner/status/1533187460074815489.

BAYC Discord server and began messaging with a Yuga Labs employee on the Discord customer service channel for Yuga Labs. *Id.* ¶ 89. Rather than offer help, the Yuga Labs employee told Mr. Armijo there was nothing Yuga Labs could do about it because "there are too many issues like this happening." *Id.* ¶¶ 89-91. Yuga Labs knowingly rewards the thief (and/or subsequent purchasers) with valuable membership benefits.

Yuga Labs' negligence knowingly put a target on Mr. Armijo's back. Among other things, Yuga Labs owed Mr. Armijo as a BAYC club member a duty to implement adequate security processes and monitor its BAYC club for stolen NFTs, and a duty to provide adequate customer service for victims of BAYC NFT theft. These duties arose from the special relationship Yuga Labs has with Mr. Armijo.

Yuga Labs is the gatekeeper of the exclusive BAYC club. It is also the distributor of the opportunities and benefits that come with BAYC NFT ownership and BAYC club membership, including the grantor of the license to the underlying commercialization rights. As such, Yuga Labs has the ability to deny access to the BAYC club, refuse to disperse BAYC club benefits, and revoke BAYC NFT commercialization rights should Yuga Labs choose to do so. A BAYC NFT that has been barred from accessing the BAYC club and stripped of its membership benefits and commercialization rights would have no utility. The incentive to buy, hold, or sell such a BAYC NFT would be minimal and, thus, a powerful deterrent against thieves. Regrettably, Yuga Labs refuses to take any such measures despite its apparent extensive knowledge of these issues.

## A.    Yuga Labs' Web3 Business Model

Web3 companies, like Yuga Labs claims to be, do not follow a traditional business model. Rather, web3 companies seek to do away with middlemen and directly engage with their users, giving community members more opportunities to be involved in an interactive experience with their chosen communities. Although Yuga Labs maintains an official BAYC website, its main tools of communication are BAYC's official social media channels on Twitter and Discord. FAC ¶¶ 26-29. Instead of a press release or advertising campaign, Yuga Labs makes announcements about new opportunities and air drops via tweet and Discord post. *Id.* ¶ 77. Chances to buy new BAYC products or attend BAYC-sponsored events are time-sensitive, requiring BAYC community members to be

constantly engaged with the BAYC community to stay abreast of new developments. *Id.* ¶ 78.

Due to the security concerns inherent in web3, Yuga Labs does not sell anything directly through its official BAYC Twitter and Discord accounts. Instead, Yuga Labs uses these platforms to post carefully worded messages about new commercial opportunities and provide detailed instructions for BAYC club members to follow, along with verified links to the interactive websites where the commercial transactions with Yuga Labs will occur. *Id.* ¶ 77.

Except for its in-real-life events, Yuga Labs' presence exists almost entirely in the digital realm. It does not maintain permanent physical stores for selling merchandise, and, upon information and belief, there is no centralized customer service center or main office where Yuga Labs employees congregate. In the decentralized world of web3, employees are scattered throughout the world, working remotely from wherever they call home. Despite the lack of traditional business organization, Yuga Labs does behave traditionally in one key respect: it exercises complete control over the BAYC club and makes all business decisions regarding the expanding BAYC ecosystem.

### B.    BAYC Club Membership Requires Rightful Ownership of a BAYC NFT

Yuga Labs promises that once an individual *buys* a BAYC NFT, that individual becomes a member of the BAYC club and will receive all the benefits, opportunities, and exclusive offers that Yuga Labs releases in the future. FAC ¶ 42. Among these benefits, as explained on the official BAYC website, is "*ownership* and commercial usage rights given to the consumer over their NFT."[2]

Recently, Yuga Labs has begun making a distinction between "owners" and "holders" of BAYC NFTs. *See, e.g.*, MTD at 4 ("While in possession of a Bored Ape NFT, holders may also be eligible for certain benefits and opportunities[.]"). This distinction is critical to understanding the danger that BAYC NFT owners face due to Yuga Labs' failure to honor its promises:

**Specifically, the public knows that Yuga Labs is no respecter of the property rights it has conferred (including intellectual property rights) and that Yuga Labs will reward the "holder" of a BAYC NFT with the benefits of BAYC club membership even if that "holder" is a thief with no legal right to the underlying property.  Thieves are therefore incentivized to target BAYC**

---

[2] *See* Bored Ape Yacht Club, https://boredapeyachtclub.com/#/home (last visited Aug. 31, 2022) (emphasis added).

**NFT owners to steal their valuable property and reap the rewards for themselves.**

Not only does this fly in the face of established property law, it also seriously complicates the intellectual property rights that are purportedly attached to each BAYC NFT.

## III.    LEGAL ARGUMENT

### A.    This Court Has Personal Jurisdiction over Yuga Labs.

When no federal statute authorizes personal jurisdiction, as is the circumstance here, "the district court applies the law of the state in which the court sits." *CollegeSource, Inc. v. AcademyOne, Inc.*, 653 F.3d 1066, 1073 (9th Cir. 2011). Nevada's long-arm statute is coextensive with the federal Constitution, meaning that "the jurisdictional analyses under state law and federal due process are the same." *Id.* (citation omitted). To satisfy federal due process, a defendant must have "certain minimum contacts" with the relevant forum "such that the maintenance of the suit does not offend 'traditional notions of fair play and substantial justice.'" *Int'l Shoe Co. v. State of Wash.*, 326 U.S. 310, 316 (1945) (citation omitted).

#### 1.    Yuga Labs is Subject to General Jurisdiction.

A court may assert general jurisdiction over a foreign corporation when its "affiliations with the State are so 'continuous and systematic' as to render them essentially at home in the forum State." *Goodyear Dunlop Tires Operations, S.A. v. Brown*, 564 U.S. 915, 919 (2011). "For general jurisdiction to exist over a nonresident defendant such as [Yuga Labs], the defendant must engage in 'continuous and systematic general business contacts,' that 'approximate physical presence' in the forum state." *CollegeSource*, 653 F.3d at 1074 (citations omitted). To determine whether Yuga Labs' contacts are sufficiently systematic, continuous, and substantial, a court must consider their "[l]ongevity, continuity, volume, economic impact, physical presence, and integration into the state's regulatory or economic markets." *Id.* (citation omitted).

