```
 1              UNITED STATES DISTRICT COURT
                    DISTRICT OF NEVADA
 2     BEFORE THE HONORABLE CARLA L. BALDWIN, MAGISTRATE JUDGE
                        ---o0o---
 3

 4   Robert Armijo,                 :
                                    :
 5               Plaintiff,         :
                                    :  No. 3:22-cv-112-CLB-MMD
 6          -vs-                    :
                                    :  September 23, 2022
 7   Ozone Networks, Inc. D/b/a     :
     OpenSea, a New York            :
 8   Corporation Yuga Labs, LLC     :
     d/b/a Bored Ape Yacht Club,    :  United States District Court
 9   a Delaware limited             :  400 S. Virginia Street
     liability company, et al.,     :  Reno, Nevada  89501
10                                  :
                 Defendants.        :
11   _____:

12

13                  TRANSCRIPT OF MOTION HEARING

14

15   A P P E A R A N C E S:

16   FOR THE PLAINTIFF:            Romaine Marshall
                                   Attorney at Law
17
     FOR DEFENDANT OZONE NETWORKS:  Jonathan Blavin
18                                  Attorney at Law

19   FOR DEFENDANT YUGA LABS:       Katherine Marshall
                                    Attorney at Law
20
     CLB/LIBERTY: 092822@9:04am
21

22   Proceedings recorded by digital recording produced by
     computer-aided transcript
23

24   Transcribed by:          KATHRYN M. FRENCH, RPR, CCR
                               NEVADA LICENSE NO. 392
25                             CALIFORNIA LICENSE NO. 8536
```

2

1          Reno, Nevada, Friday, September 23, 2022, 9:51 a.m.

2                        ---OoO---

3

4              THE CLERK:  The United States District Court

5    for the District of Nevada is now in session.  The Honorable

6    Carla Baldwin presiding.

7              This is the date set for a virtual motions hearing

8    in case number 22:cv-112-MMD-CLB, Robert Armijo versus Ozone

9    Networks, Inc., and others.

10             Present by video on behalf of plaintiff, Romaine

11   Marshall.

12             Present by video on behalf of defendants, Jonathan

13   Blavin and Katherine Marshall.

14             THE COURT:  Okay.  Good morning, everybody.

15             Let me just tell you, I think this case is

16   fascinating and I have been spending far more time than

17   probably I should have reading all of this and being

18   incredibly interested in this.  So before we get started --

19   and part of this will probably help you a little bit with your

20   argument -- for those of you that don't know my background, I

21   was a federal prosecutor for eight years, I did complex white

22   collar litigation and cyber cases.  So, I am very tech savvy

23   and very familiar with Blockchain, different technologies and

24   things like that.  So for whatever it's worth, you don't need

25   to get into that type of thing with me.  I do understand it.

1           But, as a result of that, I'm also, like I said,

2    very fascinated by this because I think that this case, in so

3    many ways, seems sort of on the cutting edge of how we're

4    going to deal with these types of things.  It's sort of

5    reminded me in an analogy of stolen artwork that we see, you

6    know, lots of cases coming out of, and how that gets handled

7    from the good faith purchasers that then have the artwork

8    after the fact.  It's -- you know, as things get transferred.

9           And so, anyway, for whatever it's worth -- and I

10   want to thank everybody for such fantastic briefing, because I

11   don't always see that, and so it was also quite helpful to

12   have such good and well-written briefs, well cited, really

13   kind of digging into those issues.

14           So what we'll do today -- before we get started, I

15   have reviewed the following things, so that you all know:  I

16   have reviewed the First Amended Complaint at ECF number 62;

17   the Joint Case Management Conference Report at ECF number 87;

18   the motions to dismiss filed by the defendants in both

19   cases -- or by both defendants, as well as all of the

20   oppositions, replies, declarations, and things like that,

21   and I believe they are ECF 78, 85, 91, 82, 80, 86, 92, as

22   well as the motions to dismiss themselves at 70 and 74.  And

23   then, finally, I've also reviewed, obviously, the motions for

24   supplemental authority and the opposition and reply to that.

25           Let me start with this, for what it's worth.  There

1   was -- one thing that I did find a bit concerning were some

2   of the comments made in the joint case management report as

3   it related to plaintiff's counsel.  Let's be clear, stays

4   of discovery are not automatic.  You don't get a stay just

5   because you filed a motion to dismiss.  If you have not read

6   my standing order at ECF number 68, you should have done so

7   by now, and for two reasons.  Number one, it explains that

8   very clearly.  And so asking to have case management

9   conference, you know, joint case management conference,

10  meetings, meet and confers, discussing initial disclosures,

11  all of that, none of that is improper.  In fact, that is what

12  is expected and, in fact, demanded by this court and by the

13  district.  Just because a motion to dismiss is filed, nothing

14  was improper, nor was it premature to be asking to do that

15  based on the Local Rules, and based on the requirements that

16  we have in this court.

17          So for whatever that's worth, bear in mind I follow

18  the rules, I know the rules, I like the rules, and we're going

19  to play by the rules as we proceed in this case, to the extent

20  that it doesn't get dismissed by the district court.

21          In addition to that, I think it's important, going

22  back to my standing Order, and in particular as it relates

23  to page 5, Footnote 3, I believe of Yuga -- and I think that's

24  how you pronounce it -- motion to stay.  There is a comment

25  about a decision made by another magistrate judge in this

1    district related to the standard that applies to motions to

2    stay.  My standing order is very clear on the standard that I

3    apply.  I do not apply the standard that was cited.  More

4    importantly, under Local Rule number IA 7-3(f):  "A decision

5    of one district court judge or other magistrate judge is not

6    binding on other district court judge or judges in this

7    district."

