DICKINSON WRIGHT PLLC
JOHN P. DESMOND
Nevada Bar No. 5618
JUSTIN J. BUSTOS
Nevada Bar No. 10320
100 W. Liberty Street, Suite 940
Reno, NV  89501
Tel: 702-550-4400
Fax: 844-670-6009
Email:  jdesmond@dickinsonwright.com
Email:  jbustos@dickinsonwright.com

(Additional counsel listed on signature page)

*Attorneys for Defendant Ozone Networks, Inc.
d/b/a OpenSea, a New York Corporation*

**UNITED STATES DISTRICT COURT**
**DISTRICT OF NEVADA**

| | |
|---|---|
| ROBERT ARMIJO,<br><br>Plaintiff,<br><br>vs.<br><br>OZONE NETWORKS, INC. d/b/a OPENSEA, a New York Corporation, YUGA LABS, LLC d/b/a BORED APE YACHT CLUB, a Delaware limited liability company, LOOKSRARE; and DOES 1 to 50,<br><br>Defendants. | CASE NO.  3:22-CV-00112-MMD-CLB<br><br>**DEFENDANT OZONE NETWORKS, INC.'S REPLY IN SUPPORT OF ITS MOTION TO DISMISS THE AMENDED COMPLAINT** |

# TABLE OF CONTENTS

PAGE

I.  INTRODUCTION ........................................................................................................1

II. ARGUMENT ..............................................................................................................2

    A. Plaintiff's Negligence Claim Fails.................................................................2

        1. OpenSea Owed No Duty to Plaintiff ..............................................2

        2. OpenSea Did Not Breach the (Non-Existent) Duty......................6

        3. OpenSea Did Not Cause the "Permanent and Irreversible" Theft of Plaintiff's NFTs ..........................................................................7

    B. Plaintiff's Negligent Hiring, Training, and Supervision Claims Also Fail..............8

    C. OpenSea's Terms of Service Bar Plaintiff's Claims..............................................10

    D. The Economic Loss Doctrine Also Bars Plaintiff's Claims .................................12

III. CONCLUSION.........................................................................................................12

# TABLE OF AUTHORITIES

Page(s)

**FEDERAL CASES**

*757BD, LLC v. Nat'l Union Fire Ins. Co. of Pittsburgh, PA*,
    804 F. App'x 592 (9th Cir. 2020) ................................................................................................8

*Beckman v. Match.com, LLC*,
    743 F. App'x 142 (9th Cir. 2018) .........................................................................................1, 3, 4

*Bibicheff v. PayPal, Inc.*,
    844 F. App'x 394 (2d Cir. 2021) ........................................................................................1, 3, 4, 5

*Bock-Kasminoff v. Walmart, Inc.*,
    No. 2:20-CV-00949-JAD-EJY, 2022 WL 891448 (D. Nev. Mar. 24, 2022) ............................8

*Calove v. Nationstar Mortg., LLC*,
    No. 2:14-CV-01329-JAD, 2015 WL 4508751 (D. Nev. July 24, 2015) ...............................9, 10

*Chiles v. Underhill*,
    No. 03:05-CV-00179-LRH-RJJ, 2008 WL 822248 (D. Nev. Mar. 26, 2008) .....................9, 10

*Cincinnati Specialty Underwriters Ins. Co. v. Red Rock Hounds*,
    511 F. Supp. 3d 1105 (D. Nev. 2021) .......................................................................................8

*Del Webb Communities, Inc. v. Partington*,
    652 F.3d 1145 (9th Cir. 2011) ...................................................................................................2

*Diep v. Apple, Inc.*,
    No. 21-CV-10063-PJH, 2022 WL 4021776 (N.D. Cal. Sept. 2, 2022) ............................11, 12

*Dyroff v. Ultimate Software Grp., Inc.*,
    934 F.3d 1093 (9th Cir. 2019) ..........................................................................................1, 3, 4, 5

*McLaren v. Hb Klub, LLC*,
    No. 07 CVC 1767, 2009 WL 8581696 (Ohio Com. Pl. Oct. 26, 2009) ...................................9

*Okeke v. Biomat USA, Inc.*,
    927 F. Supp. 2d 1021 (D. Nev. 2013) .......................................................................................9

*Pelletier v. Rodriguez*,
    No. 3:17-CV-00642-MMD-EJY, 2021 WL 3008594 (D. Nev. July 15, 2021) .......................12

*Schneider v. Cal. Dep't. of Corr.*,
    151 F.3d 1194 (9th Cir. 1998) ..........................................................................................3, 8, 10

*Turner v. Power Servs.*,
    No. 2:11-CV-00190-PMP, 2012 WL 1574849 (D. Nev. May 3, 2012) ...................................3

**STATE CASES**

*Fed. Ins. Co. v. Coast Converters*,
    339 P.3d 1281 (Nev. 2014) ......................................................................................................11

*Lee v. GNLV Corporation*,
    22 P.3d 209 (Nev. 2001) ............................................................................................... 6

