1

2

3                       UNITED STATES DISTRICT COURT

4                             DISTRICT OF NEVADA

5                                    * * *

6    ROBERT ARMIJO,                          Case No. 3:22-cv-00112-MMD-CLB

7                         Plaintiff,                        ORDER

8        v.

     OZONE NETWORKS, INC., *et al.*,

9
                          Defendants.
10

11   **I.     SUMMARY**

12          Plaintiff Robert Armijo sued Defendants Ozone Networks, Inc., doing business as

13   Opensea; Yuga Labs, LLC, doing business as Bored Ape Yacht Club ("BAYC"); and

14   LooksRare after Plaintiff's non-fungible tokens ("NFTs") were stolen. (ECF No. 62.)

15   Before the Court are Ozone Networks's motion to dismiss (ECF No. 70)[1] and Yuga Labs's

16   motion to dismiss (ECF No. 74).[2] As further explained below, because the Court finds

17   that it does not have personal jurisdiction over Yuga Labs, and the economic loss doctrine

18   bars Plaintiff's claims against Ozone Networks, the Court will grant both motions to

19   dismiss.

20   **II.    BACKGROUND**

21          The following allegations are adapted from the First Amended Complaint ("FAC")

22   (ECF No. 62). Plaintiff alleges that "[t]his action arises out of Defendants OpenSea and

23   LooksRare's failure to implement common sense and reasonable security measures to

24

25   ───────────────

26      [1]Ozone Networks subsequently filed a corrected document as its motion to
     dismiss. (ECF No. 71.) The Court therefore refers to ECF No. 71 throughout this order.

27      [2]Plaintiff filed responses (ECF Nos. 98, 100), and Yuga Labs and Ozone Networks
     filed replies (ECF Nos. 102, 103). Yuga Labs requested oral argument, but the Court
28   determined that a hearing was not necessary to resolve its motion. *See* LR 78-1 ("All
     motions may be considered and decided with or without a hearing.").

prevent the foreseeable fraud and sale of stolen [NFTs] on their online NFT marketplaces," as well as "from Defendant BAYC's failure to monitor its proprietary and exclusive ape club in order to deny entry to individuals whose access is predicated on a stolen BAYC NFT." (*Id.* at 2.) "NFTs are uniquely identifiable digital assets whose authenticity has been certified on a blockchain." (*Id.*) "NFT marketplaces, such as OpenSea and LooksRare, are virtual [platforms] that allow digital collectors [ ] to buy, sell, swap, and create NFTs." (*Id.*) "BAYC created, developed, and initially sold the BAYC NFTs," which depict "images of apathetic-looking apes, each with their own unique characteristics and properties." (*Id.* at 4.) BAYC operates a virtual BAYC club where "the key to membership . . . is ownership of a BAYC NFT (or affiliate NFT)." (*Id.*)

Plaintiff is a resident of Incline Village, Nevada and was the owner of three BAYC NFTs that he had purchased on the OpenSea marketplace in November 2021 and January 2022. (*Id.* at 8, 13-14.) On February 1, 2022, Plaintiff attempted to trade one of his NFTs and received an offer on a Discord site from a user. (*Id.* at 33.) The Discord user sent Plaintiff a purported link to the NFT Trader website, and Plaintiff clicked on the link and then on a button to approve the trade. (*Id.*) When nothing happened, Plaintiff tried to approve the trade a few more times. (*Id.*) Plaintiff then noticed that his three NFTs had vanished from his digital wallet and "realized he was the victim of a phishing attack." (*Id.* at 34.) The Discord user had sent Plaintiff a link to a fake website, and Plaintiff had inadvertently allowed the user access to his digital wallet every time he had tried to approve the trade. (*Id.*)

Plaintiff then attempted to contact OpenSea's customer service on their Discord server to obtain help in locating his stolen NFTs. (*Id.*) Plaintiff also "went to the BAYC Discord server and created a help ticket on BAYC's customer service channel." (*Id.*) A BAYC employee responded and explained that "the only thing BAYC could do was reach out to OpenSea to try and expedite [Plaintiff's] help tickets." (*Id.* at 35.) About two hours after the theft occurred, one of Plaintiff's stolen NFTs was sold on OpenSea. (*Id.*) About four hours after the sale, an OpenSea customer representative contacted Plaintiff,

"explaining that OpenSea would freeze the three BAYC NFTs that had been stolen from [Plaintiff]," preventing them from being "bought or sold on OpenSea's marketplace." (*Id.*) "However, this would not prevent the stolen NFTs from being purchased or traded on any other NFT marketplaces." (*Id.*) Plaintiff's other two stolen NFTs were subsequently sold on LooksRare. (*Id.* at 36.)

As pertinent to Yuga Labs's motion to dismiss for lack of personal jurisdiction, Plaintiff alleges the following. "Defendant BAYC was a Delaware limited liability company with its principal place of business in Alexandria, Virginia." (*Id.* at 8.) "On February 22, 2022, Yuga Labs, LLC converted to a Delaware corporation and is now Yuga Labs, Inc." (*Id.*) "At all times relevant to this lawsuit, BAYC transacted business in Nevada." (*Id.*) "This Court has general and/or specific personal jurisdiction over BAYC because BAYC purposefully directs its conduct at Nevada and Nevada residents." (*Id.* at 9.) "BAYC maintains a club that includes members in Nevada, including [Plaintiff]." (*Id.*) "BAYC utilizes multiple interactive websites to engage with its club members who reside in Nevada, including [Plaintiff]." (*Id.*) "BAYC has engaged in and is engaging in conduct that has and had a direct, substantial, reasonably foreseeable and intended effect of causing injury to persons in Nevada." (*Id.*)