Upon information and belief, Nevada residents have purchased BAYC NFTs and been members of the BAYC club since Yuga Labs began business operations in April 2021. As such, Yuga Labs has had continuous and systematic business contacts with Nevada and its residents since that time. Due to the nature of its web3 business model, Yuga Labs should be considered at home everywhere that BAYC club members reside.

Even if the Court were to find that Yuga Labs is not subject to general jurisdiction, the FAC provides sufficient facts showing that Yuga Labs is subject to specific jurisdiction.

### 2.      Yuga Labs is Subject to Specific Jurisdiction.

The Ninth Circuit analyzes specific jurisdiction under a three-prong test:

> (1) The non-resident defendant must purposefully direct his activities or consummate some transaction with the forum or resident thereof; or perform some act by which he purposefully avails himself of the privilege of conducting activities in the forum, thereby invoking the benefits and protections of its laws; (2) the claim must be one which arises out of or relates to the defendant's forum-related activities; and (3) the exercise of jurisdiction must comport with fair play and substantial justice, i.e., it must be reasonable.

*Schwarzenegger v. Fred Martin Motor Co.*, 374 F.3d 797, 802 (9th Cir. 2004). Mr. Armijo bears the burden of satisfying the first two prongs of the test. *Id.* Once he does so, the burden then shifts to Yuga Labs to present a "compelling case" that the court's exercise of jurisdiction over it would not be reasonable. *Burger King Corp. v. Rudzewicz*, 471 U.S. 462, 476-78 (1985).

### a.      Yuga Labs Is Subject to Specific Jurisdiction under Both Purposeful Direction and Purposeful Availment.

"The first prong of the specific jurisdiction test refers to both purposeful availment and purposeful direction." *CollegeSource*, 653 F.3d at 1076. Cases involving tortious conduct are analyzed under the test for purposeful direction, while contract cases are analyzed under the rubric of purposeful availment. *See Yahoo! Inc. v. La Ligue Contre Le Racism Et L'Antisemitisme*, 433 F.3d 1199, 1206 (9th Cir. 2006) (*en banc*). Here, Mr. Armijo alleges both tortious conduct and contract claims. Yuga Labs is subject to specific jurisdiction under both standards.

### i.      Yuga Labs Purposefully Directed its Activities at Nevada and its Residents.

In tort cases, courts "typically inquire whether a defendant 'purposefully direct[s] his activities at the forum state, applying an 'effects' test that focuses on the forum in which the defendant's actions were felt, whether or not the actions themselves occurred within the forum." *Yahoo! Inc.*, 433 F.3d at 1206 (quoting *Schwarzenegger*, 374 F.3d at 803). The Ninth Circuit's "effects test" requires that "the defendant [must] have (1) committed an intentional act, (2) expressly aimed at the forum state, (3)

causing harm that the defendant knows is likely to be suffered in the forum state." *Id.* (citation omitted).

Here, Yuga Labs has committed multiple intentional acts aimed at Nevada and its residents, with the knowledge that should a Nevada BAYC club member become a victim of BAYC NFT theft, the harm would be felt in Nevada. These intentional acts include: (1) forming contractual relationships with BAYC club members in Nevada, including Mr. Armijo, thus creating numerous ongoing obligations between Yuga Labs and Nevada residents; (2) doing business over the internet using highly interactive websites to conduct commercial transactions with and provide customer support services to BAYC club members in Nevada; and (3) allowing third parties to solicit BAYC club members and the public in Nevada and engage with BAYC club members in Nevada through the use of advertisements, airdrops, and exclusive commercial opportunities.

First, Yuga Labs is not a traditional manufacturer of widgets, nor is it a typical online retailer or seller of ordinary goods. Rather, Yuga Labs is a web3 company that is built for and relies upon an international community of BAYC club members. Yuga Labs may be incorporated in Delaware, but its business is anywhere its BAYC club members reside. Any person who buys a BAYC NFT becomes a BAYC club member regardless of whether they purchased the BAYC NFT from Yuga Labs directly or from a third-party seller. Buying a BAYC NFT and becoming a BAYC club member is not a one-time interaction with Yuga Labs—it is merely the beginning of a continuing contractual relationship in which Yuga Labs promises that the "benefits and offerings will increase over time." FAC ¶ 22, 39-42, 46-51, 59-68. As detailed in the FAC, and upon information and belief, Yuga Labs maintains substantial and ongoing relationships with BAYC club members, which include Mr. Armijo and other Nevada residents. *See Ford Motor Comp. v. Eighth Judicial District Court*, 141 S.Ct. 1017, 1022-23 (2021) (explaining how plaintiff fostered an ongoing relationship between Ford and its customers that satisfied the threshold for establishing personal jurisdiction).

As the Ninth Circuit explained in *Ballard v. Savage*, the first prong of the personal jurisdiction test is satisfied if the defendant "has created continuing obligations to forum residents." 65 F.3d 1495, 1498 (9th Cir. 1995). There, the defendant was an Austrian bank with its principal place of business in Vienna. It had no offices or employees in the U.S. and generally did not advertise or solicit business in the forum. *Id.* at 1497. However, the defendant conducted a substantial amount of business in the U.S.

and with California residents, including sending prospective customers information about the defendant and occasionally soliciting new business from its existing California customers. *Id.* Based on these facts, the court found that the defendant had "created numerous ongoing obligations to U.S. residents," and that "[b]y intentionally doing business with California and U.S. residents, the [defendant] purposefully availed itself of the benefit and privilege of conducting activities in California." *Id.* at 1498-99 (also collecting cases with similar holdings).