8              And so while I appreciate that judge's perspective,

9    I don't agree, and so I apply the Kor Media Tradebay factors.

10   I believe that that's important to have a standard that's

11   fairly high to get stays, and so that is the standard that's

12   applicable as we go forward today.  So as we hear argument,

13   please do not refer to the decision that was cited at that

14   footnote or to that standard, that will not be applicable to

15   me here.

16             So this is what we're going to do.  We are going

17   to have a little argument.  And because I have a lot of

18   questions.  And what I plan to do is to give the defendants

19   each about 10 minutes to argue anything that they feel that

20   they need to highlight and also to answer my questions.  And

21   then I was going to turn to plaintiff's counsel, probably

22   give you about 15 minutes.  I think that's only fair since

23   you're dealing with two different arguments from two different

24   counsel.  I have several questions for you as well.  I'll give

25   you brief reply, to the extent that I think that's necessary.

1   But, I will keep you pretty firm to the times that I've given

2   you.  I only have about 44, 45 more minutes before my next

3   hearing.  I know that's crazy, a judge setting a hearing on a

4   Friday.  It doesn't usually happen, but that's how I roll, so

5   here we are.  And I do have, like I said, some questions for

6   all of you.

7            So I think what we'll go ahead and do, I believe

8   ECF number 78 was the first filed, so we'll go ahead and let

9   you argue first, I believe -- and am I saying it correctly

10  when I say Yuga?  Is that right?

11            UNIDENTIFIED SPEAKER:  Yes, that's right, Your

12  Honor.

13            THE COURT:  Okay.

14            UNIDENTIFIED SPEAKER:  It's Yuga Labs.

15            THE COURT:  Okay.  All right.  So let's go ahead

16  and start with you, and you can go from there.

17            MS. MARSHALL:  Good morning, Your Honor.

18  Katherine Marshall on behalf of defendant Yuga Labs.

19            The background of this case is simple and

20  undisputed.  Plaintiff admits that he, alone, engaged with

21  a stranger on a server that had nothing to do with either of

22  the defendants here, clicked on an unverified link, and

23  allowed a thief to have access to his digital wallet.  The

24  thief then, allegedly, stole his NFTs.  Noticeably absent in

25  that chain of events is Yuga Labs, which is the developer of

1   the stolen NFTs.  And yet --

2                  THE COURT:  Okay.  So I'm very familiar with the

3   facts, if I wasn't already clear, so I'm just going to jump

4   into my question.

5                  One of the issues that has been raised by the

6   plaintiff is the need for discovery related to the

7   jurisdictional arguments and, of course, we have general

8   jurisdiction and we have specific jurisdiction.  So specific

9   jurisdiction, I don't think, is really at issue.  The question

10  becomes a question of general jurisdiction and whether or

11  not the contacts are so sufficient, and so continuous and

12  systematic, as to create jurisdiction here, in spite of the

13  fact that Yuga Labs was, in fact, removed from the sale.

14                 The question that I have for you is what objection

15  would you have to a narrow area of discovery?  And part of the

16  reason I'm asking this is because the Ninth Circuit case law

17  seems to indicate that a failure to provide that narrow

18  jurisdictional discovery could be an abuse of my discretion.

19                 So, number one, what objection would you have

20  to narrow discovery on the issue only of jurisdiction,

21  which   I should preface with I would also allow you to do

22  jurisdictional discovery as to the plaintiff if I granted

23  that.  So with the sale of the home that is alluded to and

24  whether or not he, in fact, isn't a citizen of Nevada, I think

25  is a good question at this point.  So what objection would you

1    have to the narrowing of discovery to that limited issue of

2    jurisdiction as it relates to Yuga Labs and to the plaintiff's

3    residency as it relates to Nevada?

4                    MS. MARSHALL:  Thank you, Your Honor.  So

5    there's a lot to unpack there, so let me start first with

6    jurisdiction as to Yuga Labs.

7                    So, certainly, there are cases with jurisdictional

8    discovery is appropriate, but that jurisdictional discovery

9    needs to be necessary in the sense that it will actually

10   change the end result on the motion to dismiss for lack of

11   jurisdiction.  And that's simply not the case here.  None of

12   the plaintiff's allegations about jurisdiction relate to facts

13   or legal theories that are in dispute here.  It's a nationwide

14   club.  Interacting with its members doesn't create personal

15   jurisdiction, even if services are provided to the members of

16   the states.  So, more information about sales to other Nevada

17   residents or things that are being done with other Nevada

18   residents --

19                    THE COURT:  I should tell everybody, not only

20   here on the argument, but for the call, please make sure that

21   when you get in front of a Nevada judge, you pronounce it

22   Ne-vad-a and not Ne-vaud-a.  It's like fingernails on a

23   chalkboard.  So, if you ever end up in front of a jury here --

24   bad.  I understand that that's not how it's pronounced other

25   place, but, trust me, you don't want to be that person.

1        So, go ahead.  Sorry to interrupt.  I'm not trying

2   to be rude.  Go ahead.

3              MS. MARSHALL:  No.  Thank you very much for that

4   clarification, Your Honor.  I'll keep that in mind.

5        So the point I was making is that jurisdictional

6   discovery here would not change the ultimate result.

7   Plaintiff talks about these advertisements that were issued

8   by third parties in Las Vegas.  And set forth in our

9   declaration, Yuga had nothing to do with those advertisements.

10  But even if those advertisements were related to Yuga Labs --

11  again, which they were not -- it still wouldn't have any

12  relevance to the jurisdictional analysis here because

13  advertisements have no connection to the plaintiff's claims

14  in this case.  And the same is true with the sales to other

15  Nevada residents or the contacts in Nevada.  They simply just

16  have nothing to do with the plaintiff's claims in this case.