*Rockwell v. Sun Harbor Budget Suites*,
    925 P.2d 1175 (Nev. 1996) ........................................................................................... 8

*Sadler v. PacifiCare of Nevada*,
    340 P.3d 1264 (Nev. 2014) ......................................................................................... 12

*Scialabba v. Brandise Constr. Co.*,
    921 P.2d 928 (Nev. 1996) ............................................................................................. 3

## I. INTRODUCTION

Plaintiff does not dispute that a third-party scammer stole his NFTs via a phishing attack on the Discord platform—which is not affiliated with Defendant OpenSea—but attempts to salvage his claims of negligence by offering the extraordinary proposition that OpenSea had a duty to protect him (and all other NFT owners) from third-party thieves operating on unaffiliated platforms who relist the stolen NFTs on OpenSea.  This is contrary to the law.  Plaintiff has not cited a single case (from Nevada or anywhere else) to support his contention that a special relationship exists between OpenSea and its users to prevent such third-party harm—much less between OpenSea and "the entire NFT community" (Opp., ECF No. 98, at 3)—and he cannot.  As the Ninth Circuit has observed, "Nevada courts have never recognized a special relationship akin to that" between a website and its users giving rise to a duty to prevent third-party harm, *Beckman v. Match.com, LLC*, 743 F. App'x 142, 142 (9th Cir. 2018) (Mem. Disp.), and courts consistently uphold dismissal of negligence claims like Plaintiff's on the pleadings.  *Id.* (dating website); *Dyroff v. Ultimate Software Grp., Inc.*, 934 F.3d 1093, 1100-01 (9th Cir. 2019) (social media network); *Bibicheff v. PayPal, Inc.*, 844 F. App'x 394, 397 (2d Cir. 2021) (financial services website).  It is for that reason that in recently ordering a stay of discovery, Magistrate Judge Baldwin concluded that she was "confident that there is a meritorious Motion to Dismiss that has been presented to the district court judge." (Hrg. Tr., ECF No. 101, at 35:9-11.)

Here, Plaintiff acknowledges that "all three of his BAYC NFTs were stolen in an instant" when he "fell prey to a phishing scam" executed by a third-party "thief through the online communication platform known as 'Discord,'" which is "a *different and separate entity* that is completely unaffiliated with OpenSea." (Opp., ECF No. 98 at 5 (emphasis added).)  Plaintiff also acknowledges that the stolen NFTs could be sold on other platforms besides OpenSea, including LooksRare—where two of the three NFTs were in fact resold after OpenSea disabled listings of the NFTs on its own platform. (*See* FAC, ECF No. 62, ¶¶ 95-96.)  These allegations, taken as true, establish as a matter of law that there was no "special relationship" giving rise to a duty of OpenSea to prevent the harm caused by a third party.  That is dispositive.

Against the weight of authority negating the existence of a special relationship, Plaintiff has taken the unprecedented position that a special relationship exists between OpenSea and literally "*any* individual who engages in buying, selling, or trading NFTs" *anywhere on the Internet* due to the purported "tremendous influence OpenSea maintains over the NFT industry as a whole." (Opp., ECF No. 98, at 3, 12 (emphasis added).) Magistrate Judge Baldwin succinctly captured the state of the case law before granting a stay of discovery in this case, commenting to Plaintiff's counsel, "I was unable to find any case that supports the theory that you've advocated in this case." (Hrg. Tr., ECF No. 101, at 31:22-32:25.) Plaintiff is essentially asking this Court, sitting in diversity, to extend Nevada law to recognize for the first time not only a special relationship between a website and its users, but between a website and market participants in an *entire segment of the economy*—without any citation to case law supporting his theories. The Ninth Circuit has specifically cautioned federal courts against doing this. *See Del Webb Communities, Inc. v. Partington*, 652 F.3d 1145, 1154–55 (9th Cir. 2011) ("Federal courts should 'hesitate prematurely to extend the law . . . in the absence of an indication from the [state] courts or the [state] legislature that such an extension would be desirable.'") (citation omitted).

Apart from the absence of any duty, Plaintiff's claims also fail for a series of additional and independent reasons. First, Plaintiff has not plausibly alleged other requisite elements of his negligence claims: He cannot show breach of this imagined duty to protect all NFT owners from third-party harm on any and all NFT platforms; he cannot show OpenSea proximately caused the "permanent and irreversible" injury he suffered at the time his NFTs were stolen from an unaffiliated platform; and he cannot show that OpenSea's employees (whom he claims were negligently hired, trained, and supervised) themselves caused this harm. Moreover, OpenSea's Terms of Service expressly bar his claims, as does the economic loss doctrine. For each of these reasons, the First Amended Complaint ("FAC") should be dismissed without leave to amend.