"BAYC also purposefully avails itself of the privilege of conducting activities within Nevada." (*Id.*) "BAYC promises owners of BAYC NFTs that '[w]hen you buy a Bored Ape, you're not simply buying an avatar or a provably-rare piece of art. You are gaining membership access to a club whose benefits and offerings will increase over time. Your Bored Ape can serve as your digital identity, and open digital doors for you.'" (*Id.*) "BAYC created and controls an exclusive and active club the members of which include Nevada residents, like [Plaintiff]." (*Id.*) Any person who buys a BAYC NFT becomes a BAYC club member, regardless of whether they purchased the BAYC NFT from Yuga Labs directly or from a third-party seller. (*Id.* at 15.) "BAYC maintains substantial and ongoing relationships with its club who reside in Nevada and has created continuing

obligations to them by offering and promising exclusive access to merchandise, gifts, opportunities, and sales of all new BAYC products and experiences." (*Id.* at 9.)

"BAYC uses a multitude of interactive websites to communicate and conduct commercial transactions" with BAYC club members. (*Id.* at 28.) "BAYC communicates with BAYC club members through multiple Twitter accounts and Discord servers." (*Id.*) "Beyond the provision of customer support services, the BAYC Twitter and Discord accounts serve the vital purpose of notifying BAYC club members of new products, services, projects, airdrops, etc. that will be made available to BAYC club members and the public." (*Id.* at 29.) "Due to the prevalence of scams and hacks on Twitter and Discord, BAYC is always very careful to provide detailed instructions for BAYC club members and nonmembers to follow, along with verified links to the interactive websites where the commercial transactions will occur." (*Id.*) "The following is a noncomprehensive list of the interactive websites BAYC uses or has used to conduct commercial transactions with BAYC club members and nonmembers:" otherside.xyz, somethingisbrewing.xyz, apecoin.com, store.boredapeyachtclub.com, apefest.com, and store.apefest.com. (*Id.* at 30-32.)

"BAYC also partners with and/or implicitly allows third parties to solicit its club members and the public in Nevada and engage with BAYC club members in Nevada through the use of advertisements, airdrops, and exclusive commercial opportunities." (*Id.* at 9.) "Upon information and belief, in July of 2021, a large advertising campaign featuring BAYC 'apes' and the BAYC logo was conducted in Las Vegas, Nevada," including billboards and bus stop posters. (*Id.* at 26.) On March 16, 2022, ApeCoin, "the de facto cryptocurrency of the BAYC ecosystem," was launched. (*Id.* at 27.) "According to BAYC, ApeCoin DAO [defining "decentralized autonomous organization"] is the entity responsible for releasing ApeCoin." (*Id.*) "BAYC club members were instructed to go to apecoin.com to claim [free] ApeCoin, which was then airdropped into their digital wallets." (*Id.*) "On April, 11, 2022, Coinbase—a popular cryptocurrency trading platform— announced via Twitter that it is 'creating an interactive three-part film featuring the [BAYC]

and [ApeCoin] communities." (*Id.* at 28.) "BAYC club members holding BAYC NFTs were invited to submit their apes along with their made[-]up character descriptions for consideration as characters in the films." (*Id.*)

Plaintiff asserts three claims against Yuga Labs: (1) breach of contract; (2) breach of the implied covenant of good faith and fair dealing; and (3) negligence. (*Id.* at 54-55, 61.)

As pertinent to Ozone Networks's motion to dismiss, Plaintiff alleges the following damages. "The theft of [his] BAYC NFTs deprived [him] of the NFTs he owned and their significant monetary values," as well as "his legal interest in membership in the BAYC club and the privileges associated with it." (*Id.* at 52, 60.) "The theft . . . also deprived [Plaintiff] of the commercialization rights he possessed in his underlying Bored Ape and Mutant Ape images" and "the ability to earn future profits from his BAYC NFTs." (*Id.* at 53.)

Plaintiff asserts three claims against Ozone Networks (and LooksRare): (1) negligence; (2) negligent supervision and training; and (3) negligent hiring. (*Id.* at 56, 63, 65.)

## III.   DISCUSSION

The Court first addresses Yuga Labs's 12(b)(2) motion to dismiss for lack of personal jurisdiction. Because the Court finds that it does not have personal jurisdiction over Yuga Labs, it may not—and does not—reach the merits of Yuga Labs's 12(b)(6) motion to dismiss. The Court lastly addresses Ozone Networks's 12(b)(6) motion to dismiss, ultimately finding that the economic loss doctrine bars all of Plaintiff's claims against Ozone Networks.

### A.   Jurisdiction Over Yuga Labs

"Personal jurisdiction must exist for each claim asserted against a defendant." *Action Embroidery Corp. v. Atl. Embroidery, Inc.*, 368 F.3d 1174, 1180 (9th Cir. 2004) (citation omitted). A two-part analysis governs whether a court retains personal jurisdiction over a nonresident defendant. "First, the exercise of jurisdiction must satisfy

1    the requirements of the applicable state long-arm statute." *Chan v. Soc'y Expeditions,*

2    *Inc.*, 39 F.3d 1398, 1404 (9th Cir. 1994). Since "Nevada's long-arm statute, NRS [§]

3    14.065, reaches the limits of due process set by the United States Constitution," the Court

4    moves on to the second part of the analysis. *Baker v. Eighth Jud. Dist. Ct. ex rel. Cnty. of*

5    *Clark*, 999 P.2d 1020, 1023 (Nev. 2000) (citation omitted). "Second, the exercise of

6    jurisdiction must comport with federal due process." *Chan*, 39 F.3d at 1404-05. "Due

7    process requires that nonresident defendants have certain minimum contacts with the

8    forum state so that the exercise of jurisdiction does not offend traditional notions of fair

9    play and substantial justice." *Id.* at 1405 (citing *Int'l Shoe v. Washington*, 326 U.S. 310,

10   316 (1945)). Courts analyze this constitutional question with reference to two forms of

11   jurisdiction: general and specific jurisdiction. Here, Plaintiff relies on both forms. (ECF No.