The same is true here. To an even greater extent than the defendant in *Ballard*, Yuga Labs interacts with and has continuous ongoing obligations to its Nevada BAYC club members. Indeed, Yuga Labs' success depends upon it fostering the BAYC club through Yuga Labs' constant engagement and interaction with its members. Yuga Labs does not "occasionally solicit new business from its existing customers"—it actively reaches out to them through Twitter and Discord, continually updating them about new Yuga Labs products, sending them free gifts, and soliciting them to participate in new commercial transactions, i.e., buying tickets to ApeFest or limited-time-only BAYC merchandise. *See, e.g.*, FAC ¶ 78. Upon information and belief, many of the BAYC club members are Nevada residents. Therefore, Yuga Labs intentionally does business with Nevada and its residents, thus subjecting it to personal jurisdiction in this District.

The cases Yuga Labs relies on to refute this argument are not comparable to the facts of this case. *See* MTD at 7-8. Yuga Labs is not merely some large national organization, detached from its local members and providing sporadic services or support. Rather, it is the highly engaged leader of a relatively small and enthusiastic web3 community. Yuga Labs is attempting to have a foot in both worlds: it wants to take advantage of the decentralized nature of web3, allowing Yuga Labs to have a substantial impact wherever its members are located, while simultaneously relying on traditional business case law to save it from suit in a district where one of its members suffered injury because of Yuga Labs' negligence. This cannot stand.

Second, Yuga Labs mischaracterizes both its own business model and use of interactive websites, but also the sliding scale test the Ninth Circuit adopted to determine when personal jurisdiction can be established due to a defendant's internet activities. *See Cybersell, Inc. v. Cybersell, Inc.* 130 F.3d 414, 419 (9th Cir. 1997). The test holds that "the likelihood that personal jurisdiction can

be constitutionally exercised is directly proportionate to the nature and quality of commercial activity that an entity conducts *over the internet*." *Id.* (quoting *Zippo Mfg. Co. v. Zippo Dot Com, Inc.*, 952 F.Supp. 1119, 1124 (W.D. Pa. Jan. 16, 1997) (emphasis added). The test is not limited, as Yuga Labs would have the Court believe, to examining single websites at an individual level—rather, it looks at a defendant's internet activities in the aggregate.

On one end of the spectrum of the *Zippo* test "are situations where a defendant clearly does business over the internet." *Zippo*, 952 F.Supp. at 1124. When the defendant "enters into contracts with residents of a foreign jurisdiction that involve the knowing and repeated transmission of computer files over the internet, personal jurisdiction is proper." *Id.* (citing *CompuServe, Inc. v. Patterson*, 89 F.3d 1257 (6th Cir. 1996). At the other end of the *Zippo* test "are situations where a defendant has simply posted information on an Internet Web site which is accessible to users in foreign jurisdictions." *Id.* Such "passive websites" are not grounds for personal jurisdiction. *Id.* "The middle ground is occupied by interactive Web sites where a user can exchange information with the host computer. In these cases, the exercise of jurisdiction is determined by examining the level of interactivity and commercial nature of the exchange of information that occurs on the Web site." *Id.*

As explained above and at length in the FAC, Yuga Labs is a web3 company that conducts its business almost exclusively over the internet, using a multitude of interactive websites and social media accounts to communicate and conduct commercial transactions with BAYC club members, including its members in Nevada. *See* FAC ¶ 78. Upon information and belief, Yuga Labs has also entered into contracts with BAYC club members in Nevada, Mr. Armijo included, and knowingly and repeatedly transferred computer code—in the form of airdrops of additional BAYC NFTs, mutant serum, Otherside deeds, and ApeCoin—into the digital wallets of its Nevada members. *See id.* ¶¶ 39, 67, 72.

Yuga Labs inexplicably ignores the detailed list of interactive commercial websites Mr. Armijo cited in the FAC (*see* ¶ 78), choosing instead to focus exclusively on the official BAYC Twitter and Discord accounts. Yuga Labs disingenuously suggests that these accounts are merely passive websites for "visitors" who are curious about the BAYC club. *See* MTD at 11. Yuga Labs seems to think that simply because it does not sell anything through Twitter and Discord, it renders the interactions that occur on these platforms as noncommercial and therefore not subject to personal jurisdiction. *See* MTD

12

at 11. This argument falsely represents how Yuga Labs conducts its business. Twitter and Discord are the official channels Yuga Labs uses to communicate with the BAYC club. Due to the security concerns inherent in web3, Yuga Labs chooses not to sell BAYC goods directly through Twitter and Discord, but it still uses these accounts to post verified links and instructions to the array of commercial websites it creates when it does sell digital and real-world products to the BAYC club members and the public at large. *See* FAC ¶ 77. Upon information and belief, not only have digital goods been sold and transferred to BAYC club members in Nevada, but Yuga Labs has shipped physical BAYC merchandise to its members in Nevada as well.

Mr. Armijo's interactions with a BAYC customer service employee following the thefts of his BAYC NFTs also highlight the interactivity of the official BAYC Discord server. Yuga Labs does not have a customer service center that can be reached through telephone, email, or live chat feature. FAC ¶ 76. The only way to contact Yuga Labs is to either post a message in the BAYC Discord server or tweet a message tagging the official BAYC Twitter accounts and hope to get a response. *Id*. BAYC representatives reach out to BAYC club members to answer their questions and provide service in whatever state or country they are located. *Id.* Yuga Labs insists that because it was Mr. Armijo who initiated the interaction with the BAYC representative, Yuga Labs cannot be subject to personal jurisdiction. MTD at 11. Again, Yuga Labs disingenuously focuses on one aspect of its internet activities to the exclusion of all others. Mr. Armijo was not a random member of the public simply contacting Yuga Labs for innocuous business information. Rather, by the time Mr. Armijo contacted Yuga Labs for help through the BAYC Discord server, Yuga Labs had already developed an ongoing relationship with Mr. Armijo as a BAYC club member.