17             THE COURT:  I think one of the concerns and

18  questions that I have -- so when we talk about an NFT, as I

19  understand it, it's -- basically it's hash value, right?  So

20  there's a digital fingerprint associated with this particular

21  item, and Yuga Labs somehow maintains that information, at

22  least from what I can gather, although that's not entirely

23  clear from the briefing.  The argument is that when these

24  entities are sold on a resale market, Yuga Labs somehow

25  receives some sort of percentage back in the sale is that

-10-

1    correct?

2              MS. MARSHALL:  It's -- it's a little -- it's a

3    little bit more complicated than that, but, generally, no.

4    It depends on how the NFT is sold.  In general, there is not

5    a cut that goes to Yuga if it's sold between two independent

6    third parties.  For example, in the manner in which -- in

7    which was alleged in this case where the plaintiff would have

8    opened his wallet to somebody else to trade, to trade the NFT,

9    that would have no connection, whatsoever, to Yuga.

10             And then with respect to sales on OpenSea, there

11   is a licensing fee related to the use of the Bored Ape Yacht

12   Club IP by OpenSea, and that's the exchange of money there.

13   It's not related to --

14             THE COURT:  So then how does -- how does the

15   noose buyer -- so I buy one of these NFTs from an owner that

16   already has it.  They bought it someplace else, whether from

17   OpenSea, or directly from Yuga labs or whatever, but I'm now a

18   new purchaser and I buy that, how is, then, that Yuga Labs can

19   extend the benefits of these different membership aspects,

20   including -- because I think this is a little more than just

21   membership, at least from what I've been described here.

22   This is also opportunities for, like, the Ape coin, and for

23   different new offerings that Yuga Labs has.  How does Yuga

24   Labs know to provide that to the new purchaser and not to the

25   old purchaser, if they don't maintain some sort of information

—11—

1    as it relates to that NFT hash value, whatever you want to

2    call it?

3                  MS. MARSHALL:  So -- so the information about

4    who was the cryptographic holder of the NFT is actually

5    contained in the NFT itself.  It's not maintained in a

6    database by Yuga Labs.  And it's not just Yuga who needs to

7    know who is the cryptographic holder of the NFT.  Many of

8    the benefits that are provided to holders of the NFTs are

9    actually from all sorts of third parties all over the country

10   and all over the world, and they're looking at a Blockchain

11   technology within the NFT itself that tells them who the

12   cryptographic owner is.  And that's what's so important about

13   this Blockchain technology, is you can look at the asset

14   itself and tell who was the owner, when the sales occurred.

15   That history is included in the NFT.

16                  THE COURT:  Okay.  All right.  That actually

17   clarifies quite a bit for me.

18                  All right.  I guess that actually addresses some of

19   the questions that I have.  And so it's within the Blockchain

20   technology itself in terms of how the -- whatever, the way

21   that it's transferred is it's maintained there.  So the NFT

22   owner then says this is mine, then they automatically get

23   these offers, or do they have to do something to let everybody

24   know that they -- that that's now, then -- it's now theirs?

25                  I mean, I know it's within the Blockchain

1    technology, but it's a little bit -- even for me -- confusing.

2                        MS. MARSHALL:  So -- sure.  So it's automatic

3    within -- within the NFT itself.  And so when you look at, in

4    an NFT on the Blockchain, it will show you who owns it --

5                        THE COURT:  Okay.

6                        MS. MARSHALL:  -- and so it's not -- sorry.

7    There's something flying outside -- it's not -- it's not

8    something, some database that Yuga maintains or that anybody

9    else maintains.  It's inside the Blockchain for that NFT.

10                        THE COURT:  Okay.

11             Okay.  Go ahead and finish.

12                        MS. MARSHALL:  And another piece of that,

13    just to add, Yuga doesn't have any ability to change that

14    information.  And so Yuga has no control.  Once these NFTs

15    were distributed, Yuga can't control what happens to them, and

16    can't change who is the cryptographic holder according to the

17    Blockchain.  That information is, is not something that Yuga

18    has any ability to change or control in anyway.  And that's

19    explained in Yuga's terms on their website.

20                        THE COURT:  So the -- this is -- and maybe I'll

21    help some of you -- not only you, but anybody else that's

22    going to argue -- so this goes to the question of special

23    relationship.  There is no relationship developed because this

24    relationship is specific to the cryptographic holder and the

25    information contained within the NFT technology itself, so

1    there's no independent accounts or some sort of, you know,

2    like with -- you know, I'm trying to think of, like -- here's

3    a good example.  So if Tesla is -- for example, you have to

4    have an app, you know, with Tesla to use their super charging

5    network or what have you.  So as the Tesla is sold to a new

6    owner, a new owner has to basically create their own new app

7    and then, that way, they can have access to these different

8    things, the updates, the software updates, all of the things

9    that come.  But there's nothing like that?  They don't sign

10   up -- the way you're describing it, nobody has to signup to an

11   app to continue these membership relationships --

12              MS. MARSHALL:  Uh-huh.

13              THE COURT:  -- it's just an automatic thing

14   based on the NFT itself?  Is that -- am I describing that

15   accurately?

16              MS. MARSHALL:  Yes.  You have it exactly right.

17   And it does relate to the question of special relationship

18   because there's nothing -- once the NFT passed the original

19   sale, Yuga has nothing to do with the information in the

20   Blockchain for that NFT.  You can't change it.  You can't edit

21   it.  It has no control over it whatsoever.

22              And, again, it's not just Yuga, but it's also third

23   parties that are looking at who owns the NFTs because a lot of

24   the benefits are provided by third parties, not by Yuga.

25              THE COURT:  Okay.

1                I've asked you a lot of questions and used most of

2      your 10 minutes.  Is there any, like, specific points that you

3      think that you need to add before I move over to -- I guess

4      it's Ozone, but I'm going to call you OpenSea because that is

5      more clear for me -- so before I move to defendants OpenSea,

6      so, actually, Ozone?