## II.  ARGUMENT

### A.  Plaintiff's Negligence Claim Fails

#### 1.  OpenSea Owed No Duty to Plaintiff

Plaintiff concedes that "a private person does not have a duty to protect another from a

criminal attack by a third person" unless the parties are in a "special relationship." (Opp., ECF No. 98, at 11 (quoting *Scialabba v. Brandise Constr. Co.*, 921 P.2d 928, 930 (Nev. 1996)); *see* MTD, ECF No. 71, at 8.) Plaintiff also concedes that the "phishing scam" to which he fell victim was executed by a third-party thief on Discord, "a *different and separate entity* that is completely unaffiliated with OpenSea." (*Id.* at 5 (emphasis added); Stay Opp., ECF No. 86, at 3-4 ("OpenSea was not involved in the actual theft of Mr. Armijo's BAYC NFTs."); FAC, ECF No. 62, ¶¶ 3, 9, 25-28, 30-31, 193-194.)[1] Plaintiff's conclusory assertion that OpenSea has a special relationship with anyone transacting in NFTs anywhere on the Internet has no support in the law.

      As set forth in the Motion, extensive authority demonstrates that a website does not have a special relationship with its own users to prevent third-party harm. In each of those cases, the court concluded that the relationship between a website and its user does not give rise to the type of special relationship supporting a negligence claim tied to third-party actions, and affirmed dismissal. *E.g.*, *Beckman*, 743 F. App'x at 142 (Match.com owed no duty under Nevada law to prevent or block third parties from causing harm to its users); *Bibicheff*, 844 F. App'x at 396-97 & n.1 (PayPal owed no duty to monitor its platform for and prevent fraudulent accounts created by third parties in the names of its users); *Dyroff*, 934 F.3d at 1100-01 (social media site owed no duty to protect user from a drug dealer). Plaintiff's efforts to distinguish this line of case law are unavailing. Although Plaintiff contends that here, "the parties have a direct and prior relationship with each other," (Opp., ECF No. 98, at 11) the same was true in every single one of these cited cases. Likewise, in each of these cases the websites indisputably had control over their platforms, as "OpenSea has complete control over its NFT marketplace" (Opp., ECF No. 98 at 12). In fact, Plaintiff's claim to a duty under the circumstances presented here is *weaker* than the basis for the

---

[1] The Opposition contains extensive material appearing nowhere in the FAC, including no fewer than 24 footnotes citing news articles and tweets. (*E.g.*, Opp., ECF No. 98 at 7-10, 20 (articles); *id.* at 13-14, 21 (tweets).) Such material is not properly considered in deciding the Motion. *See Schneider v. Cal. Dep't. of Corr.*, 151 F.3d 1194, 1197-1201 n.1 (9th Cir. 1998) ("[A] court *may not* look beyond the complaint to a plaintiff's moving papers, such as a memorandum in opposition to a defendant's motion to dismiss" (emphasis in original)); *Turner v. Power Servs.*, No. 2:11-CV-00190-PMP, 2012 WL 1574849, at *5 (D. Nev. May 3, 2012) (same). At any rate, none of this material alters the fact that Plaintiff fails to plead the basic elements of his claims.

duties proposed in each of the cases cited above, because the ultimate harm here did not occur on the OpenSea platform (unlike in *Bibicheff*, where the fraudulent accounts were created on PayPal's platform) and the wrongdoer here did not connect with Plaintiff through OpenSea's platform (unlike in *Beckman* and *Dyroff*, where the user and the wrongdoer connected through the defendants' websites). And here, Plaintiff alone bore the responsibility for maintaining the "keys" to the digital wallet holding his NFTs. *Cf. Scialabba*, 921 P.2d at 931 (contractor that "retained master keys" and was "responsible for locking doors" retained control over apartments).

Unable to effectively distinguish OpenSea's authorities showing that Nevada law has never recognized a special relationship between websites and their users, Plaintiff remarkably asserts that "OpenSea's position as the NFT industry leader" somehow puts it in a special relationship with "the entire NFT community, and any individual who engages in buying, selling, or trading NFTs . . . regardless of whether those transactions occur on OpenSea's platform." (Opp., ECF No. 98, at 3; *id.* at 12 (contending that OpenSea is in a special relationship with "NFT owners wherever they are located").) Plaintiff does not cite a single authority to suggest that this *should be* the law, let alone that it already is—and it is not. As set forth in the Motion, numerous cases have held that parties are not in a special relationship with their users, including where they have market power. (MTD, ECF No. 71, at 11-12 & n.2.) And common sense counsels that it is neither rational nor desirable to broaden the law to have a single participant in an industry owe a perpetual duty to protect *every* owner of *any* NFT from *ever* being harmed by a third party anywhere on the Internet, including on its competitors' platforms. Indeed such a rule is unworkable—on Plaintiff's theory, OpenSea simultaneously owes a duty to Plaintiff to, *inter alia*, provide "timely recourse to victims" of stolen NFTs (FAC, ECF No. 62, ¶¶ 195), but *also* owes a duty to protect the third parties who unknowingly purchased them—even those who traded using LooksRare, a competing NFT marketplace that OpenSea plainly does not control. (*See* Hrg. Tr., ECF No. 101 at 28:4-29:23 (M.J. Baldwin: "[Y]our theory would also, I think, call into question whether [OpenSea] would then owe a duty to the good faith purchaser because you're asking them to just take your client's word for it that there was a fraudulent transfer, with no proof that it was fraudulent. . . . So, from a policy perspective, how does that make a lot of sense?").)