12   62 at 9.)

13                          **1.      General Jurisdiction**

14        Plaintiff alleges that the Court has general jurisdiction over Yuga Labs because

15   Yuga Labs "purposefully directs its conduct at Nevada and Nevada residents" by

16   maintaining a club including members in Nevada, utilizing multiple interactive websites to

17   engage with its club members residing in Nevada, and engaging in conduct that has a

18   "direct, substantial, reasonably foreseeable and intended effect of causing injury to

19   persons in Nevada." (*Id.* at 9.) The Court disagrees and finds this is insufficient to make

20   out a prima facie case for general jurisdiction.

21        The exercise of general jurisdiction over a foreign corporation is proper only where

22   the corporation is "essentially at home" in the forum state. *Daimler AG v. Bauman*, 571

23   U.S. 117, 127 (2014). Generally, a corporation is "at home" in its place of incorporation

24   and its principal place of business. *Id*. at 137. Yuga Labs is a Delaware corporation with

25   its principal place of business *not* in Nevada, as it "does not have and has never had

26   offices in Nevada."[3] (ECF No. 75 at 2; ECF No. 74 at 13.) Moreover, Yuga Labs has no

27   _____

28        [3]In the FAC, Plaintiff alleges that Yuga Labs was formerly a Delaware limited
     liability company with its principal place of business in Alexandria, Virginia, and on

1    employees or contractors who reside in Nevada, "has never purchased or used any

2    physical advertising space in the state of Nevada," and "has never held a sales or

3    marketing event—or any event of any kind—within the state of Nevada." (*Id.*) Plaintiff's

4    opposition ignores the test set forth in *Daimler* and instead argues that Nevada residents'

5    purchasing of BAYC NFTs, their membership in the BAYC club, and Yuga Labs's web3

6    business model[4] make Yuga Labs's forum contacts "continuous and systematic" such

7    that it "should be considered at home everywhere that BAYC club members reside." (ECF

8    No. 100 at 8.)

9          However, merely having purchasers of its product or members of its virtual club

10   who reside in Nevada is insufficient to make Yuga Labs essentially at home in the state

11   of Nevada. Similarly, operating interactive websites that individuals may access while in

12   Nevada does not make Yuga Labs essentially at home in the state; if it did, this would

13   mean that Yuga Labs could be subject to personal jurisdiction in any state where an

14   individual is able to access its websites. This is inconsistent with both the Supreme

15   Court's decision in *Daimler* as well as Ninth Circuit precedent. *See Daimler,* 571 U.S. at

16   760-61 ("Plaintiffs would have us . . . approve the exercise of general jurisdiction in every

17   State in which a corporation engages in a substantial, continuous, and systematic course

18   of business. That formulation, we hold, is unacceptably grasping.") (internal quotation

19   marks and citation omitted); *see, e.g.*, *CollegeSource, Inc. v. AcademyOne, Inc.*, 653 F.3d

20   1066, 1075-76 (9th Cir. 2011) ("If the maintenance of an interactive website were

21

22   February 22, 2022, Yuga Labs converted to a Delaware corporation. (ECF No. 62 at 8.)

23   Yuga Labs proffers a declaration from its Chief Executive Officer, Nicole Muniz, in support
     of its motion to dismiss that is consistent with these allegations. (ECF No. 75 at 2.) Yuga

24   Labs was therefore a corporation at the time Plaintiff commenced this action on February
     28, 2022. (ECF No. 1.) It is unclear to the Court whether Yuga Labs's principal place of

25   business remains in Alexandria, Virginia or resides elsewhere. But in any case, it is clear
     that Yuga Labs's principal place of business is *not* in Nevada, and Plaintiff does not allege

26   otherwise. (ECF No. 62 at 8.)

27       [4]According to Plaintiff's opposition, "web3" is "the newest iteration of the internet"
     that is "built on decentralized blockchain technology," and "[t]he goal of web3 is

28   decentralization—transferring power and authority away from traditional internet-based
     business organizations and dispersing it to the individual users of web3 and blockchain
     technologies." (ECF No. 100 at 2.)

sufficient to support general jurisdiction in every forum in which users interacted with the website, the eventual demise of all restrictions on the personal jurisdiction of state courts would be the inevitable result.") (internal quotation marks and citations omitted). Thus, the Court finds that Plaintiff has failed to meet his prima facie burden of establishing that general jurisdiction over Yuga Labs in the state of Nevada is proper.

## 2. Specific Jurisdiction

Plaintiff also alleges that Yuga Labs is subject to specific jurisdiction. (ECF No. 62 at 9-10.) Specific jurisdiction exists where "[a] nonresident defendant's discrete, isolated contacts with the forum support jurisdiction on a cause of action arising directly out of its forum contacts." *CollegeSource, Inc.*, 653 F.3d at 1075. In examining whether specific jurisdiction exists, the minimum contacts inquiry is "defendant-focused"—that is, the relationship to be examined is that between the defendant and the forum state, and that relationship must arise out of the defendant's own contacts "with the forum state itself, not . . . with persons who reside there." *Walden v. Fiore*, 571 U.S. 277, 284-85 (2014). A court may exercise specific jurisdiction over a defendant only where "the defendant's suit-related conduct . . . create[s] a substantial connection with the forum [s]tate." *Williams v. Yamaha Motor Co. Ltd.*, 851 F.3d 1015, 1022-23 (9th Cir. 2017) (quoting *Walden*, 571 U.S. at 284).