As before, Yuga Labs refutes these arguments with a heavy dose of case citations and minimal facts and analysis. MTD 8-11. The cases cited by Yuga Labs focus on businesses whose activities involved a single passive website, a noncommercial blog, or out-of-state customer service centers. *Id.* Such businesses are not comparable to the extensive internet-based conduct Yuga Labs engages in. Instead of acknowledging the extent of Yuga Labs' internet activities, Yuga Labs seeks to hide the ball, offering this Court individual bits of information as though they occur in isolation while claiming personal jurisdiction is improper. That is not how the *Zippo* sliding scale test works. When viewing

Yuga Labs' conduct in its entirety, it is clear that Yuga Labs does business over the internet using many interactive websites to directly interact with BAYC club members, including members who reside in Nevada. Consequently, Yuga Labs is subject to this Court's personal jurisdiction.

Finally, Yuga Labs partners with and/or implicitly allows third parties to solicit BAYC club members and the public in Nevada. Upon information and belief, two such examples include: BAYC club members in Nevada were airdropped ApeCoin tokens as a gift from ApeCoin DAO, and the cryptocurrency platform Coinbase invited Nevada BAYC NFT owners to submit their apes for consideration as characters in its upcoming movie series featuring the BAYC club. *See* FAC ¶¶ 71-74. Yuga Labs does not address these activities in its MTD.

Also, in July of 2021, a large advertising campaign featuring BAYC NFT images and *Yuga Labs' intellectual property including the official "BAYC" name and BAYC logo* was conducted throughout Las Vegas, Nevada. FAC ¶¶ 69-70. Yuga Labs insists that it has "never purchased or used any physical advertising space in the state of Nevada," s*ee* MTD at 9; Declaration of Nicole Muniz, ECF No. 75 ¶ 3. Despite this denial, Yuga Labs has never explained why *its intellectual property* was used in this Nevada-based and directed advertising campaign. Yuga Labs fails to explain who actually conducted the advertising campaign and whether they did so with the approval of Yuga Labs.  The Supreme Court has been clear that promotional activities, which include "advertising in the forum State," indicate a defendant's "intent or purpose to serve the market in the forum State," thus establishing the requisite substantial connection necessary for personal jurisdiction. *See Asahi Metal Industries v. Superior Court of Solano County*, 480 U.S. 102, 112 (1987). Whether Yuga Labs was in any way involved in the Nevada advertising campaign or implicitly allowed it to be conducted by a third-party, the result is the same: Yuga Labs is subject to this Court's personal jurisdiction.

To the extent Yuga Labs challenges these contentions, Mr. Armijo requests jurisdictional discovery to ascertain how many BAYC club members have lived or currently live in Nevada and the history of transactions, including both physical and digital goods, that have been sent to BAYC club members in Nevada. "[J]urisdictional discovery would be helpful to elaborate on the contacts [Yuga Labs] had with Nevada" and could help determine purposeful direction. *See Klein v. Freedom Strategic Partners, LLC*, 595 F.Supp. 2d 1152, 1160 (D. Nev. Feb. 2, 2009). Additionally, Yuga Labs must

explain why its intellectual property was used in the BAYC advertising campaign in July 2021 in one of the most popular cities in the world. Mr. Armijo requests jurisdictional discovery to ascertain the origins of the advertising campaign and Yuga Labs' knowledge of it.

>    ii.   *Yuga Labs Purposefully Availed Itself of Conducting Activities and Consummating Transactions in Nevada.*

In contract cases, courts "typically inquire whether a defendant 'purposefully avails itself of the privilege of conducting activities' or 'consummate[s] [a] transaction' in the forum, focusing on activities such as delivering goods or executing a contract." *Yahoo! Inc.*, 433 F.3d at 1206 (quoting *Schwarzenegger*, 374 F.3d at 802). As explained more fully below, a valid and enforceable contract exists between Yuga Labs and Mr. Armijo, which was created when Mr. Armijo accepted Yuga Labs' offer to become part of the BAYC club by purchasing BAYC NFTs. Mr. Armijo accepted the offer, purchased the BAYC NFTs, and began an ongoing relationship with Yuga Labs while he lived in Nevada. As the Supreme Court explained in *Burger King*, "[W]ith respect to interstate contractual obligations . . . parties who 'reach out beyond one state and create continuing relationships and obligations with citizens of another state' are subject to regulation and sanctions in the other State for the consequences of their activities." 471 U.S. 462, 473 (1985). This includes being subject to personal jurisdiction. *Id.* at 475-76. Despite its claimed lack of physical presence in Nevada, Yuga Labs digitally reached out to citizens of Nevada, including Mr. Armijo, and created contractual, ongoing relationships with them that subject Yuga Labs to this Court's personal jurisdiction.

>    **b.    Mr. Armijo's Claims Relate to Yuga Labs' Forum-Related Activities.**

The second prong of the specific jurisdiction test is satisfied when a plaintiff shows that their claims "arise out of *or relate to* the defendant's contacts with the forum." *Burger King*, 471 U.S. at 472 (emphasis added). Citing an outdated "but for" standard, Yuga Labs insists that even if it did advertise in Nevada or use commercial interactive websites to purposely direct its conduct toward Nevada residents, this still wouldn't be enough to establish personal jurisdiction over Yuga Labs because Mr. Armijo's claims did not arise out of his interactions with those sites or advertisements. MTD at 9, 11-12. Yuga Labs' "causation-only approach" to personal jurisdiction is incorrect. *See Ford Motor*, 141 S.Ct. at 1026. As the Supreme Court recently held in *Ford Motor*, "None of our precedents

has suggested that only a strict causal relationship between the defendant's in-state activity and the litigation will do." *Id.* Rather, the "essential foundation of specific jurisdiction" is a "strong relationship among the defendant, the forum, and the litigation." *Id.* at 1028 (citation omitted). Such is the case here.