7                       MS. MARSHALL:  Sure.  So I've touched on

8      the idea of special relationship when we talked about

9      jurisdiction.  I just want to talk a little bit about,

10     just very briefly, about the competing interests here.

11               So there is, obviously, prejudice to Yuga from

12     starting discovery in this action.  There's nothing more

13     unjust than having discovery proceed when there's no

14     jurisdiction, and where the plaintiff can't state a claim.

15     And, obviously, doesn't comport with Rule 1, which favors

16     just, speedy, and inexpensive determination -- or cases.

17     Here, we don't even know what the scope of this lawsuit is

18     going to, or even if it's going to exist after this motion is

19     decided, and so expending the resources, both the parties and

20     the Court, discovery just doesn't make sense here.

21               And on the flip side, the plaintiff hasn't

22     identified any prejudice, whatsoever, from waiting just the

23     short amount of time that we're asking for a stay here.  And

24     there's actually prejudice to him for expending the resources

25     to proceed with discovery if the issues may be narrowed.

1   Obviously, you know, Yuga's preserved all relevant evidence

2   and there really is no deference to plaintiff waiting a few

3   months.

4              THE COURT:  Okay.  Thank you so much for all of

5   the clarification in your argument.

6              I'm going to turn over to counsel for OpenSea,

7   slash, Ozone, or whatever the heck it is.  Let me go ahead

8   and get started.

9              MR. BLAVIN:  Thank you, Your Honor.  Jonathan

10  Blavin on behalf of OpenSea.

11             Although Your Honor is quite correct that the

12  issues here in terms of their context may be novel, we

13  maintain that the legal questions are not novel, and that

14  they're well settled by the Ninth Circuit and several other

15  courts.

16             As plaintiff concedes here, duty is a question of

17  law for the Court, and the question is whether OpenSea had a

18  duty to plaintiff, such that a special relationship existed,

19  which is necessary for a negligence claim relating to third

20  party harm, to prevent or block that harm from occurring.

21  And the Ninth Circuit in the Beckman versus Match.com case,

22  which specifically involved Nevada law, similarly in the

23  Dyroff versus Ultimate Software Group case; and in the Second

24  Circuit, in the Bivachef versus Apel (phonetics) case, which

25  relied on the Beckman case from the Ninth Circuit, all those

1   courts uniformly have held that internet platforms, such as

2   OpenSea, do not have a special relationship with their users,

3   such that there's a duty to prevent a third party harm that

4   occurs.

5           In the Bivachef case, for example, in the Second

6   Circuit, that case involved allegations that users were

7   creating fake accounts, engaged in fraudulent transactions

8   on PayPal.  And PayPal said -- citing again the Ninth Circuit

9   in Beckman -- that there was no special relationship that

10  was created between the internet platform PayPal and the

11  user, such that they had to duty to prevent that third party

12  harm.  And that's precisely what is alleged here.  But, the

13  allegations are even more attenuated.

14          Here, you have an individual who was engaged -- who

15  is the victim of a phishing attack on a third party platform,

16  the Discord platform, then had those stolen NFTs, which

17  again -- and this is critical, Your Honor -- plaintiff

18  concedes in the Complaint -- this is at paragraph 4, and

19  similarly at paragraphs 95 and 96 -- that once those NFTs

20  were stolen on that third party platform, this was permanent

21  and irreversible.  There was absolutely nothing that OpenSea

22  could do to prevent that -- those NFTs from being stolen.

23          And, moreover, because those NFTs were stolen, they

24  could be easily sold on other online marketplaces.  That's

25  exactly what happened with two of the three NFTs at issue.

1    They were sold on LooksRare, another NFT marketplace --

2                    THE COURT:  So I need to -- I just -- I

3    apologize.  I'm not trying to be rude.  But, I know that you

4    have joined the motion to stay from Yuga Labs, but -- which is

5    largely -- well, not largely, but much of it is spent on the

6    question of jurisdiction, but Ozone does not, necessarily,

7    have the same argument as it relates to jurisdiction, correct,

8    because this was --

9                    MR. BLAVIN:  Correct.  We are not asserting a

10   personal jurisdiction argument.

11                   THE COURT:  Okay.

12                   MR. BLAVIN:  We filed our own separate motion to

13   stay, Your Honor --

14                   THE COURT:  No, I understand that.  But my point

15   is that you did join theirs, so I'm just trying to make clear

16   what aspects --

17                   MR. BLAVIN:  Oh, yes, we only joined it in the

18   context that, yes, we are seeking a stay as well.  But, we

19   did file our separate own motion -- separate motion to stay,

20   and we are not asserting a separate personal jurisdiction

21   argument.

22                   THE COURT:  Okay.

23                   MR. BLAVIN:  That is true.

24                   THE COURT:  Okay.

25                   MR. BLAVIN:  And, Your Honor, if you look at the

1    Beckman case, for example, which, again dealt with Ninth
2    Circuit law, the Ninth Circuit made very clear there that
3    Nevada courts have never recognized a special relationship
4    akin to that between an internet platform and its users.
5    And plaintiffs are essentially asking this court, without
6    citing any supporting authority, in even a remotely similar
7    situation, to create a special relationship.  And while Your
8    Honor is correct that, you know, it's high burden to establish
9    a stay here, the plaintiffs have not cited any authority.
10          And again, Your Honor is sitting in diversity, as
11   a federal judge interpreting state law, and the burden really
12   is on plaintiff to come forward with any authority sporting
13   the notion that there could be a special relationship here,
14   particularly where the Ninth Circuit has rejected that.
15          Plaintiff has come forward with this idea that
16   because OpenSea purportedly has, you know, a dominant market
17   share in the NFT community, in the marketplace, that there
18   should be a special relationship, plaintiff cites absolutely
19   no authority to support that proposition.  In our reply brief,
20   we cited several cases involving much larger internet players,
21   including Google, Apple, Facebook, none of those courts have
22   recognized a special relationship.  And, again, these are --
23   these are relationships in which users have accounts.  In the
24   PayPal case they have accounts with the internet platform.
25   That doesn't matter for the purposes of the special

—19—

1    relationship analysis.