Further, the factual allegations set forth in the FAC clearly establish that OpenSea in no way controls the general NFT market. Indeed, Plaintiff alleges that he accessed the unaffiliated Discord server *precisely because* OpenSea does not allow users to trade NFTs using OpenSea, and unaffiliated platforms like Discord operate differently from OpenSea in this regard. (*See* FAC, ECF No. 62, ¶¶ 80-81; *cf. id.* ¶ 31 ("Because Discord hosts many NFT servers in an open, community-based format, the platform is easily accessible to bad actors and is rife with phishing scams and malicious hacking.").) Likewise, Plaintiff alleges that two of the three stolen NFTs were in fact resold using one of those competing platforms—LooksRare, another defendant here—after OpenSea disabled listings of those NFTs on its own platform within hours. (*Id*. ¶¶ 4, 95-96.) Because the allegations make clear that the NFT market is not controlled by *anyone*, least of all OpenSea, they cannot support Plaintiff's fantastical theory that he (and with him every other member of the NFT community) is subject to OpenSea's absolute control.

Finally, Plaintiff's contention that "OpenSea itself acknowledges that [the alleged] duty exists" because it has publicly stated that its policies are "designed to keep our community safe" and that it "do[es] not want to incentivize theft by allowing [its] platform to be used to help sell stolen items" falls entirely flat because it begs the question. (*See* Opp., ECF No. 98, at 13-14.) Of course OpenSea (like any number of Internet platforms) seeks to make its own platform safe for its users, and here, did disable listings of the NFTs at issue within hours. But such good-faith efforts and policies do not give rise to a special relationship, as courts have specifically held. *See*, *e.g.*, *Bibicheff*, 844 F. App'x at 396 (PayPal did not have a special relationship with its users to prevent third-party fraud even though it stated on its website that "'[e]very transaction is monitored and analyzed within milliseconds to identify and help prevent fraud before it occurs'" and that "PayPal 'monitor[s] transactions 24/7 to help prevent fraud and identity theft.'"). A holding to the contrary would, if anything, *disincentivize* platforms from taking such steps to begin with, out of fear establishing a legal duty to do so. *See Dyroff*, 934 F.3d at 1100-01 ("No website could function if a duty of care was created when a website facilitates communication, in a content-neutral fashion, of its users' content.").

The bottom line is that Plaintiff asks this Court to create an expansive new duty that has

never existed in Nevada common law—as the Opposition effectively concedes by observing that some state legislatures (notably *not* including Nevada's) have passed laws to require "[t]raditional online marketplaces like Amazon, eBay, and Facebook" to collect and verify identity information from high-volume third-party sellers of tangible goods, *not* NFTs (which has little to do with the alleged duty asserted here). (Opp., ECF No. 98, at 10; *cf.* Opp. to Yuga Labs MTD, ECF No. 100, at 20 ("Here, web3 platforms are a brand-new industry and the duties NFT club creators owe to their respective communities have never been considered.")) Because no special relationship exists to support the notion that OpenSea had a duty to protect Plaintiff from the third-party harm alleged here, Plaintiff's negligence claims fail as a matter of law.

### 2.  OpenSea Did Not Breach Any (Non-Existent) Duty

Even if such a duty to protect Plaintiff from third-party harm existed, OpenSea's conduct as alleged by Plaintiff in the FAC did not constitute a breach of such a duty because (1) Plaintiff readily admits that the theft took place entirely on an unaffiliated third-party platform; (2) two of the three stolen NFTs were never resold using OpenSea because OpenSea disabled listings of the stolen NFTs within hours; and (3) even with respect to the single sale of the third NFT using OpenSea, which occurred within *two hours* of Plaintiff falling victim to a phishing attack on an unaffiliated platform, OpenSea's action to prevent this sale was expeditious enough to be reasonable. (MTD, ECF No. 71, at 13-14 (collecting cases holding that response to user reports within 24 hours to a matter of weeks was reasonable).).