Incorporating these overarching considerations, the Ninth Circuit provides a three-prong test for analyzing an assertion of specific jurisdiction: "(1) The non-resident defendant must purposefully direct his activities or consummate some transaction with the forum or resident thereof; or perform some act by which he purposefully avails himself of the privilege of conducting activities in the forum, thereby invoking the benefits and protections of its laws; (2) the claim must be one which arises out of or relates to the defendant's forum-related activities; and (3) the exercise of jurisdiction must comport with fair play and substantial justice, i.e., it must be reasonable." *CollegeSource, Inc.*, 653 F.3d at 1076 (quoting *Schwarzenegger v. Fred Martin Motor Co.*, 374 F.3d 797, 802 (9th Cir. 2004)). The party asserting jurisdiction bears the burden of satisfying the first two prongs.

1   *See id.* (citing *Sher v. Johnson*, 911 F.2d 1357, 1361 (9th Cir. 1990)).  If it does so, the

2   burden shifts to the party challenging jurisdiction to set forth a "compelling case" that the

3   exercise of jurisdiction would be unreasonable. *See id.* (quoting *Burger King Corp. v.*

4   *Rudzewicz*, 471 U.S. 462, 476-78 (1985)).

5          The first prong, which refers to both purposeful availment and purposeful direction,

6   is often determinative. *See Yahoo! Inc. v. La Ligue Contre Le Racisme Et*

7   *L'Antisemitisme*, 433 F.3d 1199, 1206 (9th Cir. 2006) (en banc). "Purposeful availment"

8   and "purposeful direction" call for distinct analyses. *See Schwarzenegger*, 374 F.3d at

9   802. Generally, a "purposeful availment analysis is most often used in suits sounding in

10  contract," and a "purposeful direction analysis, on the other hand, is most often used in

11  suits sounding in tort." *Id.* However, "where the underlying claims involve . . . negligence

12  rather than intentional torts, the purposeful availment analysis controls." *Prescott v. Slide*

13  *Fire Sols., LP*, 341 F. Supp. 3d 1175, 1183 (D. Nev. 2018) (citations omitted); *see also*

14  *Holland Am. Line Inc. v. Wartsila N. Am., Inc.*, 485 F.3d 450, 460 (9th Cir. 2007) ("[I]t is

15  well established that the *Calder* [purposeful direction "effects"] test applies only to

16  intentional torts, not to the breach of contract and negligence claims presented here.");

17  *CMB Infrastructure Grp. IX, LP v. Cobra Energy Inv. Fin., Inc.*, 572 F. Supp. 3d 950, 963

18  n.43 (D. Nev. 2021) ("Courts generally apply the purposeful-availment test to suits

19  sounding in contract or negligence."). Because Plaintiff alleges contract and negligence

20  claims and no intentional tort claims against Yuga Labs, the Court addresses only the

21  purposeful availment standard.[5] (ECF No. 62 at 54-55, 61.)

22                    a.      **Purposeful Availment**

23         As noted, the first prong for establishing specific jurisdiction here concerns whether

24  Defendant has purposefully availed itself of the privilege of conducting activities in the

25  forum state, thereby invoking the benefits and protections of its laws. *See Burger King*

26  ────────────

27              [5]The Court notes that Plaintiff argues both purposeful availment and purposeful
    direction. (ECF No. 100 at 9-15.) Yuga Labs responds that the "effects test" set forth in
28  *Calder v. Jones*, 465 U.S. 783 (1984), which is associated with the purposeful direction
    standard, does not apply here. (ECF No. 102 at 6 n.2.) The Court agrees with Yuga Labs
    and concludes the purposeful direction test is inapplicable to this case.

1  *Corp. v. Rudzewicz*, 471 U.S. at 476. "Purposeful availment requires that the defendant

2  have performed some type of affirmative conduct which allows or promotes the

3  transaction of business within the forum state." *Sher v. Johnson*, 911 F.2d at 1362

4  (internal quotation marks and citation omitted).

5  Plaintiff contends that Yuga Labs purposefully availed itself of doing business in

6  Nevada by: (1) "forming contractual relationships with BAYC club members in Nevada,"

7  including Plaintiff; (2) "doing business over the internet using highly interactive websites

8  to conduct commercial transactions with and provide customer support services to BAYC

9  club members in Nevada"; and (3) "allowing third parties to solicit BAYC club members

10  and the public in Nevada and engage with BAYC club members in Nevada through the

11  use of advertisements, airdrops, and exclusive commercial opportunities." (ECF No. 100

12  at 10; ECF No. 62 at 9.)

13  As to Plaintiff's first argument, Yuga Labs argues that its maintenance of the BAYC

14  club is insufficient to establish specific jurisdiction and that Plaintiff fails to sufficiently

15  plead that a contract existed, so the purported contract cannot be a basis for jurisdiction.

16  (ECF No. 74 at 14-15; ECF No. 102 at 6-8, 10.) Plaintiff alleges that "any person who

17  buys a BAYC NFT becomes a BAYC club member, regardless of whether they purchased

18  the BAYC NFT from Yuga Labs directly or from a third-party seller." (ECF No. 100 at 10;

19  ECF No. 62 at 9, 15.) This indicates that Yuga Labs' purported relationship with Plaintiff

20  and BAYC club members in Nevada via membership alone arise from "unilateral activity,"

21  *i.e.*, the purchase of a BAYC NFT, by Plaintiff and other third parties that cannot support

22  specific jurisdiction. *See Walden*, 571 U.S. at 284, 286. These purported contacts are

23  further not between Yuga Labs and "the forum state itself" but merely between it and

24  "persons who reside there," which is similarly insufficient to establish specific jurisdiction.