Yuga Labs conducts business in the state of Nevada and with Nevada residents who belong to the BAYC club, entering into contracts and creating continuing obligations with them by offering exclusive access to merchandise, gifts, opportunities, and sales of all new Yuga Labs products and experiences. Yuga Labs also uses commercial interactive websites as one method of directing its conduct toward each BAYC club member in Nevada. Additionally, there is "an affiliation between the forum and the underlying controversy" in that Mr. Armijo was a resident of Nevada at the time he purchased his BAYC NFTs and became part of the BAYC club; he also interacted with Yuga Labs and the BAYC club from his home in Nevada; and he was at home in Nevada when his BAYC NFTs were stolen. *Id.* at 1025 (citation omitted). The underlying lawsuit relates to these contacts, thus creating a strong connection between Yuga Labs, Nevada, and the instant litigation.

### c.     The Exercise of Personal Jurisdiction is Reasonable.

An otherwise valid exercise of specific jurisdiction is presumed to be reasonable, and the burden is on Yuga Labs to present "a compelling case" to convince this Court otherwise. *See Ballard*, 65 F.3d at 1500 (citing *Burger King*, 471 U.S. at 477). Yuga Labs' cursory glance at the factors used to determine reasonableness (*see* MTD at 12) is not enough to meet "its heavy burden of rebutting the strong presumption in favor of jurisdiction." *Id.* In addressing these factors, as described by the court in *Ballard*, the following holds true: (1) as discussed above, the purposeful availment in this case is considerable; (2) Nevada has an interest in protecting its citizens against the type of negligence alleged in this case; (3) the extent of conflict with Yuga Labs' state of Delaware is minimal; (4) the judiciary's adoption of modern communication technology, including virtual hearings, significantly reduces the burden on Yuga Labs in defending itself in Nevada; (5) the most efficient resolution of this dispute is in Nevada due to this Court's familiarity with the facts and procedural history; and (6) although an alternate forum exists in Delaware, Mr. Armijo will be considerably burdened if forced to litigate there given the fact that he has no connection to the state and none of the events giving rise to this lawsuit

occurred there. *Id.* at 1500-02.

**B.      Mr. Armijo has Stated a Claim for Negligence Against Yuga Labs.**

To prevail on a traditional negligence theory, Nevada law requires a plaintiff to demonstrate "(1) the existence of a duty of care, (2) breach of that duty, (3) legal causation, and (4) damages." *Sanchez v. Wal-Mart Stores*, 221 P.3d 1276, 1280 (Nev. 2009). Because negligence is generally a question of fact for the jury to resolve, dismissal is only appropriate if a plaintiff cannot recover as a matter of law. *See Foster v. Costco Wholesale Corp.*, 291 P.3d 150, 154 (Nev. 2012). Here, Mr. Armijo has adequately pled all four negligence elements, and Yuga Labs has failed to show that Mr. Armijo's "prima facie case is clearly lacking as a matter of law." *Scialabba v. Brandise Const. Co., Inc.*, 921 P.2d 928 (Nev. 1996).

**1.      Yuga Labs Owed Mr. Armijo a Duty of Care Based on the Special Relationship That Existed Between the Parties.**

Whether Yuga Labs owed Mr. Armijo a duty of care is a question of law. *Scialabba*, 921 P.2d at 968. "As a general rule, a private person does not have a duty to protect another from a criminal attack by a third person." *Id.* However, there is an exception to this rule when a "special relationship" exists between the parties—meaning, when "the ability of one of the parties to provide for his own protection has been limited in some way by his submission to the control of the other, a duty should be imposed upon the one possessing control (*and thus the power to act*) to take reasonable precautions to protect the other one from assaults by third parties which, at least, could reasonably have been anticipated. *Id.* at 969 (citation omitted) (emphasis added). Thus, when analyzing the independent facts of each case to determine whether a special relationship exists, courts consider two key factors: control and foreseeability.

As explained above, BAYC NFTs have reached the level of success and valuableness they enjoy because of the substantial benefits that Yuga Labs confers on BAYC club members. Because Yuga Labs maintains its gatekeeping function over the BAYC club, anyone who owns a BAYC NFT submits themselves to Yuga Labs' control. It is only at the sole discretion of Yuga Labs that a BAYC NFT owner is (1) permitted entrance to the BAYC club, (2) receives the benefits Yuga Labs chooses to distribute, and (3) exercises the commercial rights underlying each BAYC NFT. If it wanted to,

Yuga Labs could restrict the club access and revoke the privileges of stolen BAYC NFTs, thus stripping the NFTs of utility, and, therefore, attractiveness to thieves. This exclusive *power to act*, as contemplated by the *Scialabba* court, demonstrates the control Yuga Labs has to disincentivize theft and protect its BAYC club members from becoming the targets of third parties' criminal actions. Indeed, Yuga Labs' ability to exercise this control is "real and not fictional and, if exercised, would meaningfully reduce the risk of the harm that actually occurred" to Mr. Armijo. *Sparks v. Alpha Tau Omega Fraternity, Inc.*, 255 P.3d 238, 245 (Nev. 2011). Because Yuga Labs refuses to employ any type of theft deterrent measures, Mr. Armijo and other BAYC club members are limited in their ability to protect themselves from becoming the target of thieves.

Turning to foreseeability, the FAC lists numerous examples of BAYC NFT owners being targeted and attacked by scammers and thieves. FAC ¶¶ 106-117. These thefts are often highly publicized and involve similar sophisticated tactics as those used to target Mr. Armijo. Before its removal, Yuga Labs' official customer service channel on the BAYC Discord server was also filled with posts from BAYC club members pleading for help after their BAYC NFTs were stolen. Yuga Labs even has firsthand experience with these targeted attacks as its own Discord and social media accounts have been hacked on several occasions and used to steal BAYC NFTs. FAC ¶¶ 98-105. Upon information and belief, Yuga Labs was aware as early as August 2021 that BAYC NFT owners were being preyed upon by third party thieves, and yet Yuga Labs has done nothing to disincentivize the thefts.