2              And we also cited additional authority --

3              THE COURT:  So when somebody goes to sell their

4    NFT on OpenSea, they don't have to create any type of account

5    to do that?  Because this transaction --

6              MR. BLAVIN:  They have to create --

7              THE COURT:  -- took place, as I understand it,

8    the fraudulent transfers effectively did take place through

9    OpenSea, at least the subsequent sales for sure, correct?

10             MR. BLAVIN:  The subsequent resale occurred on

11   OpenSea.  The fraudulent phishing attack occurred off of

12   OpenSea.  That occurred --

13             THE COURT:  Right.  But the --

14             MR. BLAVIN:  -- on Discord.

15             THE COURT:  -- initial purchase that

16   Mr. Armijo -- is that how you pronounce his name?  I can't

17   pronounce my own name, so, you know, I always ask -- so

18   but he purchased those NFTs originally through OpenSea,

19   correct?

20             MR. BLAVIN:  Correct.  And he had to create

21   an account to do that.  And one of our arguments is in

22   creating that account, he had to agree to OpenSea's terms,

23   which explicitly disclaim liability for third party conduct,

24   including phishing attacks and the resale of stolen NFTs on

25   it.

1          So, yes, he had to create an account and we argue

2    that those terms are binding and controlling here and are a

3    separate independent basis --

4               THE COURT:  Right.

5               MR. BLAVIN:  -- as to why his claims fail.

6          But we think, Your Honor, the legal issues are very

7    settled that there was no special relationship here creating a

8    duty.  And plaintiff does not cite a single Nevada case which

9    would support the existence of the special relationship.

10          But even beyond that, Your Honor, if you look at

11    issues of proximate causation, which are a separate,

12    independent basis of our Motion to Dismiss -- which plaintiff,

13    by the way fails to recognize or even respond to in his

14    opposition to our motion to stay -- there, that is an

15    independent reason why this claim fails.  Plaintiff concedes

16    in his complaint that the moment those NFTs were stolen, this

17    was permanent and irreversible.  Even if OpenSea had somehow

18    disabled that third NFT from being resold, as plaintiff

19    acknowledges, it would have been resold on another platform.

20    The same exact harm that he's complaining about, he would have

21    suffered even if -- even if that third NFT was blocked by

22    OpenSea because it could be resold as two of the three NFTs

23    were.

24          So this not only establishes that there was no

25    proximate injury or proximate harm -- I'm sorry.  Proximate

1   causation between the harm that's alleged and the purported

2   failure of OpenSea to block every sale, it also completely

3   belies plaintiff's theory here that OpenSea somehow had a

4   dominant position in the NFT marketplace, such that a special

5   relationship would be created.  Two of the three NFTs here

6   were listed and sold on another NFT marketplace.

7           So for all these reasons, Your Honor, plaintiff has

8   cited no authority to support his position.  His claims are

9   barred by the fact that there is no special relationship here

10  creating a duty.  There is no proximate causation, much less

11  the fact that the OpenSea terms explicitly disclaim any

12  liability in this type of circumstance, and courts routinely

13  have upheld and enforced those types of terms, most recently,

14  again, in the Apple versus Deep (phonetic) case, which we

15  cited to Your Honor, and including several other cases

16  involving internet platforms.

17          And we haven't addressed the issue of the economic

18  loss doctrine; however, Your Honor, we do think these harms

19  are purely economic in nature.  They're not involving physical

20  harm to property or person, and then that's an independent

21  reason why plaintiff simply cannot state out a claim here

22  under the negligence theories that are advanced.

23          THE COURT:  Okay.  Thank you very much.  I think

24  I'm going to move over to the plaintiff because I do have a

25  lot of questions for you and I don't have a lot of time left.

1          So if it's okay with you, sir, I need to jump right

2     into a few questions with you to make sure I get some of the

3     questions answered that I need.  Just so you're clear, from

4     my perspective, I see this stay, even if I grant it, as being

5     no longer than maybe six months at the most.  I mean that,

6     probably, would be decided by March at the latest, which

7     in -- let's just be honest, reality with the holidays, with

8     Thanksgiving and Christmas and New Year's and the fact that

9     you also, to my knowledge -- and this is one of my direct

10    questions for you -- still have a third defendant that hasn't

11    appeared yet, what would be the true prejudice to you in a

12    short stay of that kind at this point?  Bearing in mind that

13    everybody understands their obligations to preserve evidence

14    at this point.  Everybody understands their obligations to

15    ensure that ESI evidence is not, you know, spoliated or

16    anything like that.

17         So, what would truly be the harm, especially when we

18    have another party that hasn't even appeared yet, to such a

19    short, minimal stay at this point?  Because these are very, I

20    think, complex issues and I think it makes sense that the DJ

21    wrestle with those.  And even if she doesn't deny -- or she

22    grants the motion, she may deny it in part and grant it in

23    part, she may narrow the issue, she may allow for amendment

24    that might really alter the scope of discovery.  So, having

25    it done by the DJ so that your clear on all of those things

—23—

 1  before you start discovery, in some ways, makes a lot of

 2  sense just under a Rule 1 theory.

 3           So if you can explain why that would be prejudicial

 4  to your client specifically, that would be helpful.