Plaintiff contends that OpenSea breached its duty to him by failing to come to his aid after the attack with sufficient alacrity, but has not submitted a single authority showing that OpenSea's action *within hours* constitutes a breach of the duty imagined by Plaintiff. (Opp., ECF No. 98, at 17-18.) Indeed, Plaintiff's lead case, *Lee v. GNLV Corporation*, 22 P.3d 209 (Nev. 2001), provides that a restaurant in a special relationship with its patrons (unlike OpenSea) acts "reasonably" to assist them when choking when it takes steps to provide that assistance— even if those steps are ultimately unsuccessful. *Id.* at 212 (granting summary judgment). That is precisely what OpenSea did here. Not only does Plaintiff fail to allege plausible factual allegations that the timing of OpenSea's actions was unreasonable, but he makes *no* allegations

as to what specific security measures or monitoring could have even prevented the listings from appearing on OpenSea, or even that such technology actually exists. (*See* Hrg. Tr., ECF No. 101, at 29:16-31:21 (M.J. Baldwin: "[I]s there even technology available that could allow them to put some sort of process in place [to prevent listings of stolen NFTs]?" . . . Counsel: "I'm not sure how to answer that technology question.").) Plaintiff has failed to allege any breach.

### 3. OpenSea Did Not Cause the "Permanent and Irreversible" Theft of Plaintiff's NFTs

Plaintiff's conclusory allegation that OpenSea is the "direct and proximate cause" of his harm is insufficient to state a claim, as Plaintiff's own allegations make clear that OpenSea could not conceivably have caused his harm—the loss of the NFTs. (MTD, ECF No. 71, at 14-16 (citing FAC, ECF No. 62, ¶ 4).) Plaintiff does not offer any meaningful argument on this point; he simply contends that the *actual* harm he suffered "was being targeted and attacked by thieves." (Opp., ECF No. 98, at 4, 18.) This is a distinction without a difference; it does not change the reality that the ultimate injury he alleges—the loss of the monetary value of his NFTs and associated benefits—flows directly from the theft, which was accomplished by a third party on a different platform. (FAC, ECF No. 62, ¶ 203 (alleging that "Mr. Armijo's resulting damages" are "the theft and loss of his property and its subsequent sale" and "the loss of his legal interest in membership in the BAYC club and the privileges associated with it").) The indisputable proximate cause of this harm was the thief, not OpenSea—as Plaintiff has effectively admitted: "OpenSea was not involved in the actual theft of Mr. Armijo's BAYC NFTs." (Stay Opp., ECF No. 86, at 3-4; *see also* FAC, ECF No. 62, ¶¶ 80-86.)

Further, OpenSea was powerless to reverse the theft or prevent any further consequences from the theft after it took place. As Plaintiff alleges, it is technically impossible for OpenSea or anyone else to unwind an NFT transfer—wrongful or otherwise—after it has occurred. (FAC, ECF No. 62, ¶ 4 ("Because blockchain technology is decentralized and spread across thousands of computer nodes at various locations, individual NFT marketplaces do not have the ability to undo a transaction once it has been completed on the blockchain—it becomes permanent and irreversible.").) Likewise, as the allegations make clear, even if OpenSea had immediately

1  blocked the relisting of all of the NFTs at issue, it is unable to prevent the *subsequent* transfer of
2  the NFTs on other platforms, as happened here with 2 of the 3 NFTs at issue.  (*Id.* ¶ 96.)
3  Because Plaintiff would have suffered this *identical* injury regardless of how many NFTs were
4  resold using OpenSea, OpenSea necessarily cannot be the proximate cause of his injuries.  *See*
5  *757BD, LLC v. Nat'l Union Fire Ins. Co. of Pitts., PA*, 804 F. App'x 592, 594 n.3 (9th Cir. 2020)
6  ("It is axiomatic that X cannot be a proximate cause of Y if Y has already occurred before X.").

7  Finally, Plaintiff's allegation that the theft was somehow the result of OpenSea's failure
8  to "implement standards and security procedures that will disincentive[ize] NFT theft" does not
9  establish a plausible allegation of proximate causation.  (Opp., ECF No. 98, at 4, 18.)  At the
10 outset, this speculative theory is not alleged in the FAC.  *See Schneider*, 151 F.3d 1194 at 1197-
11 1201 n.1.  And even if it were, this allegation does not come even *close* to crossing the threshold
12 of plausibility.  *See Cincinnati Specialty Underwriters Ins. Co. v. Red Rock Hounds*, 511 F.
13 Supp. 3d 1105, 1113 (D. Nev. 2021) ("When the claims in a complaint have not crossed the line
14 from conceivable to plausible, the complaint must be dismissed.").  By way of analogy, this is
15 akin to alleging that improved security measures at Walmart could somehow prevent a home
16 invasion.  Plainly, implementation of strict procedures to prevent theft when *using OpenSea*
17 would do nothing to prevent theft *on an unaffiliated platform*—as evidenced by Plaintiff's
18 decision to log on to Discord instead of OpenSea when he sought to trade his NFTs.  (FAC, ECF
19 No. 62, ¶¶ 80-81 (OpenSea does not allow NFT trading).)