25  *See id.* at 285.

26  Moreover, even if, as Plaintiff claims, such membership relationships constituted

27  contractual relationships between Yuga Labs and BAYC club members, including

28  Plaintiff, contracts in and of themselves cannot automatically establish sufficient minimum

10

contacts, and there is no evidence that Nevada was ever contemplated in any negotiations, terms, or future consequences of the purported contracts.[6] *See Burger King Corp.*, 471 U.S. at 478-79 (providing that what "must be evaluated in determining whether the defendant purposefully established minimum contacts with the forum" are "prior negotiations and contemplated future consequences, along with the terms of the contract and the parties' actual course of dealing"); *see also Andes Indus. Inc. v. Cheng Sun Lan*, Case No. 2:14-cv-00400-APG-GWF, 2015 WL 1397727, at *3-4 (D. Nev. Mar. 25, 2015) (finding no personal jurisdiction where contract negotiation, terms, and performance did not involve Nevada).

Next, as to Plaintiff's second argument, he alleges that Yuga Labs "uses a multitude of interactive websites to communicate and conduct commercial transactions" with BAYC club members. (ECF No. 62 at 28.) To determine whether an entity's online presence confers personal jurisdiction, the Ninth Circuit has adopted the sliding scale approach in *Zippo Mfg. Co. v. Zippo Dot Com, Inc.*, 952 F. Supp. 1119, 1124 (W.D. Pa. 1997). *See Cybersell, Inc. v. Cybersell, Inc.*, 130 F.3d 414, 418 (9th Cir.1997). Applying this approach, the Ninth Circuit recognizes a distinction between passive websites, which simply display information, and interactive websites, which allow customers to exchange information with a business. *See id.* Passive websites cannot give rise to specific jurisdiction over a defendant, while interactive websites may be a basis for jurisdiction

---

[6]The Court therefore need not—and does not—address whether Plaintiff has sufficiently alleged whether a contract existed at this stage. The Court also finds unpersuasive Plaintiff's citations to *Ford Motor Co. v. Montana Eighth Jud. Dist. Ct.*, 141 S. Ct. 1017 (2021), and *Ballard v. Savage*, 65 F.3d 1495 (9th Cir. 1995). (ECF No. 100 at 10-11.) As Yuga Labs points out, the Supreme Court in *Ford Motor Co.*, 141 S. Ct. at 1028 n.4, expressly noted that the decision does not apply to "internet transactions," such as those present in this case. (ECF No. 102 at 7.) Moreover, the defendant in *Ford Motor Co.* clearly engaged in substantial business in the forum states, including advertising, selling, and servicing vehicles, contacts that are not so evident here. *See* 141 S. Ct. at 1022, 1028. Plaintiff also attempts to analogize this case to *Ballard*, in which the court found purposeful availment where the defendant "intentionally [did] business" as a bank with customers in the forum state, by arguing that Yuga Labs "actively reaches out to [BAYC club members] through Twitter and Discord, continually updating them about new Yuga Labs products, sending them free gifts, and soliciting them to participate in new commercial transactions." (ECF No. 100 at 11.) Such analogizing goes more directly toward Plaintiff's latter two arguments, so the Court will address those arguments below.

1   depending upon the "level of interactivity and commercial nature of the exchange of

2   information that occurs on the Web site." *See id.*

3        "Where a defendant's website is either passive or falls somewhere in the middle of

4   the sliding scale, [c]ourts require 'something more' to establish specific jurisdiction." *Mina*

5   *De Oro, LLC v. Goettsche*, Case No. 2:20-cv-00994-GMN-VCF, 2022 WL 943365, at *3

6   (D. Nev. Mar. 28, 2022) (citations omitted). "In determining whether a nonresident

7   defendant has done 'something more,' [the Ninth Circuit has] considered several factors,

8   including the interactivity of the defendant's website, the geographic scope of the

9   defendant's commercial ambitions, and whether the defendant 'individually targeted' a

10  plaintiff known to be a forum resident." *Mavrix Photo, Inc. v. Brand Techs., Inc.*, 647 F.3d

11  1218, 1229 (9th Cir. 2011) (internal citations omitted).

12       Here, Plaintiff points to BAYC's Twitter and Discord accounts and several other

13  websites as "interactive websites" that support a finding of purposeful availment. (ECF

14  No. 62 at 28-33.) As to its Twitter and Discord accounts, Plaintiff alleges that these sites

15  are Yuga Labs's primary methods of communication with BAYC club members. (*Id.* at 11,

16  28.) Because these sites facilitate exchanges of information between Yuga Labs and

17  BAYC club members and the public, the Court finds the websites foster some level of

18  interaction and likely fall somewhere in the middle of the *Zippo* sliding scale. Yuga Labs

19  argues that the exchanges of information occurring on those websites are not sufficiently

20  commercial in nature to confer personal jurisdiction. (ECF No. 74 at 17.) Both parties

21  agree that nothing is sold directly through BAYC's Twitter and Discord accounts. (ECF

22  No. 100 at 7, 13; ECF No. 74 at 18; ECF No. 75 at 4.) Plaintiff however argues that

23  BAYC's use of the accounts is nevertheless commercial in nature because Yuga Labs

24  "uses these accounts to post verified links and instructions to the array of commercial

25  websites it creates when it does sell digital and real-world products to the BAYC club

26  members and the public at large." (ECF No. 100 at 13.) But even accepting these

27  allegations as true, these alleged posts are more akin to advertisements and do not

28  render Yuga Labs's use of these social media communications platforms necessarily

commercial in nature nor give rise to specific jurisdiction. *See Cybersell*, 130 F.3d at 418 ("[N]o court has ever held that an Internet advertisement alone is sufficient to subject the advertiser to jurisdiction in the plaintiff's home state.")