Yuga Labs' reframing the nature of this case and placing the blame on Mr. Armijo is simply Yuga Labs' attempt to deflect this Court's attention from Yuga Labs' own wrongful conduct. The court's analysis in *Scialabba* is instructive on this point. There, the plaintiff moved into a new apartment building even though construction was not fully complete and many of the apartments remained unfinished and empty. *See Scialabba*, 921 P.2d at 967. One evening, the plaintiff was violently attacked as she returned home by a man who had hidden in the vacant, unlocked apartment across the hall from plaintiff's home. *Id.* Plaintiff brought a negligence suit against the construction company that was finishing the building and had responsibility for locking the doors, for failing to protect her from the third-party attack. *Id.* The court found that a special relationship existed between

the parties because the company maintained sufficient control over the premises and the failure to lock the doors created a foreseeable risk of criminal activity and harm to the plaintiff. *Id.* at 970.

The *Scialabba* court rightfully focused its negligence analysis on the actions of the defendant rather than the victim. The court did not ask why the victim decided to live alone, returned home late at night, moved into a building with so many vacant apartments, or failed to take a self-defense class that would have prepared her to fight off an attacker. Rather, the court asked whether the defendant's actions and position of control gave rise to a duty to protect the victim from a foreseeable harm.

Like the plaintiff in *Scialabba*, Mr. Armijo was not engaged in an inherently risky activity. He was participating in the NFT marketplace and looking to find someone with whom to trade one of his NFTs. Given Yuga Labs' goal to make buying NFTs a mainstream activity and bring millions of new users into the web3 world,[3] this type of everyday activity should not be a dangerous pursuit where individuals are under constant threat of attack from thieves and scammers. Yet because of Yuga Labs' complete refusal to implement any theft deterrents, thieves are foreseeably emboldened to target and attack BAYC NFT owners without fear of punishment. It was not Mr. Armijo's actions that created this dangerous situation—it was Yuga Labs' own negligent actions that have endangered Mr. Armijo and all other BAYC NFT owners and club members.

Recently, Yuga Labs demonstrated that it recognizes it has a duty to keep BAYC club members safe and help them when they fall prey to phishing scams. Following the latest hack of the official BAYC Discord server, which resulted in the loss of thousands of dollars' worth of BAYC NFTs, Yuga Labs posted a tweet asking for all victims of the hack to contact Yuga Labs for help.[4] A few weeks later, one of the victims tweeted that Yuga Labs intervened on his behalf and was able to somehow

---

[3] Yuga Labs co-founder Wylie Aronow stated that Yuga Labs is "hyper focused now on how to onboard the next million people into crypto." To make web3 mainstream, Aronow explained that Yuga Labs must make onboarding easy enough that it will pass "the mom test"—simple and understandable enough that their own mothers could join the BAYC ecosystem and have fun with everyone else. *See HIBT Lab! Bored Ape Yacht Club: Greg Solano and Wylie Aronow*, at 54:51-55:37, HOW I BUILT THIS WITH GUY RAZ PODCAST (Sept. 1, 2022), https://podcasts.apple.com/si/podcast/hibt-lab-greg-solano-and-wylie-aronow-bored-ape-yacht-club/id1150510297?i=1000577263362.  Mr. Aronow also stated, "We just want to build a good culture in the company—build a good culture and be good stewards for the rest of the ecosystem." *Id.* at 1:10:00-1:10:30.
[4] *See* @BoredApeYC, Twitter (June 4, 2022, 2:16 PM), https://twitter.com/BoredApeYC/status/1533181013815349248.

facilitate the return of the *exact same* MAYC NFT that was stolen from the victim.[5] Even though the victim clicked on a harmful phishing link, just as Mr. Armijo did, Yuga Labs made this victim whole again. Upon information and belief, Yuga Labs has helped similarly situated victims either recover their stolen BAYC NFTs or compensated them for their losses. This information clearly contradicts what Mr. Armijo was told by a BAYC customer service employee following his attack that "there was nothing further BAYC could do to help him." FAC ¶¶ 89-91.

Yuga Labs argues that the duties Mr. Armijo advocates—implementing adequate security processes, monitoring the BAYC club for stolen NFTs, and providing adequate customer service—do not exist as a matter of law, and further criticizes Mr. Armijo for failing to cite case law recognizing these duties. MTD 13-14. Yuga Labs misunderstands how the duty analysis works. The first step in a negligence case is determining whether a duty of care exists. Once a duty is established, the analysis then turns to "the nature and extent" of the duty and whether the defendant breached that duty. *Lee v. GNLV, Corp.*, 22 P.3d 209, 212 (Nev. 2001). "The law is clear that if a legal duty exists, reasonable care *under the circumstances* must be exercised." *Id.* (emphasis added). Clearly, this is an inquiry based on the specific facts of each case. While it is helpful to look for analogous case law, it is not required when the issues presented are first of their kind. Here, web3 platforms are a brand-new industry and the duties NFT club creators owe to their respective communities have never been considered. Mr. Armijo is asking this Court to analyze the facts presented and determine whether the duties he ascribes to Yuga Labs are reasonable under the circumstances.

Yuga Labs is correct in stating that the "consequences of accepting plaintiff's theory is (*sic*) not trivial." MTD at 17. However, Yuga Labs is wrong to say that Mr. Armijo's theory subjects content developers and creators to endless liability. Mr. Armijo is simply asking that Yuga Labs implement measures to deter theft and protect BAYC community members from becoming targets for bad actors. Indeed, Yuga Labs is in the best position to effectively fix the problem. The practical impact and cost of Yuga Labs continuing to do nothing is that victims of BAYC NFT theft will have no recourse to any type of recovery. Many local law enforcement agencies do not have the technological expertise or

---

[5] *See* @JTea3197, Twitter (June 29, 2022, 12:08 PM), https://twitter.com/JTea3197/status/1542208444362399744.

budgets to assist in tracking down sophisticated cyber criminals, and even for the ones that do, the international nature of NFT theft and the anonymity of the thieves often bar law enforcement attempts to hold the criminals liable. The best way to deter the thefts is to make stolen BAYC NFTs unattractive to thieves and subsequent purchasers. Yuga Labs could do this by barring stolen BAYC NFTs from accessing the BAYC club and stripping them of their membership benefits and commercialization rights. The incentive to buy, hold, or sell such a BAYC NFT would be minimal and, thus, a powerful deterrent against thieves.