 5           MR. MARSHALL:  Yes.  Thank you, Your Honor.

 6  It's a pleasure to be in a court in Nevada.

 7           THE COURT:  Look at you.  Look at you.

 8           MR. MARSHALL:  I want to make sure I said that

 9  properly.

10           THE COURT:  I assume there's no relationship

11  between the two of you.

12           MR. MARSHALL:  We might be distant cousins, Your

13  Honor.

14           But, I'm a little handicapped with the way I

15  pronounce things just based on my accent, so I wanted to

16  emphasize that at the beginning, Nevada.

17           To the point, (indiscernible) is where we think

18  we're prejudiced, specifically the speedy part.  Although the

19  Court's docket is super full, like all dockets in the federal

20  system right now, in my mind, March is a long way away for my

21  client.  And he's got these NFTs that still benefit the

22  holders of them, which aren't him, through the various things

23  that have been created by Bored Ape Yacht Club, the community.

24           So, for example, we reference (indiscernible) --

25           THE COURT:  Sir, are you alleging that somehow

—24—

1    at the end of this lawsuit you're getting your NFTs back for

2    your client?

3              MR. MARSHALL:  That would be -- we would like

4    that, but also we would like the value of what those NFTs

5    would be.

6              THE COURT:  So how, exactly, do you -- so how,

7    exactly, do you claim that two parties who were unrelated to

8    the sale of these NFTs, can somehow get those returned to you?

9         Because just so you know, this is how a case

10   normally proceeds in the District of Nevada.  You will do

11   discovery.  At minimum, it's going to be six months for the

12   discovery period.  Most cases, I would say, arguably,

13   discovery lasts much longer than that.

14        You then go to dispositive motions.  Dispositive

15   motions are filed.  It then takes several months for those to

16   be decided.

17        You then have 30 days after that time to file a

18   Pretrial Order.  Usually that gets kicked out a couple

19   months because it takes a lot of time to do a pretrial order.

20   They're not a simple document.  And only then do you submit

21   to the district court judge dates for your trial.

22              MR. MARSHALL:  Uh-huh.

23              THE COURT:  The Court then will set the trial

24   and, oftentimes, that is over a year from the date of the

25   Pretrial Order.  So you're talking about two to three years

1    before you even get a trial date, much less have a trial.

2              MR. MARSHALL:  Right.

3              THE COURT:  So six months, in my mind, in this

4    litigation, it's not very long.  So, again -- especially in

5    litigation where I'm having a hard time understanding how you

6    think that your client is going to get their NFT back and

7    their Board Ape memberships back and all of that.  This is

8    about damages, as I understand it.

9              MR. MARSHALL:  Right.

10             THE COURT:  So what, exactly -- and be

11   specific -- is the prejudice to waiting a few months to

12   get a decision before you dive into expensive and extensive

13   discovery?

14             MR. MARSHALL:  So we don't think that discovery,

15   at least on the initial issues, would be that expensive or

16   extensive, Your Honor.  For example, you had mentioned limited

17   discovery on the jurisdictional issue.  As it relates to a

18   two-year schedule, discovery on those issues and other related

19   issues, could keep it on that schedule if we are to do

20   discovery starting -- beginning next week or next month.

21   But to extend out to March, in my mind, the calendar extends

22   two years from that point.  And I --

23             THE COURT:  So -- but you still don't have a

24   defendant who has appeared yet, correct?

25             MR. MARSHALL:  So with respect to LooksRare, we

1   have -- we are in the middle of an investigation as to where

2   they are and who we can serve.  We've attempted to serve,

3   but that -- we don't believe that service overseas was

4   dispositive.  We believe there are other efforts and ways we

5   can serve a party or someone who is attenuated with LooksRare.

6   So, we will be coming to the Court within the next few weeks

7   with other ways to serve process on LooksRare.

8                    THE COURT:  So, here's my concern.  When they

9   make their appearance -- assuming you can properly serve

10  them and obtain jurisdiction, at least for purposes of the

11  Complaint and filing a Motion to Dismiss -- we will now then

12  be in the position of potentially having to restart discovery

13  and duplicate discovery because a party isn't here yet.

14                   MR. MARSHALL:  Right.  And we may never get them

15  here, Your Honor.  It's prejudicial for us to have to wait for

16  that possibility.

17                   THE COURT:  Okay.  So you still have not

18  explained to me, though, how a short stay of discovery is,

19  in fact, actually prejudicial, so --

20                   MR. MARSHALL:  Yeah.  Justice -- Justice

21  delayed is justice denied, Your Honor.  That overall concept

22  of why do we have to wait, when we can ask questions without a

23  reasonable (recording cut out) we have to.

24                   THE COURT:  Well, the point of waiting is

25  because of Rule 1.  And it's more than just delay.  It's

1    expense.

2                    MR. MARSHALL:  Yes.  Understood.  And its --

3    we're the plaintiff, and he's an individual against two

4    companies that, as we've asserted in our Complaint, have made

5    tens of millions within six --

6                    THE COURT:  Okay.  Here -- let's move past that.

7                    MR. MARSHALL:  Okay.

8                    THE COURT:  Let's assume that I agree with you

9    that there's some prejudice to either a short stay when you

10   don't have every party here.  Let's just assume that for a

11   second.

12                   MR. MARSHALL:  Okay.

13                   THE COURT:  The problem that I have, and I think

14   it's going to be an issue for you in the Motion to Dismiss

15   because part of what I need to do is take a preliminary look

16   at the motion, obviously, to make a determination, in my mind,

17   whether or not a stay is appropriate because it's -- the case

18   law varies between being firmly convinced, being convinced,

19   and feeling that it's a meritorious motion.  And I think I

20   probably fall someplace in the middle of all of that.  Your

21   theory is this:  OpenSea and Yuga Labs had a duty to you

22   through this special relationship that you claim was created

23   to prevent, effectively, the fraudulent sale and to take

24   action once they were notified of the fraudulent sale.