20  **B.      Plaintiff's Negligent Hiring, Training, and Supervision Claims Also Fail**

21  Plaintiff acknowledges that OpenSea's employees were not involved in the theft of his
22 NFTs, and concedes that "for an employer to be liable for negligent hiring, training, or
23 supervision of an employee, the person involved must actually be an employee"—thus, his claim
24 for negligent hiring, training, or supervision is a non-starter. (Opp., ECF No. 98, at 19 (quoting
25 *Rockwell v. Sun Harbor Budget Suites*, 925 P.2d 1175, 1181 (Nev. 1996)).)  Nevada law is clear
26 that an employee's alleged failure to protect an individual from third-party harm is insufficient to
27 show that the employee caused the individual's injury.  *See Bock-Kasminoff v. Walmart, Inc.*, No.
28 2:20-CV-00949-JAD-EJY, 2022 WL 891448, at *3 (D. Nev. Mar. 24, 2022) ("Without evidence

1  that Walmart was responsible for the liquid on the floor, [Plaintiff] can't" show that her "injury
2  was caused by an employee"); *cf. McLaren v. Hb Klub, LLC*, No. 07 CVC 1767, 2009 WL
3  8581696 (Ohio Com. Pl. Oct. 26, 2009) (no claim when "injuries were caused by a third-party
4  criminal attack off of the premises" which employees had allegedly failed to stop).

5        Unable to overcome this fatal shortfall, Plaintiff again reconceptualizes his claim to argue
6  that the theft of his NFTs by a third-party occurred because "OpenSea employees have
7  incentivized NFT theft" generally. (Opp., ECF No. 98, at 19, 21.) In addition to the causation
8  issues set forth above—Plaintiff at no point explains how the actions of OpenSea's employees
9  could incentive theft on unaffiliated, competing platforms—this generalized theory (nowhere
10 pled) of "incentiviz[ing]" third-party theft is insufficient. Plaintiff is required to allege facts
11 supporting a claim that OpenSea hired a *particular* employee that it knew or should have known
12 had *particular* dangerous propensities that *caused* his injury. *Chiles v. Underhill*, No. 03:05-CV-
13 00179-LRH-RJJ, 2008 WL 822248, at *11 (D. Nev. Mar. 26, 2008) ("no evidence" that alleged
14 failure by police officer to pass psychological exam required as condition of employment "is in
15 any way related to the allegations of unlawful arrest and excessive force in this case"); *Calove v.*
16 *Nationstar Mortg., LLC*, No. 2:14-CV-01329-JAD, 2015 WL 4508751, at *3 (D. Nev. July 24,
17 2015) (dismissing claim for negligent hiring and supervision on the pleadings when plaintiff
18 failed to name specific employees). Put simply, "[a]n employee's wrongful behavior does not in
19 and of itself give rise to a claim," *Okeke v. Biomat USA, Inc.*, 927 F. Supp. 2d 1021, 1028 (D.
20 Nev. 2013), and Plaintiff has not even identified what the purported wrongful behavior here was.

21       Plaintiff's only factual allegations supporting these claims relate to the competence of
22 OpenSea's employees, not their propensity to take wrongful actions that caused him harm. (*See*
23 FAC, ECF No. 62, ¶¶ 216-235.) Indeed, Plaintiff does not identify a single OpenSea employee
24 with purported dangerous propensities or the specifics of what that dangerous propensity would
25 be, and cannot draw a connection between the specifics of that propensity and his harm here in
26 having his NFTs stolen on an unaffiliated platform. This failure to allege specific malfeasance by
27 a specific employee is dispositive—Plaintiffs' conclusory allegations that OpenSea failed to meet
28 its duties to reasonably hire, train, and supervise its employees are insufficient to state a claim.

1   *Chiles*, 2008 WL 822248, at *11; *Calove*, 2015 WL 4508751, at *3.

2   Plaintiff's improper attempts[2] to shore up his allegations by reference to material outside the record (*see* Opp., ECF No. 98, at 19-21) does not change the outcome here. Even if Plaintiff had included in his pleadings allegations regarding a criminal charge against a terminated former OpenSea employee (not OpenSea itself), violation of the wire fraud statute has absolutely nothing to do with whether an OpenSea employee has somehow "incentivized NFT theft," much less the actual theft of Plaintiff's NFTs by a third party. Likewise, unverifiable hearsay from Twitter user @MarleyThunder (a.k.a. "MyFrenMyFren") about options for returning a stolen NFT has nothing to do with Plaintiff being targeted by a third-party attacker on Discord.[3]

### C. OpenSea's Terms of Service Bar Plaintiff's Claims

Plaintiff does not contest that he voluntarily accepted the Terms of Service or that the Terms contain an unambiguous exculpatory clause. (*See* Opp., ECF No. 98, at 22 ("Mr. Armijo does not dispute that he agreed to OpenSea's Terms"); Meader Decl., ECF No. 72, Ex. A at 11.) Plaintiff instead argues that this provision does not bar his claims because (a) the Terms only apply when he is "*actually using* OpenSea's platform" and do not bar claims arising out of the third-party phishing attack on Discord—even though the plain language of the Terms expressly *do* bar such claims; (b) the exculpatory provision is unconscionable because OpenSea's conduct was "grossly negligent and reckless"—even though Plaintiff nowhere alleges this in the FAC and even though a court in the Northern District of California recently held that a similar limitation of liability provision contained in Apple's Terms and Conditions was valid and enforceable and applied to bar all of the plaintiff's claims, *see Diep v. Apple, Inc.*, No. 21-CV-10063-PJH, 2022 WL 4021776, at *7-8 (N.D. Cal. Sept. 2, 2022); and (c) his claims do not rely upon the Terms—

---

[2] As noted *supra*, this material is not properly before the Court because it is not alleged in the FAC and Plaintiff has not submitted a Request for Judicial Notice. *Schneider*, 151 F.3d at 1197-1201 n.1 ("[A] court *may not* look beyond the complaint to a plaintiff's moving papers").