Plaintiff must therefore demonstrate "something more" to establish specific jurisdiction. *See Mavrix Photo, Inc.*, 647 F.3d at 1229. Plaintiff asserts that his "interactions with a BAYC customer service employee following the thefts of his NFTs . . . highlight[s] the interactivity of the official BAYC Discord server." (ECF No. 100 at 13.) As Yuga Labs notes, however, Plaintiff initiated the customer service interaction, thereby constituting "unilateral activity" by a plaintiff that does not confer specific jurisdiction over a defendant. *See Walden*, 571 U.S. at 284. Notably, Plaintiff does not allege that Yuga Labs via its Twitter and Discord accounts individually targeted Plaintiff or other residents of Nevada. In any case, Yuga Labs confirms via affidavit that "[w]hile Yuga Labs is present on the internet generally, through the BAYC Discord and Twitter, and thus accessible to Nevada residents, the BAYC Discord and BAYC Twitter account do not target Nevada or its residents." (ECF No. 75 at 4.) The Court thus finds that BAYC's use of its Twitter and Discord accounts do not support a finding of purposeful availment of doing business in Nevada.

As to the remaining list of websites that Plaintiff alleges BAYC uses (ECF No. 62 at 30-32), Yuga Labs points out that some of those websites are third-party websites which Yuga Labs does not control. (ECF No. 102 at 9; EFC No. 75 at 3.) Even if some of these websites are operated by Yuga Labs and commercial in nature, and even if, as alleged, "BAYC has conducted transactions with Nevada residents through each of the interactive websites listed," Plaintiff similarly makes no allegations that any of these remaining websites, which could be viewed by anyone with access to an Internet connection, specifically targeted Plaintiff or other known Nevada residents. (ECF No. 62 at 33.) Moreover, "even minimal purchases by forum residents through a website are insufficient to establish personal jurisdiction." *Software Dev. & Inv. of Nevada v. Wall*, Case No. 2:05-cv-01109-RLH-LRL, 2006 WL 8442597 (D. Nev. Feb. 13, 2006), at *3

1    (citation omitted). The Court therefore finds that Yuga Labs's internet presence does not

2    constitute purposeful availment of doing business in Nevada.

3          Lastly, Plaintiff alleges that BAYC "partners with and/or implicitly allows third

4    parties to solicit its club members and the public in Nevada through the use of

5    advertisements, airdrops, and exclusive commercial opportunities." (ECF No. 62 at 9.)

6    Plaintiff specifically points to billboards and bus stop posters featuring images of Bored

7    Apes and the BAYC logo in Las Vegas, Nevada; ApeCoin DAO airdropping free ApeCoin

8    to BAYC club members; and cryptocurrency platform Coinbase inviting BAYC club

9    members "to submit their apes . . . for consideration as characters in the[ir] films." (*Id.* at

10   26-28). As Yuga Labs argues and the Court agrees, the alleged actions by ApeCoin DAO

11   and Coinbase are third-party actions that cannot establish jurisdiction over Yuga Labs.

12   (ECF No. 102 at 9-10.) Plaintiff points to no authority showing that an out-of-state

13   Defendant's contacts with a state can be established based on actions of a third party.

14   Such a contention is moreover contrary to well-established case law requiring the Court

15   to look to the contacts that "[D]efendant [it]self creates with the forum State." *Walden*, 571

16   U.S. at 284 (citing *Burger King Corp.*, 471 U.S. at 475). Moreover, Plaintiff does not

17   plausibly allege that these actions were specifically targeted at Nevada or its residents.

18         As to the alleged BAYC advertisements in Nevada, Yuga Labs proffers two

19   affidavits to dispute that Yuga Labs posted those advertisements. (ECF Nos. 75, 77.)

20   Yuga Labs's CEO in her declaration states that Yuga Labs "has never purchased or used

21   any physical advertising space in the state of Nevada and has never held a sales or

22   marketing event—or an event of any kind—within the state of Nevada." (ECF No. 75 at

23   2.) And Yuga Labs's counsel in her declaration states that in a May 2, 2022 letter, prior

24   to the filing of the FAC, she informed Plaintiff and his counsel that Yuga Labs "did not

25   post the billboards and bus stop advertisements" that Plaintiff references. (ECF No. 77 at

26   3.) While "uncontroverted jurisdictional allegations in the complaint must be taken as

27   true," *Schwarzenegger*, 374 F.3d at 800, the court "may not assume the truth of

28   allegations in a pleading which are contradicted by affidavit," *Data Disc, Inc. v. Sys. Tech.*

1   *Assocs., Inc.*, 557 F.2d 1280, 1284 (9th Cir. 1977). Accordingly, the Court may not accept

2   as true Plaintiff's allegations that Yuga Labs placed those advertisements in Nevada and

3   finds that they cannot support a finding of purposeful availment.