### 2. Yuga Labs Breached its Duty of Care and Was the Cause of Mr. Armijo's Injuries.

Because a special relationship exists between Yuga Labs and Mr. Armijo as a BAYC club member, Yuga Labs was under a legal duty to protect Mr. Armijo from the foreseeable criminal attacks of third parties and come to his aid when Mr. Armijo was robbed of his BAYC NFTs. *See GNLV* 22 P.3d at 212. "[R]easonable care under the circumstances" would include implementing security measures to deter theft, monitoring the BAYC club for stolen BAYC NFTs and restricting their access, and providing adequate customer service. *Id.* Yuga Labs breached its duties by failing to do *anything* at all to protect BAYC club members and deter theft of BAYC NFTs. Given the threat BAYC club members face, Yuga Labs' conduct is the exact opposite of reasonable.

### 3. Mr. Armijo's Claims for Damages are Not Barred by the Economic Loss Doctrine.

Mr. Armijo's claims are not barred by Nevada's economic loss doctrine because the losses he suffered are not solely monetary in nature. Not only did Mr. Armijo lose his BAYC NFTs, but also, his membership in the BAYC club. FAC ¶¶ 159-161. As the FAC illustrates, membership in the BAYC club provides a multitude of social and experiential benefits that are not tethered to any economic benefit. *See, e.g.*, FAC ¶¶ 42-52, 64, 68. The BAYC club is a cultural phenomenon, and BAYC club members are granted a multitude of privileges, including admittance to exclusive parties, access to limited-time only merchandise, and building BAYC's newest venture, the Otherside Metaverse. *Id.*

Likewise, Mr. Armijo has a significant property interest in the commercialization rights of his stolen BAYC NFTs, which was damaged when Mr. Armijo was targeted and attacked by thieves.

*Calloway v. City of Reno*, 993 P.2d 1259, 1267 (Nev. 2000), *overruled on other grounds by Olson v. Richard*, 89 P.3d 31, 33 (Nev. 2004) (holding that the economic loss doctrine does not bar recovery where there is "personal injury or damage to property"). In *Sadler v. PacifiCare of Nevada*, the Nevada Supreme Court clarified that the definition of injury is not limited only to a physical injury. *See* 130 Nev. 990, 999-1000, 340 P.3d 1264, 1270 (Nev. 2014). Rather, the definition of injury includes "the invasion of *any legally protected interest* of another." *Id.* (citation omitted) (emphasis in original). Therefore, a physical injury is not a required "prerequisite to a tort claim generally." *Id.* at 1268 (explaining that certain torts, such as negligent infliction of emotional distress, do require a showing of a physical injury due to the elements of the claim). Here, Mr. Armijo had a legally protected interest in his NFTs, his BAYC club membership, and the commercialization rights to his BAYC NFTs. As such, Mr. Armijo suffered a noneconomic injury when his BAYC NFTs were stolen and these interests were invaded due to Yuga Labs' negligent actions.

### C. An Implied-in-Fact Contract Existed Between the Parties Under Nevada Law.

In its MTD, Yuga Labs insists that no contract exists between Mr. Armijo and Yuga Labs. However, to make this argument, Yuga Labs relies on two Ninth Circuit cases that were based on interpretation of California law, which is not applicable here. MTD at 20-21; *see also Erie R. Co. v. Tompkins*, 304 U.S. 64 (1938) ("Except in matters governed by the Federal Constitution or by acts of Congress, the law to be applied in any case is the law of the state."). Pursuant to the Erie Doctrine, Nevada law governs whether a contract exists between Yuga Labs and Mr. Armijo.

Under Nevada law, an enforceable contract requires "an offer and acceptance, meeting of the minds, and consideration." *May v. Anderson*, 119 P.3d 1254, 1257 (Nev. 2005). "A contract implied-in-fact must be manifested by conduct; it is a true contract that arises from the tacit agreement of the parties. To find a contract implied-in-fact, the fact-finder must conclude that the parties intended to contract and promises were exchanged, the general obligations for which must be sufficiently clear." *Certified Fire Prot., Inc. v. Precision Constr.*, 283 P.3d 250, 256 (Nev. 2012). Here, Mr. Armijo has alleged enough facts in the FAC for this Court to reasonably infer an implied-in-fact contract exists.

On the official BAYC Twitter account, Yuga Labs extends an offer to all people, including Mr. Armijo, to become a member of the BAYC club by "buy[ing] a Bored Ape or Mutant Ape on

OpenSea." *See* FAC ¶ 172. The offer is also repeated on the official BAYC website, wherein a link to the BAYC NFT collection on OpenSea is provided for anyone who wants to buy a BAYC NFT and join the BAYC club. The BAYC website explains the terms of the offer in further detail, stating, "When you buy a Bored Ape, you're not simply buying an avatar or a provably-rare piece of art. You are gaining membership access to a club whose benefits and offerings will increase over time." *Id.* ¶ 173. It is clear from this language that in order to accept Yuga Labs' offer to become a member of the BAYC club, a person need only buy a BAYC NFT. Mr. Armijo accepted this offer on three separate occasions when he purchased his BAYC NFTs. *Id.* ¶ 174. In return, Yuga Labs received a 2.5% royalty fee from the purchase price of the BAYC NFTs. *Id.* ¶ 176.

The conduct of Mr. Armijo and Yuga Labs establishes that they intended to form a contract with each other and promises were exchanged: Mr. Armijo purchased a BAYC NFT in exchange for becoming a BAYC club member and receiving the promised benefits offered by Yuga Labs; upon receipt of the tacitly promised 2.5% royalty fee, Yuga Labs allowed Mr. Armijo to become a BAYC member and therefore eligible for the promised benefits. Although the exact nature of the benefits were unknown to Mr. Armijo at the time he bought his BAYC NFTs, the general obligations between the parties were sufficiently clear: whatever benefits Yuga Labs distributed in the future, Mr. Armijo was eligible to receive them as a BAYC club member and rightful owner of a BAYC NFT.