25                   Is that just -- am I correct?

1           MR. MARSHALL:  Yes.

2           THE COURT:  Okay.

3           MR. MARSHALL:  Yes.  Yes, Your Honor.

4           THE COURT:  But here's the problem, the flip

5    side of that, your theory would also, I think, call into

6    question whether they would then owe a duty to the good

7    faith purchaser because you're asking them to just take your

8    client's word for it that there was a fraudulent transfer,

9    with no proof that it was fraudulent.  So if they take action,

10   don't they then create another set of liability and potential

11   duties and other things to the other side?

12          So, from a policy perspective, how does that make a

13   lot of sense?

14          MR. MARSHALL:  So regarding the policy, Your

15   Honor, to put a finer point on our theory, it's with failure

16   to see these foreseeable frauds and sales happening, and to do

17   anything about it, to just say we're only a platform is --

18          THE COURT:  But how do they know that the

19   independent sales between two users, how are they supposed to

20   foresee that that is a fraudulent transfer?

21          In other words, how do they know that your client is

22   going to let somebody voluntarily into their house to then

23   steal things?  Because that's what he did when he --

24          MR. MARSHALL:  Yeah.

25          THE COURT:  -- voluntarily let them into his

1    digital wallet.

2              MR. MARSHALL:  Yeah.  And we're saying that that

3    was foreseeable that that could happen.

4              THE COURT:  Foreseeable that your client

5    wouldn't use protections against his own negligence of letting

6    somebody into his digital wallet by clicking on a link from

7    somebody he doesn't know?

8              MR. MARSHALL:  Foreseeable that by failing to

9    implement any adequate security measures, by failing to

10   monitor the marketplace that they created, therefore

11   failing --

12             THE COURT:  But, again, that is independent upon

13   their, A, knowing that this is a fraudulent sale of some sort.

14             MR. MARSHALL:  Nothing that these fraudulent

15   sales have been occurring, that was --

16             THE COURT:  But how are they supposed to know

17   they're fraudulent, and they're not in good faith?  How are

18   they supposed to distinguish between those things?

19        I guess that's the corps question:  How do they,

20   third parties unrelated to the transaction, not involved in

21   the communications between the buyer and the seller -- it's no

22   different -- let me give you an analogy.

23             MR. MARSHALL:  Okay.

24             THE COURT:  And I use this for my own

25   experience.  As a prosecutor, I prosecuted a case involving

1   eBay, where people were going out and stealing products from

2   Target and Wal-Mart and all of this, they then sold it to a

3   fence.  The fence then put it on eBay and sold all those

4   products to good faith purchasers on the other end.

5            But under your theory, eBay is supposed to know that

6   these products that are placed on there are stolen.

7                 MR. MARSHALL:  Well my --

8                 THE COURT:  -- before --

9                 MR. MARSHALL:  Well my theory --

10                THE COURT:  -- before anything -- but not being

11  involved in any of these steps over here.  They're not privy

12  to any of these communications.  But under your theory a duty

13  is created to know that something placed on OpenSea, for

14  example, was inappropriately listed for sale.

15                MR. MARSHALL:  Yeah.  Thanks.  That analogy is

16  helpful, Your Honor.

17           And it's not a duty to know, but it's a duty to do

18  those things so that the fence, in the eBay analogy doesn't

19  exist, so that these types of frauds aren't happening with

20  such regularity.

21           So, in other words, implement adequate security,

22  monitor the marketplace --

23                THE COURT:  But what, exactly, would the

24  adequate security be?  And part of this comes from information

25  that I gleaned from Yuga Labs.  If the NFT, itself, and

1    not some private, separate account, or relationship or

2    communication is itself holding the data, the information of

3    who owns the NFT at that point, what, exactly -- is there even

4    technology available that could allow them to put some sort

5    of process in place?  Because I don't see how that's even

6    possible with the way Blockchain works.

7                    MR. MARSHALL:  I'm not sure how to answer that

8    technology question.  It seems a factual, some type of factual

9    question that we will get into in this case.  But what we say

10   the relevant conduct here is, that creates the facts that give

11   this court the ability to deny the motion to stay are, fraud

12   happens on the platforms; fraud happens within the community

13   because failings have been committed by the two defendants

14   here.  Failure to implement adequate security to even know if

15   there's -- if there is fraud happening; or for even recourse

16   to the victims, Armijo, by calling -- casting a service, that

17   those channels just weren't adequately set up there, Your

18   Honor.

19           And so it relates to -- we're not saying they caused

20   the fraud, but they created a platform and a community by

21   failing to do a basic thing --

22                    THE COURT:  Well, I could make the same argument

23   for Apple, for eBay, for PayPal, for virtually any online

24   digital marketplace that allows for the transfer of

25   information and goods between parties.  And yet, in many

-32-

1    cases -- in fact I was unable to find any case that supports

2    the theory that you've advocated in this case.

3              MR. MARSHALL:  Which is that they create a safe

4    or secure community and platform?

5              THE COURT:  That there is a special relationship

6    created between independent buyers and sellers that utilize

7    those platforms to transfer, whether it be money in the PayPal

8    example, or goods in the eBay example, or even the Apple

9    example, where they allow for information and data to be

10   utilized between parties.

11             MR. MARSHALL:  Okay.  And I think where the

12   analogy with those companies -- that's where it breaks down

13   because, here, the relationship formed on the platform or

14   through the community is much deeper than just the process of

15   a payment or the selling --

16             THE COURT:  So much deeper than when you go to

17   PayPal and you have to provide them all of your personal data

18   and information, including bank account information, to be

19   able to utilize their platform to transfer money, wherein in

20   this case, based upon the information contained entirely

21   within a digital hash value of an NFT, where there is no

22   independent account required to be created between the

23   parties, you're saying there is more of a special relationship

24   or some sort of relationship created?