[3] @MarleyThunder's tweet claims that when he contacted OpenSea customer service about a stolen NFT, OpenSea's "support staff literally told me to sell it on Looksrare." (*See* Opp., ECF No. 98, at 21.) Even if this tweet were creditable—which it plainly is not, and OpenSea disputes the tweet's veracity—it would show (1) that OpenSea acts promptly when an NFT is reported as stolen to remove listings from OpenSea and (2) that OpenSea's actions cannot prevent further transfers of the NFT on competing platforms that it does not control.

even though the Opposition itself does exactly that (*see* Opp., ECF No. 98, at 22-23).

*First*, the plain language of the exculpatory provision unambiguously covers "ANY LOSSES, DAMAGES, OR CLAIMS ARISING FROM . . . ANY USE OF CRYPTO ASSETS," without regard to whether the alleged harm occurred on OpenSea. (Meader Decl., ECF No. 72, Ex. A at 11.) The Terms define "Crypto Assets" to mean "unique non-fungible tokens, implemented on the Ethereum blockchain," and the exculpatory provision itself explains that "ANY TRANSFER OF TITLE THAT MIGHT OCCUR IN ANY UNIQUE DIGITAL ASSET OCCURS ON THE DECENTRALIZED LEDGER WITHIN THE ETHEREUM PLATFORM," *i.e.*, **not** on OpenSea. (*Id.* at 1, 11; *cf.* Opp., ECF No. 98, at 6-7 (explaining that the Ethereum blockchain is decentralized and that individuals using OpenSea may buy or sell crypto assets on "five distinct blockchains," including the Ethereum blockchain); FAC, ECF No. 62, ¶¶ 4, 95 (similar).) Likewise, the exculpatory provision applies to bar claims regarding any "MEANS OF ATTACK **AGAINST THE SERVICE OR CRYPTO ASSETS**." (Meader Decl., ECF No. 72, Ex. A at 11 (emphases added).) By distinguishing claims regarding "the service" from claims arising from attacks against "crypto assets" more broadly, the exculpatory provision makes clear that claims arising from third-party attacks will be barred regardless of whether the victim was using OpenSea or another platform. *Cf. Fed. Ins. Co. v. Coast Converters*, 339 P.3d 1281, 1284 (Nev. 2014) (This "is a question of contract interpretation, and thus, is a question of law.").

*Second*, the exculpatory provision is not unconscionable or unenforceable because Plaintiff has never alleged (and cannot allege) gross negligence or reckless disregard. (FAC, ECF No. 62, at 56 (pleading claim for "NEGLIGENCE"); *cf.* Opp., ECF No. 98, at 23 (baldly asserting the existence of "gross negligence" and "reckless[] disregard[]" without citation to the FAC).) Nor is the provision overbroad, as it expressly excludes "ANY BREACH OF SECURITY . . . DUE TO OUR GROSS NEGLIGENCE." (Meader Decl., ECF No. 72, Ex. A at 11.) As above, Plaintiff does not contend that the phishing attack on the Discord platform was "DUE TO" OpenSea's actions, but rather, that OpenSea somehow "incentivized" the third-party attack. Because Plaintiff alleges neither a claim for gross negligence nor facts to support such a claim, the exculpatory provision is not overbroad or contrary to public policy.

The recent case *Diep v. Apple* is instructive; there, the plaintiff sought to hold Apple liable for the actions of a third party distributing an app on Apple's App Store that allegedly was "'a 'spoofing' or 'phishing' program'" that "'obtain[ed] consumers' cryptocurrency account information and thereafter rout[ed] the same to the hackers' personal accounts.'" 2022 WL 4021776, at *1. The court took judicial notice of Apple's Terms, which "govern the relationship between Apple and App Store users." *Id*., at *2. The court held that a limitation of liability provision in the Terms providing that Apple was not liable for damages "arising out of or related to use" of third-party apps was enforceable and barred all of the plaintiffs' claims. *Id*., at *7-8.

*Third and finally*, the Opposition further justifies OpenSea's request for judicial notice because it expressly contends (in arguing that a special relationship exists) that Plaintiff "submitted himself to OpenSea's control . . . by agreeing to abide by OpenSea's Terms of Service." (Opp., ECF No. 98 at 11-12; *see generally* Reply ISO RJN at 1.)