4          In sum, the Court finds that Plaintiff has not made a prima facie case that Yuga

5   Labs purposefully availed itself of Nevada's jurisdiction. Plaintiff has failed to satisfy the

6   first prong of the Ninth Circuit's three-prong test for specific jurisdiction and consequently

7   failed to meet his burden of showing that jurisdiction is proper.[7] The Court will therefore

8   dismiss this action against Yuga Labs without prejudice for lack of personal jurisdiction

9   and may not—and will not—address the merits of Yuga Labs's 12(b)(6) motion to

10  dismiss.[8] *See Freeman v. Oakland Unified Sch. Dist.*, 179 F.3d 846, 847 (9th Cir.1999)

11  ("Dismissals for lack of jurisdiction 'should be . . . without prejudice so that a plaintiff may

12  reassert his claims in a competent court.'").

13                    **3.      Request for Jurisdictional Discovery**

14         Having found that the Court does not have personal jurisdiction over Yuga Labs,

15  the Court addresses Plaintiff's request for jurisdictional discovery. "Discovery may be

16  appropriately granted where pertinent facts bearing on the question of jurisdiction are

17  controverted or where a more satisfactory showing of the facts is necessary." *Boschetto*

18  *v. Hansing*, 539 F.3d 1011, 1020 (9th Cir. 2008) (quoting *Data Disc, Inc.*, 557 F.2d at

19

20         [7]Even assuming Plaintiff could satisfy the first prong of the specific jurisdiction
21  analysis, Plaintiff cannot satisfy the second prong of relatedness. Plaintiff's main
    argument as to relatedness is that "there is 'an affiliation between the forum and the
22  underlying controversy' in that [Plaintiff] was a resident of Nevada at the time he
    purchased his BAYC NFTs and became part of the BAYC club; he also interacted with
23  Yuga Labs and the BAYC club from his home in Nevada; and he was at home in Nevada
    when his BAYC NFTs were stolen." (ECF No. 100 at 16; ECF No. 62 at 10.) Such
24  allegations cannot support a finding of specific jurisdiction, as they simply rely on
    Plaintiff's own contacts with the forum state. *See Walden*, 571 U.S. at 285 ("[H]owever
25  significant the plaintiff's contacts with the forum may be, those contacts cannot be
    'decisive in determining whether the defendant's due process rights are violated.'").

26         [8]Yuga Labs also filed a request for judicial notice and notice of documents
    incorporated by reference in support of its motion to dismiss. (ECF No. 76.) Plaintiff did
27  not oppose the request. Because the Court does not have personal jurisdiction over Yuga
    Labs, it need not—and does not—consider Yuga Labs's request for judicial notice, as its
28  contents do not change the Court's jurisdictional analysis and primarily go toward the
    merits of Yuga Labs's 12(b)(6) motion to dismiss.

1285 n.1). "[W]here a plaintiff's claim of personal jurisdiction appears to be both attenuated and based on bare allegations in the face of specific denials made by the defendants, the Court need not permit even limited discovery." *Pebble Beach Co. v. Caddy*, 453 F.3d 1151, 1160 (9th Cir. 2006) (quoting *Terracom v. Valley Nat'l Bank*, 49 F.3d 555, 562 (9th Cir.1995)).

Plaintiff first requests jurisdictional discovery "to ascertain how many BAYC club members have lived or currently live in Nevada and the history of transactions, including both physical and digital goods, that have been sent to BAYC club members in Nevada." (ECF No. 100 at 14.) Additional discovery on this basis would not be helpful nor change the outcome of the Court's personal jurisdiction analysis for the reasons already discussed. Further, Plaintiff's negligence and contract claims against Yuga Labs do not arise from nor relate to Yuga Labs's purported relationships or transactions with other BAYC club members who may incidentally reside in Nevada. *See CollegeSource, Inc.*, 653 F.3d at 1076 ("[T]he claim must be one which arises out of or relates to the defendant's forum-related activities."); *see also Williams*, 851 F.3d at 1022-23 ("[T]he defendant's *suit-related* conduct must create a substantial connection with the forum State.") (emphasis added).

Plaintiff also requests that "Yuga Labs must explain why its intellectual property was used in the BAYC advertising campaign in July 2021 in one of the most popular cities in the world" and "requests jurisdictional discovery to ascertain the origins of the advertising campaign and Yuga Labs'[s] knowledge of it." (ECF No. 100 at 14-15.) As already discussed, Yuga Labs has clearly denied by affidavit its involvement in the alleged BAYC advertising campaign in Nevada. Moreover, even if Yuga Labs were involved, Plaintiff's claims do not arise from nor relate to such advertisements. Such allegations of jurisdiction are therefore "both attenuated and based on bare allegations in the face of specific denials made by [a] defendant[ ]" such that the Court need not permit jurisdictional discovery. *See Pebble Beach Co.*, 453 F.3d at 1160 (quoting *Terracom*, 49 F.3d at 562).

16

1    Accordingly, the Court denies Plaintiff's request for jurisdictional discovery. Having

2    addressed personal jurisdiction over Yuga Labs, the Court now turns to Ozone

3    Networks's motion to dismiss.

4    **B.    Negligence Claims Against Ozone Networks**

5    Ozone Networks argues that the economic loss doctrine bars all of Plaintiff's

6    negligence claims. (ECF No. 71 at 29-30.) The Court agrees.[9]

7    Under Nevada law, the economic loss doctrine "bars unintentional tort actions

8    when the plaintiff seeks to recover 'purely economic losses,'" "as opposed to damages

9    involving physical harm to person or property." *Terracon Consultants W., Inc. v. Mandalay*

10   *Resort Grp.*, 206 P.3d 81, 86 (Nev. 2009); *Giles v. Gen. Motors Acceptance Corp.*, 494

11   F.3d 865, 873 (9th Cir. 2007) (analyzing Nevada law). Plaintiff alleges that "the theft of

12   [his] BAYC NFTs deprived [him] of the NFTs he owned and their significant monetary

13   values." (ECF No. 62 at 52.) He also alleges loss of his membership in the BAYC club

14   and the associated "benefits and offerings," loss of "the commercialization rights he

15   possessed in his underlying Bored Ape and Mutant Ape images," and loss of "the ability

16   to earn future profits from his BAYC NFTs." (*Id.* at 53.)