### 1. Mr. Armijo Is Not Bound by the BAYC or MAYC Terms and Conditions.

Yuga Labs argues that, through the BAYC terms and conditions, it has disclaimed all responsibility for determining rightful ownership of BAYC NFTs by stating that "[o]wnership of the NFT is mediated entirely by the Smart Contract and the Ethereum Network[.]" MTD at 21. Not only is this provision unconscionable in its complete disregard for the property rights of rightful BAYC NFT owners, but it is also not applicable to Mr. Armijo. The terms are merely posted on the BAYC website via a hyperlink at the bottom of the homepage screen. At no point during the purchase of his BAYC NFTs or at any other time did Mr. Armijo have actual or constructive knowledge of the terms and conditions, nor did he ever affirmatively agree to be bound by them. *See Lee v. Ticketmaster L.L.C.*, 817 Fed.Appx. 393, 394 (9th Cir. 2020) (browsewrap agreements are less likely to be upheld if the user

is not required to affirmatively acknowledge the agreement before proceeding).

Moreover, Yuga Labs' shocking statement that "the **only** 'members' of the BAYC at any given point are those who hold [BAYC] NFTs on the blockchain" reveals the cavalier attitude Yuga Labs has toward property rights including the intellectual property rights it purports to grant. MTD at 21. Rather than put itself in the middle of a "no-win situation" where it would have to assess the rightful ownership of a stolen BAYC NFT, Yuga Labs instead chooses to reward thieves who currently hold BAYC NFTs with the benefits of BAYC club membership. This is completely contrary not only to public policy but also to the promise Yuga Labs makes on its website: a person becomes a BAYC club member when they *buy* a BAYC NFT, not when they *steal* one. Additionally, Mr. Armijo has consistently maintained throughout this litigation that owning and holding a BAYC NFT are distinct categories—only rightful ownership of a BAYC NFT qualifies an individual for BAYC club membership.

**D.      Yuga Labs Breached the Implied Covenant of Good Faith and Fair Dealing.**

Under Nevada law, every contract includes an implied promise of good faith and fair dealing, which requires that the parties refrain from acting in a way that injures or destroys the right of the other to receive the benefits of the contract, and instead, to act in a manner that is faithful to the purpose of the contract and within the parties' justified expectations. *See Hilton Hotels Corp. v. Butch Lewis Prods., Inc.*, 808 P.2d 919, 923 (Nev. 1991).

As explained above, Mr. Armijo entered into an implied-in-fact contract with Yuga Labs with the justified expectation that he would receive membership in the BAYC club along with all the current and future benefits Yuga Labs bestowed upon BAYC club members. Despite the fact that Mr. Armijo remains the rightful owner of the three BAYC NFTs that were stolen, Yuga Labs wrongfully stripped Mr. Armijo of his BAYC club membership in favor of the thief who stole the BAYC NFTs. Yuga Labs admits that it grants and awards BAYC membership benefits to the "holder" of Mr. Armijo's NFTs, which is a clear admission that Yuga Labs is acting in a manner inconsistent with and unfaithful to the purpose and justified expectations of Mr. Armijo under the contract.  Yuga Labs' actions (and inaction) destroyed Mr. Armijo's right to receive the benefits of the contract, and thus, constitute a breach of the covenant of good faith and fair dealing.

## VI.    CONCLUSION

For all of the foregoing reasons, this Court must deny Yuga Labs' Motion to Dismiss Plaintiff's First Amended Complaint in its entirety.

DATED this 3rd day of October, 2022.                    **ARMSTRONG TEASDALE LLP**

By:    */s/ Michelle D. Alarie*
          MICHELLE D. ALARIE, ESQ.
          Nevada Bar No. 11894
          One Summerlin
          1980 Festival Plaza Drive, Suite 750
          Las Vegas, Nevada 89135

          EMILY NUVAN, ESQ.
          (LR IA 11-2 admitted)
          Utah Bar No. 17722
          ARMSTRONG TEASDALE LLP
          201 South Main Street, Suite 750
          Salt Lake City, Utah 84111

          ROMAINE C. MARSHALL, ESQ.
          (LR IA 11-2 admitted)
          Utah Bar No. 9654
          JOSE ABARCA, ESQ.
          (LR IA 11-2 admitted)
          Utah Bar No. 12762
          POLSINELLI
          2825 E Cottonwood Parkway, Suite 500
          Salt Lake City, UT 84104

          *Attorneys for Plaintiff Robert Armijo*

**CERTIFICATE OF SERVICE**

Pursuant to Fed.R.Civ.P.5(b) and Section IV of District of Nevada Electronic Filing Procedures, I certify that I am an employee of ARMSTRONG TEASDALE LLP, and that the foregoing document:

☒   was served via electronic service to the address(es) shown below:

John Patrick Desmond   jdesmond@dickinsonwright.com,
Justin James Bustos   jbustos@dickinsonwright.com
John D. Tennert  jtennert@fclaw.com,
Erin Joan Cox  erin.cox@mto.com
Alison Clare Jordan  ajordan@fenwick.com,
Michael S. Dicke    mdicke@fenwick.com
Jennifer C. Bretan    jbretan@fenwick.com
Katherine A. Marshall    kmarshall@fenwick.com
Samuel Sahagian    ssahagian@fenwick.com
April D. Youpee-Roll    april.youpee-roll@mto.com
Jonathan H. Blavin    jonathan.blavin@mto.com
Brandon R. Teachout   brandon.teachout@mto.com

☐   was served via the U.S. Postal Service at Las Vegas, Nevada, in a sealed envelope, with first-class postage prepaid and to the address(es) shown below:

LooksRare, Ltd.
Chase Business Center
39-41 Chase Side
London, United Kingdom, N14 5BP

Date: October 3, 2022                              /s/ Christie Rehfeld
                                                    An employee of Armstrong Teasdale LLP