25             MR. MARSHALL:  Yes.  Absolutely, Your Honor.

1          THE COURT:  Okay.  Your time --

2          MR. MARSHALL:  That has been --

3          THE COURT:  -- your time has expired.  So thank

4  you very much, sir.  I really do have to -- we only have a few

5  more minutes before this hearing is over and I have to go to

6  my next hearing.

7          I have heard the arguments of all the parties.  I

8  have reviewed all of the briefing as I've already indicated.

9  And like I said, I -- I don't know what she's going to do, in

10  all reality.  I think these are fascinating issues.  And I

11  would sit here all day and have these questions.  We could

12  spend all afternoon together -- not that you want to do that.

13  But I would, but that's a different issue.

14          But just all of the information I've gleaned from

15  the answers that I have received here today, and as well as

16  from the motions, first of all, I find that there is no

17  dispute between the parties that the motions are, in fact,

18  dispositive as it relates to the elements required under

19  Kor Media and Tradebay.  There is a bit of an argument between

20  the parties, at least Yuga Labs and plaintiffs, as to whether

21  or not some limited jurisdictional discovery needs to happen,

22  but I find that there is not a requirement for that under the

23  circumstances.  Much of the facts or circumstances needed to

24  make a determination both to general and specific jurisdiction

25  have, effectively, been acknowledged by Yuga Labs in terms of

1   their involvement, their sales, their -- you know, they have

2   provided declarations and information that I think go to

3   those issues that the district court can decide.  If she

4   disagrees with me, she can, certainly, open up discovery

5   on that issue.  But as far as I sit here today, I do not

6   believe that discovery is necessary to decide the Motions to

7   Dismiss as they're presented to the district court judge at

8   this time.

9           With respect to the preliminary peek, that is

10  probably the hardest one of the elements.  And again, it

11  goes back to, you know, do I need to be firmly convinced that

12  she's going to grant the motion; or do I need to be convinced

13  that this motion has merit and that it may be granted, even

14  in part, as it relates to the district court judge?

15          I do think that there are some really -- like I

16  said, I think that there's some fascinating issues here.  And

17  I think a part of it just comes from the very nature of the

18  technology that, really, the courts have not yet wrestled

19  with and have not had to come up with some sort of framework,

20  somehow, to deal with it.  Even the analogies that we've used

21  here today aren't perfect.  They don't fit.  They -- these

22  technologies are different.  NFTs are different.

23          Certainly, I appreciate all that plaintiff laid

24  out, not only in the Complaint, but in their motions

25  about all of the membership benefits, the access to the

1  cryptocurrencies, the -- all of the things that come along

2  with membership of owning these entities really does, I think,

3  in some ways, give me a lot of pause about whether or not

4  there really is the type of -- if this doesn't change, somehow

5  that relationship, when we look at the case law in Nevada and

6  what is and is not a special relationship, specifically under

7  Perry versus Jordan and different cases that really discuss

8  what that means.

9          But at the end ever the day, I am confident that

10  there is a meritorious Motion to Dismiss that has been

11  presented to the district court judge.  I am also convinced

12  that a short stay of discovery for only a few months --

13  particularly where we don't have a third defendant that

14  has not been served yet here present -- is appropriate under

15  Rule 1.  I understand the prejudice, but I think that that

16  prejudice is minimal in comparison to the expense and the

17  nature of discovery that would be necessary in this case

18  ultimately.

19          And so for those reasons, I am going to grant both

20  of the Motions to Stay.  I believe they're at ECF number --

21  hold on.  Let me make sure the record is clear.

22          And of course the one page I need, I can't find.

23  See, I make these nice little tables.  You can't see.

24          So, ECF number 78 is granted.  ECF number 80 is

25  granted.  I'm also going to grant the motion for supplemental

—36—

1    authority -- although, to be honest with you, I didn't find it

2    all that necessary to the decision here, but I don't see any

3    fault in pointing out to the Court that there is new cases

4    that I might need to be aware of.

5            So, I'm granting all three of those motions.  The

6    motion is like this though.  So if the district court judge

7    denies the Motion to Dismiss, within 21 days of the order

8    denying those motions, whether she grants motion for leave to

9    amend or not, or whatever she does or doesn't do, if any part

10   of this case proceeds, the parties are required to file an

11   updated Discovery Plan and Discovery Order within 21 days of

12   the order related to the Motion to Dismiss, if any part of

13   this case survives the Motion to Dismiss, and then we will

14   discuss how we will proceed with discovery.

15           It is unlikely I will continue to allow unlimited

16   stays.  We may look at what she does and then decide, okay,

17   look, let's do some narrow areas because she has allowed

18   amendment and it appears that she's going to allow the case to

19   proceed in certain areas, even if -- you know, like I said,

20   she allows for an amendment and motions to dismiss could be

21   subsequently filed.  But, that will be the order of the Court.

22           I should, again, thank all of you for being so well

23   prepared for here today, and for the amazing arguments.  And

24   in some ways I hope she doesn't dismiss this case because I

25   would be very, very excited to work with all of you on a going

1    forward basis.  But with that, we will be in recess.

2             Thank you all so much.

3                  MR. BLAVIN:  Thank you, Your Honor.

4                  MS. MARSHALL:  Thank you, Your Honor.

5                  MR. MARSHALL:  Thank you, Your Honor.

6

7             (Court Adjourned.)

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1                              -o0o-

2

3            I certify that the foregoing is a correct
             transcript from the record of proceedings
4            in the above-entitled matter.

5

\s\ Kathryn M. French                October 6, 2022
6       _____        _____

7       KATHRYN M. FRENCH, RPR, CCR              DATE
        Official Reporter
8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25