### D.  The Economic Loss Doctrine Also Bars Plaintiff's Claims

Plaintiff does not dispute that there are no allegations of physical harm to person or property here, and the case law is clear that without physical harm a plaintiff's claims are barred by Nevada's economic loss doctrine. (*See* MTD, ECF No. 71, at 23-24.) Plaintiff's reliance on *Sadler v. PacifiCare of Nevada* is misplaced, because that case involved physical harm. 340 P.3d 1264, 1271 (Nev. 2014) (economic loss of medical monitoring "is accompanied by noneconomic losses, including *unwillingly enduring an unsafe injection practice* and the resulting increase in risk of contracting a latent disease and *need to undergo medical testing that would not otherwise be required*" (emphases added)). Plaintiff alleges no such accompanying physical, non-economic harms—he relies solely on the loss of his membership in the BAYC club, which he could regain simply by purchasing another Bored Ape NFT (or even negotiating repurchase of the stolen NFTs)—an economic loss. *See Pelletier v. Rodriguez*, No. 3:17-CV-00642-MMD-EJY, 2021 WL 3008594, at *9 (D. Nev. July 15, 2021) (economic loss rule applies when harm to property is purely economic, *e.g.*, crop damage, lost profits, and lost business opportunities).

### III.  CONCLUSION

Plaintiff's claims against OpenSea should be dismissed without leave to amend.

DATED this 8th day of November, 2022.

                    DICKINSON WRIGHT PLLC

                    */s/ Justin J. Bustos*
JOHN P. DESMOND
Nevada Bar No. 5618
JUSTIN J. BUSTOS
Nevada Bar No. 10320
100 W. Liberty Street, Suite 940
Reno, NV 89501
Tel: (775) 343-7500
Fax: 844-670-6009
Email: jdesmond@dickinsonwright.com
Email: jbustos@dickinsonwright.com

MUNGER, TOLLES & OLSON, LLP
JONATHAN H. BLAVIN (Pro Hac Vice)
560 Mission Street, 27th Floor
San Francisco, CA 94105
Tel: (415) 512-4011
Email: Jonathan.Blavin@mto.com

ERIN J. COX (Pro Hac Vice)
BRANDON R. TEACHOUT (Pro Hac Vice)
APRIL D. YOUPEE-ROLL (Pro Hac Vice)
350 South Grand Avenue, Suite 5000
Los Angeles, CA 90071
Tel: (213) 683-9100
Email: Brandon.Teachout@mto.com
Email: Erin.Cox@mto.com
Email: April.Youpee-Roll@mto.com

*Attorneys for Defendant Ozone Networks, Inc. d/b/a OpenSea, a New York Corporation*

-13-   Case No. 3:22-CV-00112-MMD-CLB
OPENSEA'S REPLY IN SUPPORT OF ITS MOTION TO DISMISS THE AMENDED COMPLAINT

**CERTIFICATE OF SERVICE**

The undersigned, an employee of Dickinson Wright PLLC, hereby certifies that on the 8th day of November 2022, caused a copy of the foregoing **DEFENDANT OZONE NETWORKS, INC.'S REPLY IN SUPPORT OF ITS MOTION TO DISMISS THE AMENDED COMPLAINT** to be transmitted by electronic service in accordance the Court's CM/ECF e-filing system, addressed to:

Emily Brinn Nuvan (Pro Hac Vice)
Jose A. Abarca (Pro Hac Vice)
Romaine C. Marshall (Pro Hac Vice)
Armstrong Teasdale LLP
201 South Main Street, Suite 750
Salt Lake City, UT 84111
enuvan@atllp.com
jabarca@atllp.com
rmarshall@atllp.com

*Attorneys for Plaintiff Robert Armijo*

John D. Tennert
Fennemore Craig, P.C.
7800 Rancharrah Parkway
Reno, NV 89511
jtennert@fclaw.com

*Attorneys for Defendant Yuga Labs, LLC*

Alison Clare Jordan
Fenwick & West LLP
801 California Street
Mountain View, CA 89041
Ajordan@fenwick.com

*Attorneys for Defendant Yuga Labs, LLC*

Michelle D. Alarie
Armstrong Teasdale LLP
3770 Howard Hughes Parkway, Suite 200
Las Vegas, NV 89169
malarie@atllp.com

*Attorneys for Plaintiff Robert Armijo*

Samuel Sahagian (Pro Hac Vice)
Jennifer C. Bretan (Pro Hac Vice)
Katherine A. Marshall (Pro Hac Vice)
Michael S. Dicke (Pro Hac Vice)
Fenwick & West LLP
555 California Street, 12th Floor
San Francisco, CA 94104
ssahagian@fenwick.com
jbretan@fenwick.com
kmarshall@fenwick.com
mdicke@fenwick.com

*Attorneys for Defendant Yuga Labs, LLC*

  /s/ Laura P. Browning
An Employee of Dickinson Wright PLLC