17   Ozone Networks argues that Plaintiff's negligence claims are barred by the

18   economic loss doctrine because such alleged damages are "solely monetary in nature."

19   (ECF No. 71 at 29-30.) Plaintiff counters that his losses were not solely monetary in nature

20   because "membership in the BAYC club provide[s] . . . a multitude of social and

21   experiential benefits that are not tethered to any economic benefit," and relying on a

22   definition of injury that includes "the invasion of any legally protected interest of another,"

23   Plaintiff "has a significant property interest in the commercialization rights of his stolen

24   BAYC NFTs." (ECF No. 98 at 23-24.)

25   _____

26   [9]Having found that the economic loss doctrine bars Plaintiff's negligence claims,
     the Court need not—and does not—address Ozone Networks's remaining arguments that
27   Plaintiff fails to state his negligence claims. Ozone Networks also filed a request for
     judicial notice in support of its motion to dismiss. (ECF No. 73.) Because Ozone
28   Networks's request for judicial notice only implicates its argument that Plaintiff's claims
     are barred by OpenSea's Terms of Service, the Court also need not—and does not—
     address the request for judicial notice.

The Court ultimately agrees with Ozone Networks and finds that Plaintiff's alleged damages all amount to economic losses. The loss of Plaintiff's NFTs constitutes a purely economic loss—Plaintiff himself acknowledges that his stolen NFTs have "significant monetary values" and does not make any arguments beyond that as to the NFTs themselves. (ECF No. 62 at 52; ECF No. 98 at 23.) The loss of his ability to earn future profits from his BAYC NFTs is also plainly a purely economic loss. *See Terracon*, 206 P.3d at 83 (defining "purely economic loss" as including "consequent loss of profits").

The loss of Plaintiff's commercialization rights of his stolen NFTs is similarly a purely economic loss. While Plaintiff is correct that injuries in tort law include non-physical injuries such as "the invasion of any legally protected interest of another," the economic loss doctrine generally does not refer to such a broad definition of "injury." *See Sadler v. PacifiCare of Nev.*, 340 P.3d 1264, 1269 (Nev. 2014); *Giles*, 494 F.3d at 873 ("The term 'economic loss' refers to damages that are solely monetary, as opposed to damages involving *physical harm* to person or property.") (emphasis added). Plaintiff's reliance on *Sadler* is also misplaced because the *Sadler* plaintiffs' claims were not barred by the economic loss doctrine because they suffered noneconomic injuries that could amount to physical injuries, such as exposure to "unsafe injection practices" and placement "at risk for contracting serious blood-borne diseases." *See* 340 P.3d at 1268. Here, Plaintiff has not alleged any injuries that could amount to physical injuries. Even if Plaintiff's loss of his commercialization rights or loss of the NFTs themselves were construed as harms to property interests, harms to property that are purely economic, as here, do not suffice. *See Pelletier v. Rodriguez*, Case No. 3:17-cv-00642-MMD-EJY, 2021 WL 3008594, at *9 (D. Nev. July 15, 2021) (finding "damages to crop" as harm to property that is purely economic and therefore negligence claims for such damages were barred by the economic loss doctrine).

Lastly, the loss of Plaintiff's BAYC club membership also constitutes a purely economic loss. While Plaintiff attempts to construe the loss of membership as noneconomic, many of the purported benefits of membership—such as access to

exclusive merchandise, event tickets, and free cryptocurrency and NFTs (ECF No. 62 at 15, 18, 24, 31-32)—are monetary in nature, and in any case, the loss of "social and experiential benefits" does not constitute any physical harm or invasion to person or property. (ECF No. 98 at 23.) Moreover, because membership in the BAYC club is directly tied to ownership of a BAYC NFT, it is more appropriately characterized as a "benefit of the bargain" loss for which there can be no recovery in tort under the economic loss doctrine. *See Calloway v. City of Reno*, 993 P.2d 1259, 1263 (Nev. 2000), *overruled on other grounds by Olson v. Richard*, 89 P.3d 31, 31-33 (Nev. 2004).

The Court accordingly finds that the economic loss doctrine bars Plaintiff's negligence claims against Ozone Networks. Because Plaintiff did not request leave to amend, Plaintiff already had an opportunity to amend his complaint, and amendment would be futile as the challenged claims fail as a matter of law, the Court dismisses those claims with prejudice. *See Leadsinger, Inc. v. BMG Music Publ'g*, 512 F.3d 522, 532 (9th Cir. 2008) (providing that a court may deny leave to amend if the party has repeatedly failed to cure deficiencies or if amendment would be futile).

## IV.    CONCLUSION

The Court notes that the parties made several arguments and cited to several cases not discussed above. The Court has reviewed these arguments and cases and determines that they do not warrant discussion as they do not affect the outcome of the motions before the Court.

It is therefore ordered that Defendant Ozone Networks's motion to dismiss (ECF No. 70) is granted.

It is further ordered that claims against Defendant Ozone Networks are dismissed with prejudice.

It is further ordered that Defendant Yuga Labs's motion to dismiss (ECF No. 74) is granted.

It is further ordered that Defendant Yuga Labs is dismissed without prejudice from this action.

DATED THIS 19th Day of January 2023.

_____
MIRANDA M. DU
CHIEF UNITED STATES DISTRICT JUDGE